UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| THE MOSAIC COMPANY, | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | |
| Defendant, | Consol. Court No. 23-00246 |
| and | |
| OCP S.A., | |
| Defendant-Intervenor, | |
| and | |
| THE GOVERNMENT OF THE KINGDOM OF MOROCCO, | |
| Defendant-Intervenor. | |

## RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD SUBMITTED ON BEHALF OF THE MOSAIC COMPANY

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Consolidated

Plaintiff, Defendant-Intervenor, and Consolidated Defendant-Intervenor The Mosaic Company

("Mosaic") respectfully moves for judgment on the administrative record on the issues raised in

its Complaint challenging the U.S. Department of Commerce's ("Commerce") final results of the

first administrative review of the countervailing duty order on phosphate fertilizers from

Morocco.  *See Phosphate Fertilizers From the Kingdom of Morocco: Final Results of*

*Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,726 (Int'l Trade

Admin. Nov. 7, 2023) ("*Final Results*"), and accompanying Issues and Decision Memorandum ("IDM").

For the reasons set forth in the accompanying memorandum, Commerce's determination is unreasonable, unsupported by substantial evidence on the record, and otherwise not in accordance with law. Accordingly, Mosaic respectfully requests that the Court remand to Commerce with instructions to correct the errors identified by the Court; and grant such other or further relief that the Court deems just and proper.

Respectfully submitted,

/s/ Jeffrey I. Kessler
David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Alexandra S. Maurer
Wilmer Cutler Pickering Hale and Dorr
    LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: jeffrey.kessler@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: August 7, 2024

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| THE MOSAIC COMPANY,<br><br>              Plaintiff,<br><br>    v.<br><br>UNITED STATES,<br><br>              Defendant,<br><br>    and<br><br>OCP S.A.,<br><br>              Defendant-Intervenor,<br><br>    and<br><br>THE GOVERNMENT OF THE KINGDOM OF MOROCCO,<br><br>              Defendant-Intervenor. | Consol. Court No. 23-00246 |

## <u>ORDER</u>

Upon consideration of Plaintiff and Consolidated Defendant-Intervenor The Mosaic Company's Rule 56.2 Motion for Judgment on the Agency Record, and the Memorandum in Support of The Mosaic Company's Rule 56.2 Motion for Judgment on the Agency Record, and all other papers and proceedings herein, it is hereby

**ORDERED** that Mosaic's motion is granted; it is further

**ORDERED** that the determination of the U.S. Department of Commerce ("Commerce") in *Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,726 (Int'l Trade Admin. Nov. 7, 2023), is

unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law; and it is further

      **ORDERED** that the matter is remanded to Commerce for further consideration consistent with this opinion.

      **SO ORDERED.**

                                      _____

                                        Hon. Timothy C. Stanceu, Judge

Dated: _____
        New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| THE MOSAIC COMPANY,<br><br>     Plaintiff,<br><br>  v.<br><br>UNITED STATES,<br><br>     Defendant,<br><br>   and<br><br>OCP S.A.,<br><br>     Defendant-Intervenor,<br><br>   and<br><br>THE GOVERNMENT OF THE KINGDOM OF MOROCCO,<br><br>     Defendant-Intervenor. | Consol. Court No. 23-00246<br><br><u>NON-CONFIDENTIAL VERSION</u><br><br>**Business Proprietary Information Deleted from Pages ii, 7, 13, 14-18, 20, 22-27, 33-45** |

<u>MEMORANDUM IN SUPPORT OF PLAINTIFF THE MOSAIC COMPANY'S RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD</u>

David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Alexandra S. Maurer
Wilmer Cutler Pickering Hale and Dorr
 LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

*Counsel for The Mosaic Company*

Dated: August 7, 2024

**NON-CONFIDENTIAL VERSION**

## **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     RULE 56.2 STATEMENT .................................................................................. 2

    A.      Administrative Decision Under Review................................................. 2

    B.      Issues Presented and Summary of Arguments ...................................... 2

III.    STATEMENT OF FACTS .................................................................................. 4

    A.      The Preliminary Phase of Commerce's Administrative Review............. 4

    B.      Commerce's Preliminary Results and Post-Preliminary Developments.............. 6

    C.      Commerce's Final Results and Post-Final Determination ................... 10

IV.     STANDARD OF REVIEW ............................................................................... 12

V.      ARGUMENT .................................................................................................... 13

    A.      Commerce's Benefit Determination for the Mining Rights for LTAR Program is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance With Law ............................................ 13

        1.      Commerce's Decision to Include OCP's HQ/Support Costs and Debt Costs in the Phosphate Rock Cost Buildup Is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance with Law ............................................ 14

            a.      Commerce unlawfully imposed a burden on Mosaic to show that OCP's HQ/Support and Debt costs were related to phosphate rock mining and beneficiation. ................................15

            b.      Commerce unlawfully found that OCP's HQ/Support and Debt costs are relevant to OCP's production and beneficiation of phosphate rock ....................................................16

            c.      Commerce's wholesale inclusion of OCP's reported HQ/Support and Debt costs unlawfully departed from Commerce's practice ....................................................19

        2.      Commerce's Refusal to Exclude HQ/Support and Debt Costs That Are Unrelated to Phosphate Mining or Rock Production Is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance With Law ................................... 21

        3.      Commerce's Acceptance of OCP's Allocation Methodology for its HQ/Support and Debt Costs is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance With Law ....... 24

**Consol. Court No. 23-00246**                    **NON-CONFIDENTIAL VERSION**

4.  Commerce's Selection of Phosphate Rock Benchmark Prices is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance With Law ................................................................. 27

    a.  Commerce unreasonably excluded phosphate rock prices for China and Syria from the benchmark. ........................................ 28

    b.  Commerce unreasonably included Egyptian phosphate rock prices in the benchmark. ...................................................... 31

    c.  Commerce unreasonably excluded phosphate rock prices for [                    ] from the benchmark. ................................. 33

B.  Commerce's Refusal to Countervail Port Services Subsidies that the ANP Provided to OCP During the POR Is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance With Law .................. 34

    1.  Commerce's determination that the ANP's provision of port services did not confer a benefit on OCP is arbitrary, unsupported by substantial evidence, and otherwise not in accordance with law .............. 34

    2.  Commerce's failure to determine that the ANP's provision of port services provided a financial contribution to OCP is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law ................................................................ 43

    3.  Commerce's failure to determine that the Provision of Port Services for LTAR program is *de facto* specific is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law ......... 44

VI.  CONCLUSION ............................................................................. 45

BUSINESS PROPRIETARY
INFORMATION DELETED

**Consol. Court No. 23-00246**                    **NON-CONFIDENTIAL VERSION**

<u>**TABLE OF AUTHORITIES**</u>

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................................................ 12

19 U.S.C. § 1675(a)(3)(A) .................................................................................................. 8

19 U.S.C. § 1677 ..........................................................................................................34, 44

**Regulations**

19 C.F.R. § 351.511 ................................................................................................. *passim*

**Cases**

*Acciai Speciali Terni, S.p.A. v. United States*, 217 F. Supp. 2d 1345 (CIT 2002) ........................ 12

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 219 F. Supp. 3d 1286 (CIT 2017) ...........................................................................................................................29, 30

*Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306 (CIT 2015) .................................................................................................. 22

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156 (1962) .............................. 13

*Consol. Bearings Co. v. United States*, 412 F.3d 1266 (Fed. Cir. 2005) ........................ 19

*CS Wind Viet. Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ............................. 13

*Eregli Demir ve Celik Fabrikalari T.A.S. v. USITC*, No. 22-00351, 2024 WL 3064724 (CIT June 20, 2024) .................................................................................. 30

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ............................................................................................................. 13

*NMB Sing. Ltd. v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) ................................. 43

*Pakfood Pub. Co. v. United States*, 453 F. App'x 986 (Fed. Cir. 2011) ........................ 19

*Rhone Poulenc v. United States*, 899 F.2d 1185 (Fed. Cir. 1990) .................................. 22

*Saha Thai Steel Pipe Pub. Co. v. United States*, 101 F.4th 1310 (Fed. Cir. 2024) ........................ 43

*The Mosaic Company v. United States*, 2024 WL 208136 (CIT Jan. 19, 2024) ........................ 19

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .............................................. 12

*Vinh Hoan Corp. v. United States*, 49 F. Supp. 3d 1285 (CIT 2015) ...............................29, 30, 31

NON-CONFIDENTIAL VERSION

**Administrative Determinations**

*Certain Hot-Rolled Carbon Steel Flat Products From India: Notice of
    Preliminary Results of Countervailing Duty Administrative Review*, 73
    Fed. Reg. 1,578 (Int'l Trade Admin. Jan. 9, 2008)............................................................20

*Certain Frozen Warmwater Shrimp from India: Final Results of Antidumping
    Duty Administrative Review, Partial Rescission, and Final No Shipment
    Determination*, 76 Fed. Reg. 41,203 (Int'l Trade Admin. July 13, 2011),
    and accompanying Issues and Decision Memorandum.....................................................26

*Certain Frozen Warmwater Shrimp from Thailand: Final Results and Partial
    Rescission of Antidumping Duty Administrative Review*, 74 Fed. Reg.
    47,551 (Int'l Trade Admin. Sept. 16, 2009), and accompanying Issues and
    Decision Memorandum.....................................................................................................26

*Certain Softwood Lumber Products From Canada: Final Affirmative
    Countervailing Duty Determination, and Final Negative Determination of
    Critical Circumstances*, 82 Fed. Reg. 51,814 (Int'l Trade Admin. Nov. 8,
    2017), and accompanying Issues and Decision Memorandum.........................................21

*Certain Softwood Lumber Products From Canada: Final Results of the
    Countervailing Duty Administrative Review, 2017-2018*, 85 Fed. Reg.
    77,163 (Int'l Trade Admin. Dec. 1, 2020), and accompanying Issues and
    Decision Memorandum.....................................................................................................21

*Chlorinated Isocyanurates from Spain: Notice of Final Determination of Sales at
    Less Than Fair Value*, 70 Fed. Reg. 24,506 (Int'l Trade Admin. May 10,
    2005), and accompanying Issues and Decision Memorandum.........................................26

*Circular Welded Carbon Quality Steel Pipe from the People's Republic of China:
    Preliminary Affirmative Countervailing Duty Determination; Preliminary
    Affirmative Determination of Critical Circumstances; and Alignment of
    Final Countervailing Duty Determination with Final Antidumping Duty
    Determination*, 72 Fed. Reg. 63,875 (Int'l Trade Admin. Nov. 13, 2007) ......................44

*Circular Welded Carbon Steel Pipes and Tubes From the Republic of Turkey:
    Final Results of Countervailing Duty Administrative Review; Calendar
    Year 2018*, 86 Fed. Reg. 6,866 (Int'l Trade Admin. Jan. 25, 2021), and
    accompanying Issues and Decision Memorandum............................................................31

*Countervailing Duties; Final Rules*, 63 Fed. Reg. 65,348 (Int'l Trade Admin.
    Nov. 25, 1998) .................................................................................................................43

*Final Affirmative Countervailing Duty Determinations: Certain Steel Products
    from Belgium*, 58 Fed. Reg. 37,273 (Int'l Trade Admin. July 9, 1993) ......................44, 45

Case 1:23-cv-00246-TCS    Document 46    Filed 08/08/24    Page 10 of 57

Consol. Court No. 23-00246                    NON-CONFIDENTIAL VERSION

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87
    Fed. Reg. 35,165 (Int'l Trade Admin. June 9, 2022)..........................................................4

*Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative
    Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Int'l Trade
    Admin. Feb. 16, 2021), and accompanying Issues and Decision
    Memorandum............................................................................................. 14, 16, 19

*Phosphate Fertilizers From the Russian Federation: Final Results of
    Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg.
    76,182 (Int'l Trade Admin. Nov. 6, 2023)................................................1, 9, 12

*Polyethylene Retail Carrier Bags from Thailand: Final Results of Antidumping
    Duty Administrative Review*, 74 Fed. Reg. 65,751 (Int'l Trade Admin.
    Dec. 11, 2009) and accompanying Issues and Decision ....................................26

*Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe From the
    Republic of Korea: Final Affirmative Countervailing Duy Determination*,
    86 Fed. Reg. 35,267 (Int'l Trade Admin. July 2, 2021), and accompanying
    Issues and Decision Memorandum .....................................................................36

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results
    of Countervailing Duty Administrative Review; 2017*, 84 Fed. Reg. 48,583
    (Int'l Trade Admin. Sept. 16, 2019), and accompanying Issues and
    Decision Memorandum.......................................................................................29

*Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of
    Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 16,056
    (Int'l Trade Admin. Mar. 20, 2020).................................................................30

*Utility Scale Wind Towers From Malaysia: Final Affirmative Countervailing Duty
    Determination*, 86 Fed. Reg. 30,593 (Int'l Trade Admin. June 9, 2021),
    and accompanying Issues and Decision Memorandum....................................35

**NON-CONFIDENTIAL VERSION**

## I.    <u>INTRODUCTION</u>

On behalf of Plaintiff and Consolidated Defendant-Intervenor The Mosaic Company

("Mosaic"), we submit this brief in support of Mosaic's Rule 56.2 motion for judgment on the

agency record.

The agency determination at issue in this case – namely, the final results of the U.S.

Department of Commerce's ("Commerce") first administrative review of the countervailing duty

("CVD") order on phosphate fertilizers from Morocco – is deeply flawed.  Commerce's analysis

of two subsidy programs, the Government of Morocco's Provision of Mining Rights for Less

Than Adequate Remuneration program and its Provision of Port Services and Infrastructure for

Less than Adequate Remuneration program, is unreasonable and fails to address multiple

arguments that Mosaic presented in case and rebuttal briefs.  Commerce ultimately found that

neither subsidy program confers any benefit whatsoever to state-owned fertilizer giant OCP S.A.

– a finding that strains credulity, as the Mining Rights subsidy gives OCP the main raw material

input for phosphate fertilizers (*i.e.*, phosphate rock) essentially for free.

It is perhaps unsurprising that Commerce failed to discharge its statutory obligation to

provide a reasoned explanation, given the peculiar procedural constraint that Commerce imposed

upon itself in this case.  Specifically, due to an unexplained delay, Commerce set the deadlines

for case briefs and rebuttal briefs in mid-October 2023 – less than two weeks before the statutory

deadline for the final results of November 1, 2023.  Commerce received more than 250 pages of

briefing from four parties.  Commerce even held a hearing on October 26, 2023, a mere six days

before the statutory deadline.  With so little time to consider the issues, Commerce relied heavily

on conclusory assertions that attempted to defend its unreasonable decisions, rather than engage

meaningfully with the arguments before it.

Case 1:23-cv-00246-TCS    Document 46    Filed 08/08/24    Page 12 of 57

Consol. Court No. 23-00246                    NON-CONFIDENTIAL VERSION

Commerce's determinations regarding these two subsidy programs are unlawful and unsupported by substantial evidence. The Court should remand to Commerce, so that Commerce can reconsider and arrive at determinations that better reflect the reality of the GOM's extensive subsidization of OCP.

## II.    RULE 56.2 STATEMENT

### A.    Administrative Decision Under Review

Mosaic challenges certain aspects of the final results of Commerce's first administrative review of the CVD order on phosphate fertilizers from Morocco for the period November 30, 2020 to December 31, 2021. The final results were published in the Federal Register on November 7, 2023. *Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,726 (Int'l Trade Admin. Nov. 7, 2023) ("*Final Results*"), P.R. 369, and accompanying Issues and Decision Memorandum ("IDM"), P.R. 370. After issuing the final results, Commerce published a post-final determination attempting to support certain aspects of its benchmark calculations for the Provision of Mining Rights for LTAR subsidy program. *See* Memorandum from Jaron Moore, Int'l Trade Compliance Analyst, re: Final Results of the Countervailing Duty Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco: Business Proprietary Information Accompanying the Issues and Decision Memorandum for the Final Results (Nov. 2, 2023) ("Post-Final Determination"), P.R. 372, C.R. 410.

### B.    Issues Presented and Summary of Arguments

1.    **Whether Commerce's inclusion of costs that the company respondent, OCP S.A. ("OCP"), categorized as 2021 HQ/Support costs and 2021 Debt costs in the phosphate rock cost buildup to measure the adequacy of remuneration for phosphate mining rights is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.**

2

**NON-CONFIDENTIAL VERSION**

Yes.  Commerce's inclusion of OCP's costs categorized as 2021 HQ/Support costs and

2021 Debt costs in the phosphate rock cost buildup to measure the adequacy of remuneration

under tier three for the Provision of Mining Rights for Less Than Adequate Remuneration

("LTAR") program is unreasonable, unsupported by substantial evidence, and otherwise not in

accordance with law.  These unlawful findings contributed to Commerce's erroneous conclusion

that OCP received no measurable benefit from the Provision of Mining Rights for LTAR

program during the period of review ("POR").

> **2.      Whether Commerce's inclusion of Egyptian, Chinese, and Syrian
> phosphate rock prices in the phosphate rock benchmark used to
> measure the adequacy of remuneration for phosphate mining rights,
> and exclusion of certain other prices, is unreasonable, unsupported by
> substantial evidence, and otherwise not in accordance with law.**

Yes.  Commerce's decision in the *Final Results* to include Egyptian, Chinese, and Syrian

phosphate rock prices in the phosphate rock benchmark is unreasonable, unsupported by

substantial evidence, and otherwise not in accordance with law.  In addition, Commerce's

exclusion of certain Jordanian prices for phosphate rock of comparable BPL content to OCP's

phosphate rock is unreasonable, unsupported by substantial evidence, and otherwise not in

accordance with law.  These unlawful findings contributed to Commerce's erroneous conclusion

that OCP received no measurable benefit from the Provision of Mining Rights for LTAR

program during the POR.

> **3.      Whether Commerce's finding that the Provision of Mining Rights for
> LTAR subsidy program conferred no measurable benefit on OCP
> during the POR is unreasonable, unsupported by substantial
> evidence, and otherwise not in accordance with law.**

Yes.  As a result of Commerce's unlawful decision to include OCP's HQ/Support and

Debt costs in the phosphate rock cost buildup and its unlawful selection of phosphate rock

NON-CONFIDENTIAL VERSION

benchmark prices, Commerce erroneously found that the Provision of Mining Rights for LTAR

subsidy program conferred no measurable benefit on OCP during the POR.

<blockquote>

**4.      Whether Commerce's decision not to countervail the GOM's Provision of Port Services and Infrastructure for LTAR program is unsupported by substantial evidence or otherwise not in accordance with law.**

</blockquote>

Yes.  Commerce's finding that the Moroccan port authority, the Agence Nationale des

Ports ("ANP"), set the terms of OCP's concession agreements in accordance with market

principles, and that OCP therefore did not receive a benefit under this program, is unsupported

by substantial evidence and otherwise not in accordance with law.  Commerce also unlawfully

failed to make findings regarding financial contribution and specificity regarding this program.


III.    <u>**STATEMENT OF FACTS**</u>

A.      **The Preliminary Phase of Commerce's Administrative Review**

On June 9, 2022, Commerce initiated an administrative review of the CVD order on

phosphate fertilizers from Morocco, for the period November 30, 2020 through December 31,

2021.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg.

35,165, 35,174 (Int'l Trade Admin. June 9, 2022).  Commerce issued its initial questionnaire to

the Government of Morocco ("GOM") and OCP on June 28, 2022.  *See Phosphate Fertilizers

From the Kingdom of Morocco: Preliminary Results of the Countervailing Duty Administrative

Review, 2020-2021*, 88 Fed. Reg. 29,089 (Int'l Trade Admin. May 5, 2023) ("*Preliminary

Results*"), P.R. 264, and accompanying Preliminary Decision Memorandum ("PDM") at 2, P.R.

265.  Commerce investigated six subsidy programs for OCP that it had countervailed in the

investigation, including the Provision of Phosphate Mining Rights for Less Than Adequate

Remuneration ("LTAR").  PDM at 8-14.

NON-CONFIDENTIAL VERSION

The GOM and OCP submitted responses to the initial and supplemental questionnaires between July 2022 and April 2023.  *See* PDM at 2-3.  Mosaic submitted new subsidy allegations on September 21, 2022.  Letter from WilmerHale, re: Phosphate Fertilizers From Morocco: New Subsidy Allegations (Sept. 21, 2022), P.R. 117-119, C.R. 128-133.  On February 16, 2023, Commerce initiated an investigation into two new subsidy programs, including the Provision of Port Services and Infrastructure for LTAR.  Memorandum from Janae Martin & Jaron Moore, Int'l Trade Compliance Analysts, through Robert Palmer, Program Manager, to Irene Darzenta Tzafolias, Director, re: Countervailing Duty Administrative Review of Phosphate Fertilizers from Morocco: New Subsidy Allegations (Feb. 16, 2023), P.R. 176.  The GOM and OCP submitted questionnaire responses regarding the new subsidy allegations in April 2023.  GOM New Subsidy Allegations Questionnaire Response (Apr. 24, 2023) ("GOM 4/24/23 NSA QR"), P.R. 245, C.R. 243; OCP New Subsidy Allegations Questionnaire Response (Apr. 24, 2022) ("OCP 4/24/22 NSA QR"), P.R. 244, C.R. 232.

Mosaic and OCP submitted information on world market prices for phosphate rock for Commerce to calculate benchmarks for the Provision of Mining Rights for LTAR program. Letter from WilmerHale, re: Phosphate Fertilizers From Morocco: Petitioner's Submission of Factual Information to Measure the Adequacy of Remuneration (Mar. 22, 2023) ("Mosaic Benchmark Submission"), P.R. 190, C.R. 181; Letter from Covington, re: Phosphate Fertilizer from the Kingdom of Morocco: New Factual Information (Mar. 22, 2023) ("OCP Benchmark Submission"), P.R. 202, C.R. 203.  Mosaic submitted pricing data for phosphate rock from CRU, Argus, and Profercy Phosphates.  Mosaic Benchmark Submission at 2, Exhibits 1(a)-1(g), P.R. 190-191, C.R. 181-196.  OCP submitted pricing data for phosphate rock compiled by CRU, Fertecon, and Profercy Phosphates, which included phosphate rock price series for China, Egypt,

**NON-CONFIDENTIAL VERSION**

and Syria.  OCP Benchmark Submission at 2, Exhibits NFI-1 to NFI-3, P.R. 202-203, C.R. 203-

210.  In its rebuttal benchmark submission, Mosaic submitted additional factual information

demonstrating that phosphate rock prices from China, Egypt, and Syria were distorted or

otherwise not comparable to phosphate rock prices from Morocco.  Letter from WilmerHale, re:

Phosphate Fertilizers From Morocco: Petitioner's Benchmark Rebuttal Submission (Apr. 5,

2023) ("Mosaic 4/5/23 Benchmark Rebuttal Submission") at 2-4, Exhibits 1-13, P.R. 227, C.R.

215.

### B.    Commerce's *Preliminary Results* and Post-Preliminary Developments

Commerce issued the *Preliminary Results* on April 28, 2023.  *Preliminary Results*, 88

Fed. Reg. 29,089.  With respect to the Provision of Mining Rights for LTAR program,

determined that the program confers a financial contribution and is specific to OCP.  PDM at 10.

To assess the adequacy of remuneration, and thereby calculate the benefit, Commerce conducted

a tier three analysis under 19 C.F.R. § 351.511(a)(2)(iii).  *Id.* at 10-11.  In particular, Commerce

constructed a world market benchmark for phosphate rock.  PDM at 10-11.  Commerce

compared the actual per-unit cost buildup that OCP reported for its beneficiated phosphate rock

to an average of world market prices for phosphate rock Commerce determined to be comparable

to OCP's rock.  *Id.*

To calculate OCP's per-unit cost build up, Commerce took the total mining costs that

OCP reported for 2021 and deducted OCP's 2021 HQ/Support costs and its 2021 Debt costs.

Memorandum from Jaron Moore, Int'l Trade Compliance Analyst, through Robert Palmer,

Program Manager, to File, "OCP S.A. Calculations for the Preliminary Results" (May 3, 2023)

("OCP Prelim. Calc. Memo.") at 5, P.R. 261, C.R. 260.  Commerce added an amount for profit

and then divided the sum by the total amount of rock that OCP reported that it produced in 2021

BUSINESS PROPRIETARY
INFORMATION DELETED

**Consol. Court No. 23-00246**                    **NON-CONFIDENTIAL VERSION**

to derive a per-unit cost for phosphate rock.  *Id.*  Commerce then compared the per-unit cost to a

world market benchmark price for phosphate rock.

Commerce derived a world market benchmark price for phosphate rock using 2021 prices

for phosphate rock published in the following sources: CRU, Argus Phosphates, Fertecon, and

Profercy Phosphates Limited.  *See* OCP Prelim. Calc. Memo. at 3.  Commerce stated that it

limited its analysis to these data sources because they correspond to the [


].  *Id.*  The selected prices from

industry publications correspond to phosphate rock with BPL levels ranging from as low as 60%

BPL (for Egypt, 60-68% BPL, as reported by CRU) to as high as 72% (for Jordan, 66-72% BPL,

as reported by CRU).  *See* OCP Prelim. Calc. Memo. at Attachment I, Calculations Worksheet:

Phosphate Rock Benchmark, P.R. 262, C.R. 261.  Commerce included prices for Egyptian,

Chinese, and Syrian phosphate rock, among others.  *See id*.  Commerce calculated a simple

average of the selected price data to arrive at a per-unit phosphate rock benchmark price of

$74.63 (or MAD 670.80) per metric ton.  *Id.*

To calculate the benefit for this program, Commerce multiplied the difference between its

calculated per-unit cost buildup of OCP's beneficiated phosphate rock and the benchmark per-

unit price of phosphate rock, by the total amount of phosphate rock that OCP reported it mined

and beneficiated during the POR.  PDM at 11.  Commerce preliminarily assigned a subsidy rate

for the program of 13.63 percent ad valorem.  *Id.*

On October 11, 2023, Commerce issued a post-preliminary analysis of the new subsidy

allegations, including the alleged Provision of Port Services for LTAR program.  Memorandum

from James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty

Operations, to Lisa W. Wang, Assistant Secretary, re: Post-Preliminary Analysis of the Countervailing Duty Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco; 2020-2021 (Oct. 11, 2023) ("Post-Prelim. Analysis Memo."), P.R. 351, C.R. 401. With regard to the Provision of Port Services for LTAR program, Commerce only addressed the issue of benefit and made no findings regarding financial contribution or specificity. *Id.* at 3-6.

To assess the benefit, Commerce resorted to a tier three analysis under 19 C.F.R. § 351.511(a)(2)(iii) and examined whether the prices set by the Moroccan national port authority, ANP, in its concession agreements with OCP to operate terminals at the port of Casablanca, Jorf Lasfar, and Safi were "consistent with market principles." *Id.* at 5. Commerce found that they were, based on "the GOM's narrative explanation of ANP's price-setting philosophy" and evidence that ANP reported an operating profit and net profit in 2019, 2020, and 2021. *Id.* at 5-6. Commerce therefore concluded that OCP's concession agreements with ANP conferred no benefit to OCP during the POR. *Id.* at 6. However, Commerce stated that it intended to continue investigating this program in subsequent administrative reviews "given the novel and unique nature of this program." *Id.*

On October 11, 2023, Commerce set the deadlines for case briefs and rebuttal briefs as October 16, 2023 and October 20, 2023, respectively. *See* Memorandum from Jaron Moore, Int'l Trade Compliance Analyst, to the File, re: First Administrative Review of the Countervailing Duty Order on Phosphate Fertilizers from the Kingdom of Morocco (Oct. 11, 2023), P.R. 352. These briefing deadlines were a mere 16 and 12 calendar days before the statutory deadline for the final results, *i.e.*, November 1, 2023. *See* 19 U.S.C. § 1675(a)(3)(A). Commerce did not explain why it waited until this late stage of the proceeding to invite briefing, leaving itself less than two weeks to consider and address arguments in the briefs.

Mosaic argued in its case brief that Commerce correctly found that OCP receives countervailable subsidies under the Provision of Mining Rights for LTAR program but erred in calculating the benefit of this program.  *See* Letter from WilmerHale, re: Phosphate Fertilizers from Morocco: Petitioner's Case Brief (Oct. 16, 2023) ("Mosaic Case Br.") at 2-12, P.R. 355, C.R. 402.  In particular, Mosaic argued that Commerce erred in excluding certain price data that reflected phosphate rock with a similar BPL to OCP's.  *Id*. at 4-6.  Mosaic also argued that Commerce erred in including Egyptian, Chinese, and Syrian phosphate rock prices in the world market benchmark price.  *Id.* at 6-9.  Mosaic argued that Commerce should exclude Egyptian phosphate rock prices because the record shows that Egyptian rock is of low quality and not comparable to OCP's phosphate rock.  *Id.*  Mosaic also argued that Commerce should exclude Chinese and Syrian phosphate rock prices because non-market forces significantly distort phosphate rock prices in those countries.  *Id.* at 9-12.

Mosaic argued with respect to the Provision of Port Services for LTAR program that Commerce erred in finding no benefit because the record evidence shows the concession fees that ANP charges to OCP are not set in accordance with market principles.  Mosaic Case Br. at 19-20.  Mosaic argued further that this program involved a financial contribution to OCP and that it is *de facto* specific, and therefore Commerce erred by declining to countervail the ANP's provision of port services and infrastructure to OCP for LTAR.  *Id.* at 16-19.

In its rebuttal brief, Mosaic argued that Commerce should reject OCP's arguments regarding its alleged HQ/Support and Debt costs and continue to omit such costs from its phosphate rock cost buildup.  *See* Letter from WilmerHale, re: Phosphate Fertilizers from Morocco: Petitioner's Rebuttal Brief (Oct. 20, 2023) ("Mosaic Rebuttal Br.") at 5-11, P.R. 362,

C.R. 405.  Mosaic further argued that OCP's allocation method for its 2021 HQ/Support and 2021 Debt costs contains multiple distortions and is therefore unreasonable.  *Id.* at 11-15.

With six days left before the statutory deadline for the final results, Commerce held a hearing on October 26, 2023.  *See* IDM at 3.  Counsel for Mosaic and other parties participated and presented arguments.  *See id.*

### C.   Commerce's *Final Results* and Post-Final Determination

Commerce issued the *Final Results* on November 1, 2023, and published them in the *Federal Register* on November 7, 2023.  *Final Results*, 88 Fed. Reg. 76,726.  In the *Final Results*, Commerce reversed its position from the *Preliminary Results* and included the costs that OCP had characterized as 2021 HQ/Support costs and 2021 Debt costs in its cost build-up for phosphate rock.  IDM at 33-37.  Commerce correctly stated that OCP's HQ/Support costs and Debt costs "are not directly tied to production{.}"  *Id.* at 35.  However, Commerce asserted that "HQ and {s}upport costs are relevant to OCP's production and pricing of phosphate rock" and that OCP's Debt costs were "primarily used to fund capital improvements associated with its mining operations."  *Id.*  Commerce also found that "{a}n attempt to further segregate OCP's reconciled and verified HQ, {s}upport, and {d}ebt costs in a manner inconsistent with its accounting methodology would be unreasonable and extremely complex."  *Id.*  Commerce therefore accepted OCP's allocation of its 2021 HQ/Support costs allocated across four sites – two phosphate rock mining sites and two chemical manufacturing sites – based on a partial calculation of total site costs and capital expenditures.  *Id.*; *see also* OCP Section III Initial Questionnaire Response (Aug. 22, 2022) ("OCP 8/22/22 IQR") at 76-77, P.R. 76, C.R. 8.  As a result of these changes in approach from the *Preliminary Results*, Commerce concluded that the Provision of Mining Rights for LTAR subsidy program is not countervailable because it did not confer a measurable benefit.  IDM at 12.

Case 1:23-cv-00246-TCS   Document 46   Filed 08/08/24   Page 21 of 57

Consol. Court No. 23-00246                    NON-CONFIDENTIAL VERSION

Commerce also rejected Mosaic's arguments that it should exclude Egyptian, Chinese, and Syrian prices from the world market benchmark price for phosphate rock, stating that its "practice is not to exclude particular benchmark prices simply because they are low or high." IDM at 27-29.  Commerce found with regard to the Chinese and Syrian prices that: "The petitioner has failed to point to market dynamics in the destination countries for the exports in question that would lead to a finding of distortion, nor has it provided sufficient information to support the argument that government influence in these respective countries is causing export prices to other markets to be distorted." *Id.*  Commerce failed to address the evidence discussed in Mosaic's case brief that the Chinese government has directly intervened in the export market by imposing export taxes or export bans.  *See* Mosaic Case Br. at 10.  Nor did Commerce address the record evidence discussed in Mosaic's case brief of how sanctions had forced Syria to "sell {phosphate rock} at a political discount{.}"  *Id.* at 11-12 (citing Mosaic 4/5/23 Benchmark Rebuttal Submission at Exhibit 11).

Commerce found with regard to Egyptian phosphate rock prices that its "practice is not to exclude particular benchmark prices simply because they are high or low" and that "the petitioner's claims regarding Egyptian Phosphate's Minor Element Ratio (MER) ratio {*sic*} are insufficiently supported by factual evidence."  IDM at 28.  Commerce found that Egyptian phosphate rock has similar BPL content as OCP's phosphate rock and therefore continued to use Egyptian phosphate rock prices in the benchmark.  *Id.*  Commerce also found that Mosaic provided "insufficient evidence to indicate that Egyptian export prices are distorted," because "'distortion' in a country's domestic market does not necessarily speak to *export prices*."  *Id.* at 29 (emphasis original).

With respect to the Provision of Port Services and Infrastructure for LTAR program, Commerce rejected Mosaic's arguments that it erred in preliminarily finding the program is not countervailable because ANP's prices were not set in accordance with market principles. *Id.* at 52-54. Commerce stated that it "examined the methodology that ANP uses when setting concession fees, which indicates that ANP does account for its costs, revenues, and profits when it sets prices" and that this information, in addition to evidence that ANP was profitable from 2019-2021, supports a determination that the prices were set in accordance with market principles. *Id.* at 53. Commerce nonetheless reiterated that it intended to continue examining this program in future reviews. *Id.* at 54.

On November 2, 2023 – after the statutory deadline for the final results – Commerce issued a Post-Final Determination with additional explanation regarding its approach to measuring the adequacy of remuneration for the Provision of Mining Rights for LTAR program. *See* Post-Final Determination. In the Post-Final Determination, Commerce rejected Mosaic's arguments from its case brief that Commerce should include certain prices for phosphate rock of comparable BPL content to OCP's phosphate rock. *See id*.

## IV.    **STANDARD OF REVIEW**

In reviewing Commerce's CVD determinations, the Court will hold unlawful any determination, finding, or conclusion found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Acciai Speciali Terni, S.p.A. v. United States*, 217 F. Supp. 2d 1345, 1346-47, 26 C.I.T. 892, 893 (CIT 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)), taking into account "whatever in the record fairly detracts" from the weight of

**NON-CONFIDENTIAL VERSION**

supportive evidence.  *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016).

The substantial evidence standard also requires the agency to "examine the relevant data and

articulate a satisfactory explanation for its action including a 'rational connection between the

facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.

Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*,

371 U.S. 156, 168 (1962)).  Failure to consider "an important aspect of the problem" renders a

determination by an agency arbitrary.  *State Farm*, 463 U.S. at 43.


**V.    ARGUMENT**

    **A.    Commerce's Benefit Determination for the Mining Rights for LTAR Program is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance With Law**

In the *Final Results*, Commerce made two errors that contributed to its unlawful finding

that OCP did not receive a measurable benefit during the POR from the Provision of Mining

Rights for LTAR program.  First, Commerce erred in including OCP's reported 2021

HQ/Support and 2021 Debt costs in the cost buildup for phosphate rock.  Commerce

unreasonably declined to make any adjustments for the fact that **[                    ]** reported costs

were unrelated to OCP's phosphate mining and rock production.  Second, Commerce erred in

including phosphate rock prices from Egypt, Syria, and China in the phosphate rock benchmark

– which are distorted and not suitable as benchmark prices – while excluding certain prices for

phosphate rock that is comparable to OCP's.  Commerce's cost buildup, benchmark selection,

and finding of no measurable benefit are thus unreasonable, unsupported by substantial evidence,

and otherwise not in accordance with law.

        **1.    Commerce's Decision to Include OCP's HQ/Support Costs and Debt Costs in the Phosphate Rock Cost Buildup Is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance with Law**

**Consol. Court No. 23-00246**                    NON-CONFIDENTIAL VERSION

In the investigation, Commerce based its tier-three benefit calculation for OCP's phosphate mining rights on "a comparison of the actual per-unit cost buildup of OCP's beneficiated rock with a market price of phosphate rock." *Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Int'l Trade Admin. Feb. 16, 2021) and accompanying Issues and Decision Memorandum ("Inv. IDM") at 23. Commerce reasonably took into consideration only "the relevant production costs *associated with producing the phosphate rock* from the minerals in the ground as well as *the pricing of phosphate rock*." *Id.* at 24 (emphasis modified). As part of this analysis, Commerce properly excluded OCP's reported HQ/Support and Debt costs from the cost buildup, because OCP failed to establish that these costs contributed to OCP's mining operations and that they were relevant to the pricing of phosphate rock. *Id.* Commerce's decision to exclude these costs is reasonable, supported by substantial evidence, and otherwise in accordance with law.[1]

In the *Preliminary Results*, Commerce took the same approach as in the investigation – namely, excluding OCP's reported HQ/Support and Debt costs from the cost buildup – and on that basis, Commerce calculated a subsidy rate for the Provision of Mining Rights for LTAR program of 13.63 percent *ad valorem*. PDM at 10-11. The magnitude of the subsidy rate reflects the fact that phosphate rock is the principal raw material input into the subject merchandise, and that OCP produced **[                    ]** of phosphate rock during the POR, which it received essentially for free. Memorandum from Jaron Moore, Int'l Trade Compliance Analyst, re: OCP

---

[1] OCP appealed this finding from the original investigation. *See The Mosaic Co. v. United States*, Slip Op. 23-134 (CIT Sept. 14, 2023). However, in the first administrative review, Commerce stated: "{T}he recent *Mosaic* opinion is not a final and conclusive decision and is part of ongoing litigation. As that case is still in active litigation, and the CIT's holding was based on the record before it, it is relevant that we are not restricted by that decision with respect to the facts on the record before us." IDM at 36.

NON-CONFIDENTIAL VERSION

S.A. Calculations for the Final Results (Nov. 2, 2023) at Attachment I, Calculations Worksheet: MiningRightsCalc Tab, P.R. 371, C.R. 408-409

However, in the *Final Results*, Commerce reversed its position from the investigation and the *Preliminary Results*, and included all of OCP's reported HQ/Support and Debt costs without making any adjustment. Commerce erroneously and unreasonably found that OCP's "HQ and Support costs are relevant to OCP's production and pricing of phosphate rock," and it included the entirety of those costs, as well as the entirety of OCP's Debt costs, in OCP's cost buildup. IDM at 35-37. The consequence of this erroneous finding is to eliminate completely the 13.63 percent subsidy rate that Commerce had calculated for this program in the *Preliminary Results*. Stated differently, Commerce found that OCP did not receive *any benefit at all* from receiving [

            ] of phosphate rock effectively for free. This was unlawful for several reasons, as discussed below. *Id.*

    a.  <u>Commerce unlawfully imposed a burden on Mosaic to show that OCP's HQ/Support and Debt costs were related to phosphate rock mining and beneficiation.</u>

In the investigation, Commerce explained its decision to reject OCP's HQ/Support and Debt costs as follows:

> Although OCP itemized the expenses that constitute its HQ/support costs and cost of debt into generic categories, we do not have sufficient information on how each of these line items contributed to OCP's mining operations and how these costs are relevant to the pricing of phosphate rock. Moreover, to the extent that some items in OCP's HQ/support expenses in the cost build up could arguably be related to mining operations, the record does not contain sufficient evidence that would allow us to segregate and remove those costs which are considered unrelated to mining operations.

Inv. IDM at 24. In other words, in the investigation, Commerce properly placed the burden on OCP to justify how each line item that it sought to include in the cost buildup was a "relevant production cost *associated with producing the phosphate rock* from the minerals in the ground as

NON-CONFIDENTIAL VERSION

well as *the pricing of phosphate rock.*"  *See NTN Bearing Corp. of Am. v. United States*, 104 F. Supp. 2d 110, 152 (CIT 2000) ("… the burden of proof {is} with the party who intends to benefit from the claim made.").  As noted above, Commerce followed the same, correct approach in the *Preliminary Results*.  However, in the *Final Results*, Commerce removed the burden from OCP, and found that as long as OCP could document that *any* of the line items could arguably be related to mining operations, it would accept *all* of OCP's HQ/Support and Debt costs, unless *Mosaic* could demonstrate that it is distortive to do so.  IDM at 36.  In essence, Commerce established a presumption that OCP's reported costs related to phosphate rock mining and beneficiation – and although Mosaic theoretically could rebut the presumption, this could only be done with information that is in OCP's sole possession, to which Mosaic does not have access.

> **b.**   Commerce unlawfully found that OCP's HQ/Support and Debt costs are relevant to OCP's production and beneficiation of phosphate rock.

In attempting to justify its skewed approach, Commerce stated that "the record contains evidence that OCP's HQ and Support costs are relevant to OCP's production and pricing of phosphate rock."  IDM at 35.  In reality, however, at most some small portion of OCP's HQ and Support costs could arguably be relevant.  For example, Commerce stated that "OCP provided descriptions, explanations, and supporting documentation for related costs such as HQ personnel, insurance, and electronic equipment" and that OCP's "HQ personnel provide training to industrial personnel at OCP's mines, support the acquisition of industrial materials at each site, and provide technology services to the mining sites that are critical to operations."  *Id.* at 35.  Commerce failed to note, however, that OCP only documented **[      ]** HQ personnel whose positions related to phosphate mining or rock processing, out of approximately **[        ]** employees.  OCP 8/22/22 IQR at 82-84, Exhibits MIN-12, MIN-14, P.R. 76, 80, C.R. 8, 15; OCP Section III Initial Questionnaire (Sept. 1, 2022) ("OCP 9/1/22 IQR") at 2, Exhibit GEN-4(a)(iii),

P.R. 89-90, C.R. 76, 78; *see also* Mosaic Case Br. at 7-9.  Commerce also failed to note that

OCP documented only **[                    ]** – accounting for **[                         ]** of its 2021

HQ/Support costs – as arguably related to phosphate rock mining and processing.  *See* OCP

8/22/22 IQR at 82-84, Exhibits MIN-12, MIN-14, MIN-16, P.R. 76, 80, C.R. 8, 15; *see also*

Mosaic Rebuttal Br. at 9.  Thus, for the vast majority of OCP's reported costs, there is no

evidence that they are related to OCP's production and pricing of phosphate rock.

> In addition, Commerce further asserted:
>
>> In explaining the nature of its operations and providing context for
>> its costs of production, OCP noted that the production of phosphate
>> rock necessarily involves four main phases: extraction, stone
>> removal, beneficiation, and transportation. These phases involve
>> distinct and diverse activities involving multiple mining sites,
>> processing facilities, and transportation hubs (*i.e.*, rail terminals and
>> pipelines). Our tier-three analysis appropriately addresses the
>> unique nature of OCP's phosphate mining and processing
>> operations.

IDM at 34.  Apart from this conclusory assertion, however, Commerce failed to explain how its

acceptance of the entirety of OCP's HQ/Support and Debt costs reflects the "unique nature of

OCP's phosphate mining and processing operations."  In fact, **the [                    ] of OCP's**

**2021 HQ/Support costs consisted of [**

                                        **].  This single expense category accounted for MAD [**

          **] of the total of MAD [                    ] in OCP's 2021 HQ/Support costs, or [      ]**

**percent of the total**.  *See* OCP Response to Third Supplemental Questionnaire (Apr. 21, 2023)

("OCP 4/21/23 TSQR") at 11 n.21, Exhibit MIN3-4(a), P.R. 242, C.R. 222, 226.  Given OCP's

failure to explain how these expenses related to any of the "four main phases" of the production

of phosphate rock, Commerce's inclusion of the expenses in the cost buildup is unreasonable.

BUSINESS PROPRIETARY
INFORMATION DELETED

NON-CONFIDENTIAL VERSION

Moreover, the record evidence shows that [


].[2]  *See* OCP 8/22/22 IQR; Letter from WilmerHale, re: Phosphate Fertilizers

From the Morocco: Deficiency Comments on the GOM's and OCP's Initial CVD Questionnaire

Responses (Sept. 13, 2022) ("Mosaic 9/13/22 Comments"), at 11-12, Exhibits 2, 3, P.R. 110,

C.R. 118.  The [                                              ] category in particular [

    ].  One driver of this [                          ] is OCP's [


                                              ].  OCP 9/1/22 IQR at

Exhibit GEN-4(a)(iii), P.R. 90, C.R. 78.  Such costs are wholly unrelated to OCP's production of

phosphate rock.  This evidence detracts from Commerce's finding that OCP's HQ/Support costs

"are relevant to OCP's production and pricing of phosphate rock."  IDM at 33.

Mosaic presented most of these arguments in its rebuttal brief.  *See* Mosaic Rebuttal Br.

at 7-9.  However, Commerce failed to meaningfully address Mosaic's arguments or the

contradictory evidence that undermined its conclusions.[3]  *See* IDM at 33-35.

---

[2] As Mosaic pointed out to Commerce, the [

                                              ] supports the conclusion that HQ, support,

and debt costs were [

                          ].  Mosaic Rebuttal Br. at 8.  However, Commerce failed to acknowledge
this argument in the *Final Results*.

[3] For example, Commerce stated: "The petitioner argues that, amongst other problems with
OCP's cost reporting, OCP failed to sufficiently describe how certain of its reported HQ,
Support, and Debt costs relate to phosphate mining.  Therefore, according to the petitioner, the
inclusion of such costs would render

Commerce's tier-three benchmark inaccurate."  IDM at 33 (citation omitted).  But Commerce
never addressed this argument.  Instead, it changed the subject and discussed the reasons why it
disagreed with Simplot's arguments about the applicability to this review of its findings in the
*Softwood Lumber from Canada 2017* proceeding.  *See id*.

18

**NON-CONFIDENTIAL VERSION**

> c.    Commerce's wholesale inclusion of OCP's reported HQ/Support and Debt costs unlawfully departed from Commerce's practice.

Commerce's practice is to include indirect costs in a tier three cost buildup only when they have a demonstrated connection with production of the subject merchandise.  Indeed, this is the approach that Commerce took in the companion investigation of *Phosphate Fertilizers From the Russian Federation*.  In a decision affirmed by this Court, Commerce stated:

> Under this "Tier Three" approach, we based our benchmark on the value of the underlying good conveyed via mining rights.  As a result of this approach, our benefit analysis *focused on the production costs of phosphate ore extracted and phosphate rock produced* by {the respondent} during the POI from the mining deposit tied to the license in question.

Inv. IDM at Comment 2 (emphasis added); *The Mosaic Company v. United States*, 2024 WL 208136 (CIT Jan. 19, 2024).  By contrast, in this case, Commerce unlawfully included *all* of OCP's HQ/Support and Debt costs in the tier-three cost buildup, including expenses that are unrelated to OCP's phosphate mining and beneficiation.  Such an unexplained departure from agency precedent is, standing alone, unlawful.  *See Pakfood Pub. Co. v. United States*, 453 F. App'x 986, 989 (Fed. Cir. 2011) (citing *Consol. Bearings Co. v. United States*, 412 F.3d 1266, 1269 (Fed. Cir. 2005)).

In the *Final Results*, Commerce attempted to resist this characterization of its practice, citing two cases: *Hot-Rolled Steel From India* and *Softwood Lumber From Canada*.  IDM at 33-34.  However, in neither case did Commerce include corporate-wide expenses unrelated to the production of subject merchandise in a cost buildup.  In fact, these cases confirm that Commerce's practice requires it not to accept OCP's reported HQ/Support and Debt costs wholesale for use in the cost buildup.

In *Hot-Rolled Steel From India*, Commerce included in the tier-three cost buildup for coal mining rights "*operational mining costs . . .* which consisted of materials, labor,

Consol. Court No. 23-00246                                    NON-CONFIDENTIAL VERSION

depreciation, overhead, and royalties." *See Certain Hot-Rolled Carbon Steel Flat Products From India: Notice of Preliminary Results of Countervailing Duty Administrative Review*, 73 Fed. Reg. 1,578, 1,591-92 (Int'l Trade Admin. Jan. 9, 2008) (emphasis added).  However, Commerce did not include an allocation of headquarters-level costs with no documented connection to the respondent's mining operations in the buildup.  Here, Commerce had already included in the cost buildup approximately MAD **[            ]** in "site indirect costs" for OCP's Gantour and Khouribga mines, separate and apart from the HQ/Support and Debt costs.  OCP 8/22/22 IQR at Exhibit MIN-3, P.R. 80, C.R. 15.  These mining site-specific indirect costs include similar categories as the indirect costs that Commerce described in *Hot-Rolled Steel From India*, *i.e.*, purchases consumed, local taxes, depreciation, and personnel expenses.  Thus, *Hot-Rolled Steel From India* does not support Commerce's decision to include – in addition to the mining site-specific indirect costs – HQ/Support and Debt costs that have no documented connection to OCP's phosphate mining or rock production.  To the contrary, *Hot-Rolled Steel From India* supports the approach that Commerce originally took in the investigation and the *Preliminary Results*.

Similarly, Commerce's decisions in *Softwood Lumber From Canada* do not support the inclusion of HQ/Support and Debt costs with no connection to phosphate mining or rock production in the cost buildup.  In the *Softwood Lumber* CVD investigation, Commerce constructed a cost buildup, with a default approach *not* to include respondents' indirect costs. Commerce then included only those indirect costs that the respondents "*must* take into account . . . to access and harvest Crown timber."  *See Certain Softwood Lumber Products From Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 Fed. Reg. 51,814 (Int'l Trade Admin. Nov. 8, 2017), and

Case 1:23-cv-00246-TCS   Document 46   Filed 08/08/24   Page 31 of 57

Consol. Court No. 23-00246                   NON-CONFIDENTIAL VERSION

accompanying Issues and Decision Memorandum at Comment 24 (emphasis in original).

Furthermore, in *Softwood Lumber* administrative reviews, Commerce repeatedly rejected

Canadian respondents' arguments for adjustments to the tier-three benchmark to account for

costs that the Canadian respondents were *not* legally obligated to incur as a condition for

accessing Crown timber, or that were unrelated to accessing and harvesting timber.  *See, e.g.*,

*Certain Softwood Lumber Products From Canada: Final Results of the Countervailing Duty*

*Administrative Review, 2017-2018*, 85 Fed. Reg. 77,163 (Int'l Trade Admin. Dec. 1, 2020), and

accompanying Issues and Decision Memorandum at Comment 23.  In the *Final Results*,

Commerce admits that it made adjustments in *Softwood Lumber* to account for indirect costs that

respondents "must take into account . . . to access and harvest Crown timber," but asserts that it

"did not state that *only* costs that the respondent 'must incur' may be included in the COP

buildup."  IDM at 33-34.  However, this is a *non sequitur*: as explained above, in *Softwood*

*Lumber*, the default was to exclude indirect costs.  Therefore, although Commerce did not make

such a statement, its methodology in *Softwood Lumber* nonetheless confirms that Commerce's

practice is to exclude indirect costs from the cost buildup unless they have a demonstrated

connection with the production of the subject merchandise.

Accordingly, Commerce's wholesale inclusion of OCP's reported HQ/Support and Debt

costs in this case was unlawful and contrary to its practice.

<blockquote>

**2.    Commerce's Refusal to Exclude HQ/Support and Debt Costs That Are Unrelated to Phosphate Mining or Rock Production Is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance With Law**

</blockquote>

In addition to its erroneous decision to accept OCP's HQ/Support and Debt costs as a

general matter, Commerce erred by refusing to exclude specific categories of OCP's HQ/Support

and Debt costs that are unrelated to its phosphate mining and rock production.  Commerce

BUSINESS PROPRIETARY
INFORMATION DELETED

attempted to justify its "all or nothing" approach on the grounds that, "although the record indicates these costs are related to production, they are not directly tied to production in OCP's accounting methodology, and thus, cannot be reasonably further segregated into costs that are 'relevant' or 'irrelevant' to phosphate rock production." IDM at 35. There is no support for this conclusory assertion. On the contrary, the record indicates that many of the costs that OCP includes under HQ/Support and Debt are irrelevant to phosphate rock production. One example is an [                                        ]. OCP made no effort to omit those costs from its proposed allocation. OCP 9/1/22 IQR at Exhibit GEN-4(a)(iii), P.R. 90, C.R. 78. Since OCP is the company in possession of the relevant information, and since the inclusion of extraneous costs is to OCP's advantage, the burden should be on OCP to demonstrate that each category of costs is relevant. Commerce could have asked OCP to identify and eliminate extraneous costs, or it could have done so itself, but it failed to do so.

Commerce's statement that "{a}n attempt to further segregate OCP's . . . HQ, Support, and Debt costs in a manner inconsistent with its accounting methodology would be unreasonable and extremely complex" is another conclusory and false assertion. IDM at 35. As an initial matter, there is no complexity exception to the countervailing duty law. Commerce is required to calculate the subsidy rate as accurately as possible, even if doing so entails complexity. *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1337 (CIT 2015) (quoting *Rhone Poulenc v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)). Furthermore, contrary to Commerce's assertion, it would have been straightforward to exclude costs from the cost buildup.

Mosaic argued in its rebuttal brief that if Commerce were to accept all of OCP's HQ/Support costs, it would significantly overstate the relevant costs by including expenses with

**NON-CONFIDENTIAL VERSION**

no clear relationship to phosphate rock mining, such as **[                                    ]**, **[**

**                    ]**, **[                    ]**, **[                         ]**, and **[                    ]**.

Mosaic Rebuttal Br. at 11-13.  As noted above, the **[                                    ]** line item

alone accounted for over **[                    ]** of the total of OCP's 2021 HQ/Support costs.  OCP

provided no description of the **[                                    ]** incurred at the HQ/Support

level other than a vague statement that this category **[**

**]**.  OCP 4/21/23 TSQR at 11 n.21.  However, OCP's financials show that OCP **[**

1.8 billion dirham in financial subsidies to the OCP Foundation for the operation of its project

**                    ]** during the POR.  OCP 9/1/22 IQR at Exhibit GEN-4(a)(iii), P.R. 90, C.R. 78.  It is

indisputable that the costs of these [          ] are unrelated to the production of phosphate rock.

Similarly, OCP provided no explanation whatsoever of the **[                         ]** recorded

at the HQ/Support level.

Segregating these categories of costs from the remainder of OCP's 2021 HQ/Support

costs would have been a matter of simple arithmetic.  By refusing to do so – and thus uncritically

accepting the distortions that OCP's methodological choices have introduced into Commerce's

benefit calculation – Commerce abdicated its responsibility under the statute to accurately

calculate the full amount of the subsidies that OCP received during the POR.  It has also

provided a roadmap for future respondents to manipulate Commerce's CVD calculations:  if a

respondent wants to ensure that Commerce will find a zero benefit for a mining rights subsidy

program, all it needs to do is spend sufficient money on extraneous activities – such as

**[                                                    ]** – and then the benefit will

automatically decrease and potentially disappear, as it did in this review.  Commerce's approach

to this issue is unreasonable and unsupported by substantial evidence.

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 23-00246                                    NON-CONFIDENTIAL VERSION

     **3.**     **Commerce's Acceptance of OCP's Allocation Methodology for its HQ/Support and Debt Costs is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance With Law**

In addition to its erroneous decision to uncritically accept OCP's reported HQ/Support and Debt costs, Commerce also erroneously found that "OCP provided a reasonable methodology to allocate its HQ/Support and Debt costs for the production of phosphate rock" and that Mosaic "fail{ed} to substantiate its claim that OCP's method of allocation was distortive." IDM at 36. These findings are unreasonable and unsupported by substantial evidence.

As an initial matter, Commerce failed to provide any support or explanation for these findings in the *Final Results*. *See* IDM at 36. In addition, the findings were incorrect. Mosaic explained in its rebuttal brief that OCP's allocation methodology is distortive for multiple reasons – none of which Commerce addressed in the *Final Results*. *First*, OCP significantly overstated HQ/Support costs by including expenses that bear no relationship to the sites to which OCP allocated the costs. *See* Mosaic Rebuttal Br. at 11-12. OCP is a highly diversified company with almost 40 affiliates and joint ventures that operates in a variety of sectors, including acquisition and operation of hotel properties, developing a "green" city, real estate development, and investing in agricultural entrepreneurship. OCP Section III Affiliated Companies Response (July 19, 2022) ("OCP 7/19/22 AQR") at 3-4, Exhibit AFF-1, P.R. 23, C.R. 3, 4. Although some of these activities were performed by separate legal entities, many of the entities were co-located at the same address as OCP's headquarters office: 2, Rue Al Abtal Hay Erraha, Casablanca. *Id.* This suggests that a significant portion of the HQ/Support costs were incurred by separate legal entities. Moreover, the record indicates that **[**

**]**. OCP 9/1/22 IQR at Exhibits GEN-4(b)(iii), GEN-4(c)(iii), GEN-

24

4(d)(iii), GEN-4(e)(iii), and GEN-4(f)(iii), P.R. 91-93, C.R. 79-81.  OCP's inclusion of these

expenses in HQ/Support costs inflated the amount and distorted Commerce's calculations.

Commerce failed to address this argument.

OCP allocated HQ/Support costs to only two of OCP's activities, phosphate rock mining

and chemical production, even though OCP houses numerous separate legal entities and business

activities that incur the purported HQ/Support costs.  In fact, the [                    ] category of

HQ/Support costs, [                                        ], is wholly unrelated to either phosphate

rock mining or chemical production.  *See* OCP 4/21/23 TSQR at Exhibit MIN3-4, P.R. 242, C.R.

229.  Moreover, an [          ] that OCP recorded at the HQ/Support level indicates that some of

the costs were related to services used by [

].  OCP 8/22/22 IQR at Exhibit MIN-16, P.R. 80, C.R. 15.  Therefore, allocating the

HQ/Support costs only to OCP's industrial operations – without accounting for the costs incurred

by distinct business activities or separate legal entities – unreasonably overstates the costs.

Commerce failed to address this argument.

*Second*, Mosaic explained that OCP's methodology significantly overstates its Debt costs

by omitting financial income.  Mosaic Rebuttal Br. at 13.  As Mosaic explained in its rebuttal

brief, the omission of financial income means the cost buildup does not account for certain cost-

saving activities OCP undertakes as part of its financial activity.  Commerce has acknowledged

that it is standard practice for companies to store funds necessary to cover their daily cash

requirements in short-term income producing products to minimize the costs associated with

maintaining such funds.  *See*, *e.g.*, *Certain Frozen Warmwater Shrimp from India: Final Results*

*of Antidumping Duty Administrative Review, Partial Rescission, and Final No Shipment*

*Determination*, 76 Fed. Reg. 41,203 (Int'l Trade Admin. July 13, 2011) and accompanying

BUSINESS PROPRIETARY
INFORMATION DELETED

**Consol. Court No. 23-00246**                                    NON-CONFIDENTIAL VERSION

Issues and Decision Memorandum at Comment 4; *see also Polyethylene Retail Carrier Bags*

*from Thailand: Final Results of Antidumping Duty Administrative Review*, 74 Fed. Reg. 65,751

(Int'l Trade Admin. Dec. 11, 2009) and accompanying Issues and Decision Memorandum at

Comment 5; *Certain Frozen Warmwater Shrimp from Thailand: Final Results and Partial*

*Rescission of Antidumping Duty Administrative Review*, 74 Fed. Reg. 47,551 (Int'l Trade Admin.

Sept. 16, 2009), and accompanying Issues and Decision Memorandum at Comment 7;

*Chlorinated Isocyanurates from Spain: Notice of Final Determination of Sales at Less Than Fair*

*Value*, 70 Fed. Reg. 24,506 (Int'l Trade Admin. May 10, 2005), and accompanying Issues and

Decision Memorandum at Comment 10.  By omitting the income earned from such financial

practices, OCP has inflated the costs of its financial expenses.  *See* Mosaic Rebuttal Br. at 13.

Commerce failed to address this argument.

       *Third*, Mosaic argued that OCP's allocation of HQ/Support costs based on total site costs

is distortive.  Mosaic Rebuttal Br. at 14.  Specifically, OCP allocated HQ/Support costs to the

phosphate rock mining operation based on the proportion of site-level production costs that the

phosphate rock mining operation incurred, relative to site costs incurred by other parts of OCP.

*Id.*  However, OCP acknowledged that HQ/Support costs are "not directly related to production,"

Letter from Covington, re: Phosphate Fertilizer from the Kingdom of Morocco: Pre-Preliminary

Determination Comments (Apr. 10, 2023) at 15, P.R. 235, C.R. 217, and therefore do not

necessarily correlate with site costs.  Further, OCP's HQ/Support costs [

    ] from 2019 to 2021, while its costs of phosphate rock production [

    ].  *See* OCP 8/22/22 IQR at Exhibits MIN-1, MIN-3; P.R. 80, C.R. 15, Mosaic 9/13/22

Comments at 11-12, Exhibits 2, 3.  It is unreasonable for Commerce to adopt an allocation

Case 1:23-cv-00246-TCS   Document 46   Filed 08/08/24   Page 37 of 57

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 23-00246                                   NON-CONFIDENTIAL VERSION

method that does not accurately reflect the phosphate rock mining unit's use of HQ/Support costs.

Moreover, OCP's calculation of total site costs arbitrarily [

],

even though [

]. *See* OCP 8/22/22 IQR at Exhibit MIN-18, P.R. 80, C.R. 16. By excluding them from the calculation of total site costs, OCP effectively used an accounting sleight of hand to shift HQ/Support costs from [                                                                        ]. Commerce's adoption of this methodology is therefore unreasonable.

*Fourth*, Mosaic explained that OCP's allocation of Debt costs based on the capital expenditures of its four operational sites is distortive because OCP did not issue debt solely to fund capital expenditures. Mosaic Rebuttal Br. at 14-15. The record shows that OCP uses its debt issuances to fund general corporate activities. *See* OCP 8/22/22 IQR at Exhibit MIN-15, P.R. 80, C.R. 15. Allocation of OCP's 2021 Debt costs based solely on its capital expenditures also arbitrarily inflated the phosphate rock cost buildup.

Mosaic presented these arguments to Commerce, as indicated above. Mosaic Rebuttal Br. at 11-15. Commerce failed to address them, while nevertheless making a conclusory and unsupported finding that OCP's allocation methodology is reasonable. *See* IDM at 36. Thus, Commerce's decision is unsupported by substantial evidence and otherwise not in accordance with law.

        **4.**      **Commerce's Selection of Phosphate Rock Benchmark Prices is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance With Law**

NON-CONFIDENTIAL VERSION

In the *Final Results*, Commerce constructed a benchmark price for phosphate rock using world market prices for calendar year 2021 from industry publications submitted by both Mosaic and OCP.  Commerce selected the prices that it included in the benchmark based on "their similarity in BPL level, and therefore, comparability, to OCP's own phosphate rock."  IDM at 27.  Commerce rejected Mosaic's arguments that it should exclude the prices from China, Egypt, and Syria because they are distorted and, with respect to Egypt, do not reflect phosphate rock comparable to OCP's.  *See id.* at 27-29.  As explained below, Commerce's findings are unsupported by substantial evidence and otherwise not in accordance with law.

a.   <u>Commerce unreasonably excluded phosphate rock prices for China and Syria from the benchmark.</u>

Mosaic argued that Commerce should exclude Chinese and Syrian prices for phosphate rock in the benchmark because export prices for those countries are distorted.  Mosaic Case Br. at 9-12.  Commerce rejected this argument, citing its findings in the original investigation that "{t}he mere fact that domestic, in-country prices, including imports for a good or service, have been found to be distorted, do not, for purposes of this analysis, mean that the prices for goods exported from that market are also necessarily distorted."  IDM at 28.  Commerce stated that "{t}his is consistent with the logic that export prices would reflect 'the commercial realities on the world market for such goods and services.'"  *Id.*  Commerce also found that Mosaic "has {not} provided sufficient information to support that argument that government influence in these respective countries is causing *export prices* to other markets to be distorted."  *Id.* (emphasis in original).  However, the record contradicts these findings.

With respect to China, Mosaic explained in its case brief that the Government of China's ("GOC") policies and interventions in the market distort Chinese *export prices* for phosphate rock.  Specifically, the GOC declared phosphate rock a strategic resource, and it has taken steps

28

NON-CONFIDENTIAL VERSION

to restrict exports of phosphate rock, including by imposing export taxes and an export ban, starting in September 2021, *i.e.*, during the POR.  *See* Mosaic Case Br. at 10; Mosaic 4/5/23 Benchmark Rebuttal Submission at Exhibit 3; *see also id.* at Exhibits 1, 2.  Commerce did not address this evidence in its decision, much less explain "why {the} evidence is insufficient to support the claim."  *Ad Hoc Shrimp Trade Action Comm. v. United States*, 219 F. Supp. 3d 1286, 1297 (CIT 2017); *see also Vinh Hoan Corp. v. United States*, 49 F. Supp. 3d 1285, 1325 (CIT 2015) ("Commerce has ignored facts . . . .  The substantial evidence standard requires more than this.  It requires that Commerce "provide a 'rational connection between the facts found and the choice made . . . {and} articulate a satisfactory explanation for its action.'") (citations omitted; brackets in original).

        In other cases, Commerce has found that export taxes, export bans, and other restrictive government interventions in the market distort export prices.  *See, e.g.*, *Steel Concrete Reinforcing Bar From the Republic of Turkey: Preliminary Results of Countervailing Duty Administrative Review; 2017*, 84 Fed. Reg. 48,583 (Int'l Trade Admin. Sept. 16, 2019), and accompanying Issues and Decision Memorandum at 12 & n.85 (concluding that Russian natural gas export prices were distorted because the Government of Russia, by way of its state-owned monopoly Gazprom, engaged in "cutting, or disrupting gas supplies {and} . . . restrictive supply contracts," which Commerce characterized as "distorting the natural gas market for its own geopolitical purposes"); unchanged in the *Steel Concrete Reinforcing Bar From the Republic of Turkey: Final Results of Countervailing Duty Administrative Review; 2017*, 85 Fed. Reg. 16,056 (Int'l Trade Admin. Mar. 20, 2020).  Commerce failed to explain why the same principle should not apply in this case with respect to China.

**NON-CONFIDENTIAL VERSION**

With respect to Syria, Mosaic explained that Syrian *export prices* for phosphate rock were distorted because of Western sanctions on Syria.  The United States and the European Union imposed sanctions on entities involved in Syria's phosphate industry, including the Syrian Ministry of Petroleum and Minerals and Russian oil and gas company Stroytransgaz, which operate Syria's phosphate mines.  Mosaic Case Br. at 11-12; Mosaic 4/5/23 Benchmark Rebuttal Submission at Exhibits 10-13.  The United States imposed both primary and secondary sanctions on dealings with the Government of Syria, meaning that non-U.S. persons are also at risk of being sanctioned if they engage in transactions with Syrian phosphate producers.  *See* Mosaic 4/5/23 Benchmark Rebuttal Submission at Exhibit 10.  These Western sanctions distort Syrian *export prices* because they force Syria to sell its goods "at a political discount because its goods are so toxic to handle."  Mosaic 4/5/23 Benchmark Rebuttal Submission at Exhibit 11.  These increased risks necessarily reduce foreign demand for phosphate rock from Syria, which in turn forces Syrian exporters to lower their *export* prices to attract foreign customers.  In fact, the sanctions on Syria generated a "secretive trade" in "{c}heap Syrian phosphate exports."  *See* Mosaic 4/5/23 Benchmark Rebuttal Submission at Exhibit 11.  This is precisely what U.S. sanctions policy intended to accomplish.

Commerce failed to meaningfully engage with this evidence and, accordingly, its findings are therefore unsupported by substantial evidence and otherwise not in accordance with law.  *See, e.g.*, *Ad Hoc Shrimp Trade Action Comm.*, 219 F. Supp. 3d at 1297; *Vinh Hoan Corp.*, 49 F. Supp. 3d at 1325; *Eregli Demir ve Celik Fabrikalari T.A.S. v. USITC*, No. 22-00351, 2024 WL 3064724, at *6 (CIT June 20, 2024) ("To be supported by substantial evidence, a determination must account for whatever in the record fairly detracts from its weight, including

Case 1:23-cv-00246-TCS   Document 46   Filed 08/08/24   Page 41 of 57

Consol. Court No. 23-00246                          NON-CONFIDENTIAL VERSION

contradictory evidence or evidence from which conflicting inferences could be drawn") (internal
quotations omitted).

>    b.    Commerce unreasonably included Egyptian phosphate rock prices
>          in the benchmark.

Commerce's regulation on LTAR programs, 19 C.F.R. § 351.511(a), directs the agency
to consider "product similarity; quantities sold, imported, or auctioned; and other factors
affecting comparability" in deriving benchmarks. Commerce has previously found that product
grade or quality differences affect comparability where the market for the good in question
accounts for such product characteristics in the ordinary course of business. *See, e.g.*, *Circular
Welded Carbon Steel Pipes and Tubes From the Republic of Turkey: Final Results of
Countervailing Duty Administrative Review; Calendar Year 2018*, 86 Fed. Reg. 6,866 (Int'l
Trade Admin. Jan. 25, 2021), and accompanying Issues and Decision Memorandum at Comment
1.

Mosaic explained in its case brief that there are significant quality differences between
Egyptian phosphate rock and OCP's phosphate rock, and that the market accounts for these
quality differences. Specifically, there are two relevant metrics that determine quality and
therefore prices for phosphate rock: BPL content and the level of impurities (*i.e.*, unwanted
mineral elements). Mosaic Case Br. at 7. The level of impurities in phosphate rock is typically
measured as the "minor element ratio" or MER, which is the ratio of iron, magnesium, and
aluminum content to phosphate (P2O5) content. *Id.* It is extremely difficult, if not impossible,
to use phosphate rock with high MER levels to produce downstream phosphate fertilizer
products. *See* Mosaic 9/13/22 Comments at Exhibit 9. OCP itself acknowledged that both the
BPL level and the MER affect downstream uses and product characteristics, noting in a brief to
the U.S. International Trade Commission that "the BPL and the Minor Elements Ratio . . . is an

Case 1:23-cv-00246-TCS    Document 46    Filed 08/08/24    Page 42 of 57

Consol. Court No. 23-00246                        NON-CONFIDENTIAL VERSION

essential parameter calculated from ore composition which impacts the quality of the final

fertilizer. . . .  The rock quality can also play a role in reaching certain chemical specifications

and grain size that customers require."  *See id.* at Exhibit 10.

    The record shows that Egyptian phosphate rock is considered low quality because of its

low BPL/P2O5 content and high MER levels.  *See id.*; Mosaic 9/13/22 Comments at Exhibits 9,

10.  Specifically, Egyptian phosphate rock "has iron impurities that make it a low grade 24-26

percent P205," which is "less expensive than Morocco's 34 percent grade" rock.  Mosaic 4/5/23

Benchmark Rebuttal Submission at Exhibit 8.  OCP produces phosphate rock with P205

percentages as high as 36.15.  *See* Mosaic 9/13/22 Comments at Exhibit 7.  As a result of these

quality differences, Egyptian phosphate rock is unsuitable for use in certain downstream

applications and commands lower prices than phosphate rock from other sources.  For example,

most Egyptian phosphate rock is used in "lower value SSP {single super phosphate} or direct

application (DAPR) markets" rather than in the production of higher value-added types of

phosphate fertilizer that are within the scope of the CVD order.  *Id.*

    Although Commerce asserted that Mosaic's "claims regarding Egyptian Phosphate's

Minor Element Ratio (MER) ratio {*sic*} are insufficiently supported by record evidence", it

failed to explain why.  *See* IDM at 28.  In addition, Commerce faulted Mosaic for not

"provid{ing} a comparison of the MER to OCP's phosphate rock to demonstrate the differences

between Egyptian phosphate rock and OCP's phosphate rock."  IDM at 28.  However, as

discussed above, OCP itself acknowledged the importance of both MER and BPL levels in

determining ore quality, and in the context of both of these criteria – MER and BPL levels –

stated that "OCP's ore is of high quality."  Mosaic 9/13/22 Comments at Exhibit 10.  Commerce

failed to explain why any further "comparison" was needed, and it failed to ask the parties to submit such a comparison.

Commerce also attempted to defend the exclusion of Egyptian phosphate rock prices from the benchmark by stating that the "benchmark price is necessarily comprised of prices both above and below the average benchmark price" and its "practice is not to exclude particular benchmark prices simply because they are high or low." IDM at 28. However, reciting a truism does not satisfy Commerce's obligation to provide a reasoned explanation for its determination. Moreover, as discussed above, Mosaic did not argue that Commerce should exclude Egyptian phosphate rock prices merely because they were below the average benchmark price. Rather, Mosaic explained that Egyptian phosphate rock is of inferior quality and therefore not comparable to the phosphate rock that is mined and beneficiated by OCP. *See* Mosaic Case Br. at 6. By criticizing an inaccurate straw man rather than genuinely engaging with Mosaic's arguments, Commerce made an unlawful determination.

> c.   Commerce unreasonably excluded phosphate rock prices for [                    ] from the benchmark.

The phosphate rock locally consumed and exported by OCP has a BPL of up to, and potentially exceeding, 78 percent, as multiple sources of evidence (including from OCP itself) indicate. Indeed, OCP's own website indicates that it produces phosphate rock with BPL levels as high as 75 percent. Mosaic 9/13/22 Comments at Exhibit 7. These BPL levels are squarely in line with the BPL levels of phosphate rock from **[**

**].**

However, in the *Final Results*, Commerce excluded prices for [                    ] from the benchmark. Commerce provided no explanation whatsoever in the *Final Results*. After the statutory deadline for Commerce's determination, in the Post-Final Determination, Commerce

stated that "the phosphate rock produced by these countries contains BPL content outside of the established range used to construct the benchmark price," which is the "average BPL level of OCP's phosphate rock{.}"  Post-Final Determination at 4-5.  Yet Commerce still failed to address the evidence discussed in Mosaic's case brief, which showed that that is untrue.  *See* Mosaic Case Br. at 5.

Commerce also claimed to have "used the totality of OCP's reported and verified data to construct an average BPL level of OCP's phosphate rock, therefore including all of OCP's data." Post-Final Determination at 5.  However, OCP reported average BPL levels of rock "expedited" during the POR, meaning consumed locally or sold for export, not BPL levels of all rock extracted during the POR. OCP 8/22/22 IQR at 89-91, Exhibit MIN-21, P.R. 76, 80, C.R. 8, 16. As noted above, OCP's website confirms it produces rock with BPL levels as high as 75 percent. Mosaic 9/13/22 Comments at Exhibit 7.  Thus, Commerce's determination is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law.

> **B.    Commerce's Refusal to Countervail Port Services Subsidies that the ANP Provided to OCP During the POR Is Unreasonable, Unsupported by Substantial Evidence, and Otherwise Not in Accordance With Law**
>
> > **1.    Commerce's determination that the ANP's provision of port services did not confer a benefit on OCP is arbitrary, unsupported by substantial evidence, and otherwise not in accordance with law**

Commerce determined that ANP's provision of port services and infrastructure to OCP and its cross-owned affiliates did not confer a benefit within the meaning of 19 U.S.C. § 1677(5)(E)(iv) because, according to Commerce, there was insufficient evidence on the record to conclude that the concession fees that ANP charges are not set in accordance with market principles.  In reality, however, there is substantial record evidence demonstrating this point, including evidence showing that ANP [

NON-CONFIDENTIAL VERSION

]. Commerce failed to meaningfully address this evidence, or Mosaic's arguments citing the evidence, rendering its determination arbitrary and unsupported by substantial evidence. Further, while Commerce cited its Post-Preliminary Analysis memorandum as providing much of the rationale for its determination, the memorandum is nothing more than an uncritical summary of the GOM's misleading narrative responses with no analysis of the contrary evidence that Mosaic identified.

As an initial matter, in attempting to justify its determination, Commerce placed great weight on "{r}ecord information show{ing} that ANP reported both an operating profit and net profit in 2019, 2020, and 2021." IDM at 53. However, the mere fact that a government authority's provision of services is profitable does not mean that it sets prices consistent with market principles within the meaning of 19 C.F.R. § 351.511(a)(2)(iii). Indeed, in other cases, Commerce has rejected arguments that a government authority's profitability is sufficient evidence that its prices are set in accordance with market principles. *See, e.g.*, *Utility Scale Wind Towers From Malaysia: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 30,593 (Int'l Trade Admin. June 9, 2021), and accompanying Issues and Decision Memorandum at 36-37 (rejecting arguments that an electricity provider's prices were set in accordance with market principles because it was profitable and applied a cost pass through mechanism); *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe From the Republic of Korea: Final Affirmative Countervailing Duy Determination*, 86 Fed. Reg. 35,267 (Int'l Trade Admin. July 2, 2021), and accompanying Issues and Decision Memorandum ("*Seamless Carbon*

BUSINESS PROPRIETARY
INFORMATION DELETED

**Consol. Court No. 23-00246**                                      **NON-CONFIDENTIAL VERSION**

*and Alloy Steel From Korea* IDM") at 20 (noting that in "Wind Towers from Malaysia. . . we found electricity to provide a benefit, despite the fact the electricity company was profitable").[4]

Commerce also argued that "the methodology that ANP uses when setting concession fees . . . indicates that ANP does account for its costs, revenues, and profits when it sets prices." IDM at 53. Apart from this conclusory assertion, however, Commerce failed to provide any explanation. In reality, the record evidence demonstrates the opposite.

For example, the record evidence shows that Commerce instructed the GOM to provide contemporaneous documentation of how ANP took "normal market conditions" into account in its negotiations with OCP, including whether and how ANP considered its own costs, revenues, and profit. GOM Response to Commerce's New Subsidy Allegation Second Supplemental Questionnaire (Aug. 28, 2023) ("GOM 8/28/23 NSA SSQR") at 3-4, P.R., 335, C.R. 298. In response, the GOM reported that ANP [

**]** *Id.* at 4. However, this [          ] does not account for *ANP's* costs or desired revenues or profits, as Mosaic explained in its deficiency

---

[4] Among other issues, Commerce has flagged the risk that a government may vary the fees it charges to various categories of users with the result that some users cross-subsidize others. *See, e.g.*, *Seamless Carbon and Alloy Steel From Korea* IDM at 19. There is record evidence suggesting that this may be happening here, given [
                                                                    ] Mosaic discusses this evidence of [                              ] in greater detail below. Commerce unlawfully failed to address Mosaic's arguments and evidence of [                        ] in the *Final Results*.

comments and in its case brief before Commerce.  Commerce failed to address this evidence, or

Mosaic's argument, in the *Final Results*.

Similarly, the GOM asserted to Commerce that: **[**





**]**.  *Id.* at Exhibit 2D-SUPP-PORT-9 at 45-51, P.R. 338, C.R. 308.  Mosaic also

pointed out to Commerce that **[**




**]**.  *Id.* at Exhibit 2D-SUPP-PORT-9 at 45,

P.R. 338, C.R. 308; *see also id.* at 42-44.  Commerce ignored this evidence – and Mosaic's

argument – as well.

In addition, the GOM asserted to Commerce that ANP used **[**




**]**.  GOM 8/28/23 NSA

SSQR at 7-8.  As Mosaic pointed out in response, however, the GOM provided no

contemporaneous evidence that ANP **[**

**]**.  Rather, the GOM only provided **[**




**]** by *ANP*.  Although Mosaic called this

BUSINESS PROPRIETARY
INFORMATION DELETED

**Consol. Court No. 23-00246**                    **NON-CONFIDENTIAL VERSION**

evidence to Commerce's attention during the proceeding, Commerce failed to address it in the *Final Results*.

Moreover, in addition to its arguments about ANP's failure to account for its own costs, revenues, and profits in setting the fees, Mosaic also pointed to substantial record evidence relating to ANP's negotiations with OCP, which showed that ANP [

]. Given the extent of the evidence and argumentation on this point, it is striking that Commerce failed even to acknowledge the issue in the *Final Results*.

The evidence included the following:  As Mosaic pointed out to Commerce, the GOM submitted [                    ] in Exhibit SUPP-PORT-2 to its first NSA supplemental questionnaire response that it described as [

]. GOM Response to Commerce's New Subsidy Allegation Supplemental Questionnaire (June 30, 2023) ("GOM 6/30/23 NSA SQR") at 5, Exhibit SUPP-PORT-2, P.R. 303-304, C.R. 268-269.  The [

BUSINESS PROPRIETARY
INFORMATION DELETED

**Consol. Court No. 23-00246**                                   **NON-CONFIDENTIAL VERSION**

].

GOM 6/30/23 NSA SQR at Exhibit SUPP-PORT-2, P.R. 304, C.R. 269.

The GOM provided no further [          ] relating to ANP's negotiations with OCP.

However, [

].

GOM Response to Commerce's New Subsidy Allegation Questionnaire (Apr. 24, 2023) ("GOM

4/24/23 NSA IQR") at Exhibit PORT-4, P.R. 246, 251, C.R. 244, 249-250.

OCP's concession agreements for [

].  GOM 4/24/23

NSA IQR at Exhibits PORT-5, PORT-6, P.R. 251, C.R. 249-251; GOM 6/30/23 NSA SQR at

Exhibit SUPP-PORT-6, P.R. 304, C.R. 270-271.  As Mosaic pointed out to Commerce, this was

extremely advantageous to OCP, because OCP has [

BUSINESS PROPRIETARY
INFORMATION DELETED

**Consol. Court No. 23-00246**                                    **NON-CONFIDENTIAL VERSION**

]. *See id.* As Mosaic noted, this means that, under the generous terms of its agreements with ANP for the concessions to operate at the ports of Jorf Lasfar, Casablanca, and Safi, OCP's [

].

Mosaic also noted to Commerce that this favorable treatment is in marked contrast to ANP's concession agreements with other terminal operators in Morocco, which have [

]. *See* GOM 6/30/23 NSA SQR at Exhibits SUPP-PORT-7, SUPP-PORT-8, SUPP-PORT-9, P.R. 304, C.R. 271-282. Indeed, as Mosaic noted, the record shows that [

]. *See* Letter from WilmerHale, re: Phosphate Fertilizers From Morocco: Petitioner's Deficiency Comments on the Government of Morocco's Response to Commerce's New Subsidy Allegation Second Supplemental Questionnaire (Sept. 11, 2023) ("Mosaic 9/11/23 Deficiency Comments on GOM NSA SSQR") at 6-7, P.R. 344, C.R. 311.

The GOM claimed to Commerce that "{t}ypically, the fixed and variable components of a given concession fee are calibrated such that a low fixed fee is paired with a high variable fee, while a high fixed fee is paired with a low variable fee." GOM 8/28/23 NSA SSQR at 7-8. However, as Mosaic noted in response, [

]. Further, Mosaic also noted that the [          ] that the GOM submitted as Exhibit 2D-SUPP-PORT-3 showed that ANP [

40

Consol. Court No. 23-00246                           NON-CONFIDENTIAL VERSION

]. *See* Mosaic 9/11/23 Deficiency Comments on GOM

NSA SSQR at 5-6.  The GOM also conceded that ANP [

].  GOM 8/28/23 NSA SSQR at 5.

Commerce discusses none of this record evidence, or Mosaic's arguments based on this

evidence, in the *Final Results*.  In fact, the only mention of other terminal operators in

Commerce's determination is its uncritical summary of the GOM's self-serving argument that it

is impossible to reasonably compare concession agreements given the "multifaceted

considerations" underlying each agreement,[5] and that other concession-holders [

], such that ANP's [

].  *See* Post-Prelim. Analysis Memo. at 5.

Mosaic noted in its case brief that this hypothetical statement from the GOM was not

well-founded, because the record shows that [

].  Mosaic Case Br. at 23.  Like OCP, each of the other concessionaires for which the

GOM provided concession agreements [

].[6]  Each of their concession agreements [

---

[5] Mosaic respectfully submits that one of these "multifaceted considerations" may have been the
GOM's interest in subsidizing its national champion phosphate fertilizer producer.

[6] The GOM refused to provide Commerce copies of ANP's concession agreements with private
companies, which precluded Commerce from comparing the terms of those agreements with
ANP's agreements with OCP.  Mosaic 9/11/23 Deficiency Comments on GOM NSA SSQR at 9-
12; GOM 6/30/23 NSA SQR, Exhibits SUPP-PORT-7, SUPP-PORT-8, and SUPP-PORT-9, P.R.
304, C.R. 271-282; GOM 8/28/23 NSA SSQR at 9.

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 23-00246                          NON-CONFIDENTIAL VERSION

]. Mosaic specifically noted that this evidence contradicted the GOM's unsupported assertions, and that as a result, the fact that OCP [

] failed to demonstrate that the terms of the concession agreements are based on market principles, or to explain why those terms are more favorable than the ANP's agreements with other concessionaires. *Id.* at 24-25 (citations omitted). However, Commerce failed to address any of this evidence or argumentation in the *Final Results*.

Further, Mosaic also pointed to record evidence showing that private third party companies [                                        ] in 2021, on a per tonnage basis. Mosaic Case Br. at 28-30. In particular, Mosaic noted that the concessionaire-specific concession fee and revenue data that the GOM reported in Table 2 (Rev.) of its second supplemental NSA questionnaire response showed that [

]. GOM 8/28/23 NSA SSQR at 13-15. Mosaic also pointed to evidence that [

]. *Id*. By comparison, OCP paid an average of [

] at the three ports where it operates. *Id.* In light of this record evidence of [

], Mosaic argued that Commerce should measure the benefit as [

42

Case 1:23-cv-00246-TCS    Document 46    Filed 08/08/24    Page 53 of 57

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 23-00246        NON-CONFIDENTIAL VERSION

[. Mosaic Case Br. at 30. However, once again, Commerce failed to address any of this evidence or argumentation in the *Final Results*.

In sum, the record evidence demonstrates that ANP did not set the prices for OCP's concession agreements consistent with market principles because [

]. Commerce failed to meaningfully address this evidence and Mosaic's arguments, rendering its decision arbitrary and unsupported by substantial evidence. *See Saha Thai Steel Pipe Pub. Co. v. United States*, 101 F.4th 1310, 1326 (Fed. Cir. 2024); *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1320 (Fed. Cir. 2009).

> **2. Commerce's failure to determine that the ANP's provision of port services provided a financial contribution to OCP is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law**

OCP reported in its initial questionnaire response that the goods and services it purchases from GOM-owned entities include Port Services from the ANP, and Commerce confirmed this fact in the *Final Results*. OCP 8/22/22 IQR at 133; IDM at 53-54. Commerce also confirmed that OCP had concession arrangements with the ANP to operate terminals at the ports of Jorf Lasfar, Casablanca, and Safi during the POR. Post-Prelim. Analysis Memo. at 3 n.15 and accompanying text. Further, no party disputed that the ANP is a "government authority" within the meaning of section 771(5)(B) of the Act. Therefore, although Commerce failed to make a determination on this issue, IDM at 51, there can be no dispute that the ANP's provision of port services and infrastructure to OCP constitutes a financial contribution within the meaning of section 771(5)(D)(iii) of the Act. *See Countervailing Duties; Final Rules*, 63 Fed. Reg. 65,348, 65,402 (Int'l Trade Admin. Nov. 25, 1998) ("{W}e intend to continue our longstanding practice of treating most government-owned corporations as the government itself, and not as

BUSINESS PROPRIETARY
INFORMATION DELETED

Consol. Court No. 23-00246                                     NON-CONFIDENTIAL VERSION

corporations that transfer subsidies received from the government to other government-owned

corporations through loans or other financial transactions.  For example, where a government-

owned corporation producing the product under investigation purchases electricity from a

government owned utility, a subsidy is conferred if the utility does not receive adequate

remuneration.").  Commerce's failure to determine that the GOM's provision of port services

provided a financial contribution to OCP is unreasonable, unsupported by substantial evidence,

and otherwise not in accordance with law.

> **3.** **Commerce's failure to determine that the Provision of Port Services for LTAR program is *de facto* specific is unreasonable, unsupported by substantial evidence, and otherwise not in accordance with law**

Under 19 U.S.C. § 1677(5A)(D)(iii), a subsidy is *de facto* specific if, *inter alia*, the actual

recipients of the subsidy are limited in number; an enterprise or industry is a predominant user of

the subsidy; or an enterprise or industry receives a disproportionately large amount of the

subsidy.

The tariff revenue data that the GOM submitted show that [

].  GOM 8/28/23 NSA SSQR at

Exhibit 2D-SUPP-PORT-3 at 13-15, P.R. 336, C.R. 300; Mosaic 9/11/23 Deficiency Comments

on GOM NSA SSQR at 6-7. Commerce has previously found similarly small numbers of subsidy

recipients to be "limited" within the meaning of section 771(5A)(D)(iii).  *See, e.g.*, *Circular

Welded Carbon Quality Steel Pipe from the People's Republic of China: Preliminary Affirmative

Countervailing Duty Determination; Preliminary Affirmative Determination of Critical

Circumstances; and Alignment of Final Countervailing Duty Determination with Final

Antidumping Duty Determination*, 72 Fed. Reg. 63,875, 63,882 (Int'l Trade Admin. Nov. 13,

2007) (finding that a subsidy was *de facto* specific when the recipients were limited to six

industries); *Final Affirmative Countervailing Duty Determinations: Certain Steel Products from*

Consol. Court No. 23-00246                          NON-CONFIDENTIAL VERSION

*Belgium*, 58 Fed. Reg. 37,273, 37,276 (Int'l Trade Admin. July 9, 1993) (finding the same when

the recipients were limited to eight industries).

The GOM's responses also show that [



]. GOM 8/28/23

NSA SSQR at Exhibit 2D-SUPP-PORT-3 at 13-15, P.R. 336, C.R. 300; Mosaic 9/11/23

Deficiency Comments on GOM NSA SSQR at 6-7. This constitutes "predominant" use of the

subsidy. *See, e.g.*, *Circular Welded Carbon Quality Steel Pipe from the People's Republic of*

*China*, 72 Fed. Reg. at 63,882; *Certain Steel Products from Belgium*, 58 Fed. Reg. at 37,276.

Thus, although Commerce failed to make a determination on this issue, *see* IDM at 51,

the record evidence demonstrates that this subsidy program is *de facto* specific because the actual

recipients of the subsidy are limited in number, and because OCP is a predominant user of the

subsidy, within the meaning of section 771(5A)(D)(iii) of the Act. Commerce's failure to

determine that this program is *de facto* specific is unreasonable, unsupported by substantial

evidence, and otherwise not in accordance with law.


**VI.    <u>CONCLUSION</u>**

Mosaic requests that the Court find that Commerce's findings on the Provision of Mining

Rights for LTAR and the Provision of Port Services for LTAR subsidy programs, as discussed

above, are unsupported by substantial evidence and otherwise not in accordance with law.

Mosaic requests that the Court remand for redetermination consistent with the Court's opinion.

**NON-CONFIDENTIAL VERSION**

Respectfully submitted,

/s/ Jeffrey I. Kessler
David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Alexandra S. Maurer
Wilmer Cutler Pickering Hale and Dorr
    LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: jeffrey.kessler@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: August 7, 2024

## **CERTIFICATE OF COMPLIANCE**

Pursuant to paragraphs 2(B)(1) and (2) of the U.S. Court of International Trade's Standard Chambers Procedures, the undersigned certifies that this Memorandum in Support of Mosaic's Rule 56.2 Motion for Judgment on the Agency Record complies with the word limitation requirement.  The word count for the Memorandum, as computed by WilmerHale's word processing system, is 13,916 words, including footnotes, and excluding the title page, table of contents, table of authorities, counsel's signature block, and this certificate.

/s/ Jeffrey I. Kessler
(Signature of Attorney)

Jeffrey I. Kessler
(Name of Attorney)

The Mosaic Company
(Representative Of)

August 7, 2024
(Date)