IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | | |
|---|---|---|
| THE MOSAIC COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| OCP S.A., | ) | |
| | ) | |
| Consolidated Plaintiff, | ) | |
| | ) | Consol. Court No. 23-00246 |
| v. | ) | |
| | ) | ████████████████ |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| OCP S.A., *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

---

DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTIONS FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

OF COUNSEL:                          SOSUN BAE
ASHLANDE GELIN                       Senior Trial Counsel
Attorney                             Commercial Litigation Branch
Office of the Chief Counsel          Civil Division
for Trade Enforcement & Compliance   Department of Justice
U.S. Department of Commerce          P.O. Box 480

Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-7568
Fax: (202) 307-0972
Email: sosun.bae@usdoj.gov

Dated: January 14, 2025                    Attorneys for Defendant

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ........................................................2

    I.    Administrative Decision Under Review ...............................................2

    II.    Issues Presented .................................................................................2

STATEMENT OF FACTS .........................................................................................3

SUMMARY OF THE ARGUMENT ..........................................................................5

ARGUMENT ...............................................................................................................7

    I.    Standard Of Review ............................................................................7

    II.    Commerce Correctly Rejected OCP's Late Submission Regarding Its Payroll Tax Refund .........................................................................8

        A.   Relevant Legal And Factual Background ...........................................8

           1.   Legal Background For Verification And Application Of AFA ....................8

           2.   OCP Attempts To Report A New Program At Verification ............................9

        B.   Commerce Properly Rejected OCP's Reporting Of The Payroll Tax Refund Program As Untimely .........................................................10

        C.   Commerce's Application Of Facts Available With An Adverse Inference Is Supported By Substantial Evidence And In Accordance With Law ...............15

    III.   Commerce Acted Within Its Authority In Asking About Other Benefits.................20

    IV.   Commerce's Determination That OCP's Reductions In Tax Fines And Penalties Were *De Facto* Specific Is Lawful And Supported By Substantial Evidence ........23

        A.   Relevant Factual Background ..........................................................24

        B.   Commerce Accounted For Economic Diversification ......................25

        C.   OCP's Remaining Arguments Fail To Detract From Commerce's Determination That OCP Was A Disproportionate User Of The Tax Fines And Penalties Program .........................................................31

    V.   Commerce's Determination Regarding The Provision Of Mining Rights For LTAR Was Lawful And Supported By Substantial Evidence ...............35

i

A.  Relevant Framework For Calculating Benchmarks And Benefit ....................35

B.  Commerce Reasonably Calculated The Benchmark For Phosphate Rock Prices .........................................................................................................37

   1.  Commerce Properly Included Chinese And Syrian Prices Of Phosphate Rock In Its Benchmark Price ......................................................37

   2.  Commerce Properly Included Egyptian Prices Of Phosphate Rock In Its Benchmark Price ......................................................................41

   3.  Commerce Reasonably Declined To Include Prices From Certain Countries In Its Benchmark ........................................................44

C.  Commerce Reasonably Determined That The Provision Of Phosphate Mining Rights For LTAR Did Not Confer A Measurable Benefit To OCP ..................45

   1.  Relevant Factual Background ....................................................45

   2.  Commerce Reasonably Decided To Accept OCP's Allocation Methodology ............................................................................46

   3.  Mosaic's Arguments That OCP's Cost Buildup Should Not Include HQ, Support, and Debt Costs Fail ....................................................50

VI.  Commerce's Determination That OCP Conferred No Benefit From ANP's Provision Of Port Services And Infrastructure Was Lawful And Supported By Substantial Evidence ........................................................................56

A.  Relevant Factual Background ..........................................................56

B.  In Light Of Its Determination That OCP Did Not Receive A Benefit, Commerce Had No Obligation To Make Financial Contribution And Specificity Findings ........................................................................58

C.  Commerce Reasonably Determined That OCP Was Not Conferred A Benefit ....................................................................................59

D.  Mosaic Raises A New, Meritless Argument ......................................64

CONCLUSION ....................................................................................65

## <u>TABLE OF AUTHORITIES</u>

**Cases**      **Page(s)**

*AK Steel Corp. v. United States,*
     192 F.3d 1367 (Fed. Cir. 1999) ......................................................................... *passim*

*Allegheny Ludlum Corp. v. United States,*
     25 C.I.T. 816 (2001) ................................................................................... 22, 23

*Altx, Inc. v. United States,*
     370 F.3d 1108 (Fed. Cir. 2004) .............................................................................. 7

*Aluminum Extrusions Fair Trade Comm. v. United States,*
     36 C.I.T. 1370 (2012) ....................................................................................... 40

*Atl. Sugar, Ltd. v. United States,*
     744 F.2d 1556 (Fed. Cir. 1984) .............................................................................. 7

*Bethlehem Steel Corp. v. United States,*
     140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001) ............................................... 31, 32, 33

*Bethlehem Steel Corp. v. United States,*
     26 C.I.T. 1003 (2002) ....................................................................................... 58

*Bomont Indus. v. United States,*
     733 F. Supp. 1507 (Ct. Int'l Trade 1990) ............................................................... 11

*Boomerang Tube, LLC, TMK IP-SCO v. United States,*
     856 F.3d 908 (Fed. Cir. 2017) ................................................................. 28, 32, 64

*Borusan Mannesmann Boru Sanayi v. Ticaret A.S. v. United States,*
     61 F. Supp. 3d 1306 (Ct. Int'l Trade 2015), *aff'd sub nom. Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017) ......................................................... 40

*Changzhou Trina Solar Energy Co. v. United States,*
     195 F. Supp. 3d 1334 (Ct. Int'l Trade 2016) ....................................................... 22, 23

*Coalition for the Preservation of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States,*
     44 F. Supp. 2d 229 (Ct. Int'l Trade 1999) ............................................................. 11

*Coalition of Am. Flange Producers v. United States,*
     448 F. Supp. 3d 1340 (Ct. Int'l Trade 2020) ........................................................... 40

*Consolo v. Fed. Mar. Comm'n,*
     383 U.S. 607 (1966) ........................................................................................... 7

*Corus Staal v. United States,*
    502 F.3d 1370 (Fed. Cir. 2007) .................................................................... 28

*Essar Steel, Ltd. v. United States,*
    721 F. Supp. 2d 1285 (Ct. Int'l Trade 2010) ....................................... 16, 18

*Essar Steel, Ltd. v. Unted States,*
    753 F.3d 1368 (Fed. Cir. 2014) .................................................................... 19

*Ferrostaal Metals Gmbh v. United States,*
    518 F. Supp. 3d 1357 (Ct. Int'l Trade 2021) ............................................. 16

*Fine Furniture (Shanghai) Ltd. v. United States,*
    748 F.3d 1365 (Fed. Cir. 2014) .................................................................... 58

*Fujitsu Gen. Ltd. v. United States,*
    88 F.3d 1034 (Fed. Cir. 1996) ....................................................................... 7

*Goodluck India Ltd. v. United States,*
    11 F.4th 1335 (Fed. Cir. 2021) ...................................................................... 8

*Guizhou Tyre Co. v. United States,*
    523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) ............................................. 13

*HabaS Sinai v. Tibbi Gazlar Istihsal Endustrisi A.S. v. United States,*
    536 F. Supp. 3d 1333 (Ct. Int'l Trade 2021) ............................................. 39

*Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States,*
    992 F.3d 1348 (Fed. Cir. 2021) .................................................................... 20

*Hitachi Metals, Ltd. v. United States,*
    949 F.3d 710 (Fed. Cir. 2020) ....................................................................... 7

*Hung Vuong Corp. v. United States,*
    483 F. Supp. 3d 1321 (Ct. Int'l Trade 2020) ....................................... 11, 18

*Jacobi Carbons AB v. United States,*
    422 F. Supp. 3d 1318 (Ct. Int'l Trade 2019) ............................................. 40

*Magnola Metallurgy, Inc. v. United States,*
    30 C.I.T. 1808 (2006), *aff'd*, 508 F.3d 1349 (Fed. Cir. 2007) .................. 29

*Maverick Tube Corp. v. United States,*
    857 F.3d 1353 (Fed. Cir. 2017) .................................................................... 40

iv

*Max Fortune Indus. Co. v. United States*,
37 C.I.T. 549 (2013) ............................................................................................. 13

*Mittal Steel Point Lisas v. United States*,
548 F.3d 1375 (Fed. Cir. 2008) ............................................................................ 64

*Monsanto Co. v. United States*,
698 F. Supp. 275 (Ct. Int'l Trade 1988) ................................................................ 8

*Mosaic Co. v. United States*,
659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023) ................................................ *passim*

*Mosaic Company v. United States*,
No. 21-00117, 2024 WL 208136 (Ct. Int'l Trade Jan. 19, 2024), *aff'd*, *The Mosaic Company v. United States*, No. 21-00117, 2024 WL 208136 (Ct. Int'l Trade Jan. 19, 2024) ............... 24, 53

*Motor Vehicle Mrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ............................................................................................... 26

*Ningo Dafa Chemical Fiber Co., Ltd. v. United States*,
580 F.3d 1247 (Fed. Cir. 2009) ...................................................................... 30, 33

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003) ............................................................... 9, 17, 18

*Nippon Steel Corp. v. United States*,
458 F.3d 1345 (Fed. Cir. 2006) .............................................................................. 7

*NTN Bearing Corp. of Am. v. United States*,
757 F. Supp. 1425 (Ct. Int'l Trade 1991) ............................................................. 27

*Nucor Corp. v. United States*,
633 F. Supp. 3d 1225 (Ct. Int'l Trade 2023) ........................................................ 59

*Nucor Corp. v. United States*,
633 F. Supp. 3d 1302 (Ct. Int'l Trade 2023) ........................................................ 49

*PAM, S.p.A. v. United States*,
582 F.3d 1336 (Fed. Cir. 2009) .............................................................................. 7

*Papierfabrik August Koehler SE v. United States*,
843 F.3d 1373 (Fed. Cir. 2016) .............................................................................. 9

*POSCO v. United States*,
296 F. Supp. 3d 1320 (Ct. Int'l Trade 2018) ........................................................ 17

*SeAH Steel Corp. v. United States,*
   659 F. Supp. 3d 1318 (Ct. Int'l Trade 2023) .................................................. 8, 10, 17

*Tatung Co. v. United States,*
   18 C.I.T. 1137 (1994) ............................................................................................. 13

*United States v. Eurodif S.A.,*
   555 U.S. 305 (2009) .................................................................................................. 7

*Wheatland Tube Corp. v. United States,*
   841 F. Supp. 1222 (Ct. Int'l Trade 1993) ............................................................. 50

**Statutes**

19 U.S.C. § 1516a(b) ....................................................................................................... 7

19 U.S.C. § 1677(5) ................................................................................................. 35, 58

19 U.S.C. § 1677(5A) ....................................................................................... *passim*

19 U.S.C. § 1677d ............................................................................................. 21, 22, 23

19 U.S.C. § 1677e(a) ......................................................................................... *passim*

19 U.S.C. § 1677e(b) ................................................................................... 9, 10, 15

19 U.S.C. § 1677e(d) ................................................................................. 19, 20

19 U.S.C. § 1677f(i) ..................................................................................... 28

19 U.S.C. § 1788e(d) ................................................................................... 20

28 U.S.C. § 2637(d) ..................................................................................... 28

**Rules**

U.S. Ct. Int'l Trade R. 56.2 ............................................................................................ 1

**Regulations**

19 C.F.R. § 351.301(c)(1) ........................................................................................ 11, 12

19 C.F.R. § 351.511(a) ..................................................................................... *passim*

**Adiministrative Determinations**

*1-hydroxyethilidene-1, 1-diphosphonic acid from the People's Republic of China: Verification of the Questionnaire Responses* (Dep't of Commerce Jan. 10, 2017) ........................................ 13

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea,*
    87 Fed. Reg. 20,821 (Dep't of Commerce Apr. 8, 2022)...................................................... 59

*Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Verification of the Questionnaire Responses* (Dep't of Commerce Oct. 3, 2014) ................... 13

*Certain Hot-Rolled Carbon Steel Flat Products from India,*
    73 Fed. Reg. 1,578 (Dep't of Commerce Jan. 9, 2008) ......................................................... 53

*Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China,*
    80 Fed. Reg. 34,888 (Dep't of Commerce June 18, 2015) ...................................................... 14

*Certain Polyethylene Terephthalate Resin from the People's Republic of China,*
    81 Fed. Reg. 13,337 (Dep't of Commerce March 14, 2016) .................................................... 14

*Certain Softwood Lumber Products from Canada,*
    82 Fed. Reg. 51,814 (Dep't of Commerce Nov. 8, 2017)................................................. 54, 55

*Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey,*
    86 Fed. Reg. 6,866 (Dep't of Commerce Jan. 25, 2021) ....................................................... 42

*Coated Free Sheet Paper from Indonesia,*
    72 Fed. Reg. 60,642 (Dep't of Commerce Oct. 25, 2007)...................................................... 55

*Coated Free Sheet Paper from the Republic of Korea,*
    72 Fed. Reg. 60,639 (Dep't of Commerce Oct. 25, 2007)...................................................... 34

*Countervailing Duties,*
    63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998)........................................ 36, 55, 60

*Countervailing Duty Investigation of Fine Denier Polyester Staple Fiber from the People's Republic of China,*
    83 Fed. Reg. 3,120 (Dep't of Commerce Jan. 23, 2018) ....................................................... 38

*Dynamic Random Access Memory Semiconductors from the Republic of Korea,*
    76 Fed. Reg. 2,336 (Dep't of Commerce Jan. 13, 2011) ....................................................... 34

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
    87 Fed. Reg. 35,165 (Dep't of Commerce Jun. 9, 2022)......................................................... 3

*Live Swine from Canada,*
    70 Fed. Reg. 12,186 (Dep't of Commerce Mar. 11, 2005) ..................................................... 34

*Non-Oriented Electrical Steel from Taiwan*,
  79 Fed. Reg. 61,602 (Dep't of Commerce Oct. 14, 2014) ....................................... 31

*Phosphate Fertilizers from the Kingdom of Morocco*,
  86 Fed. Reg. 9,482 (Dep't of Commerce Feb. 16, 2021) ....................................... 19

*Phosphate Fertilizers from the Kingdom of Morocco,*
  88 Fed. Reg. 76,726 (Dep't of Commerce Nov. 7, 2023) ....................................... 2, 4

*Ripe Olives from Spain*,
  83 Fed. Reg. 28,186 (Dep't of Commerce Jun. 18, 2018) ....................................... 14

*Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Republic of Korea*,
  86 Fed. Reg. 35,267 (Dep't of Commerce July 2, 2021) ....................................... 65

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
  84 Fed. Reg. 48,583 (Dep't of Commerce Sept. 16, 2019) ....................................... 38

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
  85 Fed. Reg. 16,056 (Dep't of Commerce Mar. 20, 2020) ....................................... 38

*Truck and Bus Tires from the People's Republic of China,*
  82 Fed. Reg. 8,606 (Dep't of Commerce Jan. 27, 2017) ....................................... 14

*Utility Scale Wind Towers from Malaysia*,
  86 Fed. Reg. 30,593 (Dep't of Commerce June 9, 2021) ....................................... 65

**Other Authorities**

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act,
  H.R. Rep. No 103-316 at 931, as reprinted in 1994 U.S.C.C.A.N. 4040 (1994) ............... *passim*

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

_____

| | |
|---|---|
| THE MOSAIC COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| OCP S.A., | ) |
| | ) |
| Consolidated Plaintiff, | ) |
| | ) Consol. Court No. 23-00246 |
| v. | ) |
| | ) ███████████████ |
| UNITED STATES, | ) |
| | ) |
| Defendant, | ) |
| | ) |
| and | ) |
| | ) |
| OCP S.A., *et al.*, | ) |
| | ) |
| Defendant-Intervenors. | ) |

_____

## DEFENDANT'S RESPONSE TO PLAINTIFFS'
## MOTIONS FOR JUDGMENT UPON THE ADMINISTRATIVE RECORD

Pursuant to Rule 56.2 of this Court's rules, defendant, the United States, respectfully submits this response to the motions for judgment upon the administrative record filed by plaintiffs The Mosaic Company (Mosaic) and OCP, S.A. (OCP) challenging various aspects of the Department of Commerce's (Commerce) final results in the first administrative review of the countervailing duty order covering phosphate fertilizers from Morocco. Because Commerce's final results are supported by substantial evidence and otherwise in accordance with law, the Court should deny the motions and enter judgment for the Government.

## STATEMENT PURSUANT TO RULE 56.2

I.    Administrative Decision Under Review

The administrative determination under review is *Phosphate Fertilizers from the*

*Kingdom of Morocco,* 88 Fed. Reg. 76,726 (Dep't of Commerce Nov. 7, 2023) (final results)

(P.R. 374), and accompanying Issues and Decision Memorandum (P.R. 370) (IDM).[1]  The period

of review is November 30, 2020, through December 31, 2021.  *Id.*

II.    Issues Presented

1.    Whether Commerce properly rejected OCP's untimely submission of new factual

information regarding payroll tax refunds received from the Moroccan Office de Formation

Professionnelle et de la Promotion du Travail (OFPPT).

2.    Whether Commerce acted lawfully in requesting information regarding "other

forms of assistance" and "other benefits," during the initiation phase of the review.

3.    Whether Commerce's *de facto* specificity determination regarding the government

of Morocco's reductions in tax fines and penalties is supported by substantial evidence and in

accordance with law.

4.    Whether Commerce's selection of tier-three benchmark prices for the provision of

phosphate mining rights for less than adequate remuneration (LTAR) is supported by substantial

evidence and in accordance with law.

5.    Whether Commerce reasonably included certain costs for the cost buildup for

phosphate rock in determining that OCP did not receive a measurable benefit through provision

of phosphate mining rights for LTAR.

---

[1]  "P.R." and "C.R." refer to documents in the public and confidential records, respectively.

6.      Whether Commerce reasonably determined that OCP did not receive a measurable benefit under The Moroccan Port Services and Infrastructure regime.

## STATEMENT OF FACTS

On June 9, 2022, Commerce initiated its first administrative review of the countervailing duty order covering phosphate fertilizers from Morocco.  *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 35,165 (Dep't of Commerce Jun. 9, 2022) (P.R. 5).  On June 28, 2022, Commerce issued an initial questionnaire to the Government of Morocco (GOM) and respondent OCP.  *Se*e Initial Questionnaire (P.R. 11-12).  In the questionnaire, Commerce asked about programs previously found to be countervailable, such as tax-related subsidies and the provision of phosphate mining rights for LTAR.  *Id.* at 57-59. Commerce also inquired as to whether "the government . . . provided to the producers or exporters of the subject merchandise under review any other non-recurring benefits over the 10-year AUL . . . or recurring benefits during the POR{.}"  *Id.* at 61.  On August 22, 2022, and December 7, 2022, OCP and the GOM provided their responses.  *See* Initial Questionnaire Response (OCP IQR) (P.R. 76; C.R. 8); GOM Initial Questionnaire Response (GOM IQR) (P.R. 44-75; C.R. 20-24); GOM First Supplemental Questionnaire Response (GOM 1st SQR) (P.R. 162; C.R. 154-155).

On September 21, 2022, petitioner Mosaic filed a new subsidy allegation.  *See* New Subsidy Allegation (P.R. 117-119, C.R. 128-133).  Commerce then initiated an investigation into two new alleged subsidy programs, including the provision of port services and infrastructure for LTAR.  *See* New Subsidy Allegations Mem. (NSA Memo) (P.R. 176).  On March 22, 2023, OCP and Mosaic both submitted benchmark information to measure the adequacy of remuneration. *See* Mosaic Benchmark Submission (P.R. 190-191, C.R. 181-196); OCP Benchmark Submission

(P.R. 202-203, C.R. 203-210).  Mosaic also submitted rebuttal benchmark information.  *See* Mosaic Benchmark Rebuttal Submission (P.R. 227, C.R. 215).

On April 28, 2023, Commerce issued its preliminary results.  *See* Preliminary Decision Memorandum (PDM) (P.R. 265).  Commerce preliminarily determined that OCP had received countervailable subsidies during the period of review, with respect to both the provision of mining rights for LTAR and the reductions in tax fines and penalties program.  *Id.* at 10-11, 12–13.  On October 11, 2023, Commerce issued a post-preliminary analysis memo, in which it determined that the provision of port services and infrastructure for LTAR did not confer a measurable benefit to OCP.  *See* Post-Preliminary Memo at 3-8 (P.R. 351; C.R. 401).

Following the issuance of the preliminary results, Commerce conducted on-site verification.  *See* OCP Verification Report (P.R. 349); GOM Verification Report (P.R. 350).  At verification, OCP submitted—for the first time—a payroll tax refund from the Moroccan OFPPT.  *See* OCP Verification Report at 2.  OCP claimed this submission to be a minor correction, but Commerce declined to accept this previously unreported program as such.  *Id*.  Following the preliminary results and verification, the interested parties timely filed opening and rebuttal case briefs.  *See* GOM Case Brief (P.R. 354); Mosaic Case Brief (P.R. 355); OCP Case Brief (P.R. 356); Mosaic Rebuttal Brief (P.R. 362); OCP Rebuttal Brief (P.R. 363); GOM Rebuttal Brief (P.R. 364).  On October 26, 2023, Commerce held a public hearing regarding this review.  *See* Hearing Transcript (P.R. 368).

On November 7, 2023, Commerce published its final results.  *See* Final Results, 88 Fed. Reg. 76,726.  Except for the phosphate mining rights for LTAR program, Commerce made no methodological changes to its preliminary results or to its post-preliminary analysis.  *See generally* IDM.  Regarding the provision of phosphate mining rights for LTAR, Commerce

4

determined to include certain headquarter (HQ), support, and debt costs in the cost buildup for OCP's phosphate rock production. *Id.* at 33-37. With this change to OCP's profit rate, Commerce found that the program conferred no measurable benefit to OCP. *Id*. at 12, 29-41. Accordingly, Commerce determined that OCP had received countervailable subsidies during the period of review at a rate of 2.12 percent *ad valorem*.

## SUMMARY OF THE ARGUMENT

Commerce's final results should be sustained. First, OCP should have reported its receipt of its payroll tax refund in response to Commerce's initial questionnaire. Because it waited until verification to disclose usage of the program, Commerce properly rejected OCP's submission of this new factual information as untimely. As a result of OCP's failure to timely provide the information, Commerce determined it necessary to rely on facts available, and, because OCP had failed to cooperate to the best of its ability by not timely reporting, Commerce also appropriately applied an adverse inference.

Second, OCP cannot establish that Commerce's question as to whether any other benefits were provided was unlawful; seeking such information falls well within Commerce's statutory authority to "discover" a practice that could potentially constitute a countervailable subsidy.

Third, Commerce appropriately found that the GOM's program allowing for reductions in tax fines and penalties was *de facto* specific. Commerce reasonably concluded that OCP was a disproportionate user of this program because it had received a share of reductions approximately 900 times larger than the average amount. OCP's argument that Commerce should consider its large size in accounting for its disproportionate use of the program finds no support in the statute, the Statement of Administrative Action Accompanying the Uruguay Round

Agreements Act (SAA), H.R. Rep. No 103-316 at 931, as reprinted in 1994 U.S.C.C.A.N. 4040 (1994), or Commerce's practice.

Fourth, Commerce reasonably constructed a benchmark for phosphate rock prices that included prices for phosphate rock falling within or overlapping with the BPL content range of OCP's phosphate rock, including phosphate rock from China, Syria, and Egypt.  Commerce also reasonably declined to include prices from ███████████ because the phosphate rock produced in these countries contains BPL content outside of the established range for OCP's phosphate rock.  In addition, Commerce did not err in rejecting Mosaic's arguments that China and Syria had distorted prices.

Fifth, Commerce appropriately included OCP's HQ, support, and debt costs, and relied on OCP's allocation methodology, when calculating OCP's cost buildup.  In doing so, Commerce explained that any attempt to further segregate OCP's reconciled and verified HQ, support, and debt costs in a manner inconsistent with its accounting methodology would have been unreasonable and extremely complex.  Accordingly, Commerce reasonably determined that OCP did not receive a measurable benefit from the provision of mining rights for LTAR.

Finally, Commerce reasonably determined that OCP conferred no measurable benefit from the Moroccan provision of port services and infrastructure.  Commerce analyzed the GOM's explanation of the program's price-setting philosophy to generate profit and recover costs, along with actual evidence affirming that the program was ██████████.  Given the lack of record evidence that the government's prices were not set in accordance with market principles, Commerce determined that the program did not confer a benefit to OCP.

## ARGUMENT

I.    Standard Of Review

In reviewing Commerce's antidumping and countervailing duty determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)). "The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). Even if the Court may draw two inconsistent conclusions from the record evidence, that possibility "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966). Under this standard, a reviewing court "must affirm {Commerce's} determination if it is reasonable and supported by the record as a whole, even if some evidence detracts from {Commerce's} conclusion." *Hitachi Metals, Ltd. v. United States*, 949 F.3d 710, 716 (Fed. Cir. 2020) (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)).

A party challenging Commerce's determination under the substantial evidence standard "has chosen a course with a high barrier to reversal," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (citation omitted), and the Court will sustain Commerce's factual determinations as long as they are reasonable and supported by the record as a whole, even if some evidence detracts from them. *See Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984).

7

II.    <u>Commerce Correctly Rejected OCP's Late Submission Regarding Its Payroll Tax Refund</u>

Commerce correctly rejected OCP's attempt to submit its payroll tax refund information at verification.  Rather than a minor correction, as OCP claims, the payroll tax refund submission was OCP's first reporting of the use of a potentially countervailable program; therefore, it constituted untimely filed new factual information.  Because OCP failed to report its payroll tax refund in its responses to Commerce's initial and supplemental questionnaires, Commerce determined that OCP had withheld necessary information, failed to provide that information in the form and manner requested by the deadline, and significantly impeded the proceeding by preventing Commerce from fully investigating the program; accordingly, Commerce was justified in resorting to facts available.  And, because OCP failed to cooperate by not timely reporting this program to Commerce, Commerce also appropriately applied an adverse inference.

A.    <u>Relevant Legal And Factual Background</u>

1.    <u>Legal Background For Verification And Application Of AFA</u>

Verification serves as a spot-check for the accuracy and completeness of information that interested parties submit in their questionnaire responses.  *See Monsanto Co. v. United States*, 698 F. Supp. 275, 281 (Ct. Int'l Trade 1988).  As part of the verification process, Commerce allows parties to submit minor corrections to information already submitted in their questionnaire responses.  *See* OCP Verification Agenda at 2 (P.R. 339).  Crucially, verification is *not* an opportunity to submit new factual information or non-minor corrections.  *See Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343 (Fed. Cir. 2021) (affirming Commerce's practice "to accept corrective information at verification only for minor corrections to information already on the record."); *see also SeAH Steel Corp. v. United States*, 659 F. Supp. 3d 1318, 1324 (Ct. Int'l Trade 2023).

Commerce applies facts otherwise available to fill gaps in the record if "necessary information is not available on the record," 19 U.S.C. § 1677e(a)(1), or if an interested party: (a) withholds information requested by Commerce; (b) fails to provide the information in the form or in the manner requested; (c) significantly impedes the proceedings; or (d) provides information that cannot be verified.  19 U.S.C. § 1677e(a)(2)(A)-(D).  During a countervailing duty proceeding, Commerce may select a rate with which to countervail a subsidy program by applying an adverse inference when it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with {Commerce's} request for information."  19 U.S.C. § 1677e(b).  An interested party fails to act to the best of its ability when it does not exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation."  *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  To avoid the application of facts available with an adverse inference, respondents must "conduct prompt, careful and comprehensive investigations of all relevant records that refer or relate to the imports in question."  *Papierfabrik August Koehler SE v. United States,* 843 F.3d 1373, 1379 (Fed. Cir. 2016) (citing *Nippon Steel*, 337 F.3d at 1382).

2.     <u>OCP Attempts To Report A New Program At Verification</u>

On September 6, 2023, Commerce began conducting on-site verification of the information OCP and the GOM submitted in their questionnaire responses.  *See* OCP Verification Report (C.R. 399).  At the start of verification, OCP submitted various minor corrections to its questionnaire responses, which Commerce accepted.  *See* OCP Verification Report at 2-5.  OCP also presented—as a purported "minor correction"—an unreported payroll tax refund received from the Moroccan Office de Formation Professionnelle et de la Promotion du Travail (OFPPT), claiming that it only discovered the refund while preparing for verification.  *Id*. at 2.  Because

OCP had not previously reported its use of this program, no information regarding the payroll tax refund program was on the record prior to verification. *Id*. Commerce thus found that OCP's submission did not constitute a minor correction of reported information, but rather untimely new factual information, and declined to accept it. *Id.*; *see also* IDM at 15-17.

In the final results, Commerce further addressed its decision to decline OCP's submission, explaining that OCP's failure to report the payroll tax refund program in response to Commerce's questionnaires prevented Commerce—which was unaware of the program until verification—from analyzing whether the program constituted a financial contribution or is specific, and from requesting additional information from the GOM with regard to the program. IDM at 7. Because OCP had failed to provide requested necessary information by the established deadline, and in doing so significantly impeded the proceeding, Commerce determined OCP's benefits from the payroll tax refund program by applying facts available pursuant to 19 U.S.C. §§ 1677e(a)(1) and (a)(2)(A)-(C). *Id*. at 7, 16. Commerce also found that OCP had failed to cooperate by not timely reporting this program to Commerce prior to verification, and therefore applied facts an adverse inference, pursuant to 19 U.S.C. § 1677e(b). *Id*. at 7. Commerce selected as the rate the highest calculated rate for a similar/comparable program from the investigation—the Tax Incentives for Export Operations Program—applying a 1.27 percent rate for the payroll tax refund program. *Id.* at 10-11.

> B.    Commerce Properly Rejected OCP's Reporting Of The Payroll Tax Refund Program As Untimely

Commerce correctly declined to accept OCP's untimely reporting of a new potentially countervailable program. *See e.g., SeAH Steel*, 659 F. Supp. 3d at 1326 ("Commerce's rejection of information regarding the KEXIM Performance Guarantee program as untimely new information first presented at verification is supported by substantial evidence because {it} did

not corroborate, support, or clarify factual information already on the administrative record.").

OCP was required to report its usage of the payroll tax refund program in response to

Commerce's initial questionnaire, and indisputably failed to do so. IDM at 7, 17. Accordingly,

Commerce properly rejected OCP's late disclosure of the program at verification. *Id.* at 7, 16-17.

Commerce, of course, has "broad discretion to fashion its own rules of administrative

procedure, including the authority to establish and enforce time limits concerning the submission

of written information and data." *Coalition for the Preservation of Am. Brake Drum & Rotor

Aftermarket Mfrs. v. United States*, 44 F. Supp. 2d 229, 237 (Ct. Int'l Trade 1999) (citation

omitted). Commerce sets specific deadlines for the submission of initial questionnaire responses

and will reject untimely filed responses. 19 C.F.R. § 351.301(c)(1). Commerce also notifies

respondents that new factual information will not be accepted during verification. *See*

Verification Agenda at 2 (P.R. 339).

Commerce, in its initial questionnaire, directed OCP to report whether it had received any

other benefits from the GOM during the period of review. *See* Initial Questionnaire at 61 (P.R.

11). Although it was clearly required to do so, OCP did not report the payroll tax refund program

in its questionnaire response. Instead, OCP reported the program at verification, presenting it as

an alleged "minor correction." As Commerce explained in its verification agenda, "verification

is not intended to be an opportunity for the submission of new factual information. Information

will be accepted at verification only when the information makes minor corrections to

information *already on the record*." Verification Agenda at 2 (emphasis added). This practice

comports with the purpose of verification, which is to "test information provided by a party for

accuracy and completeness." *Bomont Indus. v. United States*, 733 F. Supp. 1507, 1509 (Ct. Int'l

Trade 1990); *see also Hung Vuong Corp. v. United States,* 483 F. Supp. 3d 1321, 1349 (Ct. Int'l

Trade 2020) ("{V}erification is not an opportunity for a do-over; instead, the purpose of verification is to confirm information previously submitted by a respondent in response to Commerce's requests for information.").  Given Commerce's discretion to establish and enforce administrative deadlines, and its well-known admonition that verification is not an opportunity to submit new factual information, Commerce appropriately determined not to accept OCP's late reporting of a potentially countervailable program.

OCP argues that its submission constituted a minor correction, emphasizing the "trivial" nature of the payroll tax refund and contending that the amount of the refund was too small to make a meaningful difference in its countervailing duty rate.  *Id*. at 15-17.  But OCP's arguments ignore that its untimely submission was not a correction to existing record information at all, but rather the first reporting of an entirely new potentially countervailable program, which OCP was required to disclose in its initial questionnaire response.  *See* 19 C.F.R. § 3531.301(c)(1)(i).  OCP tries to excuse its reporting failure by explaining that it only discovered the payroll tax refund when preparing for verification because this particular refund was not provided through OCP's tax returns, but rather a separate application process.  OCP Br. at 16.  But OCP's explanation does not absolve it of its failure to timely disclose the refund, and cannot transform the untimely reporting of a heretofore unmentioned program into the type of "minor correction" Commerce accepts at verification.  As Commerce explained, OCP's failure to timely provide information on the program made it impossible for Commerce to timely analyze whether it constituted a financial contribution or was specific, or for it to request additional information regarding the program from the GOM.  IDM at 7.

Commerce's determination to reject the untimely new factual information provided by OCP constituted an appropriate exercise of Commerce's discretion.  As this Court has held,

respondents cannot, at verification, attempt to "fill gaps in the record caused by {their} own failure to respond fully to Commerce's questionnaires." *Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021). Furthermore, Commerce is not required to accept information when there is insufficient time to fully evaluate it. *See, e.g., Tatung Co. v. United States*, 18 C.I.T. 1137, 1140–41 (1994) ("Due to stringent time deadlines and the significant limitations on Commerce's resources, 'it is vital that accurate information be provided promptly to allow the agency sufficient time for review.'"); *Max Fortune Indus. Co. v. United States*, 37 C.I.T. 549, 555 (2013) ("Commerce properly exercised its discretion in rejecting the late-submitted information.").

OCP cites three administrative proceedings in claiming that Commerce has a practice of accepting minor corrections even where they constitute new programs. OCP Br. at 18-19. But these proceedings are distinguishable. For instance, in *Crystalline Silicon Photovoltaic Products from China*, Commerce allowed the respondent to report—as a minor correction—a grant that had not previously been reported; however, unlike here, the respondent had not received any unreported income pursuant to the grant during the period of review. *See Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Verification of the Questionnaire Responses* at 11 (Dep't of Commerce Oct. 3, 2014) (ACCESS Barcode 3233091) ("This review did not indicate any unreported subsidy income received by Wuxi Suntech"). In *1-hydroxyethilidene-1 from China*, the previously unreported grants Commerce accepted as a minor correction were "the same kind of grants already reported," just for different years. *See 1-hydroxyethilidene-1, 1-diphosphonic acid from the People's Republic of China: Verification of the Questionnaire Responses* at 2 (Dep't of Commerce Jan. 10, 2017) (ACCESS Barcode 3535537). And, in *Certain Passenger Vehicle and Light Truck Tires from China*, the respondent

13

*had already* timely identified multiple grants in its questionnaire responses, but discovered a few additional grants while preparing for verification; there is no suggestion these grants were of an entirely different nature than the ones previously reported.[2]  *See Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China*, 80 Fed. Reg. 34,888 (Dep't of Commerce June 18, 2015), and accompanying IDM at 19–20; *Minor Corrections and Clarifications* at Att. 1 p. 2 (Dep't of Commerce Mar. 10, 2015) (ACCESS Barcode 3263608).

Moreover, Commerce has—in multiple prior proceedings—declined to accept unreported programs at verification and applied facts available with an adverse inference.  *See e.g., Truck and Bus Tires from the People's Republic of China,* 82 Fed. Reg. 8,606 (Dep't of Commerce Jan. 27, 2017), and accompanying IDM at Cmt. 27 ("Presenting new information about previously unreported loans and grants after the Department specifically requested the information in questionnaires and after the deadline to submit new factual information, does not meet constitute a 'minor correction.'"); *Ripe Olives from Spain*, 83 Fed. Reg. 28,186 (Dep't of Commerce June 18, 2018), and accompanying IDM at Cmt. 20 ("By not divulging the receipt of this unreported assistance prior to verification in the initial and subsequent questionnaire responses requesting information on 'other subsidies,' {the respondent} precluded Commerce from an adequate examination of the grant."); *Certain Polyethylene Terephthalate Resin from the People's Republic of China*, 81 Fed. Reg. 13,337 (Dep't of Commerce Mar. 14, 2016) and accompanying IDM at Cmt. 2 (finding that respondents "offered new factual information as minor corrections at verification in the form of assistance from previously unreported programs.").  Accordingly, neither Commerce's practice nor this Court's precedent indicate that Commerce acted

---

[2]  Because it appears no party challenged Commerce's acceptance of these corrections, the record information is limited.

14

unreasonably or beyond its discretion in declining to accept OCP's untimely reporting of a new program as a "minor correction."

C.    Commerce's Application Of Facts Available With An Adverse Inference Is Supported By Substantial Evidence And In Accordance With Law

As a result of OCP's failure to timely report the payroll tax refund program, Commerce reasonably found that necessary information regarding OCP's use of the program was missing from the record. IDM at 7; *see also* 19 U.S.C. § 1677e(a) (1). Commerce also found that OCP withheld necessary information (accurate reporting of recurring benefits) requested by Commerce, failed to provide a complete response to Commerce's initial questionnaire with respect to the question of "other benefits," and significantly impeded Commerce's investigation by preventing Commerce from fully investigating the program. IDM at 7; *see also* 19 U.S.C. §§ 1677e(a)(2)(A)-(C). Commerce further determined, pursuant to 19 U.S.C. § 1677e(b)(1), that OCP had failed to cooperate to the best of its ability by not timely reporting the information that was in its possession. *Id*. Accordingly, Commerce applied an adverse inference with regard to the payroll tax refund program. OCP cannot establish that Commerce acted unreasonably or unlawfully in doing so.

OCP claims that the conditions necessary for the application of facts available were not present. *See* OCP Br. at 20-22. According to OCP, no gap exists in the record related to the payroll tax refund program because it (untimely) disclosed the program and demonstrated that a countervailing duty rate for the program could be calculated; OCP also claims, for the same reasons, that it did not impede the proceeding. *Id*.

As an initial matter, if one were to follow this argument to its logical end, Commerce would have to simply accept any new subsidy program presented for the first time at verification,

so long as the respondent purports to perform the countervailing duty calculations on Commerce's behalf—an absurd result.

More importantly, OCP completely disregards Commerce's explanation that OCP's failure prevented Commerce from being able to fully analyze the program and request further information from the GOM.  IDM at 7.  OCP's untimely reporting also deprived other interested parties of the opportunity to comment on or rebut the information concerning the program.  OCP cannot unilaterally determine what information Commerce should deem necessary, nor can it decide which stage of a proceeding is appropriate for submitting information.  *See, e.g., Ferrostaal Metals Gmbh v. United States,* 518 F. Supp. 3d 1357, 1376 (Ct. Int'l Trade 2021) ("It is well established that it is Commerce, not the respondent, that determines what information is to be provided…") (citations omitted); *Essar Steel Ltd. v. United States*, 721 F. Supp. 2d 1285, 1299 (Ct. Int'l Trade 2010) ("Regardless of whether {the respondent} deemed the license information relevant, it nonetheless should have produced it in the event that Commerce reached a different conclusion.").

In any event, Commerce did not only find that OCP had significantly impeded the proceeding and that facts were not on the record; it also determined, pursuant to 19 U.S.C. § 1677e(a)(2)(B), that OCP had not provided information on the program by the requested deadlines.  IDM at 7, 16.  OCP does not contest that it failed to report the program in its questionnaire responses, but instead claims that its reporting was timely because it constituted a "minor correction" that OCP reported by the start of verification.  *See* OCP Br. at 21.  But, as already demonstrated, Commerce correctly determined that OCP's untimely reporting of a new

program did not constitute a minor correction, and that OCP was required to—but did not—report the program in response to Commerce's questionnaires.[3]

As to Commerce's application of an adverse inference, OCP claims that it acted to the best of its ability to comply with Commerce's requests throughout the course of the review and that its "inadvertent mistake . . . simply do{es} not support that OCP failed to fully cooperate in this review." OCP Br. at 23. But the Court of Appeals for the Federal Circuit has explained that "{c}ompliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp. v. United States*, 337 F.3d at 1382. And, while "the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping." *Nippon Steel Corp.*, 337 F.3d at 1382. OCP had an obligation to "conduct prompt, careful, and comprehensive investigations of all relevant records," *id.*, and its failure to report the program in its questionnaire response, despite the tax refund being recorded in its normal books and records, exemplifies inattentiveness and carelessness.[4]

OCP asks this Court to forgive its failures, but the Court should not be so persuaded. *See POSCO v. United States*, 296 F. Supp. 3d 1320, 1345 (Ct. Int'l Trade 2018) ("Commerce is not

---

[3] To the extent that OCP claims to have misunderstood Commerce's verification agenda or initial questionnaire—which it has not thus far done—the burden was on OCP to timely clarify that understanding with Commerce. *See SeAH Steel*, 659 F. Supp. 3d at 1326; *see also* Initial Questionnaire at II-4-II-5.

[4] OCP's positions also contradict each other. On one hand, OCP admits that "it inadvertently missed the small OFPTT tax refund when preparing its initial questionnaire response{.}"). OCP Br. at 22. On the other, OCP claims that it "did not fail to provide the information by the established deadline." OCP Br. at 20-21.

required to look elsewhere in the record for allegedly exculpatory information or to credit such information when the use of an adverse inference is otherwise justified."). First, OCP claims that it had inadvertently overlooked this refund until it began to prepare for verification. OCP Br. at 22. This does not excuse "inattentiveness, carelessness, or inadequate record keeping." *Nippon Steel*, 337 F.3d at 1382. Verification was not an opportunity for OCP to start gathering information regarding the payroll tax refund program and explain why it failed to report the program. Rather, verification is for Commerce to "confirm information previously submitted by a respondent in response to Commerce's requests for information." *Hung Vuong*, 483 F. Supp. 3d at 1349. Even assuming the veracity of OCP's claim that it did not discover this refund until preparing for verification, OCP's inattentiveness and carelessness left Commerce without the option to adequately evaluate the program, issue any necessary supplemental questionnaires, and allow other interested parties the chance to comment.

OCP also asserts that the tax refund was booked in a different account than it normally uses for recording tax refunds. *See* OCP Br. at 16-17. But OCP's unfamiliarity with its own books and records does not excuse its obligation to report its usage of a potentially countervailable program. The "best of its ability" standard recognizes that mistakes may sometimes occur, but requires a respondent to, among other things, "have familiarity with all of the records it maintains," and "conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of" its ability to do so. *Id.* Commerce relies on respondents to provide information regarding their individual usage of a program. *See Essar Steel Ltd.*, 721 F. Supp. 2d at 1297. OCP failed to report the use of this program in response to Commerce's questionnaires, even though the tax refund disbursed under

18

this program appears in its normal books and records.  OCP's inattentiveness, carelessness, and inadequate record-keeping should not be excused.

Finally, OCP argues that, because the selected facts available with an adverse inference rate is several times greater than the rate it calculated for this program, it is not supported by record evidence.  OCP Br. at 25-26.  But the information OCP relied on in self-calculating a rate is *not on the record*, as Commerce properly rejected it.  Commerce thus lawfully and reasonably relied on its established methodology in selecting the appropriate rate for the payroll tax refund program.  IDM at 10-11.

When applying facts available with an adverse inference, Commerce may "use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country."  19 U.S.C. § 1677e(d)(1)(A)(i); *see also Essar Steel Ltd. v. United States*, 753 F.3d 1358, 1373-74 (Fed. Cir. 2014) (upholding "hierarchical methodology for selecting an AFA rate").  Here, because there was no rate for an identical program, Commerce selected the highest calculated rate from a similar program—the Tax Incentives for Export Operations program, which confers the same type of benefit as the Payroll Tax Refund program, *i.e.*, tax savings as provided by the GOM.  *See Phosphate Fertilizers from the Kingdom of Morocco*, 86 Fed. Reg. 9,482 (Dep't of Commerce Feb. 16, 2021), and accompanying IDM (Investigation IDM) at 5.

OCP claims, based on non-record information (*i.e.*, its self-calculated rate for the program), that the rate selected by Commerce is punitive.  *See* OCP Br. at 25-26.  But, as Commerce explained, no record evidence existed with respect to the payroll tax refund program, and Commerce's rate was based on an actual calculated countervailing duty rate for a similar Moroccan program.  IDM at 10; *see Essar Steel Ltd.*, 753 F.3d at 1373-74 (upholding

"hierarchical methodology for selecting an AFA rate").  There is nothing punitive about relying on a calculated rate from a similar program from the same country—an approach contemplated by the statute.  *See* 19 U.S.C. § 1788e(d)(1)-(2).  And Commerce is not required to estimate what the countervailable subsidy would have been had OCP cooperated with Commerce's requests for information.  19 U.S.C. § 1677e(d)(3); *see also Habas Sinai Ve Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 992 F.3d 1348, 1354 (Fed. Cir. 2021) (plaintiffs "would have this court impose on Commerce an obligation that is not supported by the statute, namely to use only facts otherwise available that reflect the commercial reality of the affected party or that bends to the benefit of the affected party.") (cleaned up).  Because Commerce acted lawfully and reasonably, the Court should reject OCP's arguments.

III.    Commerce Acted Within Its Authority In Asking About Other Benefits

OCP claims—as it did during the investigation—that Commerce does not have the statutory authority to inquire as to whether OCP has received any other benefits from the GOM, and in particular cannot request information regarding programs Commerce determined were not countervailable in a prior segment of the proceeding.  *See* OCP Br. at 36-37 (citing Initial Questionnaire at 61).  But, as OCP acknowledges, the Court already rejected this argument during litigation over the final results of the investigation.  *See Mosaic Co. v. United States*, 659 F. Supp. 3d 1285, 1313-14 (Ct. Int'l Trade 2023) (*Mosaic I*) (holding that Commerce did not exceed its statutory authority when it asked OCP about 'any other forms of assistance.).  OCP provides no reason for this Court to depart from its prior holding.

In the investigation, Commerce had, in its initial questionnaire, requested that OCP report whether the Moroccan government had provided "any other forms of assistance" to OCP that had not been specifically alleged in the petition.  *Mosaic I*, 659 F. Supp. 3d at 1312.  OCP responded to this question under protest.  *Id.*  As a result of OCP's responses, Mosaic submitted a new

subsidy allegation concerning five potentially countervailable programs. *Id.* Commerce investigated the programs and determined three to be countervailable. *Id.* at 1312-13.

On appeal to this Court, OCP argued that Commerce had exceeded its statutory authority when it asked OCP about "any other forms of assistance" and improperly investigated the five programs based on allegedly unlawfully obtained information. *Id.* at 1313. The Court rejected OCP's argument, "find{ing} no merit in this claim." *Id.* The Court explained that the statute "expresses no limitations on the means or methods by which Commerce 'discovers a practice which appears to be a countervailable subsidy.'" *Id.* (citing 19 U.S.C. § 1677d). Accordingly, the Court held that Commerce did not act unlawfully into inquiring as to "other forms of assistance" in its questionnaire. *Id.* The Court also found unconvincing OCP's argument that Congress did not intend Commerce to have such investigative authority, stating that "OCP's interpretation would impose an unwarranted limitation on the investigative authority Congress intended Commerce to have," and that the statute was "written as an expansion, not a limitation," on Commerce's authority. *Id.*

In the underlying review, Commerce asked a similar question in its initial questionnaire, inquiring about "any other benefits" OCP received from the GOM. *See* Initial Questionnaire at 61. As it did in the investigation, OCP responded under protest but identified other programs, and Mosaic filed new subsidy allegations. *See* OCP IQR, Section III at 129-134; (P.R. 76, C.R. 8); Mosaic New Subsidy Allegations (P.R.117-119) (C.R. 128 -133). Commerce initiated an investigation into two of the subsidies alleged by Mosaic, including the provision of port services and infrastructure for LTAR. Commerce NSA Memo (P.R. 176). Commerce ultimately determined that the port services program did not confer a measurable benefit during the period of review. IDM at 12, 52-54; Post-Preliminary Memo at 3-7 (P.R. 351, C.R. 401).

21

OCP does not claim any meaningful distinction between the underlying review and the investigation that should lead this Court to a different result. Rather, it argues that Commerce must first be in possession of information indicating the "appearance" of a countervailable subsidy before it may ask a respondent to disclose any other benefits it might have received from a foreign government. OCP Br. at 36. In doing so, OCP continues to ignore Commerce's authority to "discover" information under 19 U.S.C. § 1677d. Even aside from *Mosaic I*, this Court has held that "{s}ection 1677d contains no limiting language as to how the agency is to 'discover' the apparent subsidies in the course of a proceeding before including them in its investigation." *Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1341 (Ct. Int'l Trade 2016). And asking a respondent to identify any other benefits it received from a foreign government during the relevant period is a reasonable and measured way to exercise Commerce's broad statutory authority to "discover" a practice that could potentially constitute a countervailable subsidy.

OCP also relies on *Allegheny Ludlum Corp. v. United States*, 25 C.I.T. 816 (2001), OCP Br. at 36, but, as this Court held in *Mosaic I*, that case does not support OCP's position. *Allegheny* did not concern Commerce's independent statutory authority to discover subsidy programs under section 1677d. Rather, the plaintiff in that case alleged that Commerce was required to investigate subsidy programs at the petitioner's request, even though the petition did not establish the necessary elements for the imposition of a countervailing duty. *Id.* at 817. Rejecting the plaintiff's argument that Commerce is *required* investigate any subsidy that a petitioner alleges is countervailable, the Court reasoned that Commerce is afforded latitude in making those sorts of determinations. *Mosaic I*, 659 F. Supp. 3d at 1314 (citing *Allegheny*, 25

C.I.T. at 824); *see also Changzhou Trina*, 195 F. Supp. 3d at 1342.  Thus, if anything, *Allegheny* supports Commerce's entitlement to broad discretion under section 1677d.

Finally, OCP contends that Commerce's decision not to countervail the provision of rail transport services for LTAR program demonstrates that Commerce did not have a factual basis to request such information in the first place.  *See* OCP Br. at 36-37 (citing OCP IQR at Exh. RAIL-12 at 12–14 (P.R. 81; C.R. 75); Investigation IDM at 6, 87).  OCP's logical leap is puzzling; simply because Commerce ultimately determined a program not to be countervailable does not mean that Commerce had no cause to request information on it in the first place, or to ask broader questions about the receipt of any benefits or assistance from a foreign government.[5]  As Commerce explained, it retains the investigative authority to ask questions about governmental assistance beyond only the subsidies initially alleged by the petitioner.  IDM at 20.  Moreover, Commerce did not find this program not to be countervailable; rather, it determined there was no measurable benefit during the period of investigation.  Accordingly, Commerce did not continue its countervailability analysis.  *See* Investigation IDM at 65, 87.

Despite OCP's attempts to unlawfully restrict Commerce's investigative authority, Commerce could reasonably attempt to discover potentially countervailable subsidies by asking OCP to identify "other benefits" it had received from the GOM.  OCP has failed to cite any legal authority that should cause the Court to depart from its sound reasoning in *Mosaic I*.

IV.    **Commerce's Determination That OCP's Reductions In Tax Fines And Penalties Were *De Facto* Specific Is Lawful And Supported By Substantial Evidence**

Commerce reasonably determined, based on record evidence, that the GOM's program

---

[5]  OCP studiously ignores situations where Commerce has requested information on "other assistance" or "other benefits" in a similar manner and then ultimately determined the respondent to have received a countervailable subsidy.

allowing for reductions in tax fines and penalties under Article 236 of Morocco's tax code was *de facto* specific under 19 U.S.C.§ 1677(5A)(D)(iii)(III).  OCP claims that Commerce's determination is unlawful because Commerce failed to consider the extent of economic diversification in the Moroccan economy, erred in comparing the total amount of the reductions received by OCP to the average amount received across all companies (*i.e.*, simple average approach), and failed to consider OCP's large size in Morocco's overall economy.  None of these arguments have merit, as Commerce complied with the statutory requirements by considering diversification and applied a reasonable methodology consistent with prior practice (*i.e.*, the simple average approach) in comparing the benefits OCP received to the average amount received by other companies in Morocco.[6]

    A.    <u>Relevant Factual Background</u>

In the investigation, Commerce determined that the reductions in tax fines and penalties program was *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(I) because the recipients of the reductions are limited in number.  Investigation IDM at 75.  In doing so, Commerce— consistent with past practice—compared the number of companies using the program with the total number of corporate tax filers and found that only 3.3 percent of Morocco's corporate taxpayers applied for and received reductions in tax fines and penalties.  *Id*.

During the instant review, the GOM provided additional information concerning the number of recipients, the industry breakdowns, and the total amount of assistance received by all companies.  PDM at 12.  Specifically, the record demonstrates that 68,738 companies out of

---

[6] We acknowledge the Court's very recent decision, issued January 8, 2025, in which it disagreed with similar findings Commerce made regarding OCP's disproportionate use of the program.  *See Mosaic*, No. 21-00116, Slip. Op. 25-3, ECF No. 134 (Ct. Int'l Trade Jan. 8, 2025) (*Mosaic II*).  However, that decision is non-final.  Moreover, the issues and arguments do not exactly mirror those here.

301,240 corporate taxpayers obtained reductions in tax fines and penalties during the period of review. *Id*. In light of this information, Commerce reevaluated its specificity determination, comparing the benefits (*i.e.*, reductions in fines and penalties) received by OCP to the average amount of benefits received by other companies in Morocco; doing so, Commerce found that OCP was a disproportionate user of the program on an enterprise basis. *See* GOM SQR1 at 6, 8, 15-18; (P.R. 163, C.R.154).

Commerce also evaluated the extent of Morocco's economic diversification and length of time during which the subsidy has been in operation. IDM at 49. While the record did not reflect the total number of establishments in Morocco, it demonstrated that Morocco has numerous manufacturing and service sectors in 21 industrial sectors, reflecting a wide diversification of economic activities. *See* GOM IQR at Exhibit III-4. Additionally, the record showed that the reduction in tax fines and penalties provision was established in 1987 and has been part of the Moroccan tax code since 2007. *Id*. at III-0 and Exhibit III-3. Commerce, addressing OCP's and the GOM's arguments, also explained that, while the program may be available to all taxpayers, that does not necessarily mean that it cannot be disproportionately used by certain companies. *Id*.

B.    Commerce Accounted For Economic Diversification

OCP's claim that Commerce failed to consider the economic diversification of the Moroccan economy is belied by the record, which demonstrates that Commerce explicitly considered the subject. *See* OCP Br. at 27, IDM at 49.

Commerce will find a subsidy specific if: 1) the recipients of the subsidy are limited in number, 2) an enterprise or industry is a predominant user of the subsidy, 3) an enterprise or industry receives a disproportionately large amount of the subsidy, or 4) the manner in which the

authority providing the subsidy indicates that an enterprise or industry is favored over others. 19 U.S.C.§ 1677(5A)(D)(iii). The statute also provides that Commerce "shall take into account the extent of diversification of the economic activities within the {jurisdiction's economy} and the length of time during which the subsidy program in question has been in operation." 19 U.S.C.§ 1677(5A)(D)(iii). The criteria regarding diversification and length of time serve to inform the application of, rather than supersede or substitute for, the enumerated specificity factors. SAA at 931. In other words, diversification and length of time are not additional indicators of whether specificity exists, but rather provide further context within which the *de facto* specificity factors are analyzed. *Id*. Thus, while they may be instructive, they do not, in and of themselves, determine specificity or the lack thereof. *Id.*

In the final results, Commerce explained that Morocco has numerous manufacturing and service sectors within 21 industrial sectors. IDM at 49. As such, Commerce found a wide diversification of economic activities in Morocco. *Id*. Given that Commerce examined disproportionate use of the subsidy in question on an enterprise basis, it is reasonably discernable that Commerce understood the diversification of Morocco's economy not to be instructive to its *de facto* specific analysis. *See Motor Vehicle Mrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (the Court will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."). Commerce was not required, by either the terms of the statute or the SAA, to address diversification any further.

In spite of this, OCP presents arguments that ignore the purpose of Commerce's diversification analysis—whether the extent of diversification within the Moroccan economy detracts from Commerce's determination that this program is *de facto* specific. OCP cites no record evidence detracting from Commerce's determination that there is wide economic

diversification within the Moroccan economy.  Instead, OCP claims that relying on the "number of economic sectors, without considering their relative roles in the overall economy, provides an inadequate evidentiary basis *under the law* for Commerce's determination that Morocco's economy includes 'a wide diversification of economic activities.'"  OCP Br. at 28 (emphasis added).  But OCP *cites no actual law in making this argument*, other than a general reference—without explanation—to the substantial evidence standard.  *Id*. (citing *NTN Bearing Corp. of Am. v. United States*, 757 F. Supp. 1425, 1427 (Ct. Int'l Trade 1991) ("Substantial evidence is relevant evidence that 'a reasonable mind might accept as adequate to support a conclusion.'")).  It is not even clear whether OCP wants the Court to find that there is not a wide diversification of economic activities, or what impact OCP believes such a finding would have.  In any event, Commerce relied on record evidence from the GOM in making its finding that Morocco has a wide diversification of economic activities, and OCP cites no evidence to the contrary.  Accordingly, Commerce's determination was not unsupported by substantial evidence and did not violate the statute.

OCP seeks to supplant Commerce's diversification finding, claiming that a diversification analysis must include a comparison of the respondent company's size to other companies in the economic jurisdiction.  *See* OCP Br. at 29.  In doing so, OCP implicitly seeks to make size an enumerated factor.  But, as the SAA establishes, "{the extent of diversification of economic activities} serve{s} to inform the application of, rather than supersede or substitute for, the enumerated specificity factors."  SAA at 931.  OCP provides no authority supporting its contention that Commerce is required to consider a respondent's size in considering diversification of a jurisdiction's economic activity.  Nor can OCP establish, as a matter of

common reason, what its size has to do with whether Morocco overall has a wide diversification of economic activity.

OCP argues that, in considering diversification, Commerce should have been required to address the "concentration of economic activity" in Morocco to the phosphate mining industry, as well as OCP's large size relative to other Moroccan companies.  OCP Br. at 29.  OCP failed to raise these arguments before Commerce; accordingly, the Court should not consider them here. In *Boomerang Tube, LLC, TMK IP-SCO v. United States*, 856 F.3d 908, 912-13 (Fed. Cir. 2017), the Federal Circuit confirmed that 28 U.S.C. § 2637(d) requires parties (except in limited circumstances not relevant here) to exhaust administrative remedies prior to bringing an action at the Court of International Trade.  *Accord* 19 U.S.C. § 1677f(i)(3) (stating that Commerce's final determination must address "relevant arguments, made by interested parties").

Here, OCP argued only that Commerce did not consider the extent of the diversification of economic activities—an issue Commerce rectified in the final results.  OCP Case Br. at 29 (C.R. 403).  It made no arguments as to what it believed Commerce was required to *do* in considering diversification, much less explicitly argue that Commerce was required to consider "concentration of economic activity" and OCP's size in its diversification analysis.  And, while there are limited exceptions to the exhaustion requirement, none apply here.  OCP does not raise a pure question of law requiring no further agency involvement, it had access to the record, it cites no intervening judicial interpretation, and there is no indication raising such an argument would have been futile.  *See Corus Staal v. United States,* 502 F.3d 1370, 1378-79 (Fed. Cir. 2007).

In any event, OCP cites no support for these alleged requirements.  The statute only requires Commerce to "take into account the extent of the diversification of economic activities

within the jurisdiction of the authority providing the subsidy, and the length of time during which

the subsidy has been in operation."  19 U.S.C. § 1677(5A)(D)(iii).  And, as this Court has held

with regard to the length of time a subsidy program has been in operation—a sister requirement

to diversification—while Commerce is required to consider the issue, the means by which it is to

be evaluated is left for Commerce to reasonably determine.  *See Magnola Metallurgy, Inc. v.

United States*, 30 C.I.T. 1808, 1816 (2006), *aff'd*, 508 F.3d 1349 (Fed. Cir. 2007).  Here,

Commerce evaluated diversification based on record evidence, determined there was wide

diversification of economic activity in Morocco, and did not find such a fact dispositive of its

specificity determination; it did not need to go further.

Moreover, while OCP asserts that Commerce must consider "the concentration of

economic activity in Morocco to the phosphate mining industry," it does not elaborate on what

this actually *means*, how it should be considered in the context of Commerce's diversification

analysis, or how such consideration would lead to the conclusion that "OCP did not receive a

disproportionately large amount of reductions of tax fines and penalties relative to other

companies."  OCP Br. at 29.  OCP's confusing statements only serve to highlight why it should

have raised these issues before Commerce in the first instance.

OCP observes that it received a small percentage of the total reductions in 2021, even

though its sales were equivalent to 6.6 percent of Morocco's GDP; it contends that Commerce

could not conclude—based on these facts—that "OCP's percentage of tax reductions was

'disproportionately large' during the period of review."  *Id*. at 29-30.  But OCP does not establish

how these facts, even if true, are relevant to Commerce's *diversification* analysis, as opposed to

its *disproportionality* analysis.  As already discussed, the extent of economic diversification does

not necessarily inform or decide whether a subsidy is *de facto* specific based on disproportionate use, which, unlike diversification, is an enumerated factor. *See* SAA at 931.

Moreover, OCP's argument amounts to no more than mere disagreement with Commerce's methodology (*i.e.*, simple average approach), which compared OCP's total amount to the average amount received by each other recipient on an individual and/or industry bases. IDM at 49-50; *see also Ningo Dafa Chemical Fiber Co., Ltd. v. United States*, 580 F.3d 1247, 1259 (Fed. Cir. 2009) ("Commerce is the master of antidumping law, and reviewing courts must accord deference to the agency in its selection and development of proper methodologies. In fact, the methodologies relied upon by Commerce in making its determinations are presumptively correct.") (cleaned up). Commerce found, based on *its* methodology, that OCP received reductions under this program that are 900 times greater than the average received from other Moroccan companies. *See* IDM at 48 (citing GOM SQR1 at 6, 8, and 15). Accordingly, Commerce reasonably determined OCP to be a disproportionate user on an enterprise basis under 19 U.S.C. § 1677(5A)(D)(iii)(III). *Id.* at 48-50.

OCP insinuates that Commerce acted inconsistently with past practice, citing the "stark contrast" between its small percentage of the overall refunds with other cases in which Commerce declined to find disproportionate use despite the respondents having had "higher percentages" of a benefit. OCP Br. at 30. Again, this ignores Commerce's methodology for analyzing disproportionality on an enterprise basis, and the cases OCP relies on do not establish that Commerce acted unreasonably or contrary to that methodology in finding OCP a disproportionate user. Indeed, in *AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999), Commerce found the respondent not to be a disproportionate user because the respondent's revaluation of its assets were not higher than the average increase in asset value. *Id.*

at 1385.  Commerce's finding here that OCP received a share of reductions 900 times larger than the average amount, is consistent with *AK Steel*.  Meanwhile, *Bethlehem Steel Corp. v. United States*, 140 F. Supp. 2d 1354 (Ct. Int'l Trade 2001), appears to have concerned disproportionality on an *industry* bases, not an *enterprise* basis as here.[7]  *Id.* at 1369 (explaining that while "the steel industry received over 51{percent} of the financial benefits . . . there is nothing in the record to indicate this percentage was disproportionately higher than would be expected.").

Moreover, it is axiomatic Commerce also conducts its *de facto* specificity analysis on a case-by-case basis.  As the Federal Circuit has stated, "{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all facts and circumstances of a particular case." *AK Steel*, 192 F.3d at 1384.  Accordingly, "Commerce's analysis of usage ratios in one proceeding does not necessarily inform its analysis in subsequent proceedings." *Non-Oriented Electrical Steel from Taiwan*, 79 Fed. Reg. 61,602 (Dep't of Commerce Oct. 14, 2014), and accompanying IDM at Cmt. 1.

Because OCP fails to demonstrate how its legal and factual assertions are relevant to Commerce's diversification analysis or supported by legal authority, the Court should reject OCP's arguments.

C.    OCP's Remaining Arguments Fail To Detract From Commerce's Determination That OCP Was A Disproportionate User Of The Tax Fines And Penalties Program

OCP remaining arguments mischaracterize Commerce's analysis and/or the record evidence, or otherwise fail to undermine Commerce's *de facto* specificity determination.  OCP

---

[7]  OCP's argument regarding extractive industries encapsulates OCP's misunderstanding of disproportionality based on industry versus enterprise.  *See* OCP Br. at 30.  According to OCP, extractive industries represent only 2.4 percent of the total amount of reduction under the program.  *Id.*  But Commerce found disproportionate use of the program on an *enterprise* basis, not an industry basis.  IDM at 49.

claims that "Commerce's failure to account for OCP's large size relative to other recipients of the reductions is contrary to the express requirements of the Statute." OCP Br. at 31.  But OCP here does little more than rehash the same argument made in the context of the diversification analysis.  Again, OCP fails to cite any statutory language requiring Commerce to consider the size of a company in undertaking a disproportionality analysis.  Instead, for the first time, OCP states that "any examination of whether OCP received a 'disproportionately' large amount of reductions as compared to other companies in Morocco necessarily requires Commerce to compare OCP and its characteristics to those other companies and their characteristics, including with respect to proportionate size and role in the overall Moroccan economy."  *Id*.  Given that OCP did not present this argument to Commerce, the Court should decline to consider it for failure to exhaust.  *See Boomerang Tube*, 856 F.3d at 912.

Even if the Court considers this argument, OCP provides no legal authority supporting its position and points to no record evidence demonstrating why Commerce should base its finding on OCP's size.  *See Mosaic I*, No. 21-00116, ECF No. 115 (Investigation Remand Results) ("{N}either the GOM nor OCP provided information which would draw a correlation between a company's size and the amount of tax fines and penalties it incurs.").  As it does when discussing size in the context of diversification, OCP relies on *Bethlehem Steel* in an attempt to undermine Commerce's fact-specific analysis.  *See* OCP Br. at 32 -36.  Notwithstanding the fact that—as discussed above—Commerce analyzed disproportionality on an enterprise basis, and not an industry basis like in *Bethlehem Steel*, there is no record evidence demonstrating that one of the inherent characteristics of the Moroccan phosphate industry is to incur significant amounts of tax fines and penalties.  *Cf. Bethlehem Steel*, 140 F. Supp. 2d at 1368–70 (explaining that one of the inherent characteristics of the Korean steel industry is its large consumption of electricity).

Moreover, OCP equates a program in which Korean producers received *the same* discounted electricity rates in return for curtailing usage with a subsidy program that allows the Moroccan government to grant waivers or reduce tax fines and penalties at its discretion. *Compare Bethlehem Steel*, 140 F. Supp. 2d at 1369–70 ("{A}ll parties receive the same discount, there can be no exercise of discretion, and no favorable treatment afforded to any one industry.") *with* OCP IQR at 45 (P.R. 76) ("The Ministry's General Tax Administration, upon examination of the request and based on the circumstances, then decides whether a reduction is appropriate.").

OCP next argues that the taxes and fees owed by OCP were larger in magnitude than those paid by other companies, and therefore its fines and penalties—as well as any reductions in those fines and penalties—were also larger than those of an average company. OCP Br. at 33. But the record does not establish a correlation between the size of a company and its taxes, or the fines, penalties, and reductions incurred. *See* Investigation Remand Results at 32. OCP bases much of its disproportionality argument on multiple comparison metrics not relied on by Commerce, but does not demonstrate that it applied those same metrics to the other companies receiving reductions under the program, much less show that a comparison along those metrics establishes that OCP did not receive a disproportionate benefit on an enterprise basis.

The statute does not mandate any specific methodology in conducting a *de facto* specificity analysis; accordingly, Commerce has the discretion to apply any reasonable methodology in making such determination in light of facts and circumstances of each particular case. *See AK Steel Corp.*, 192 F.3d at 1367; *Ningo Dafa*, 580 F.3d at 1247. The Court should decline to entertain OCP's unsupported conditions for determining whether a program is *de facto* specific based on its relative size within the Moroccan economy.

OCP cites a number of administrative proceedings for the proposition that Commerce is required to consider size, but OCP's reliance on these proceedings is unavailing, as Commerce performed distinct analyses examining and comparing the benefit distribution of different industries based on the facts of each case and, in at least two of the proceedings, it analyzed disproportionality on an industry basis, not an enterprise basis as here. *See Coated Free Sheet Paper from the Republic of Korea*, 72 Fed. Reg. 60,639 (Dep't of Commerce Oct. 25, 2007), and accompanying IDM at 18-20 (in determining whether the investigated *sector* received a disproportionate share of manufacturing lending, Commerce based its comparison on *other sectors'* share of manufacturing GDP); *Live Swine from Canada*, 70 Fed. Reg. 12,186 (Dep't of Commerce Mar. 11, 2005), and accompanying IDM at 19 (determining that, because the benefit received under the program was less than the amount of the total agricultural cash receipts collected by the live swine *industry*, the agricultural program in question was not *de facto* specific); *Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 76 Fed. Reg. 2,336 (Dep't of Commerce Jan. 13, 2011) and accompanying IDM at 3 (determining that a company "received a disproportionately large share of the income tax benefits relative to its size among all companies in the Republic of Korea.").[8]  OCP fails to demonstrate a consistent practice of Commerce relying on the size of a company when making an enterprise-based determination regarding disproportionate use.  If anything, the disparate nature of the proceedings underscores how fact-specific Commerce's *de facto* analysis is.

---

[8]  While Commerce did cite the company's size in finding disproportionality, the record does not contain sufficient information to ascertain how similar, or different, the facts of that proceeding are to the one at issue here.  In any event, one administrative determination is hardly indicative of a consistent practice of relying on a company's size.

Commerce complied with the statute and the SAA by examining information on the record and employing a reasonable methodology to determine whether OCP received a disproportionately large amount of the reductions in tax fines and penalties subsidy. Commerce was not required "to examine *why* OCP received a disproportionate amount of subsidy benefits"—such as, for instance, due to its large size. IDM at 50 (emphasis added). The fact that OCP is a disproportionate user was itself sufficient to find the program *de facto* specific. Because OCP fails to undermine Commerce's disproportionate use finding, the Court should sustain Commerce's decision.

V.     Commerce's Determination Regarding The Provision Of Mining Rights For LTAR Was Lawful And Supported By Substantial Evidence

Commerce's analysis of the program concerning the provision of mining rights for LTAR was reasonable and lawful, both with regard to Commerce's selection of a tier-three benchmark for phosphate rock and its determination to include HQ, support, and debt costs in the cost buildup for OCP's phosphate rock production. Mosaic cannot demonstrate otherwise.

A.     Relevant Framework For Calculating Benchmarks And Benefit

When the financial contribution at issue is the provision of goods, a "benefit" exists "if such goods . . . are provided for less than adequate remuneration{.}" 19 U.S.C. § 1677(5)(E)(iv). Commerce's regulations establish a hierarchy of options, or tiers, to determine whether adequate remuneration was paid. 19 C.F.R. § 351.511. Under tier one, Commerce seeks to compare the price paid by the respondent to a market-determined price for the good resulting from actual transactions in the country in question. *Id*. § 351.511(a)(2)(i). If Commerce concludes that "there is no useable market-determined price with which to make" such comparisons, it will engage in a tier-two analysis and compare "the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in

question." *Id*. § 351.511(a)(2)(ii). If a world market price is unavailable, Commerce will

"measure the adequacy of remuneration by assessing whether the government price is consistent

with market principles." *Id*. § 351.511(a)(2)(iii). When, as here, Commerce relies on a tier-three

analysis to construct a benchmark, *see* PDM at 10-11, it assesses whether the government price

was set in accordance with market principles through an analysis of such factors as the

government's price-setting philosophy, costs (including rates of return sufficient to ensure future

operations), or possible price discrimination. 19 C.F.R. § 351.511(a)(2)(iii). These tier-three

factors are not hierarchical in application, and Commerce may rely on one or more of them in

any particular case. *See Countervailing Duties*, 63 Fed. Reg. 65,348, 65,378 (Dep't of

Commerce Nov. 25, 1998) (*CVD Preamble*).

 Consistent with the approach in the investigation and prior proceedings, Commerce

conducted its analysis not based on mining rights *per se*, but on the value of the underlying good

conveyed via mining rights (*i.e.*, phosphate rock). PDM at 10. To calculate the benefit received

by a respondent (here, OCP), Commerce compares the actual per-unit cost buildup of the

respondent's beneficiated phosphate rock, inclusive of all taxes paid to the foreign government,

to the benchmark, *i.e.*, a world market price of comparable phosphate rock. *Id*. at 10-11.

Commerce obtains a world market price by selecting from among the benchmark data submitted

by interested parties, which includes information related to the "'bone phosphate of lime' level or

$P_2O_5$ content of the rock, such that {Commerce} could exclude data which relate to phosphate

rock which does not compare to that which was mined/beneficiated by {the respondent} during

the {period of review}." *Id.* at 9.

 Commerce then multiplies the difference between the calculated per-unit cost buildup,

including the production cost of the phosphate rock and the extraction taxes paid, and the

benchmark per-unit price of phosphate rock, by the total amount of phosphate rock mined and beneficiated during the period of review. *Id*. at 11. Finally, Commerce divides this difference by the respondent's sales to derive whether a benefit is conferred, and, if so, how much.

      B.      <u>Commerce Reasonably Calculated The Benchmark For Phosphate Rock Prices</u>

Commerce based its tier-three benchmark for phosphate rock on a simple average of certain worldwide prices of phosphate rock, as reported by the following industry publications: CRU, Argus Phosphates, Fertecon, and Profercy Phosphates Limited (Profercy). *See* Preliminary Calculation Memo at 3 (C.R. 308), Final Calculation Memo at Att. 1, Rock Benchmark Tab (C.R. 408). The benchmark included all prices that fall within or overlap with the BPL range of OCP's phosphate rock, and incorporated prices from China, Syria, and Egypt. *Id*. This benchmark calculation was lawful and supported by substantial evidence, and none of Mosaic's arguments demonstrate otherwise.

      1.      Commerce Properly Included Chinese And Syrian Prices Of Phosphate Rock In Its Benchmark Price

In the final results, Commerce rejected Mosaic's invitation to exclude prices from China and Syria because allegedly "market-distorting" behavior by certain entities in these countries rendered those prices unusable. IDM at 28. As Commerce noted, Mosaic failed to establish any market dynamics in the destination countries for exports that would support a finding of distortion, and failed to provide sufficient evidence to support a claim that government influence in the exporting countries caused export prices to external markets to be distorted. IDM at 28. Moreover, as Commerce explained in the investigation, and reiterated in this proceeding:

> {such arguments} largely pertain to Tier 1 distortion of domestic market analysis. The mere fact that domestic, in-country prices, including imports for a good or service, have been found to be distorted, do not, for purposes of this analysis, mean that the prices for goods exported from that market are also necessarily distorted.

*See* IDM at 28 (citing Investigation IDM at 19); *see also Countervailing Duty Investigation of Fine Denier Polyester Staple Fiber from the People's Republic of China*, 83 Fed. Reg. 3,120 (Dep't of Commerce Jan. 23, 2018), and accompanying IDM at Cmt. 4.

Mosaic fares no better with its arguments before this Court, mischaracterizing record evidence and Commerce's tier-three analysis, and failing to provide sufficient evidence demonstrating that export prices from China and Syria were distorted.  Mosaic first points to the Chinese government's decision to implement an export tax (and export ban) on phosphate products in the wake of price spikes—a strategy oriented towards supplying the domestic market.  Mosaic Br. at 29 (citing Benchmark Rebuttal Submission at Exhs. 1-3).  Mosaic claims that this constitutes evidence that the export prices from China are distorted, but does not explain how an export tax on a domestic company would distort export prices to other countries, which, as Commerce explained, reflect the commercial realities on the *world market* for such goods and services.  IDM at 28; *see also* OCP Benchmark Submission Exh. NFI-6 (explaining how world market prices are derived).

Mosaic also relies on Commerce's determination in *Steel Rebar from Turkey* in alleging that Commerce has found export prices distorted in similar situations, but that proceeding is inapposite.  OCP Br. at 29 (citing *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 84 Fed. Reg. 48,583 (Dep't of Commerce Sept. 16, 2019), and accompanying PDM at 12, *unchanged by Steel Concrete Reinforcing Bar from the Republic of Turkey*, 85 Fed. Reg. 16,056 (Dep't of Commerce Mar. 20, 2020) (*Steel Rebar from Turkey*).  In *Steel Rebar from Turkey*, Commerce rejected a respondent's *tier-two* benchmark submission concerning imports of natural gas from Russia based on several factors, including evidence of Russia's dominance in the natural gas market.  *Id*. ("{This} enables {Russia} to leverage natural gas prices and supplies for

38

geopolitical purposes."), *aff'd*, *Habas Sinai v. Tibbi Gazlar Istihsal Endustrisi A.S. v. United States*, 536 F. Supp. 3d 1333, 1342 (Ct. Int'l Trade 2021) ("Commerce explicitly weighed RTAC's submissions against the evidence submitted by Habaş and determined that 'due to the {Russian government's} practice of distorting the natural gas market for its own geopolitical purposes, Russian export prices are unsuitable for use in constructing' a tier-two benchmark.").

First, *Steel Rebar from Turkey* concerned a tier-two analysis, not a tier-three analysis, as is the case here.  In addition, Mosaic does not explain how China's actions to improve its domestic phosphate industry were done for "geopolitical purposes."  Indeed, unlike in *Steel Rebar from Turkey*, there appears to be no discussion of the market dynamics of the Chinese exports in question and no evidence that the Chinese export prices are anything but market-driven.  IDM at 28.

Mosaic then turns to Syria, claiming that the underlying political conflict in that country, which includes sanctions by the United States and the European Union, has caused export prices for phosphate to be distorted.  *See* Mosaic Br. at 30.  Mosaic primarily relies on a news article that discusses how trade has resumed between Syria and EU companies and how Syria has had to sell its phosphates "at a political discount because its goods are so toxic to handle."  *Id*. (citing Mosaic Benchmark Rebuttal Submission at Exh. 11 (P.R. 227).  But a single offhand statement, without more, is not sufficient to establish that Syrian *world* export prices for phosphate are distorted.  For instance, Mosaic has not explained what this "political discount" entails, or how it has impacted Syrian export prices to the point of distortion.  Moreover, the article—read as a whole—discusses how companies have been engaging in sanctions evasion and using a "convoluted network of shell companies and middlemen."  Mosaic Benchmark Rebuttal Submission at Exh. 11.  None of this demonstrates that Syria has been selling phosphate at

distortedly low prices; if anything, it would be logical to expect that the need to engage in "convoluted" mechanisms would drive the price up, rather than down. Simply put, Mosaic provides insufficient reason for Commerce to remove Syrian benchmark data based on distortion. IDM at 28; *see also Borusan Mannesmann Boru Sanayi v. Ticaret A.S. v. United States*, 61 F. Supp. 3d 1306, 1328-31 (Ct. Int'l Trade 2015), *aff'd sub nom. Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017) (holding that Commerce improperly applied a *per se* rule of market distortion and failed to explain what specific circumstances which implied significant distortion, and thus Commerce's determination was not based on substantial record evidence of distortion.).

Mosaic contends that Commerce has not meaningfully engaged with the evidence it presented regarding Chinese and Syrian exports, and therefore its findings are not supported by substantial evidence. Mosaic Br. at 30. This argument misses the mark. The standard is whether Commerce's determination is supported by substantial evidence; accordingly, if the record supports Commerce's determination, the determination must stand, even if Commerce has not explicitly discussed every piece of evidence raised by the parties. *See, e.g., Coalition of Am. Flange Producers v. United States*, 448 F. Supp. 3d 1340, 1351 (Ct. Int'l Trade 2020) ("{T}he agency is not required to address every piece of evidence submitted by the parties, and Commerce is presumed to have considered all the evidence in the record absent a showing to the contrary.") (quoting *Aluminum Extrusions Fair Trade Comm. v. United States*, 36 C.I.T. 1370, 1373 (2012); *Jacobi Carbons AB v. United States*, 422 F. Supp. 3d 1318, 1325 n.10 (Ct. Int'l Trade 2019). While Commerce did not address Mosaic's arguments in a granular fashion, it still considered Mosaic's arguments and rejected them, explaining that Mosaic "has failed to point to market dynamics in the destination countries . . . that would lead to a finding of distortion, nor

has it provided sufficient information to support that argument that government influence in these respective countries is causes *export prices* to other markets to be distorted."  IDM at 28 (emphasis in original).  Commerce thus accounted for Mosaic's arguments and found they did not support a finding of distortion.

Commerce's objective for creating a world benchmark price is to provide a reasonable measure of world prices for phosphate rock.  IDM at 28.  In doing so, Commerce selected certain worldwide prices based on their similarity in BPL level, and therefore, comparability, to OCP's own phosphate rock.  *Id*. at 27.  Although Mosaic attempts to undermine the validity of certain export prices, it does not provide sufficient evidence to rebut the presumption that these exports were sold at a market price that would reflect "the commercial realities on the world market." *Id.* at 28 (citing Investigation IDM at Cmt. 3).  Accordingly, the Court should sustain the inclusion of Syrian and Chinese prices.

> 2.  Commerce Properly Included Egyptian Prices Of Phosphate Rock In Its Benchmark Price

In measuring adequacy of remuneration, Commerce used a tier-three benchmark that included all prices that fall within or overlap with the BPL range of OCP's phosphate rock.  IDM at 27.  The Court has sustained Commerce's practice in this regard.  *See Mosaic I*, 659 F. Supp. 3d at 1308.  Mosaic does not contest Commerce's consideration of BPL content, or seriously dispute that Egyptian phosphate rock falls within the appropriate range of BPL levels. Nonetheless, Mosaic disputes Commerce's inclusion of Egyptian phosphate rock because its purportedly high levels of Minor Element Ratio (MER) (*i.e.*, the ratio of iron, magnesium, and aluminum to phosphate) allegedly render it lower quality than OCP's Moroccan phosphate rock. Mosaic Br. at 31-32.  This argument fails.

As an initial matter, this Court has already rejected Mosaic's argument that Commerce should exclude Egyptian phosphate rock for low quality based on non-BPL factors. *Mosaic I*, 659 F. Supp. 3d at 1308-09. In doing so, the Court explained that "Mosaic's argument relies on record evidence that Commerce could have regarded as having little if any probativity on the issue presented." *Id.* Such is the case here as well.

OCP reported that its phosphate rock from the Khouribga and Gantur mines in Morocco have a ██████ percent BPL range (a combined average of ████ percent BPL). OCP IQR at 90 (C.R. 8). According to benchmark data submitted by Mosaic, BPL levels for Egyptian phosphate rock fall within or overlap with the BPL ranges of OCP's phosphate rock. Final Calculation Memo at Att. I, Rock Benchmark Tab (C.R. 408-409); Mosaic Benchmark Submission at Exh. 1(b) (P.R. 191). Commerce thus properly included Egyptian phosphate rock prices in its benchmark calculation. Mosaic claims that the high level of MER Egyptian phosphate rock renders it an inappropriate comparison to OCP's phosphate rock. Mosaic Br. at 31-32. However, as Commerce explained, Mosaic did not even provide a comparison of the MER levels in Egyptian rock to those in OCP's rock.[9] IDM at 28.

Mosaic relies on *Circular Welded Pipes and Tubes from Turkey* in contending that Commerce finds that product characteristics affect comparability where the market for the good in question accounts for such product characteristics in the ordinary course of business. Mosaic Br. at 31 (citing *Circular Welded Carbon Steel Pipes and Tubes from the Republic of Turkey*, 86 Fed. Reg. 6,866 (Dep't of Commerce Jan. 25, 2021), and accompanying IDM at Cmt. 1.

---

[9] Mosaic claims that OCP's statement that its ore is of "high quality" is sufficient to demonstrate its MER levels are not comparable, Mosaic Br. at 32-33, but it belies reason that such a generic statement—not based on any actual MER levels—is sufficient to render Egyptian rock noncomparable.

However, in that proceeding, there was record evidence distinguishing the respondent's purchases between comparable and non-comparable grades. Here, Mosaic has not actually pointed to record evidence showing differences in the MER levels of Egyptian rock and OCP's rock, and has not demonstrated that, even if MER levels differed, MER is a driver of price differences.

Mosaic proceeds to argue that Egyptian phosphate rock is of markedly lower quality than OCP's rock, but mischaracterizes the record evidence in doing so. For example, Mosaic claims that the record shows that "OCP produces phosphate rock with P205 percentages as high as 36.15" whereas Egyptian phosphate rock "has iron impurities that make it a low grade 24-26 percent P205." Mosaic Br. at 32 (citing Mosaic Benchmark Rebuttal Submission at Exhs 7-8 (P.R. 225)). But the report Mosaic relies on to describe Egyptian phosphate rock discusses only one Egyptian mine and is dated October 2011—not remotely contemporaneous to the period of review. *See* Mosaic Benchmark Rebuttal Submission at Exh. 8. Accordingly, it does not substantiate Mosaic's claims as to the low $P_2O_5$ level of Egyptian phosphate rock. Mosaic's cited "evidence" also fails to undermine Commerce's finding that the Egyptian phosphate rock prices Commerce actually *used* for its benchmark have a BPL/$P_2O_5$ content as low as Mosaic claims. *See* Final Calculation Memo at Att. I, Rock Benchmark Tab; Mosaic Benchmark Submission at Exh. 4(a) (P.R. 191).

Finally, Mosaic complains that Commerce simply recited a truism by stating that the "benchmark price is necessarily comprised of prices both above and below the average benchmark price" and its "practice is not to exclude particular benchmark prices simply because they are high or low." *See* Mosaic Br. at 33. But Commerce did not simply "recite a truism." Rather, as demonstrated above, Commerce found that Egyptian rock has similar BPL content to

OCP's rock, and rejected Mosaic's unsupported contention that MER levels were both probative

and demonstrated the noncomparability of Egyptian rock to OCP's.  IDM at 28-29.  Because

Commerce's decision to include Egyptian phosphate rock prices in the benchmark was supported

by substantial evidence, this Court should sustain Commerce's determination.

> 3.    Commerce Reasonably Declined To Include Prices From Certain
>         Countries In Its Benchmark

Commerce reasonably declined to include prices from ███████████ in its

benchmark because, as it explained, the phosphate rock produced in these countries contains

BPL content outside of the range established for OCP's phosphate rock.  *See* BPI Supplement to

IDM at 4-5.  The record demonstrates that these countries have a BPL content of 74-78 (*i.e.*, 34-

36 $P_2O_5$ x 2.1853 conversion factor).  *See* Mosaic Benchmark Submission at Exh. 1(a) (C.R.

182).

As it did below, Mosaic claims that OCP's website represents that it produces phosphate

rock with BPL levels as high as 75 percent and that "these BPL levels are squarely in line with

the BPL levels of phosphate rock from ███████████.  Mosaic Br. at 33 (citing Mosaic

Deficiency Comments at Exh. 7 (C.R. 118).).  But Commerce, in addressing Mosaic's

contention, explained that it relied on OCP's *actual reported and verified data* to construct BPL

levels for OCP's phosphate rock.  *See* BPI Supplement to IDM at 5.  Mosaic cannot colorably

claim that an undated, unverified chart on OCP's website should supersede the verified

information OCP submitted to measure the BPL of the phosphate rock it actually produced

during the relevant time period.

Mosaic also contends that "OCP reported average BPL levels of rock {} consumed

locally or sold for export, not BPL levels of all rock extracted during the POR."  Mosaic Br. at

34.  But Mosaic does not establish why it matters that OCP reported rock consumed locally or

sold for export rather than extracted,[10] whether there is any reason to think the BPL levels would differ between extracted rock and consumed/sold rock, and how this would support reliance on an undated chart on OCP's website over the data verified by Commerce. The Court should reject Mosaic's arguments.

C.    Commerce Reasonably Determined That The Provision Of Phosphate Mining Rights For LTAR Did Not Confer A Measurable Benefit To OCP

Commerce reasonably determined that OCP did not receive a measurable benefit during the period of review from the Provision of Mining Rights for LTAR program. IDM at 12, 29-41. Mosaic challenges Commerce's decision to include OCP's reported 2021 HQ, support, and debt costs in the cost buildup calculation for phosphate rock, and to accept OCP's allocation methodology for those costs. *See* Mosaic's Br. at 13-27. Commerce's determination accords with this Court's decisions in *Mosaic I* and *Mosaic II* (the opinion issued on January 8, 2025, after remand). Moreover, any attempt to further segregate OCP's reconciled and verified HQ, support, and debt costs in a manner inconsistent with its accounting methodology would have been unreasonable and extremely complex. Accordingly, Commerce reasonably determined it was appropriate to accept OCP's allocation methodology.

1.    Relevant Factual Background

As described above, Commerce's tier-three benefit calculation is based on a comparison of the actual per-unit cost build-up of OCP's beneficiated phosphate rock against a market price of phosphate rock. PDM at 9. When performing the cost build-up, Commerce considered the relevant production costs associated with producing and pricing the phosphate rock. IDM at 33. As a result, Commerce instructed OCP to report all costs associated with its production and

---

[10]  If anything, it would seem that the BPL levels of the phosphate rock *sold* would be more meaningful than the BPL levels of the phosphate rock only *extracted*.

pricing of phosphate rock. *Id*. OCP provided its production costs, including amounts for certain indirect costs classified as HQ, support, and debt. *Id*.

In the investigation, OCP reported these costs using an allocation methodology based on the proportion of each of its production sites' share of total costs and capital expenditures. *Mosaic I*, 659 F. Supp. at 1299. Commerce—in the investigation—found that not all the SG&A expenses reported by OCP were necessarily relevant to phosphate rock production and pricing. Investigation IDM at 23-24. As Commerce could not further segregate OCP's HQ, support, and debt costs into costs that were "relevant" or "irrelevant" to phosphate rock production, it determined to exclude OCP's allocated HQ, support, and debt costs from its cost buildup calculations. *Id*. at 24. In *Mosaic I*, however, this Court held Commerce's decision to do so "*per se* unreasonable" in light of "record evidence that OCP engaged in mining activities and incurred SG&A costs in doing so{.}" *Mosaic I*, 659 F. Supp. 3d at 1300. The Court also held that Commerce had not substantiated its rejection of OCP's allocation methodology. *Id.* at 1301.

In the underlying review, Commerce preliminary determined to exclude HQ, support, and debt costs from the cost buildup, as it did in the investigation. Preliminary Calculations Memo at 5 (C.R. 250). However, subsequent to the issuance of *Mosaic I* and after performing an in-person verification of OCP's reported costs, including HQ, support, and debt costs, where Commerce noted no discrepancies, Commerce reevaluated the issue and, in the final results, determined to include those costs and accept OCP's allocation methodology. IDM at 33-37.

> 2.    Commerce Reasonably Decided To Accept OCP's Allocation
>        Methodology

Commerce's decision to accept OCP's reported SG&A cost allocation methodology and include the resulting costs in OCP's cost buildup was reasonable and in accordance with *Mosaic*

*I* and *Mosaic II*.[11]  *See* IDM at 33-37.  OCP's HQ, support, and debt costs are, by their nature, recorded on a companywide basis.  IDM at 35; *see also* OCP Case Brief at 9-16; (C.R. 403).  In other words, although the record indicates these costs are related to production, they are not directly related to production in OCP's accounting methodology, and thus, cannot be reasonably further segregated into costs that are "relevant" or "irrelevant" to phosphate rock production.  *See id.; Mosaic I*, 659 F. Supp. 3d at 1301 ("OCP could not place on the record "segregated" SG&A cost data that did not exist.").  Therefore, to report these costs, OCP relied on an allocation methodology.  IDM at 35.  After verification of OCP's costs, and in the absence of evidence that OCP's method of allocation is distortive or that a superior alternative exists, Commerce accepted OCP's allocation methodology.  IDM at 36.  Mosaic establishes no reason to disturb this determination.

Commerce, in explaining its decision to rely on OCP's methodology, first observed that, when considering relevant costs in a cost buildup calculation under a tier-three analysis, neither 19 CFR § 351.511(a)(2)(iii) nor the *CVD Preamble* imposes specific requirements or mandates a specific approach.  IDM at 33.  Commerce then found that the record evidence demonstrated that OCP's HQ, support, and debt costs were relevant to OCP's production and pricing of phosphate rock.  *Id.* at 35 (citing, *e.g.*, OCP IQR at 82-25, Exhs. MIN-12(a) and (b), MIN-14, and MIN-16 (C.R. 8, 15); OCP SQR2 at 15-17 and Exh. MIN2-5(a)-(f) (C.R. 156, 161-162); OCP SQR3 at 1-27 and Exh. MIN-3-1 to MIN-3-6I (C.R. 222-226), Verification Report).  Commerce explained that OCP's HQ, support, and debt costs could not reasonably be further segregated into more specific costs that are "relevant" or "irrelevant" to phosphate rock production, and that

---

[11]  We recognize that, in *Mosaic II*, the Court remanded for Commerce to consider an alternative cost allocation methodology proposed by Mosaic.  *Mosaic II* at 18.  However, here there are no alternative methodologies on the record.

attempting to further segregate OCP's reconciled and verified costs in a manner inconsistent with its accounting methodology would have been unreasonable and extremely complex. *Id*. Accordingly, Commerce determined that OCP's allocation methodology, which was based on the proportion of each of its production sites' share of total costs and capital expenditures, reasonably reflected OCP's phosphate rock production costs and determined to use it in creating a cost buildup for OCP. *Id*.

Mosaic lodges multiple complaints against OCP's allocation methodology, alleging that Commerce did not address them in the final results. Mosaic claims that: 1) OCP's HQ and support allocations costs are distorted from including costs that had no direct bearing on the provision of phosphate rock and that the record supports that a portion of the allocation costs were "incurred at different legal entities" because those entities shared OCP's headquarters address as well as involved sales to OCP's affiliates; 2) the allocation of OCP's HQ and support costs based on OCP's phosphate rock and chemical production industrial divisions was unreasonable because OCP's headquarters supported other business activities and operations, OCP's site-level production costs were not incurred in relation to OCP's HQ support costs, and OCP's allocation by site costs arbitrarily excluded certain costs; and 3) OCP overstated its debt costs by omitting financial income, thus inflating the cost of OCP's financial expenses and leading to distortion because OCP's lending was not solely based on funding capital expenditures. *See* Mosaic Br. at 23-27.

While Commerce did not explicitly address these specific arguments, it explained that it found OCP's cost allocation methodology to be reasonable under the circumstances, and that Mosaic had not substantiated its allegations that the methodology was distortive. IDM at 36. Commerce also observed that Mosaic had not suggested an alternative that would better capture

the relevant HQ, support, and debt costs while also assuaging Mosaic's concerns about distortions. *Id.* at 36.  Having verified the costs in question, including those claimed to cause distortion, Commerce reasonably concluded that, based on the information available, OCP's allocation methodology was the most appropriate way to reflect the HQ, support, and debt costs incurred by OCP that were relevant to its mining. *Id.* at 33-36.  As explained above, Commerce is not required to explicitly address all evidence, but is presumed to have considered it.

Commerce is afforded broad discretion in constructing a reasonable methodology for measuring the benefit of a subsidy. *See Nucor Corp. v. United States*, 633 F. Supp. 3d 1302, 1309 (Ct. Int'l Trade 2023) ("Commerce otherwise has discretion to develop a method for assessing the adequacy of remuneration.").  Although Mosaic may disagree with OCP's method of allocation and what constitutes a related expense, it has not provided a reasonable alternative for how Commerce should remove expenses it subjectively deems "unrelated" to the production of phosphate rock, nor has it proffered evidence or legal authority that would render OCP's allocation methodology *per se* unreasonable.  *See AK Steel*, 192 F.3d at 1381 ("{A}lthough the burden of production initially {is} on Commerce to establish a prima facie case for imposing a countervailing duty, the burden of production then shift{s} to the {disagreeing party} to come forward with sufficient evidence to rebut the prima facie case") (citations omitted).

Given the substantial record evidence that OCP incurred HQ, support, and debt costs relevant to OCP's production and pricing of phosphate rock, for Commerce to exclude all of OCP's HQ, support, and debt costs from the cost buildup would be tantamount to an "implied finding that OCP incurred *zero* SG&A expenses." *See Mosaic I*, 659 F. Supp. 3d at 1300.  The wholesale exclusion of these costs, which Mosaic argues for, would unreasonably distort

Commerce's calculation by indiscriminately removing indirect costs clearly relevant to phosphate rock production.  Mosaic cannot demonstrate otherwise.

Because the record demonstrates that OCP incurred HQ, support, and debt costs while mining phosphate ore and during the beneficiation of phosphate rock for sale, OCP reasonably explained why and how those costs should be accounted for in its cost buildup calculations, and because Commerce verified OCP's costs and found no discrepancies, Commerce's determination to accept OCP's allocation methodology and include its HQ, support and debt costs in its cost buildup is supported by substantial evidence and in accordance with law.  *See Wheatland Tube Corp. v. United States*, 841 F. Supp. 1222, 1234 (Ct. Int'l Trade 1993) ("Commerce has broad discretion to choose a methodology to satisfy the statutory mandate.").

> 3.    Mosaic's Arguments That OCP's Cost Buildup Should Not Include HQ, Support, and Debt Costs Fail

Mosaic lodges numerous arguments in an attempt to demonstrate that OCP's HQ, support, and debt costs were unrelated to phosphate rock mining and beneficiation.  *See* Mosaic Br. at 15-21.  These arguments fail, as they are unsupported by the record and do not accord with this Court's precedent.

First, Mosaic contends that Commerce unlawfully shifted the burden of proof onto Mosaic to show that OCP's HQ, support, and debt costs were related to phosphate rock mining and beneficiation.  Mosaic Br. at 15.  This contention has no merit.  Commerce explained that the record evidence supported a finding that those costs were relevant; requiring Mosaic to overcome that evidence to make a contrary finding does not constitute impermissible burden-shifting.  IDM at 35.  Moreover, Mosaic's position cannot be squared with this Court's "rul{ing} that OCP incurred certain identified corporate-wide SG&A costs that were reasonably related to its phosphate mining activities."  *Mosaic II* at 17 (citing *Mosaic I*, 659 F. Supp. 3d at 1300-01).

50

While Mosaic may disagree with the conclusion that "documentation demonstrate{es} that OCP's SG&A expenses included costs attributable to its phosphate mining operations{,}" *Mosaic I,* 659 F. Supp. 3d at 1300, it cannot establish that the Court erred, or that Commerce put an unreasonable burden on Mosaic to demonstrate that the costs should not be included in OCP's cost buildup.

This is particularly so given the multiple pieces of record evidence demonstrating that OCP had incurred HQ, support, and debt costs associated with phosphate rock for this period of review. IDM at 35. OCP provided descriptions, explanations, and supporting documentation for including these costs as related costs. *Id.* (citing OCP IQR at 82-85, Exhs. MIN-14 and MIN-16; OCR SQR2 at 15-17 and Exhs. MIN2-5(a) to (f); OCP SQR3 at 1-27 and Exhs. MIN3-1 to MIN-3-6; Verification Report). OCP also explained that phosphate mining is a capital-intensive activity, and thus financing and debt costs are routinely an essential part of its mining operations. *See* OCP IQR at 84-85, Exhs. MIN-12(b) and MIN-15. OCP pointed out that, for example, financing and debt costs associated with OCP's mining operations primarily represent interest expenses on loans used to fund capital improvements associated with its mining operations. *Id*. And, when Commerce conducted verification, it found this information to be consistent with OCP's representations, and noted no discrepancies. IDM at 33-35; *see also* OCP Rebuttal Comments at 6-7; Verification Report (C.R. 399). Through OCP's questionnaire response and Commerce's verification of these responses, Commerce was satisfied with the reliability of OCP's financial recording system and satisfied that the financial recording system supports the submitted financial statements. IDM at 35. Accordingly, Commerce reasonably determined that OCP used financing for projects connected directly to its mining and phosphate rock production operations. As the Court held in *Mosaic I*, it would have been unreasonable for Commerce to

exclude the HQ, support, and debt costs in light of the record. *See Mosaic I,* 659 F. Supp. 3d at 1300-01.

Mosaic counters that only a small portion of OCP's HQ and support costs are relevant to OCP's production and pricing of phosphate rock. *Id.* at 16. Mosaic claims that "OCP only documented ███ HQ personnel whose positions related to phosphate mining or rock processing, out of approximately ███ employees" and "documented only ███ – accounting for ███ of its 2021 HQ/Support costs – as arguably related to phosphate rock mining and processing." *Id.* at 16-17. Mosaic also alleges that the ███ ███ of OCP's 2021 HQ/Support costs consisted of ███ ███" and that this category has grown because of its ███ ███. *Id.* at 18, 21-23.

Based on these examples, Mosaic argues that certain costs are indisputably unrelated to the production of phosphate rock. Mosaic's arguments rely on the faulty premise that Commerce may not include any of OCP's HQ and support costs in the cost buildup unless OCP would be able to segregate these costs into those related and unrelated to phosphate rock production. But, as the Court observed in *Mosaic I*, OCP could not have segregated the costs in such a manner. *See Mosaic I*, 659 F. Supp. 3d at 1301 ("OCP could not place on the record 'segregated' SG&A cost data that did not exist."). OCP explained, as it did in the investigation, that these costs are recorded on a company-wide basis and are not directly tied to production in OCP's accounting methodology; thus, they cannot be reasonably further segregated into costs that are "relevant" or "irrelevant" to phosphate rock production. Given this, and the Court's admonition in *Mosaic I* that Commerce's exclusion of the costs in the investigation was unreasonable, Commerce

justifiably determined to include the costs—many of which the record demonstrated were relevant—and accept OCP's cost allocation methodology.

Mosaic relies on Commerce's remand in litigation concerning phosphate fertilizers from Russia in alleging that Commerce found in a similar situation that the respondent had improperly included unrelated expenses. *See* Mosaic Br. at 19 (citing *The Mosaic Company v. United States*, No. 21-00117, ECF No. 128 (Fertilizers from Russia Remand Results), *aff'd*, *The Mosaic Company v. United States*, No. 21-00117, 2024 WL 208136 (Ct. Int'l Trade Jan. 19, 2024) ("We find no evidence that EuroChem improperly included costs not related to phosphate ore mining and phosphate rock production in its reported costs.")). But Mosaic misunderstands the nature of Commerce's remand redetermination. Commerce explained on remand that it had "*no information* on the specific expenses {for} {} line items such as 'Selling Expenses,' 'Administrative Expenses,' and 'Other Expenses' {.}" *See* Fertilizers from Russia Remand Redetermination at 19 (emphasis added). Accordingly, Commerce determined not to adjust the buildup for costs. In contrast, here there is substantial record information that the allocated HQ, support, and debt costs OCP reported are related to the production of phosphate fertilizers.

Mosaic also cites two administrative determinations—*Hot-Rolled Steel from India* and *Softwood Lumber from Canada*—in claiming "that Commerce's practice requires it not to accept OCP's reported HQ/Support and Debt costs wholesale for use in the cost buildup." Mosaic Br. at 19-20. But these determinations merely discuss Commerce's inclusion of indirect costs under its benefit analysis and provide no limitation on how Commerce is to do so. *See Certain Hot-Rolled Carbon Steel Flat Products from India*, 73 Fed. Reg. 1,578, and accompanying PDM (Dep't of Commerce Jan. 9, 2008) ("{W}e added the operational mining costs, on a per unit basis, which

consisted of materials, labor, depreciation, overhead, and royalties.");[12] *Certain Softwood*

*Lumber Products from Canada*, 82 Fed. Reg. 51,814 (Dep't of Commerce Nov. 8, 2017), and

accompanying IDM at Cmt. 24 ("{Commerce} examined these costs at verification and found

that the reported costs were tied to either the respondents' tenure obligations or to expenses

relating to accessing, harvesting, or hauling timber to the mills.").

Commerce further discussed these determinations in its final results, concluding that they

did not support a practice of including only costs that must be incurred.  IDM at 33-34.  If

anything, Commerce found that *Hot-Rolled Steel from India* supported including indirect costs.

IDM at 34 (citing the inclusion of overhead in that proceeding).  Mosaic further mischaracterizes

*Softwood Lumber from Canada* as establishing a practice for when Commerce is to accept or

deny indirect expenses.  *See* Mosaic's Br. at 20-21.  In *Softwood Lumber from Canada*, the

petitioner had argued that cost adjustments should not be granted for indirect costs because they

were not directly related to production.  *Softwood Lumber from Canada* IDM at Cmt. 23.

However, because record evidence demonstrated that the respondents must incur these costs to

access and harvest timber, Commerce examined these costs at verification and determined that

they were tied to tenure rights and expenses relating to accessing, harvesting, or hauling timber

to the mill, warranting adjustments for the costs reported by the respondents.  *Id.*  But, as stated

above, that determination did not establish a limitation for what Commerce should consider

when including indirect expenses, require that Commerce *only* include indirect costs when they

*must* be incurred, or establish a practice of excluding indirect costs by default.

---

[12]  Commerce expressly considered "overhead," a common measure of indirect expenses, as part of "operational mining costs" along with materials, labor, and other things.

If anything, *Softwood Lumber from Canada* only illustrates the fact-specific nature of Commerce's tier-three analysis. The aim of that analysis is not to construct an exact market price of phosphate rock, but instead to determine a reasonable estimate of the market value for phosphate rock as consumed in Morocco, relying on the data available on the record. In assessing whether the government price is consistent with market principles, Commerce's practice is to analyze and apply certain factors (*e.g.*, the government's price-setting philosophy, costs, possible price discrimination) on a case-by-case basis. *See CVD Preamble*, 63 Fed. Reg. at 65,378. Commerce has stated as much. *See Coated Free Sheet Paper from Indonesia*, 72 Fed. Reg. 60,642 (Dep't of Commerce Oct. 25, 2007), and accompanying IDM at Cmt. 11 ("by its nature, the {tier-three} analysis depends upon available information concerning the market sector at issue and, therefore, must be developed on a case-by-case basis.") (*CFS from Indonesia*).

Citing its practice in *CFS from Indonesia*, Commerce explained that its tier-three analysis allows it to appropriately address the unique nature of OCP's phosphate mining and processing operations. IDM at 34. Mosaic claims that Commerce "failed to explain how its acceptance of the entirety of OCP's HQ/Support and Debt costs reflects the 'unique nature of OCP's phosphate mining and processing operations'" or "any of the 'four main phases' of the production of phosphate rock." Mosaic Br. at 17. But OCP explained that the production of phosphate rock necessarily involves four main phases: extraction, stone removal, beneficiation, and transportation. IDM at 34. These phases involve distinct and diverse activities involving multiple mining sites, processing facilities, and transportation hubs (*i.e.*, rail terminals and pipelines). *Id.* And, as Commerce observed, OCP provided descriptions, explanations, and supporting documentation for these related costs, as well as audited financial information for the basis of its cost build-up calculation. *Id.* at 35. Moreover, Commerce confirmed that this

information was consistent with its observations at verification and with OCP's representation of these costs.  *Id*.  Given this, plus OCP's inability to segregate costs and this Court's decision in *Mosaic I*, Commerce reasonably included OCP's HQ, support, and debt costs.

VI.    Commerce's Determination That OCP Conferred No Benefit From ANP's Provision Of Port Services And Infrastructure Was Lawful And Supported By Substantial Evidence

Mosaic alleges that Commerce erred in finding that the Agence Nationale des Ports (ANP)'s provision of port services and infrastructure conferred no measurable benefit to OCP during the period of review, and that Commerce was required to make findings of financial contribution and specificity for this program but declined to do so.  These arguments lack merit, and the Court should reject them.  Commerce was not required to make additional findings for a program it determined it could not countervail, and it properly determined—based on a careful examination of the record—that OCP had received no measurable benefit from ANP's provision of port services and infrastructure.

A.    Relevant Factual Background

ANP—the Morrocan port authority—can enter into concession or authorization contracts with third-party companies that wish to provide commercial port services in Morocco.  *See Post-Preliminary Memo* at 3 (C.R. 401); *see also* GOM NSA IQR at PORT-I-1 and Exh. PORT-3 (C.R. 249).  According to the GOM, ANP does not provide "port services" other than managing water and electricity connections to the ports.  *Id*.

During the period of review, OCP held concession contracts with ANP to operate terminals at the ports of Casablanca, Jorf Lasfar, and Safi.  *Id*.  After reviewing the concession agreements between OCP and ANP, Commerce determined that OCP operates terminals at each port on its own behalf and within the limits identified by the concession agreement.  *Id*.  OCP pays a concession fee to ANP to operate these terminals.  *Id*.  (citing GOM NSA IQR at PORT-I-

11 and Exhs. PORT-4 to PORT-6 (C.R. 244, C.R. 249-251)).  Commerce also found that OCP █

███████████████████████████████████████████████████████. *Id*. (citing GOM

NSA IQR at PORT-I-2 to PORT-I-3).  Though concession holders may provide services to third

parties and establish revenue-sharing agreements with ANP, OCP and the GOM both reported

that OCP did not provide services to third parties during the period of review, and OCP's

concession agreements did not indicate that it had a revenue-share arrangement with ANP.  *Id*.

Commerce also found no evidence during verification at the Port of Casablanca that OCP was

providing services to third parties from its terminal there.  *Id*.

Commerce conducted a tier-three analysis to determine whether the provision of port

services and infrastructure were provided for LTAR.  *Id*.  In doing so, Commerce assessed

whether the prices charged by ANP (*i.e.*, the concession fees) were set in accordance with market

principles, examining factors such as ANP's price setting philosophy and costs—including rates

of return sufficient to ensure future operations.  *Id*. at 5.  Commerce observed that the GOM had

stated that the concession agreements between OCP and ANP established that ████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████

████.  *Id*. (citing GOM NSA SQR2 at 6 (C.R. 298).  Accordingly, as explained by the GOM,

ANP reasonably anticipated incurring ████████ costs in connection with those concessions and

███████████████████████████████████████████████████████

████████████████████████.  *Id*. (citing GOM NSA SQR2 at 6-7).

To support its statements, the GOM provided total cost and total revenue data on a port-

by-port basis, as maintained in ANP's normal accounting books and records, demonstrating that

the three ports out of which OCP operates ████████████████████████.  *Id*. at 6 (citing

GOM NSA SQR at Exh. SUPP-PORT-3 (C.R. 269, 283); GOM NSA SQR2 (C.R. 298). The

GOM further reported that ANP reported both an operating profit and net profit in 2019, 2020,

and 2021. *Id.* (citing GOM NSA IQR at PORT-I-3, Exh. Port-1 (C.R. 244-248). Given all this,

Commerce preliminary determined that this program conferred no benefit to OCP. *Id.*

In the final results, Commerce continued to find that the program conferred no benefit to

OCP. IDM at 52-54. In doing so, Commerce cited ANP's reported profit and the lack of

evidence demonstrating that the concession fees charged by ANP were not set in accordance with

market principles. Commerce also explained that it would not address financial contribution and

specificity, as it had found that OCP did not receive a benefit. *Id.* at 50-51.

B.     In Light Of Its Determination That OCP Did Not Receive A Benefit, Commerce
       Had No Obligation To Make Financial Contribution And Specificity Findings

Mosaic alleges that Commerce unreasonably failed to determine that the provision of port

services was specific and provided a financial contribution. Mosaic's Br. at 43-45. But, because

Commerce found no benefit was conveyed to OCP from this program during the period of

review, it was not required to further analyze specificity and financial contribution. Mosaic fails

to cite any authority requiring Commerce to make such findings following a determination that a

program conferred no benefit.

For a subsidy to be countervailable, Commerce must find that the subsidy: 1) is one in

which an authority provides a financial contribution to a person, 2) a benefit is thereby conferred,

and 3) the subsidy is specific. *See Bethlehem Steel Corp. v. United States*, 26 C.I.T. 1003, 1009

(2002) (citing 19 U.S.C. § 1677(5)(A)-(B)). All three elements must be satisfied before

Commerce may countervail a program. *See Fine Furniture (Shanghai) Ltd. v. United States*, 748

F.3d 1365, 1369 (Fed. Cir. 2014) ("Analyzing all three factors is therefore necessary for

Commerce to determine whether a {countervailing duty} must be imposed.").

Here, Commerce explained that, because it determined that the prices charged by ANP are set in accordance with market principles, no benefit was conferred to OCP and therefore the program was not countervailable.  IDM at 54.  Accordingly, Commerce was not required to analyze the additional factors—specificity and financial contribution.  *See e.g., Certain Cold-Rolled Steel Flat Products from the Republic of Korea*, 87 Fed. Reg. 20,821 (Dep't of Commerce Apr. 8, 2022), and accompanying IDM at Cmt. 1 ("{A}s we find no benefit from the provision of electricity for LTAR in these final results of review, we need not address the comments regarding the specificity of this program.") *aff'd*, *Nucor Corp. v. United States*, 633 F. Supp. 3d 1225, 1228 (Ct. Int'l Trade 2023) (sustaining Commerce's no benefit determination).  Mosaic cannot demonstrate otherwise.  As we demonstrate below, Commerce's determination that OCP was not conferred a benefit by the provision of port services was lawful and supported by substantial evidence.  But, even if this Court were to find that it was not, the only proper recourse would be to remand for Commerce to make specificity and financial contribution findings in the first instance.

      C.      <u>Commerce Reasonably Determined That OCP Was Not Conferred A Benefit</u>

Commerce reasonably determined, based on substantial record evidence, that ANP's pricing was consistent with market principles, and that the provision of port services did not confer a benefit to OCP during the period of review.  IDM at 53, Post-Preliminary Memo at 3-6.

In determining whether the provision of port services and infrastructure are provided for less than adequate remuneration, Commerce relied on a tier-three benchmark analysis pursuant to 19 C.F.R. § 351.511(a)(2)(iii).  *See* Post-Preliminary Memo at 3.  Under this analysis, Commerce assessed whether the prices charged by ANP (*i.e.*, the concession fees) were set in accordance with market principles through an analysis of factors such as ANP's price setting philosophy and costs (including rates of return sufficient to ensure future operations).  IDM at 53; Post-

Preliminary Memo at 5.  Commerce did not place these factors into any particular hierarchy. IDM at 53; *see also CVD Preamble*, 63 Fed. Reg. at 65,348.

 The GOM stated that the concession agreements between OCP and ANP established that

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████

███████████████.  *See* GOM NSA SQR2 at 6.  Accordingly, ANP reasonably anticipated incurring ███████ costs in connection with those concessions and █████████████

█████████████████████████████████████████████████████████████

████.  *Id*. at 6-7.  The GOM's data also demonstrated the ██████████ of the three ports out of which OCP operates.  Given the GOM's narrative explanation of ANP's price-setting philosophy (including the consideration of OCP's ███████████████), ANP's generation of ███████████

████████████████, and overall profitability, Commerce reasonably determined that this program conferred no benefit to OCP.  Post-Preliminary Memo at 5-6.

 Mosaic makes several arguments, which largely overlook the unique nature of the agreements between OCP and ANP, whereupon ████████████████████████

█████████████████████████████████████████████████████████████

█████████████████, and which, in any event, are unpersuasive.  First, Mosaic contends that the ████████████ ANP uses to determine the starting point for its concession negotiations does not account for ANP's costs, revenues or profits.  Mosaic Br. at 36-37.  This argument lacks basis.  As discussed above, ANP negotiated its concession contracts to ensure its profitability, and record evidence demonstrates that this goal was achieved for three consecutive years.  *See* GOM 2nd NSA SQR at 7; Post-Preliminary Memo at 5.  Furthermore, the GOM provided total cost and total revenue data on a port-by-port basis demonstrating that the three ports out of which

OCP operates ████████████████████████████. *See* GOM NSA SQR at Exhibit

SUPP-PORT-3; GOM NSA SQR2).  Commerce was also able to verify this information when it

conducted on-site verification at the Port of Casablanca.  *See* GOM Verification Report at 3.

Given this, one market ██████████████████████████████████████████████

████.  Moreover, during concession negotiations, ANP ██████████████████

████████████████████████████████████████████████████████

████.  *See* Exhibit 2D-SUPP-PORT-9 (C.R. 308).

Mosaic also claims that ANP's ████████████ does not contain evidence that ANP

███████████████████████████████████████████████████.  Mosaic

Br. at 37.  But Mosaic has no basis for assuming that such evidence is necessary or even relevant

to determining that the specific concession agreements between ANP and OCP were market-

based.  The GOM reported that ANP does not use a ████████████████████

██████████████████████████ that ANP used to determine the starting point

for its negotiations.  *See* GOM NSA IQR at PORT-1-5; GOM NSA SQR at 6.  This ████████

████████████████████████████████████████████████████████

███████████████████████.  *See* GOM NSA SQR at 3-5 and Exh. 2D-

SUPP-PORT-3; *see also* GOM Verification Report at 5-6.  The GOM also explained that, given

ANP's ████████████ as a result of these concession agreements, tethering the level of

concession fees to ANP's profitability would result in substantially lower concession fees.  *See*

GOM NSA SQR2 at 4.  Accordingly, the ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████ ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████. GOM NSA SQR at 6-7.

Mosaic attempts to undermine the GOM's reliance on the ████████████████,

arguing that ████████████████████████████████████████

████████████████████████████████████ and that ██

████████████████████████████████████████████

████████████████ Mosaic Br. at 37 (citing GOM 2nd NSA SQR at Exh. 2D-SUPP-PORT-

9 at 45-51). While Mosaic may have preferred that ANP use an alternate price setting

methodology, this does not mean that ANP's actual methodology was inconsistent with market

principles, or that ANP's methodology did not ensure its profitability. Indeed, the evidence

demonstrates otherwise.

Mosaic also argues that record evidence shows that ANP ████████████████

████████████████████. Mosaic Br. 38-42. Specifically, Mosaic cites

emails detailing negotiations between ANP and OCP, and compares OCP's concession agreement

with other concessionaires to imply that OCP was given some sort of an advantage. *Id*. But

Mosaic does no more than make unsupported accusations that OCP received favorable treatment.

And Mosaic again ignores that the concession agreements between OCP and ANP were

predicated on ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████. *See, e.g.*, GOM NSA IQR at Exh. PORT-4, Part 4-A-

I, Arts. 6.1, 8, and 10; *id*. at Part 4-B-I, Arts. 3-1, 7-4-2, 9, 16, 18, 20, 22-2, and 24-2.

Accordingly, ANP anticipated incurring ████ costs and its ███████████████

███████████████████████████████████████████████████████

████. Post-Preliminary Memo at 5-6. In sum, the record demonstrates that ANP had ████

████████████ from its agreement with OCP. This differentiates OCP's agreements from

those ANP entered into with other concessionaires, and renders Mosaic's claims meritless.

To the extent that Mosaic implies that there is any sort of cross-subsidization, Mosaic

provides no evidence to support this assumption other than some companies have paid ████

████████████. But the GOM explained that, regarding OCP, "███████████████

███████████████████████████████████████████████████████

██████████████████████████." *See* GOM

SQR at 6-7. The mere fact that certain █████████████████ does not

detract from Commerce's finding that ANP's concession fee negotiations were consistent with

market principles.

Mosaic nitpicks further at the record, but does not establish that, even if its

characterizations are accurate, Commerce's determination that OCP was conferred no benefit

was unreasonable. For instance, Mosaic claims that "the ████ that the GOM submitted as

Exhibit 2D-SUPP-PORT-3 showed that ANP ██████████████████

███████████████████████████████████████████████

████" and "that ANP ████████████████████████

███████████████████████████████████████████████

████████." *See* Mosaic Br. at 40-41. But Mosaic cannot demonstrate why ANP ████

██████████████████████ is problematic, and, again,

Mosaic ignores the distinctive nature of the agreements between OCP and ANP, whereupon

████████████████████████████████████████.  After considering the record

evidence and arguments raised by interested parties, Commerce reasonably determined that the

concession fees charged by ANP were set in accordance with market principles and that OCP did

not receive a benefit.  The Court should sustain this determination.

      D.    <u>Mosaic Raises A New, Meritless Argument</u>

     Mosaic raises—for the first time—a new argument that ANP's profitability is non-

dispositive.  Mosaic Br. at 35.  The Court should decline to consider this new argument because

Mosaic did not raise it during the administrative proceeding, and so Commerce was deprived of

the opportunity to address it in the first instance.  *See Boomerang Tube*, 856 F.3d at 912; *see also*

*Mittal Steel Point Lisas v. United States*, 548 F.3d 1375, 1383-84 (Fed. Cir. 2008) ("Simple

fairness to those who are engaged in the tasks of administration, and to litigants, requires as a

general rule that courts should not topple over administrative decisions unless the administrative

body not only has erred but has erred *against objection made at the time appropriate under its*

*practice*.") (emphasis in original).  Mosaic cannot establish that any of the limited exceptions to

the exhaustion requirement apply.

     Even if the Court considers Mosaic's new argument, the argument fails.  Mosaic argues

that "the mere fact that a government authority's provision of services is profitable does not

mean that it sets prices consistent with market principles."  Mosaic Br. at 35.  First, Commerce

did not rely solely on ANP's profitability in rendering its determination.  Commerce also looked

to ANP's price-setting philosophy, taking into account that ANP negotiates its contracts under

normal market conditions, and looking at ANP's ████████████ that serves as the starting

point for negotiations, as well as ████████████████.  *See* Post-Preliminary Memo at

5.  Moreover, the administrative determinations Mosaic relies on do not support its claim; rather,

they only show that Commerce evaluated the evidence in those respective records to determine whether the application of certain price-setting mechanisms provide cost recovery for the authority administering the program under review. *See Utility Scale Wind Towers from Malaysia*, 86 Fed. Reg. 30,593 (Dep't of Commerce June 9, 2021), and accompanying IDM at Cmt. 3 (explaining that the record had too incomplete costs/profit information to allow Commerce to affirmatively conclude that the program was profitable, and that, along with the government's funding of the program, the pricing mechanism did not necessarily demonstrate that the government's pricing reflected market principles.); *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the Republic of Korea*, 86 Fed. Reg. 35,267 (Dep't of Commerce July 2, 2021), and accompanying IDM at Cmt. 1 ("{C}ost recovery is one of the primary factors that impact pricing decisions and the extent that KEPCO receives adequate remuneration for its electricity sales.").

In sum, ANP's price setting methodology corroborated with its profitability and supports a determination that ANP's prices are set in accordance with market principles. None of Mosaic's arguments successfully refute this finding. The Court should thus sustain Commerce's determination that OCP was not conferred a benefit from the provision of port services and infrastructure.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny plaintiffs' motions for judgment upon the administrative record and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

<div style="float:right">

PATRICIA M. McCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

/s/ Sosun Bae
SOSUN BAE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 305-7568
Fax: (202) 307-0972
Email: sosun.bae@usdoj.gov

</div>

OF COUNSEL:
ASHLANDE GELIN
Attorney
Office of the Chief Counsel
  for Trade Enforcement & Compliance
U.S. Department of Commerce

Dated: January 14, 2025                    Attorneys for Defendant

## <u>CERTIFICATION OF COMPLIANCE</u>

Pursuant to this Court's January 10, 2025 order, defendant's counsel certifies that this brief complies with the Court's type-volume limitations rules.  According to the word count calculated by the Microsoft Word processing system used to prepare this brief, I certify that this brief contains 19,703 words, excluding those exempted portions of this brief.

<u>/s/ Sosun Bae</u>

January 14, 2025