## UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| THE MOSAIC COMPANY,<br><br>PLAINTIFF,<br><br>AND<br><br>OCP S.A.,<br><br>CONSOLIDATED PLAINTIFF,<br><br>V.<br><br>UNITED STATES,<br><br>DEFENDANT,<br><br>AND<br><br>THE GOVERNMENT OF THE KINGDOM OF MOROCCO AND OCP S.A.,<br><br>DEFENDANT-INTERVENORS,<br><br>AND<br><br>THE MOSAIC COMPANY,<br><br>CONSOLIDATED DEFENDANT-INTERVENOR. | Consol. Court. No. 23-00246 |

## ORDER

Upon consideration of the Rule 56.2 motions for judgment on the agency record filed by The Mosaic Company (ECF Doc. 45), and OCP S.A. (ECF Doc. 43), all responses thereto, and all other relevant papers and proceedings herein, it is hereby:

ORDERED that The Mosaic Company's Rule 56.2 motion for judgment on the agency record is DENIED; and it is further

ORDERED that OCP S.A.'s Rule 56.2 motion for judgment on the agency record is GRANTED; and it is further

ORDERED that the final determination of the U.S. Department of Commerce is REMANDED for further proceedings consistent with the Court's opinion.

SO ORDERED.

Date:_____          Signed:_____
       New York, New York                      Timothy C. Stanceu, Judge

## UNITED STATES COURT OF INTERNATIONAL TRADE
### BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| THE MOSAIC COMPANY, <br>           PLAINTIFF, <br>     AND <br> OCP S.A., <br>           CONSOLIDATED PLAINTIFF, <br>     V. <br> UNITED STATES, <br>           DEFENDANT, <br>     AND <br> THE GOVERNMENT OF THE KINGDOM OF MOROCCO AND OCP S.A., <br>           DEFENDANT-INTERVENORS, <br>     AND <br> THE MOSAIC COMPANY, <br>           CONSOLIDATED DEFENDANT-INTERVENOR. | Consol. Court. No. 23-00246 <br><br> **NON-CONFIDENTIAL VERSION** <br><br> **Confidential Information Removed from Square Brackets at Pages i, iv, 1, 3-5, 9-15, 18-22, and 24-25.** |

## RULE 56.2 RESPONSE BRIEF OF THE GOVERNMENT OF THE KINGDOM OF MOROCCO

Jonathan M. Zielinski
James E. Ransdell, IV
Stephen A. Laufer

CASSIDY LEVY KENT (USA) LLP
2112 Pennsylvania Avenue, N.W.
Suite 300
Washington, D.C. 20037
(202) 787-5507
(202) 567-2301
*jzielinski@cassidylevy.com*

*Counsel to The Government of the Kingdom of Morocco*

Dated:  January 28, 2025

Confidential Information Contained
in Square Brackets

NON-CONFIDENTIAL VERSION

## Table of Contents

Page

**RULE 56.2 STATEMENT** ................................................................................. 1

**I.    Administrative Determination** ................................................................. 1

**II.   Issues Presented** ....................................................................................... 1

**III.  Statement of Facts** ................................................................................... 2

**SUMMARY OF ARGUMENT** ....................................................................... 5

**ARGUMENT** ..................................................................................................... 6

**I.    Standard of Review** ................................................................................... 6

**II.   Mosaic's Arguments Are Contradicted by the Verified and Substantial Record
        Evidence that ANP's Concession Pricing is Based Upon Market Principles** ................. 7

    A.   Contrary to Mosaic's Claim, Commerce Verified that ANP's Concession
        Negotiations are Based Upon Market Principles ........................................ 9

        1.   Commerce scrutinized and verified ANP's reporting that OCP's
            concession fees were set to ensure ANP would cover its costs and make a
            profit ............................................................................................ 9

        2.   Mosaic's arguments regarding ANP's [
                       ] contradict the record and Commerce
            found that Mosaic's comparisons to other concession agreements are not
            meaningful ................................................................................... 12

        3.   Mosaic's newly raised arguments regarding profitability and cross-
            subsidization should be disregarded and are otherwise without merit ................ 15

    B.   Mosaic's [                          ] Arguments Fail to Overcome Commerce's
        Reasonable Determination That ANP's Concession Fees Are Consistent With
        Market Principles ......................................................................................... 18

        1.   Because the standard for market-based price setting is not inconsistent
            with [                          ], this Court need not reach Mosaic's [
                       ] arguments ................................................................... 18

        2.   ANP [
                             ] ................................................................... 19

　　　3.　Mosaic's attempts to compare concession agreements do not withstand
　　　　　scrutiny ....................................................................................... 20

III.　Substantial Record Evidence Demonstrates that the Alleged Concessions Program
　　　Was Not Specific and Did Not Confer a Financial Contribution ......................................... 23

**CONCLUSION** .................................................................................................... 25

## Table of Authorities

Page(s)

Statutes

19 U.S.C. § 1516a(b)(1)(B) ........................................................6

19 U.S.C. § 1677(5) ...............................................................8

19 U.S.C. § 1677(5)(D)(iii) ....................................................23

19 U.S.C. § 1677(5)(E)(iv) ..................................................8, 21

19 U.S.C. § 1677(5A) .............................................................8

19 U.S.C. § 1677(5A)(D)(iii) .................................................24

19 U.S.C. § 1677(5A)(D)(iii)(I) .............................................23

19 U.S.C. § 1677(5A)(D)(iii)(III) ..........................................23

28 U.S.C. § 2637(d) .............................................................16

Regulations

19 C.F.R. § 351.309(c)(2) .....................................................16

19 C.F.R. § 351.511(a)(2)(i) ...................................................8

19 C.F.R. § 351.511(a)(2)(ii) ..................................................8

19 C.F.R. § 351.511(a)(2)(iii) ..............................................8, 9

Court Decisions

*Altx, Inc. v. United States*, 370 F.3d 1108 (Fed. Cir. 2004) ...................7

*Am. Silicon Techs. v. United States*, 334 F.3d 1033 (Fed. Cir. 2003) ............7

*Apple Inc. v. Samsung Elecs. Co., Ltd.*, 839 F.3d 1034 (Fed. Cir. 2016) .........7

*Arkansas v. Oklahoma*, 503 U.S. 91 (1992) ....................................7

*Boomerang Tube, LLC, TMK IPSCO v. United States*, 856 F.3d 908 (Fed. Cir. 2017) ......................................................................16

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) ..........................6

*Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) ...............16

Confidential Information Contained
in Square Brackets

NON-CONFIDENTIAL VERSION

*Fujian Lianfu Forestry Co., Ltd. v. United States*, 638 F. Supp. 2d 1325 (Ct. Int'l Trade 2009) ...................................................................................23

*Home Prods. Int'l, Inc. v. United States*, 837 F. Supp. 2d 1294 (Ct. Int'l Trade 2012) ...........................................................................................16

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) ...............................6

*Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056 (Fed. Cir. 2001) ......................................................................................................7

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006)...........................7

*NMB Sing. Ltd v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) .................................13

*Nucor Corp. v. United States*, 414 F.3d 1331 (Fed. Cir. 2005) ....................................7

*Nucor Corp. v. United States*, 633 F. Supp. 3d 1302 (Ct. Int'l Trade 2023) ...............17

*Nucor Corp. v. United States*, 927 F.3d 1243 (Fed. Cir. 2019) .............................13, 20

[                                                          ].......................................................18

*POSCO v. United States*, 2023 WL 6969789 (Fed. Cir. Oct. 23, 2023)........................17

*SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312 (Fed. Cir. 2006)............................16

*United States v. Zannino*, 895 F.2d 1 (1st Cir. 1990) ............................................16, 23

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) .................................................6

Administrative Determinations

*Phosphate Fertilizers From the Kingdom of Morocco*, 88 Fed. Reg. 76,726 (Nov. 7, 2023) .................................................................................... *passim*

*Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe From the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 35,267 (July 2, 2021) ......................................17

*Utility Scale Wind Towers from Malaysia: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 30,593 (June 9, 2021) .............................17

Other Administrative Materials

*CVD Preamble*, 63 Fed. Reg. 65,348 (Nov. 25, 1998)........................................8, 9, 24

NON-CONFIDENTIAL VERSION

*Regulations Enhancing the Administration of the Antidumping and Countervailing Duty Trade Remedy Laws*, 89 Fed. Reg. 101,694 (Dec. 16, 2024) ..................................................................................................................9

<u>Other Materials</u>

Statement of Administrative Action, H. Doc. No. 103-316, vol. 1 (1994)....................................18

Confidential Information Contained
in Square Brackets

NON-CONFIDENTIAL VERSION

## <u>RULE 56.2 RESPONSE BRIEF OF THE GOVERNMENT OF THE KINGDOM OF MOROCCO</u>

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, The Government of the Kingdom of Morocco ("GOM") respectfully submits this response to the motion for judgment on the agency record and accompanying memorandum of law filed by The Mosaic Company ("Mosaic") (ECF Doc. 45) (hereinafter "Mosaic Br.").  To conserve resources and avoid repetition, the GOM addresses only Mosaic's arguments regarding the U.S. Department of Commerce's ("Commerce") determination not to countervail so-called "Port Services."  *See* Mosaic Opening Br. at 34-45.

Commerce's determination that the alleged Provision of Port Services for Less than Adequate Remuneration ("LTAR") program (hereinafter the "Concessions Program") did not confer a benefit upon OCP S.A. ("OCP") is supported by verified substantial evidence.  The Court should reject Mosaic's improper request to reweigh that evidence and should sustain Commerce's final determination.

## RULE 56.2 STATEMENT

### I.   <u>Administrative Determination</u>

This action concerns Commerce's final results in the first administrative review of the countervailing duty ("CVD") order covering phosphate fertilizers from the Kingdom of Morocco. *See Phosphate Fertilizers From the Kingdom of Morocco*, 88 Fed. Reg. 76,726 (Dep't of Commerce Nov. 7, 2023) (CVD AR1 Final) (P.R. 374), and accompanying Issues and Decision Memorandum ("IDM") (P.R. 370) (together, the "*Final Results*").

### II.   <u>Issues Presented</u>

A.  Whether Commerce's determination that ANP's concessions were negotiated based upon market principles is supported by substantial evidence when the verified record establishes that ANP used a [                              ] methodology and considered

its costs and revenues to ensure ANP would be profitable given the factual circumstances for each of OCP's concessions.

B. Whether Commerce, having already found that the Concessions Program provided no countervailable benefit, was required to set forth formal determinations regarding financial contribution and specificity despite record evidence demonstrating that neither such element of countervailability had been satisfied.

### III. <u>Statement of Facts</u>

Like virtually every other maritime nation on earth, a national port authority, the Agence Nationale des Ports ("ANP"), oversees affairs in Moroccan ports. Mosaic alleged that ANP subsidized OCP by "provid{ing} port services to OCP and its cross-owned affiliates pursuant to concession agreements at the ports of Jorf Lasfar, Safi, and Casablanca, and that these concession agreements conferred a countervailable benefit upon OCP because "ANP does not set its rates for port services at a level sufficient to cover its costs and generate a profit." Mosaic's New Subsidy Allegation (Sept. 21, 2022) at 11 (P.R. 117-119, C.R. 128-133);[1] *id.* at 13-15 (C.R. 128) (describing the alleged "financial contribution" as "provision of port services"). Mosaic alleged "{t}his shows that ANP does not set prices according to market principles." *Id.* at 17 (C.R. 128).

Commerce initiated an investigation concerning whether "ANP's revenues, including its revenue from concession agreements, from 2016-2020 have not kept pace with its operating cost." Commerce New Subsidy Allegation Decision Memorandum (Feb. 16, 2023) at 3 (P.R. 176) ("Commerce NSA Decision Memo") at 2. Commerce set out to "examine whether ANP sets its prices for port services 'according to market principles' in accordance with 19 C.F.R. § 351.511(a)(2)." *Id.* at 3 (P.R. 176).

---

[1] After the first citation to a document appearing on the confidential administrative record, only the confidential administrative index number ("C.R.") will be provided.

Confidential Information Contained
in Square Brackets

NON-CONFIDENTIAL VERSION

In a series of questionnaire responses thereafter, the GOM and OCP explained that:

- ANP and OCP had concession agreements in effect in 2021 for the ports of Jorf Lasfar, Safi, and Casablanca, *e.g.*, GOM New Subsidy Allegation Questionnaire Response (Apr. 24, 2023) (P.R. 245-252, C.R. 243-252) ("GOM NSA QR") at PORT-I-11, Exs. PORT-4 to PORT-6; GOM New Subsidy Allegation Supplemental Questionnaire Response (June 30, 2023) (P.R. 303-305, C.R. 268-283) ("GOM NSA 1SQR") at Ex. SUPP-PORT-6;

- ANP did not provide port services to OCP, but OCP's concessions permitted OCP to provide port services to itself (and not to any third parties), *e.g.*, GOM NSA QR at PORT-I-1 & n.1 (C.R. 244); GOM NSA 1SQR at 8 (C.R. 268);

- The ANP-OCP concession agreements provided that OCP [
                                                      ] for each concession area in Jorf Lasfar, Safi, and Casablanca, *e.g.*, GOM NSA QR at PORT-I-2 to PORT-I-3 (C.R. 244);

- ANP posted entity-wide operating and net profits in 2019, 2020, and 2021, *e.g.*, GOM NSA QR at PORT-I-2, Ex. PORT-1 (C.R. 244-247);

- ANP [                         ] in each of the ports in which OCP had a concession agreement, the most specific basis on which ANP maintained profitability data, *e.g.*, GOM NSA 1SQR at 7, Ex. SUPP-PORT-3 (C.R. 268-269, 283); *see also* GOM NSA QR at PORT-I-10 (C.R. 244);

- Because OCP was [

                                                                          ], ANP anticipated incurring [          ] additional costs in connection with those agreements, GOM New Subsidy Allegation Second Supplemental Questionnaire Response (Aug. 28, 2023) (P.R. 335-338, C.R. 298-308) ("GOM NSA 2SQR") at 6-7; and

- Because [                                            ], ANP negotiated a market-based concession fee by [

                                                                          ], GOM NSA 2SQR at 7 (C.R. 298); *see also id.* at 3-5, 9-10 (C.R. 298).

Commerce spent days at ANP's facilities in Morocco interviewing its personnel, combing through its computer systems, and studying paper records. Commerce found no material discrepancies with GOM's questionnaire responses. *See* Commerce Verification Report for the

Confidential Information Contained
in Square Brackets

NON-CONFIDENTIAL VERSION

GOM (Oct. 6, 2023) at 3-7 (P.R. 350, C.R. 400) ("GOM On-Site Verification Report"); *see also*

GOM On-Site Verification Exhibits (Sept. 19, 2023) (C.R. 364-398).

Based on this verified information, Commerce preliminarily determined that the alleged

port subsidies program provided no countervailable benefit to OCP during the POR.  Commerce

Post-Preliminary Determination (Oct. 11, 2023) at 3-6 (P.R. 351, C.R. 401) ("DOC Post-

Preliminary Analysis").  Commerce noted that ANP had accounted for "any costs borne by ANP

(e.g., terminal infrastructure, dredging, common area maintenance, etc.), fees agreed upon

between ANP and other concession-holders following competitive bidding, and the prospective

concession-holder's business plan." *Id.* at 5  (C.R. 401).  Commerce recognized that "[

]" and ANP "anticipated incurring [          ] costs" such that ANP's [

].  *Id.* at 5 (C.R. 401).  Commerce noted that

ANP "provide{d} [                         ] that ANP uses to determine the starting point for its

negotiations" and that this [

].  *Id.* at 5-6 (C.R. 401).

Importantly, as Commerce verified, given the [          ] cost of these concessions for

ANP, "tethering the level of concession fees to ANP's profitability would result in substantially

lower concession fees."  *Id.* at 6 (C.R. 401).  Finally, consistent with the focus of Mosaic's own

allegation, *see* Mosaic NSA at 16-17 (C.R. 128); Mosaic NSA SQR at 7-9 (P.R. 149-152, C.R.

150-153), Commerce assessed ANP's profitability, noting that Commerce had verified that ANP

"does not conduct cost-accounting on a concession-specific basis," but that "the three ports out

Confidential Information Contained
in Square Brackets

NON-CONFIDENTIAL VERSION

of which OCP operates [                              ]" and ANP as a whole "reported both

an operating and net profit in 2019, 2020, and 2021."  DOC Post-Preliminary Analysis at 6 (C.R.

401).  Commerce concluded that ANP had acted consistent with market principles by

considering, *inter alia*, [                ] and charging concession fees that made ANP profitable

overall and [                              ]. *Id.* (C.R. 401).

Following briefing by the parties, in its *Final Results*, Commerce affirmed its preliminary

conclusion that the alleged Port Services program did not confer a benefit upon OCP, continuing

to find that the ANP-OCP concession fees accorded with market principles.  *See* IDM at 51-54

(P.R. 370).  Commerce incorporated its post-preliminary analysis in full and otherwise discussed

all significant additional arguments raised in Mosaic's administrative case brief.  *See* IDM at 52-

54 (P.R. 370); DOC Post-Preliminary Analysis at 3-6 (C.R. 401).

## SUMMARY OF ARGUMENT

Commerce reasonably determined based on verified record evidence that the alleged

Concessions Program did not confer a benefit upon OCP.  Applying a tier-three benchmark

analysis for measuring the adequacy of remuneration, which is uncontested here, Commerce

concluded that substantial record evidence demonstrates the ANP-OCP concession agreements

were consistent with market principles, and consistently resulted in [                    ].

Mosaic's shallow criticism that ANP had [                              ] rather than ANP's

own, ignores Commerce's straightforward, verified finding that ANP's [

    ] under OCP's concessions because [

                              ].  ANP thus maximized its revenue

by using an [

                              ].

Underscoring the weakness in Mosaic's administrative case, it otherwise proffers

evidentiary arguments that it failed to exhaust administratively and proffers rote fee-to-fee comparisons of OCP's concession agreements with others. But Mosaic fails to offer any record-based response to Commerce's reasonable and well-supported finding that concession fees cannot meaningfully be compared without first adjusting for the wide-ranging differences underpinning each concession. The Court cannot re-weigh the evidence and Mosaic has identified no meaningful infirmity in Commerce's benefit determination. (**Argument II.B**).

Having reasonably determined that no benefit was conferred upon OCP by the alleged Concessions Program, Commerce determined that it need not reach a formal conclusion as to whether the alleged Concessions Program is specific and/or provided a financial contribution. Even if Commerce were to reach these questions, record evidence demonstrates that the alleged Concessions Program does not provide a financial contribution (as Mosaic failed to identify the good or service provided) and is not specific (as OCP's benefits are, if anything, disproportionately low) within the meaning of the countervailing duty statute. (**Argument III**).

The Court should therefore sustain Commerce's *Final Results* in all respects challenged by Mosaic.

## ARGUMENT

### I.   Standard of Review

This Court will "hold unlawful any determination, finding, or conclusion found…to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence review examines whether the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984). Even "{w}here an agency has not made a particular determination

NON-CONFIDENTIAL VERSION

explicitly, the agency's ruling nonetheless may be sustained as long as 'the path of the agency may be reasonably discerned.'" *Nucor Corp. v. United States*, 414 F.3d 1331, 1339 (Fed. Cir. 2005).  "A party challenging the {agency's} determination under the substantial evidence standard 'has chosen a course with a high barrier to reversal.'" *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (quoting *Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001)).

Substantial evidence review "is not to review whether {a} losing position was also supported by substantial evidence or to weigh the relative strength of {the losing position's} evidence against {the winning position's} evidence." *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 839 F.3d 1034, 1052 (Fed. Cir. 2016).  Rather, Commerce's determination may be supported by substantial evidence "even if it is possible to draw two inconsistent conclusions from evidence on the record." *Am. Silicon Techs. v. United States*, 334 F.3d 1033, 1037 (Fed. Cir. 2003).  Thus, a reviewing court must affirm Commerce's determination "if it is reasonable and supported by the record as a whole, even if some evidence detracts from the {agency's} conclusion." *Nippon Steel*, 458 F.3d at 1352 (quoting *Altx, Inc. v. United States*, 370 F.3d 1108, 1121 (Fed. Cir. 2004)).  Succinctly stated, a reviewing court "should not supplant the agency's findings merely by identifying alternative findings that could be supported by substantial evidence." *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992).  Likewise, it is reversible error for the Court to "assess{} credibility and reweigh{} the evidence," as "it is the role of the expert factfinder . . . to decide which side's evidence to believe." *Nippon Steel*, 458 F.3d at 1359.

## II. Mosaic's Arguments Are Contradicted by the Verified and Substantial Record Evidence that ANP's Concession Pricing is Based Upon Market Principles

Commerce carefully weighed the verified record evidence and correctly determined that the alleged Concessions Program did not confer a benefit upon OCP and found that ANP's

concession agreements with OCP were consistent with market principles. IDM at 52-54 (P.R. 370); DOC Post-Preliminary Analysis at 3-6 (C.R. 401). For a subsidy to be countervailable, Commerce must determine that a government authority provides a financial contribution to the respondent that is specific and confers a benefit. *See* 19 U.S.C. §§ 1677(5), (5A). A benefit may be conferred "where goods or services are provided, if such goods or services are provided for less than adequate remuneration." 19 U.S.C. § 1677(5)(E)(iv). Commerce will measure the adequacy of remuneration by comparing the government price to a multi-tiered series of benchmark prices. *See* 19 C.F.R. §§ 351.511(a)(2)(i)-(iii). Where the record does not contain an in-country market-determined price or a world market price for the good or service in question, Commerce "will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles." 19 C.F.R. § 351.511(a)(2)(iii). Here, all parties agree that application of a "Tier Three" analytical framework was reasonable. *See* Mosaic's New Subsidy Allegation (Sept. 21, 2022) at 16-17 (C.R. 128) (arguing that Commerce "should rely on a tier three benchmark"); DOC Post-Preliminary Analysis at 4-5 (C.R. 401); IDM at 52 (P.R. 370).

Under Commerce's Tier Three benchmark analysis, particularly "{w}here the government is the sole provider of a good or service, and there are no world market prices available or accessible to the purchaser," Commerce's practice is to "assess whether the government price was set in accordance with market principles through an analysis of such factors as the government's price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination." *CVD Preamble*, 63 Fed. Reg.

65,348, 65,378 (Nov. 25, 1998).[2]  Commerce does "not put{} these factors in any hierarchy" and "may rely on one or more of these factors in any particular case."  *Id.*

Mosaic raises two substantial evidence challenges,[3] *i.e.*, (A) Mosaic claims that Commerce insufficiently addressed evidence that ANP [

], and (B) Mosaic claims that Commerce ignored evidence that ANP [                                                  ]. However, as explained below, Commerce verified that ANP considered its own costs, revenues, and profits, and Mosaic's "evidence" of [                              ] is contradicted by the same sources on which Mosaic purports to rely.  Mosaic's arguments do nothing to undermine the substantial record support for Commerce's determination that ANP's concession agreements with OCP were consistent with market principles and thus conferred no benefit to OCP.

### A.  Contrary to Mosaic's Claim, Commerce Verified that ANP's Concession Negotiations are Based Upon Market Principles

1.  *Commerce scrutinized and verified ANP's reporting that OCP's concession fees were set to ensure ANP would cover its costs and make a profit*

Commerce relied on verified record evidence to conclude that due to "ANP's price-setting philosophy (including its consideration of ANP's [

]), and that ANP generated [                                           ] and was profitable overall, . . . this program conferred no benefit to OCP during the POR."  DOC Post-

---

[2] Effective January 15, 2025, Commerce formally codified these preambular factors into the "market principles" regulation at 19 C.F.R. § 351.511(a)(2)(iii).  *See Regulations Enhancing the Administration of the Antidumping and Countervailing Duty Trade Remedy Laws*, 89 Fed. Reg. 101,694, 101,732 (Dec. 16, 2024).

[3] Despite stating that Commerce's determination was also "not in accordance with law," Mosaic's brief fails to argue any issue of law relevant to the alleged Concessions Program.  *See* Mosaic Br. at 34-43.

Confidential Information Contained
in Square Brackets

NON-CONFIDENTIAL VERSION

Preliminary Analysis at 6 (C.R. 401).[4]  ANP's verified reporting constitutes substantial evidence

to support Commerce's findings and flatly contradicts Mosaic's assertion that ANP [

].

ANP reported that it accounted for both ANP's own profitability and market forces when

negotiating its concession agreements with OCP, and Commerce scrutinized the process by

which ANP negotiated its concession agreements with OCP through supplemental questionnaires

and during on-site verification.  *See* GOM NSA 1SQR at Q.2-3 (C.R. 268); GOM NSA 2SQR at

Q.3-6, Q.8 (C.R. 298); GOM On-Site Verification Report at 5-6 (C.R. 400).  This included

probing ANP's [


], and studying how the fee for each concession is "based upon the factual

circumstances relevant to the particular concession(s) at issue," GOM NSA 1SQR at 11 (C.R.

268), including:

- "any costs borne by ANP (*e.g*., terminal infrastructure, dredging, common area maintenance, etc.), fees agreed upon between ANP and other concession-holders following competitive bidding, and the prospective concession-holder's business plan," GOM NSA QR at PORT-I-2 (C.R. 244); *see also* GOM NSA 1SQR at 10 (C.R. 268) (referencing similar factors), *i.e.,* whether the concession holder "[    ]," GOM NSA 1SQR at 11 (C.R. 268); and

- "{t}he level of investment supported by the Concessionaire and/or by ANP" and "{t}he level of charges borne by the Concessionaire and/or by ANP," GOM NSA 2SQR at 16 (C.R. 298); and

- "[                                    ]," GOM NSA QR at PORT-I-5 (C.R. 244), *i.e.*, "the extent of the concession sought," GOM NSA QR at

---

[4] The portions of Commerce's post-preliminary analysis memorandum relevant to the alleged Concessions Program were incorporated by reference into Commerce's Final IDM. *See* IDM at 53 n.338 ("For Commerce's analysis of BPI that we have considered for this determination, *see* the Post-Preliminary Analysis.") (P.R. 370).

Confidential Information Contained
in Square Brackets

NON-CONFIDENTIAL VERSION

PORT-II-2 (C.R. 244), including whether the concession agreement covers multiple ports or a single port, GOM NSA 1SQR at 11 (C.R. 268); and

- "[                                                      ]," GOM NSA QR at PORT-I-5 (C.R. 244); *see also* GOM NSA 1SQR at 5 (C.R. 268); GOM NSA 2SQR at 16 (C.R. 298), and [                                                      ], *see* GOM NSA 1SQR at 9 (C.R. 268).

Commerce verified that ANP considered these factors when negotiating OCP's concession agreements. *See* GOM On-Site Verification Report at 5-6 (C.R. 400) (referencing consideration of [                                                      ] the "number of terminals to be operated and the projected traffic of the port," and that "[                                                      ].").

In particular, "{t}he OCP-ANP concession agreements were predicated on [

                                                      ]." GOM NSA 2SQR at 6 (C.R. 298); *see also, e.g.*, GOM NSA QR at Exhibit PORT-4, Part 4-A-I, Arts. 6.1, 8, and 10 (C.R. 249); *id.* at Part 4-B-I, Arts. 3-1, 7-4-2, 9, 16, 18, 20, 22-2, and 24-2 (C.R. 249), and the corresponding articles in Exhibits PORT-5 (C.R. 250), PORT-6 (C.R. 250), and SUPP-PORT-6 (C.R. 270-271). Given this arrangement, the GOM reported—and Commerce verified—that [                                                      ]. GOM On-Site Verification Report at 6 (C.R. 400); *see also* GOM NSA 2SQR at 6-7 (C.R. 298) ("ANP reasonably anticipated incurring [                    ] costs in connection with those concessions . . . [

                                                      ]). Therefore, "in order to [                    ]," GOM On-Site Verification Report at 6 (C.R. 400), ANP informed its concession fee negotiations with OCP using a [

11

Confidential Information Contained
in Square Brackets

NON-CONFIDENTIAL VERSION

], GOM NSA 2SQR at 4-5 (C.R. 298).  ANP's efforts to [                              ] are further proven by the fact that "{t}he ports in which OCP had a concession agreement in 2021 . . . [                              ]," GOM NSA 1SQR at 7, Ex. SUPP-PORT-3 (C.R. 268-269, 283),[5] and ANP as a whole [        ] posted operating and net profits in 2019, 2020, and 2021, *see* GOM NSA QR at PORT-I-5, Ex. PORT-1 (C.R. 244-247).

Commerce's determination was based upon this substantial evidence of ANP's market-based concession pricing.  *See* IDM at 53-54 (P.R. 370); DOC Post-Preliminary Analysis at 5-6 (C.R. 401).

   2.  *Mosaic's arguments regarding ANP's [          ] contradict the record and Commerce found that Mosaic's comparisons to other concession agreements are not meaningful*

Mosaic does not dispute that ANP used a [                              ] to determine concession rates that produced profitable results for ANP.  Instead, Mosaic argues that Commerce ignored ANP's [                              ] and supposed failure to "account for *ANP's* costs or desired revenues or profits."  Mosaic Br. at 36.  Mosaic further claims that ANP only used [        ] for one of the three ports at issue and that Commerce failed to compare the OCP concessions with other concessions.  Mosaic is wrong because ANP's concession analysis considered its own costs and profits and negotiated fees based upon the market conditions related to each concession.

*First*, the record demonstrates that ANP considers its own costs and profits when determining concession fees.  Commerce verified that, in each of the ANP-OCP concessions,

---

[5] Commerce confirmed that ANP does not maintain concession-specific cost accounting.  *See* GOM On-Site Verification Report at 4 (C.R. 400).

"[



]."  DOC Post-Preliminary Analysis at 5 (C.R. 401).  Because of this,

ANP "reasonably anticipated incurring [           ] costs in connection with" OCP's concessions

and concluded that [                                                       ]."  *Id.* (C.R.

401); *see also* GOM On-Site Verification Report at 6 (C.R. 400).  Regardless of the particulars

of ANP's [           ], Commerce identified verified record evidence showing that ANP analyzed

its own costs and profitability.[6]

Nor did Commerce ignore evidence of what the [           ] includes.  Rather, as Commerce

recognized at verification, were ANP to [           ] concession fee rates [

], ANP would have [

] because [               ] would build in infrastructure costs that would in reality be

[                              ].  *See* GOM On-Site Verification Report at 6 (C.R. 400); *see also*

GOM NSA 2SQR at 4 (C.R. 298).  Moreover, insofar as ANP's approach [

], GOM NSA 2SQR at 4 (C.R. 298) it is consistent with the Federal Circuit's

"repeated{} recogni{tion}" "that 'market principles' tie pricing to value."  *Nucor Corp. v.*

*United States*, 927 F.3d 1243, 1253 (Fed. Cir. 2019).

---

[6] At minimum, Commerce's rejection of Mosaic's arguments is "reasonably discernible" based on Commerce's adoption in the *Final Results* of its Post-Preliminary Analysis and Verification Report.  *See NMB Sing. Ltd v. United States*, 557 F.3d 1316, 1323 (Fed. Cir. 2009) ("While a more substantial explanation from Commerce might have been helpful to us or preferable to {plaintiff}, its absence here is not grounds for us not to affirm because we can nonetheless reasonably discern the path of Commerce's decision").

Confidential Information Contained
in Square Brackets
NON-CONFIDENTIAL VERSION

*Second*, Mosaic claims that Commerce ignored that the GOM "provided no contemporaneous evidence that ANP [

], and that ANP [

]. Mosaic Br. at 37, 41. Rather, Mosaic claims the GOM only provided [                    ] at Exhibit 2D-SUPP-PORT-3 of the GOM's NSA 2SQR. *Id.* However, Commerce verified that ANP and OCP engaged in rounds of negotiations that were informed by ANP's [                    ]. *See, e.g.*, GOM NSA 1SQR at 5, Ex. SUPP-PORT-2 (C.R. 268-269) (containing documents [

],
thus demonstrating normal negotiations between the parties); GOM On-Site Verification Report at 5-6 (C.R. 400) ("By inputting proposed fees, the [

].  We observed ANP officials adjusting the fixed fee level, which affects the [                    ] dashboard.").  Commerce also verified ANP's usage of its [                    ] in negotiations for ANP's Safi and Casablanca concessions, which was "adapted to account for differences in projected traffic volume between" those ports.  GOM On-Site Verification Report at 6 (C.R. 400).  Mosaic's arguments contradict the verified record.

*Third*, Mosaic accuses Commerce of ignoring that [

], thus undermining the fact that [

].  Mosaic Br. at 41 (citing three other concession agreements at GOM NSA 1SQR at Exs. SUPP-PORT-7 to SUPP-PORT-9).  However, Commerce noted that "the multifaceted considerations underlying each concession agreement make it impossible to

14

Confidential Information Contained
in Square Brackets

NON-CONFIDENTIAL VERSION

reasonably compare concession agreements on a fee-to-fee basis."  DOC Post-Preliminary

Analysis at 5 (C.R. 401); IDM at 53 (P.R. 370).  That is, Commerce recognized that comparisons

like those Mosaic suggests are meaningless because each concession is specific to the

circumstances surrounding it.  For example, [

                                                                                  ].  *See* GOM

NSA 1SQR at Ex. SUPP-PORT-7, Part PORT-7-B, Art. 3; Ex. SUPP-PORT-8, Part PORT-8-B,

Art. 3; Ex. SUPP-PORT-9, Part PORT-9-B, Art. 11-1, 11-2 (C.R. 271-282).  Rather, these non-

OCP concessions cover the concessionaires' [

                  ], which are far different and [

                                                                          ], which OCP [

                        ] in its concession agreements.  *See id.* (C.R. 271-282); *see also*

GOM NSA QR at Ex. PORT-4 to PORT-6 (C.R. 249-251); GOM NSA 2SQR at 6 (C.R. 298).

Mosaic's argument fails because, as Commerce recognized, comparisons of factually distinct

concessions are meaningless.

   3.   *Mosaic's newly raised arguments regarding profitability and cross-subsidization
        should be disregarded and are otherwise without merit*

   Mosaic raises two new arguments for the first time in its opening brief: (1) that

"Commerce placed great weight on '{r}ecord information show{ing} that ANP reported both an

operating profit and net profit in 2019, 2020, and 2021,'" and the "the mere fact {of ANP's

profitability} does not mean that it sets prices consistent with market principles within the

meaning of 19 C.F.R. § 351.511(a)(2)(iii)," *see* Mosaic Br. at 35; and (2) the variance in

concession fees charged by ANP to OCP and other concessionaires may suggest that the GOM is

using some concessionaires to cross-subsidize OCP, *see* Mosaic Br. at 36 n.4.  The Court should

disregard these arguments because Mosaic failed to raise them during the administrative

proceeding.  The Federal Circuit has explained that 28 U.S.C. § 2637(d) requires parties (except in limited circumstances) to exhaust administrative remedies prior to bringing an action to the Court of International Trade.  *See Boomerang Tube, LLC, TMK IPSCO v. United States*, 856 F.3d 908, 912-13 (Fed. Cir. 2017); *see also Corus Staal BV v. United States*, 502 F.3d 1370, 1379 (Fed. Cir. 2007) ("{T}he court should insist that parties exhaust their remedies before the pertinent administrative agencies.").  Further, Commerce's regulations require interested parties to "present all arguments . . . in the submitter's view to be relevant to {Commerce's} final determination or final results."  19 C.F.R. § 351.309(c)(2).  Because Mosaic failed to raise these arguments during the administrative proceeding and none of the limited exceptions to the exhaustion requirement have been established, the Court should disregard both of Mosaic's arguments concerning profitability and cross-subsidization.

Furthermore, the Court should deem Mosaic's cross-subsidization argument waived. Mosaic's bare assertion in a footnote that "record evidence suggest{s}" other port concessionaires paying concession fees to ANP are "cross-subsidizing" OCP lacks any supporting analysis or citation to record evidence.  Mosaic Br. at 36.  Arguments raised in such a "perfunctory manner" are waived.  *Home Prods. Int'l, Inc. v. United States*, 837 F. Supp. 2d 1294, 1301 (Ct. Int'l Trade 2012) (citing *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)).[7]  In any event, Mosaic's bare theory lacks substantive merit insofar as Mosaic has failed to establish any of the factual prerequisites, *e.g.*, that ANP incurs a loss in connection with OCP's concessions.

---

[7] Mosaic cannot build out this argument for the first time in its reply brief, as "arguments not raised in the opening brief are waived." *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006).

Even if the Court were to consider Mosaic's new argument that profitability alone does not establish consistency with market principles, Mosaic Br. at 35, it lacks merit as well. *First*, Mosaic ignores the evidence beyond ANP's profitability on which Commerce relied here. *See* IDM at 53 (P.R. 370). As explained above, Commerce also analyzed the methodology by which ANP set up concession fees, "which indicates that ANP does account for its costs, revenues, and profits when it sets prices." IDM at 53 (P.R. 370); *see also* DOC Post-Preliminary Analysis at 5-6 (C.R. 401).

Furthermore, Mosaic relies entirely on factually distinct administrative precedent for support. Mosaic Br. at 35. In *Utility Scale Wind Towers from Malaysia*, Commerce determined that it was "unable to determine whether {Malaysia's} electricity system was market based" because, unlike here, "the record {was} incomplete with respect to costs/profits" data. *See Utility Scale Wind Towers from Malaysia: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 30,593 (June 9, 2021), IDM at Comment 3. Similarly, Mosaic's citation to *Seamless Carbon and Alloy Steel From Korea* omits important context. *Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe From the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 35,267 (July 2, 2021), IDM at Comment 1 ("In *Wind Towers from Malaysia*, the government failed to provide cost data for a similar allegation and we found electricity to provide a benefit, despite the fact the electricity company was profitable."). By contrast, Courts have upheld Commerce's conclusion that covering costs and turning a profit establishes that a government price is consistent with market principles. *See POSCO v. United States*, 2023 WL 6969789, at *3 (Fed. Cir. Oct. 23, 2023); *Nucor Corp. v. United States*, 633 F. Supp. 3d 1302, 1309 (Ct. Int'l Trade 2023) ("Commerce was within its discretion to determine whether KEPCO's (i.e., the Government of Korea's) tariff rates were set

Confidential Information Contained
in Square Brackets

NON-CONFIDENTIAL VERSION

in accordance with market principles through its evaluation of whether KEPCO's 'income from

prices charged for each electricity consumption category covers KEPCO's costs, plus profit' for

those categories.").  And here, the administrative record contains considerable record evidence

beyond ANP's bottom-line profit figures, encompassing, *e.g.*, ANP's policy of considering costs,

revenues, and profits in setting concession fees, including through [                    ] based

on [

      ].  DOC Post-Preliminary Analysis at 5-6 (C.R. 401); IDM at 53 (P.R. 370).

**B.   Mosaic's [                        ] Arguments Fail to Overcome Commerce's
Reasonable Determination That ANP's Concession Fees Are Consistent With
Market Principles**

1.   *Because the standard for market-based price setting is not inconsistent with
[                    ], this Court need not reach Mosaic's [
] arguments*

Mosaic claims that [

] when setting up OCP's concession fees.  Mosaic Br. at 34.  The

Federal Circuit has cautioned that "[



]," [

], especially in light of the Uruguay Round Agreements Act's express [

].  *See* SAA at [




].  As explained

above, verified record evidence supports Commerce's determination that ANP's concession fees

were based upon fair-market principles, and Mosaic's opening brief contains no explanation

regarding how [                    ], even if it did exist, could negate the verified record

evidence of market-based price setting.  Thus, this Court need not reach Mosaic's arguments.

    2.  *ANP [*

                     *]*

Mosaic asserts that "ANP [

].  Mosaic Br. at 38, 40-

41.  Mosaic ignores the record evidence of [

], market-based considerations that justified these negotiated terms.  *See* Mosaic Br. at

39 (citing GOM NSA QR at Exs. PORT-4, PORT-5, PORT-6 and GOM NSA 1SQR at Ex.

SUPP-PORT-6).  The record shows that the concession fee amounts paid by OCP for 2021 [

].[8]

*Compare* GOM NSA QR at Ex. PORT-4, Part 4-B-I, Arts. 21-1(2), 21-2(2) (C.R. 249) (OCP Jorf

Lasfar inflated fixed concession fee amount for 2021 was [                    ]), *with* GOM

NSA 2SQR at 14 (C.R. 298) (OCP paid [                ] in concession fees in the Port of

Jorf Lasfar for 2021); *compare* GOM NSA 1SQR at Ex. SUPP-PORT-6, Part PORT-6-A-II,

Arts. 21(b-1), 21(b-2) (C.R. 270-271) (OCP Casablanca inflated fixed concession fee amount for

2021 was [                ]), *with* GOM NSA 2SQR at 14 (C.R. 298) (OCP paid

[                    ] in concession fees in the Port of Casablanca for 2021).  Moreover,

[                                        ], *see*

GOM NSA QR at Ex. PORT-4, Part 4-B-I, Art. 21-2 (C.R. 249), [

---

[8] The [                    ] reported by the GOM in the confidential administrative
record were amounts applicable to 2021 activities regardless of what year the invoice was issued,
*i.e.*, amounts of [                ] and amounts of [                ] applicable to
2021 quantities.  *See* GOM NSA 2SQR at 13 (C.R. 298).

Confidential Information Contained
in Square Brackets

NON-CONFIDENTIAL VERSION

], *see* GOM NSA 2SQR at Ex. 2D-SUPP-PORT-4 (C.R. 299)

([

]).  This is consistent with ANP's [           ], which Commerce considered, verified, and relied upon for the *Final Results*.  *See* IDM at 52-54 (P.R. 370); DOC Post-Preliminary Analysis at 5-6 (C.R. 401).

> 3.    *Mosaic's attempts to compare concession agreements do not withstand scrutiny*

Mosaic claims that Commerce ignored evidence that ANP's concession agreements with other terminal operators in Morocco have [

], in contrast to OCP.

Mosaic Br. at 40.  Without explanation or citation to record, Mosaic also characterizes the [

].  Mosaic Br. at 40-41.

In the first instance, as explained above, Commerce recognized that "the multifaceted considerations underlying each concession agreement make it impossible to reasonably compare concession agreements on a fee-to-fee basis."  DOC Post-Preliminary Analysis at 5 (C.R. 401); *see also* GOM On-Site Verification Rep. at 7 (reporting that "each terminal is separate and distinct" with "unique equipment and configurations at each terminal based on the nature of the cargo") (C.R. 400).  Thus, Mosaic's arguments are based upon an unreasonable comparison of concessions agreements that Commerce recognized are not meaningfully comparable and Mosaic fails to account for "the complex of 'conditions' relevant to assessing prices charged."  *Nucor Corp.*, 927 F.3d at 1251.

In any event, Mosaic's premise is factually incorrect.  Comparing the POR concession fees (fixed and variable) applicable to OCP's three concession agreements with the three comparison agreements on the record, and adjusted for contractual inflation, *see* GOM Admin.

Confidential Information Contained
in Square Brackets

NON-CONFIDENTIAL VERSION

Rebuttal Br. 17-18 (P.R. 364, C.R. 407), the comparison contracts for [

].  Moreover,

ANP explained that fixed and variable fee components cannot be considered in isolation, as they

both form part of the overall concession fee, *i.e.*, the "remuneration."  GOM NSA QR at PORT-

I-3 (C.R. 244); 19 U.S.C. § 1677(5)(E)(iv).  Thus, "{t}ypically, the fixed and variable

components of a given concession fee are calibrated such that a low fixed fee is paired with a

high variable fee, while a high fixed fee is paired with a low variable fee."  GOM NSA 2SQR at

15-16 (C.R. 298).  Mosaic's claim that [

].  *Id*. (C.R. 298).

Citing a GOM table containing concessionaire-specific concession fee and revenue data

for 2021, Mosaic also asserts that private third-party companies [

] in 2021, on a per tonnage basis.  Mosaic Br. at 42.  However, Mosaic offers no

calculations to support this assertion, nor does it identify and explain which concession holders it

deems "private third-party companies," and it omits concession holders that do not transport

goods without explanation.  *See id; see also,* GOM NSA 2SQR at 13-15 (C.R. 298) (table

providing concessionaire tonnage and noting that certain concession holders report "a tonnage of

zero").

Finally, Mosaic claims that [

], whereas OCP paid an average of [

] at the three ports where OCP maintains

concessions.  Mosaic Br. at 42.  Mosaic then claims that this "record evidence" of

[                    ] should have induced Commerce to measure the benefit under this alleged

21

Confidential Information Contained
in Square Brackets

NON-CONFIDENTIAL VERSION

program as [

]. *Id.* at 42-43.

Again, consistent with Commerce's finding, *see* DOC Post-Preliminary Analysis at 5 (C.R. 401), the record demonstrates that concession fees vary for each concession "based upon the factual circumstance relevant to the particular concession(s) at issue." GOM NSA 1SQR at 11 (C.R. 268). Comparing the concessions maintained by OCP and [      ] demonstrates significant differences, including:

- [

], *see* GOM On-Site Verification Exhibits at Ex. VE1A (Table 2) (C.R. 365);

- [

], *see* GOM NSA 2SQR at 9 (C.R. 298);

- [

], *see id.* (C.R. 298); *see also* GOM On-Site Verification Report at 6 (C.R. 400);

- [

], *see* GOM On-Site Verification Report at 7 (C.R. 400); and

- [

].

There is no evidence that OCP's and [      ] (or any other) concessions were comparable, and Commerce reasonably found that differences among concessions make such rote fee-to-fee comparisons arbitrary and non-probative. *See* DOC Post-Preliminary Analysis at 5 (C.R. 401).

NON-CONFIDENTIAL VERSION

### III. Substantial Record Evidence Demonstrates that the Alleged Concessions Program Was Not Specific and Did Not Confer a Financial Contribution

Mosaic faults Commerce for not reaching determinations concerning the Concession Program's financial contribution and specificity. *See* Mosaic Br. at 43-45. Even if Commerce were required to reach a final determination with respect to the existence of a financial contribution and specificity, substantial record evidence demonstrates that these mandatory subsidy elements were not present.

A financial contribution includes, among other things, "providing goods or services, other than general infrastructure. 19 U.S.C. § 1677(5)(D)(iii). Mosaic's argument lacks any detail regarding what particular "port service" OCP supposedly received from ANP. *See* Mosaic Br. at 43-44. The Court should therefore treat Mosaic's "skeletal" arguments regarding the existence of a financial contribution as waived. *Fujian Lianfu Forestry Co., Ltd. v. United States*, 638 F. Supp. 2d 1325, 1350 (Ct. Int'l Trade 2009) (quoting (*United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). Regardless, OCP's concession agreements at the ports of Jorf Lasfar, Casablanca, and Safi confirm that no port services were received from ANP, as these agreements require OCP to operate its concession terminals on its own behalf, *i.e.*, OCP provides its <u>own</u> port services. DOC Post-Preliminary Analysis at 5 (C.R. 401). Mosaic has failed to identify a financial contribution as defined in 19 U.S.C. § 1677(5)(D)(iii).

Mosaic's arguments for finding the alleged Concessions Program to be *de facto* specific are illogical and otherwise unsupported by record evidence. Mosaic advances two possible grounds for specificity: that users are limited in number (19 U.S.C. § 1677(5A)(D)(iii)(I)) and that OCP receives disproportionate benefits (19 U.S.C. § 1677(5A)(D)(iii)(III)). Mosaic fails to support either claim. Mosaic Br. at 44-45.

Confidential Information Contained
in Square Brackets

NON-CONFIDENTIAL VERSION

Regarding the supposedly "limited" number of users, Mosaic first asserts that "[

] during the POR.  *Id.* at 44.  However, the record demonstrates that

[                                        ] during the POR.  GOM NSA QR at PORT-II-15 (C.R. 244).

Moreover, Mosaic's rote citation of the number of firms involved fails to account for Morocco's

economic context, which the statute obliges Commerce to consider. *See* 19 U.S.C. §

1677(5A)(D)(iii) (requiring consideration of "the extent of diversification of economic activities

within {Morocco}").  The "phosphate industry and the consolidated companies that make up the

OCP Group are a very significant component of the Moroccan economy," comprising

"Morocco's largest corporate group by annual revenue in 2021, with revenue equivalent to

roughly 6% of Morocco's GDP."  *See* Letter from the GOM, "The Government of the Kingdom

of Morocco's Response to Commerce's First Supplemental Questionnaire" (Dec. 7, 2022) (P.R.

162, C.R. 154-155) at 4-5.  Thus, OCP accounted for a [        ] number of concession-holders

([        ]) than its contribution to Moroccan GDP (6%) would suggest.

As for OCP's supposedly disproportionate benefits, Mosaic's reasoning is unreasonable.[9]

Mosaic begins by conceding that [


] Mosaic Br. at 45.  This is backwards.  OCP held three out of [      ], or

[      ], of all concessions in 2021, *see* GOM NSA QR at PORT-II-15 (C.R. 244), [

] of ANP's total concession fees for the year.  *Compare* GOM NSA QR at PORT-II-12

---

[9] Mosaic also contradicts its "limited users" specificity argument by arguing [
                ].  Commerce will "[

]."  *CVD Preamble*, 63 Fed. Reg. at [        ].  It is unreasonable for Mosaic to argue the
program is both specific because of its limited users while also arguing that Commerce should
use [                                                                ].

Confidential Information Removed
from Square Brackets

NON-CONFIDENTIAL VERSION

(C.R. 244) (ANP 2021 total concession fees, [                    ]), *with* GOM NSA 2SQR

at 14 (C.R. 298) (OCP's 2021 concession fees for Casablanca ([                    ]), Jorf Lasfar

([                    ]), and Safi ([                    ]).  This indicates, if anything, that OCP received a

disproportionately *small* amount of the subsidy.  Moreover, considering the economic context,

even if all else were equal, one would expect OCP to account for a greater-than-average

proportion of program "benefits," not to be benefiting less (*i.e.*, [

]).  Therefore, record evidence does not support finding the alleged port services and

infrastructure for LTAR program to be *de facto* specific.

## CONCLUSION

As explained above, Commerce's determination that the GOM did not provide a

countervailable subsidy under the alleged Port Services for LTAR program is supported by

substantial evidence.  The Court should reject Mosaic's arguments and sustain Commerce's

*Final Results* in this respect.

*         *         *

Respectfully submitted,

/s/ Jonathan M. Zielinski

Jonathan M. Zielinski
James E. Ransdell
Stephen A. Laufer

CASSIDY LEVY KENT (USA) LLP

*Counsel for the Government of the Kingdom of
Morocco*

January 28, 2025

## <u>Certificate of Compliance with Chambers Procedures 2(B)(1)</u>

The undersigned hereby certifies that the foregoing brief contains 7,649 words, exclusive of the caption block, table of contents, table of authorities, signature block, any braces designating proprietary information, and certificates of counsel, and therefore complies with the maximum 14,000 word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By:    <u>/s/ Jonathan M. Zielinski</u>
       Jonathan M. Zielinski