UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| THE MOSAIC COMPANY,<br><br>    Plaintiff,<br><br>  v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br> and<br><br>OCP S.A.,<br><br>    Defendant-Intervenor,<br><br> and<br><br>THE GOVERNMENT OF THE KINGDOM OF MOROCCO,<br><br>    Defendant-Intervenor. | Consol. Court No. 23-00246<br><br>__NON-CONFIDENTIAL VERSION__<br><br>Business Proprietary Information Deleted From Pages 20, 26, 34 |

__THE MOSAIC COMPANY'S MEMORANDUM IN OPPOSITION TO OCP'S RULE 56.2__
__MOTION FOR JUDGMENT UPON THE AGENCY RECORD__

David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Jake A. Laband
Wilmer Cutler Pickering Hale and Dorr
 LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

January 28, 2025      *Counsel for The Mosaic Company*

Consol. Court No. 23-00246                         **NON-CONFIDENTIAL VERSION**

<u>**TABLE OF CONTENTS**</u>

INTRODUCTION ........................................................................................................... 1

RULE 56.2 STATEMENT ............................................................................................. 1

    I.   Administrative Decision Under Review ...........................................................1

    II.  Issues Presented and Summary of Arguments.................................................2

STATEMENT OF FACTS .............................................................................................. 3

    I.   The Administrative Review ...............................................................................3

    II.  Verification .........................................................................................................4

    III. Commerce's Final Results ..................................................................................5

STANDARD OF REVIEW ............................................................................................ 6

ARGUMENT .................................................................................................................. 7

    I.   Commerce's Decision to Reject OCP's Untimely New Factual Information
        Improperly Submitted as a "Minor Correction," and to Apply AFA for the
        OFPPT Payroll Tax Refund Program, is Lawful ............................................7

        A.  Commerce's Decision to Reject OCP's Untimely Filed New Factual
            Information Improperly Submitted as a "Minor Correction" is Lawful .......................8

        B.  Commerce Did Not Unlawfully Depart from Its Prior Practice in Rejecting
            OCP's Untimely New Factual Information Improperly Submitted as a
            "Minor Correction" at Verification.................................................................10

        C.  Commerce's Application of AFA With Respect to the OFPPT Tax Refund
            is Lawful .........................................................................................................13

    II.  Commerce's Determination that the GOM's Reductions in Tax Fines and
        Penalties Program is *De Facto* Specific is Lawful ...........................................22

        A.  Commerce Properly Considered the Economic Diversification of the
            Moroccan Economy in its *de facto* Specificity Analysis .............................27

        B.  Commerce Reasonably Compared the Benefit Received by OCP Against
            the Average Benefit, and was Not Required to Consider OCP's Size
            Relative to Other Companies in Morocco ....................................................31

    III. Commerce's Investigation of "Other Assistance" is Lawful ............................40

CONCLUSION................................................................................................................ 44

Case 1:23-cv-00246-TCS    Document 67    Filed 01/29/25    Page 3 of 53

Consol. Court No. 23-00246                      NON-CONFIDENTIAL VERSION

# TABLE OF AUTHORITIES

**STATUTES, RULES, AND REGULATIONS**                                    Page(s)

19 C.F.R. § 351.301(c)(1) ..................................................................................8

19 C.F.R. § 351.308(c)(1)(iii) ..........................................................................20

19 C.F.R. § 351.502 ..........................................................................................24

19 U.S.C. § 1516a(b)(1)(B)(i) ............................................................................6

19 U.S.C. § 1671a(a) ..............................................................3, 40, 41, 42, 43, 44

19 U.S.C. § 1677(5)(B) .....................................................................................25

19 U.S.C. § 1677(5A)(D)(iii)(I) ........................................................................24

19 U.S.C. § 1677(5A)(D)(iii)(III) ...............................................5, 23, 24, 32

19 U.S.C. § 1677d ..................................................................3, 40, 41, 42, 43, 44

19 U.S.C. § 1677e(a) ...................................................................................13, 14

19 U.S.C. § 1677e(b)(1)(A) ..............................................................................16

19 U.S.C. § 1677e(b)(2) .....................................................................................20

19 U.S.C. § 1677e(d)(1)(A)(i) .....................................................................19, 21

19 U.S.C. § 1677e(d)(2) .....................................................................................21

19 U.S.C. § 1677e(d)(3)(A) ......................................................................19, 20, 22

Omnibus Trade and Competitiveness Act of 1988, Pub. L. 100-418, 102 Stat.
    1107....................................................................................................................25

Uruguay Round Agreements Act, Pub. L. 103-465, 108 Stat. 4809 (1994).................25

**CASES**

*Acciai Speciali Terni, S.p.A. v. United States*,
    26 CIT 892 (2002) ..................................................................................6

*AK Steel Corp. v. United States*,
    192 F.3d 1367 (Fed. Cir. 1999)....................................25, 29, 32, 33

*Allegheny Ludlum Corp. v. United States*,
    25 CIT 816 (2001) ...........................................................29, 42, 43

Case 1:23-cv-00246-TCS    Document 67    Filed 01/29/25    Page 4 of 53

Consol. Court No. 23-00246                              NON-CONFIDENTIAL VERSION

*Bethlehem Steel v. United States*,
    140 F. Supp. 2d 1354 (CIT 2001)....................................................25, 26, 33, 34

*Bomont Indus. v. United States*,
    733 F. Supp. 1507, 1508 (CIT 1990) .............................................................15

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*,
    419 U.S. 281, 284 (1974) ...............................................................................7

*BMW of N. Am. LLC v. United States*,
    926 F.3d 1291 (Fed. Cir. 2019)....................................................................21

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156, 168 (1962) ...............................................................................6

*Changzhou Trina Solar Energy Co. v. United States*,
    195 F. Supp. 3d 1334 (CIT 2016)......................................................40, 42, 43

*Changzhou Wujin Fine Chem. Factory Co. v. United States*,
    701 F.3d 1367 (Fed. Cir. 2012)......................................................................7

*CS Wind Viet. Co. v. United States*,
    832 F.3d 1367 (Fed. Cir. 2016)......................................................................6

*Deacero S.A.P.I. de C.V. v. United States*,
    996 F.3d 1283 (Fed. Cir. 2021)....................................................................20

*Ferrostaal Metals Gmbh v. United States*,
    518 F. Supp. 3d 1357 (CIT 2021)................................................................14

*Fresh Garlic Producers Ass'n v. United States*,
    121 F. Supp. 3d 1313 (CIT 2015)................................................................14

*Hyundai Steel Co. v. United States*,
    No. 23-00211, 2024 WL 5135390 (CIT Dec. 12, 2024)...............................23

*Goodluck India Ltd. v. United States*,
    11 F.4th 1335 (Fed. Cir. 2021) ...................................................................15

*Jiangsu Zhongji Lamination Materials Co. v. United States*,
    405 F. Supp. 3d 1317 (CIT 2019)..........................................................41, 44

*Jindal Poly Films Ltd. of India v. United States*,
    439 F. Supp. 3d 1354 (CIT 2020)................................................................16

*Matsushita Elec. Indus. Co. v. United States*,
    750 F.2d 927 (Fed. Cir. 1984)......................................................................6

Case 1:23-cv-00246-TCS   Document 67   Filed 01/29/25   Page 5 of 53

Consol. Court No. 23-00246                     NON-CONFIDENTIAL VERSION

*Mitsubishi Heavy Indus., Ltd. v. United States*,
    275 F.3d 1056 (Fed. Cir. 2001)................................................................6

*Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)........................................................................................6

*Nat'l Ass'n of Mirror Mfrs. v. United States*,
    696 F. Supp. 642 (CIT 1988)......................................................................6

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003)............................................................14, 17

*PrimeSource Bldg. Prods. v. United States*,
    111 F.4th 1320 (Fed. Cir. 2024) ..............................................................20

*Pro-Team Coil Nail Enter. Inc. v. United States*,
    No. 2022-2241, 2024 WL 3824005 (Fed. Cir. Aug. 15, 2024) .................22

*Royal Thai Gov't v. United States*,
    436 F.3d 1330 (Fed. Cir. 2006)............................................................24, 36

*SeAH Steel Corp. v. United States*,
    659 F. Supp. 3d 1318 (CIT 2023) ............................................................10

*The Mosaic Co. v. United States*,
    659 F. Supp. 3d 1285 (CIT 2023) ........................................................40, 41

*The Mosaic Co. v. United States*,
    Consol. Court No. 21-00116, 2025 WL 48415 (CIT Jan. 8, 2025) ..........29, 30

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474, 477 (1951)............................................................................6

*USEC Inc. v. United States*,
    259 F. Supp. 2d 1310 (CIT 2003) ............................................................6

**ADMINISTRATIVE DETERMINATIONS**

*100- to 150-Seat Large Civil Aircraft from Canada: Final Affirmative
    Countervailing Determination*, 82 Fed. Reg. 61,252 (Dep't Commerce
    Dec. 27, 2017)............................................................................................38

*Bottom Mount Combination Refrigerator-Freezers from the Republic of Korea:
    Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 17,
    410 (Dep't Commerce Mar. 26, 2012)........................................................5

*Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination Commerce*, 79 Fed. Reg. 33,174 (Dep't Commerce June 10, 2014) ...............................10

*Certain Hot-Rolled Carbon Steel Flat Products From India: Final Results of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Preliminary Affirmative Countervailing Duty Determination Commerce*, 79 Fed. Reg. 33,174 (Dep't Commerce June 10, 2014) ...............................................................................10

*Certain Steel Products From Korea: Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations*, 58 Fed. Reg. 37,338, 37,342 (Dep't Commerce July 9, 1993) ......................................................................................25

*Coated Free Sheet Paper From the Republic of Korea: Notice of Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Dep't Commerce Oct. 25, 2007) ...........................................37

*Countervailing Duties Final Rule*, 63 Fed. Reg. 65,359 (Dep't Commerce Nov. 25, 1988) ..................................................................24, 36

*Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 79 Fed. Reg. 76,962 (Dep't Commerce Dec. 23, 2014) ..................................11

*Countervailing Duty Investigation of 1-Hydroxyethylidene-1, 1-Diphosphonic Acid From the People's Republic of China: Final Affirmative Determination*, 82 Fed. Reg. 14,872 (Dep't Commerce Mar. 23, 2017)............................11

*Countervailing Duty Investigation of Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 80 Fed. Reg. 34,888 (Dep't Commerce June 18, 2015) ...........................................................................12

*Dynamic Random Access Memory Semiconductors From the Republic of Korea: Final Results of Countervailing Duty Administrative Review*, 76 Fed. Reg. 2,336 (Dep't Commerce Jan. 13, 2011)............................................37

*Dynamic Random Access Memory Semiconductors From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review*, 75 Fed. Reg. 55,764, 55,767 (Dep't Commerce Sept. 14, 2010) ....................37, 38

*Final Negative Countervailing Duty Determination: Live Swine from Canada*, 70 Fed. Reg. 12,186 (Dep't Commerce Dec. 27, 2017) ........................................37

Case 1:23-cv-00246-TCS    Document 67    Filed 01/29/25    Page 7 of 53

Consol. Court No. 23-00246                    NON-CONFIDENTIAL VERSION

*Forged Steel Fluid End Blocks From Italy: Final Results of Countervailing Duty
   Administrative Review; 2020-2021*, 88 Fed. Reg. 53,863 (Dep't
   Commerce Aug. 9, 2023) ................................................................................39

*Frozen Warmwater Shrimp From Ecuador: Final Affirmative Determination of
   the Countervailing Duty Investigation*, 89 Fed. Reg. 85,506 (Dep't
   Commerce Oct. 21, 2024) ..............................................................................39

*Non-Oriented Electrical Steel from Taiwan: Final Affirmative Determination in
   the Countervailing Duty Investigation*, 79 Fed. Reg. 61,602 (Dep't
   Commerce Oct. 6, 2014) .............................................................................5, 39

*Phosphate Fertilizers From the Kingdom of Morocco: Final Results of
   Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg.
   76,726 (Dep't Commerce Nov. 7, 2023) ................................................. passim

*Ripe Olives from Spain: Final Results of Countervailing Duty Administrative
   Review, 2019*, 87 Fed. Reg. 13,970 (Dep't Commerce Mar 11, 2022)..............................5

*Sugar from Mexico: Final Affirmative Determination in the Countervailing Duty
   Investigation*, 80 Fed. Reg. 57,337 (Dep't Commerce Sept. 16, 2015)............................39

## CONGRESSIONAL MATERIAL

S. Rep. No. 96-249 (1979),
   *reprinted in* 1979 U.S.C.C.A.N. 381 ...................................................................41

Uruguay Round Agreements Act Statement of Administrative Action,
   H.R. Rep. No. 103-316, Vol. 1 ...............................................................23, 24, 27, 30, 32

Consol. Court No. 23-00246                    NON-CONFIDENTIAL VERSION

## INTRODUCTION

On behalf of Plaintiff The Mosaic Company ("Mosaic"), we submit this brief in opposition to the Rule 56.2 motion for judgment upon the agency record filed on August 7, 2024, by Consolidated Plaintiff OCP, S.A. ("OCP").  *See* OCP's Rule 56.2 Mot. for J. Upon the Agency R. (Aug. 7, 2024), ECF No. 44 ("OCP Br.").  OCP challenges three aspects of the final results of the U.S. Department of Commerce's ("Commerce") first administrative review of the countervailing duty ("CVD") order on phosphate fertilizers from Morocco.  *Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 76,726 (Dep't Commerce Nov. 7, 2023), P.R. No. 374, ECF No. 24-5 ("*Final Results*"), and accompanying Issues and Decision Memorandum, P.R. No. 370, ECF No. 24-4 ("IDM").  Specifically, OCP challenges: (1) Commerce's rejection of OCP's purported minor correction pertaining to the *Office de Formation Professionnelle et de la Promotion du Travail* ("OFPPT") payroll tax refund and the Department's application of Adverse Facts Available ("AFA"); (2) Commerce's finding that the Government of Morocco's ("GOM") Reduction in Tax Fines and Penalties program is *de facto* specific; and (3) Commerce's investigation of "other assistance" that the GOM provided to OCP.

As demonstrated below, Commerce's determinations with respect to these three issues are reasonable, supported by substantial evidence, and otherwise in accordance with law. Accordingly, Mosaic respectfully requests that the Court deny OCP's motion in its entirety.

## RULE 56.2 STATEMENT

### I.    Administrative Decision Under Review

The administrative determination under review is the final results of the first administrative review of the CVD order on phosphate fertilizers from Morocco, covering the

Consol. Court No. 23-00246                    NON-CONFIDENTIAL VERSION

period November 30, 2020 to December 31, 2021.  The final results were published in the

Federal Register on November 7, 2023.  *See Final Results* and IDM.

## II.    Issues Presented and Summary of Arguments

**A.    Whether Commerce's rejection of OCP's information pertaining to a payroll tax refund from the OFPPT, and Commerce's subsequent application of AFA, are reasonable, supported by substantial evidence, and otherwise in accordance with law.**

Yes.  Commerce refused to accept information concerning OCP's previously unreported

payroll tax refund, which OCP presented for the first time at verification as a purported "minor

correction." OCP should have reported that it used the program in response to Commerce's

initial questionnaire, which was due more than a year earlier.  OCP's purported "minor

correction" constitutes untimely new factual information that Commerce properly rejected per its

regulations and established practice.  Additionally, Commerce's application of AFA with respect

to this subsidy program is lawful because OCP failed to provide requested information by the

established deadlines; impeded Commerce's conduct of this review by not reporting usage of a

subsidy program until verification; and, as a result, created a gap in the record due to its failure to

cooperate to the best of its ability.

**B.    Whether Commerce's *de facto* specificity finding relating to the GOM's reductions in tax fines and penalties is reasonable, supported by substantial evidence, and otherwise in accordance with law.**

Yes.  Commerce found that OCP was a disproportionate user of this program during the

POR because the amount of benefit that OCP received was approximately 900 times greater than

the average amount received by all other beneficiaries under this subsidy program.  Commerce's

analysis took into account the degree of economic diversification of the Moroccan economy and

was lawful under the statute, as interpreted by the courts, and consistent with Commerce's well-

established practice.

2

**C.    Whether Commerce's investigation of "other assistance" that the GOM provided to OCP is reasonable, supported by substantial evidence, and otherwise in accordance with law.**

Yes.  Commerce's investigation of "other assistance" that OCP reported receiving from the GOM was reasonable, supported by substantial evidence, and otherwise in accordance with law.  The Department has broad investigative discretion under 19 U.S.C. §§ 1671a(a) and 1677d. In every case in which this Court has examined Commerce's authority to investigate subsidies reported in response to a question regarding "all other assistance," the Court has affirmed that Commerce is within the scope of its statutory authority to investigate such subsidies, and it has rejected the arguments that OCP makes here.

## <u>STATEMENT OF FACTS</u>

Consistent with Rule 81(k) of the Rules of this Court, the facts in this section are limited to those necessary to correct inaccuracies and omissions in OCP's brief.  Other facts relevant to specific issues are discussed below in the context of each argument.

## I.    The Administrative Review

Commerce issued the initial questionnaire to the GOM on June 28, 2022, with instructions to forward the questionnaire to the sole company respondent, OCP.  The initial questionnaire included a question about "other" assistance provided by the GOM:

> Has the government, or entities owned in whole or in part by the government, directly or indirectly, provided to the producers or exporters of the subject merchandise under review any other non-recurring benefits over the 10-year {average useful life (AUL)} (i.e., the POR and preceding nine years), or recurring benefits during the POR?

OCP S.A. Section III Questionnaire Response at 129, P.R. 76, C.R. 8 ("OCP IQR").  The original deadline for OCP's responses to the initial questionnaire was August 4, 2022, but OCP

Consol. Court No. 23-00246                    NON-CONFIDENTIAL VERSION

requested two extensions, ultimately resulting in a deadline of August 22, 2022.[1]  OCP did not

report receiving a payroll tax refund during the POR in its initial questionnaire response.

## II.    Verification

Commerce conducted verification of OCP from September 6 to September 8, 2022.  OCP

Verification Report at 1, P.R. 349, C.R. 399.  Prior to verification, Commerce issued a

verification agenda to OCP, which states:

> verification is not intended to be an opportunity for the submission of new factual
> information.  *Information will be accepted at verification only when the information
> makes minor corrections to information already on the record* or when information is
> requested by the verifiers, in accordance with the agenda below, to corroborate, support,
> and clarify factual information already on the record....

OCP Verification Agenda at 2, P.R. 339; C.R. 309 (emphasis added).  The verification agenda

also provides instructions for preparation and submission of "Corrections to Response{s}," 

which state that corrections presented at verification must concern information that is already on

the record.  *Id.* at 6.

During verification, OCP presented several purported minor corrections to its

questionnaire responses.  *See* OCP Verification Report at 2-5, P.R. 349, C.R. 399.  In addition,

OCP claimed that, during the course of preparation for verification, it discovered a payroll tax

refund provided by the OFPPT during the POR that it did not report in its questionnaire

responses.  Payroll tax refunds provided by the OFPPT are an entirely new tax subsidy program

that Commerce has not previously investigated, either in this review or the investigation.  Neither

---

[1] The IDM describes the deadline as August 8, 2022.  *See* IDM at 7, 16.  However, this date appears to be a typo, as the underlying documents indicate that the original deadline was August 4, 2022.  *See* Commerce Letter, Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco: Countervailing Duty Questionnaire (June 28, 2022) at II-5 ("Due Date for Response to Sections II and III: August 4, 2022").  OCP requested two extensions of time, resulting in a final deadline of August 22, 2022.  *See* Commerce Letter, Countervailing Duty Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco: First Request for Extension of Time to Submit Section III of the Initial Questionnaire (July 26, 2022), P.R. No. 27; Commerce Letter, Countervailing Duty Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco: Second Request for Extension of Time to Submit Section III of the Initial Questionnaire (Aug. 10, 2022), P.R. No. 35.

Consol. Court No. 23-00246                     NON-CONFIDENTIAL VERSION

OCP nor the GOM had ever provided any information regarding this subsidy program, despite

the instructions in the initial questionnaire to report any "other" benefits provided.  While

Commerce accepted most of OCP's purported minor corrections, Commerce rejected OCP's

submission of new factual information regarding the previously unreported OFPPT tax refund

program as a minor correction to its questionnaire responses.  *See id.* at 2.

## III.    Commerce's Final Results

In the *Final Results*, Commerce affirmed its preliminary finding that the GOM's

Reduction in Tax Fines and Penalties Program is *de facto* specific under section

771(5A)(D)(iii)(III) of the Tariff Act of 1930, as amended (the "Act"), 19 U.S.C. §

1677(5A)(D)(iii)(III), because OCP is a disproportionate user of the program.  IDM at 48.

Commerce stated that the "CVD statute does not mandate any specific methodology in

conducting a *de facto* specificity analysis and Commerce has discretion to apply a reasonable

methodology in making a *de facto* determination in light of facts and circumstances of each

particular case."  *Id*.  Commerce then proceeded to evaluate the information on the record

consistent with its normal practice – specifically, the "simple average approach" it has used "in

multiple past proceedings."  *Id.* at 48 & n.306 (citing *Ripe Olives from Spain: Final Results of*

*Countervailing Duty Administrative Review, 2019*, 87 Fed. Reg. 13,970 (Dep't Commerce Mar

11, 2022) and accompanying IDM; *Bottom Mount Combination Refrigerator-Freezers from the*

*Republic of Korea: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 17, 410

(Dep't Commerce Mar. 26, 2012), and accompanying IDM, Comment 4; and *Non-Oriented*

*Electrical Steel from Taiwan: Final Affirmative Countervailing Duty Determination*, 79 Fed.

Reg. 61,602 (Dep't Commerce Oct. 14, 2014), and accompanying IDM, Comment 1)).

5

Commerce also directly addressed each of OCP's and the GOM's arguments regarding why this program is not specific.  *See* IDM at 49-50.

## STANDARD OF REVIEW

In reviewing Commerce's CVD determinations, this Court will hold unlawful any determination, finding, or conclusion found "to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Acciai Speciali Terni, S.p.A. v. United States*, 26 CIT 892, 893 (2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951)), taking into account "whatever in the record fairly detracts" from the weight of supportive evidence.  *CS Wind Viet. Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016).  This standard also requires the agency to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

However, "{t}he Court's function is not to re-weigh the evidence," *USEC Inc. v. United States*, 259 F. Supp. 2d 1310, 1317 (CIT 2003), and "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (citation omitted).  Absent some showing to the contrary, Commerce is entitled to the presumption that it considered the record evidence as a whole. *Nat'l Ass'n of Mirror Mfrs. v. United States*, 696 F. Supp. 642, 648 (1988); *see also Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1062 (Fed. Cir. 2001).

NON-CONFIDENTIAL VERSION

This standard of review also encompasses the "arbitrary and capricious" standard

established under the Administrative Procedure Act.  *See Changzhou Wujin Fine Chem. Factory*

*Co. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (citing *Bowman Transp., Inc. v.*

*Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284 (1974)).

## **ARGUMENT**

**I.**    **Commerce's Decision to Reject OCP's Untimely New Factual Information Improperly Submitted as a "Minor Correction," and to Apply AFA for the OFPPT Payroll Tax Refund Program, is Lawful**

Mosaic agrees with the Defendant's arguments that Commerce correctly rejected OCP's

untimely disclosure of tax refunds received under the OFPPT Payroll Tax Refund program and

that Commerce's application of AFA with regard to this subsidy program is supported by

substantial evidence and in accordance with law, and hereby incorporates these arguments by

reference.  *See* Def. Br. at 8-20.

In the Final Results, Commerce correctly refused to accept new factual information

concerning OCP's previously unreported payroll tax refund that OCP presented at verification as

a so-called minor correction because OCP failed to report that it used the program by

Commerce's deadline.  Commerce instructed OCP to report other assistance that the GOM

provided in the initial Section III questionnaire; the deadline for responding to the questionnaire

was August 22, 2022.  *See supra* n.1.  However, OCP failed to disclose that it received a payroll

tax refund from the OFPPT during the POR until verification – more than a year after the

deadline for the initial questionnaire.  OCP asserted that information regarding this previously

unreported program is a "minor correction."  Commerce rightly rejected this argument because

minor corrections must concern information already on the record; OCP had not previously

reported this program, and accordingly there was no information on the record concerning OCP's

receipt of this payroll tax refund to correct in the first place.  Commerce thus correctly

determined that OCP's disclosure constituted untimely filed new factual information, not a minor

correction.  Commerce also correctly applied an AFA rate of 1.27 percent because OCP's failure

to provide requested necessary information by the deadline significantly impeded the proceeding

and, as a result, necessary information about the program was missing from the record.

OCP makes three arguments regarding Commerce's refusal to accept this untimely new

factual information, none of which have merit.  First, OCP argues that Commerce's decision is

unsupported by record evidence because the addition of the undisclosed program would lead to

what OCP characterizes as "trivial" adjustment to the CVD rate.  *See* OCP Br. at 15.  Second,

OCP argues that Commerce's decision is not in accordance with the law.  OCP Br. at 17-19.

Third, OCP argues that the application of AFA was contrary to law and unsupported by the

record evidence because "there was no requisite gap in the record for the agency to fill, and …

OCP acted to the best of its ability throughout this review."  OCP Br. at 19.  All of these

arguments fail, as discussed below.

### A.    Commerce's Decision to Reject OCP's Untimely Filed New Factual Information Improperly Submitted as a "Minor Correction" is Lawful

19 C.F.R. § 351.301(c)(1) provides that "The Secretary will not consider or retain in the

official record of the proceeding unsolicited questionnaire responses … or untimely filed

questionnaire responses."  When conducting verification, Commerce allows respondents to

submit "minor" corrections to their questionnaire responses.  However, Commerce's instructions

are clear that such corrections must pertain to information contained in the questionnaire

responses already on the record.  *See* OCP Verification Agenda at 2, P.R. 339, C.R. 309.

Here, OCP reported the receipt of benefits under a new subsidy program in the form of

payroll tax refunds for the first time at verification.  Commerce properly adhered to its

regulations and the deadlines for submission of factual information in this review in declining to accept this information as a minor correction to OCP's questionnaire responses.  As Commerce stated, "OCP had not previously reported use of this program, and thus information about OCP's receipt of this payroll tax refund was not already on the record of this review prior to verification, which OCP does not contest{.}"  IDM at 16-17.  OCP and the GOM should have reported the benefits provided under this subsidy program in their initial questionnaire responses. Having failed to do so, there was no information about OFPPT tax refunds contained in the questionnaire responses already on the record for OCP to "correct" at verification.  Thus, Commerce's rejection of OCP's untimely new information about the OFPPT tax refunds was lawful.

OCP argues that Commerce acted unlawfully and that the purportedly "trivial" impact of the previously unreported program on the final CVD rate is "manifestly minor" and therefore should have been accepted as a "minor correction."   OCP Br. at 17.  However, the actual subsidy rate associated with this subsidy program is unknown, because OCP deprived Commerce of the opportunity to investigate it.  The CVD statute does not permit Commerce to accept a respondent's self-serving assertions regarding subsidy rates at face value; rather, Commerce is charged with investigating subsidies.  In this case, however, Commerce could not investigate because the subsidy program remained undisclosed until verification.  Commerce was therefore justified in drawing an adverse inference to estimate the magnitude of the subsidy.

Furthermore, the verification agenda states that Commerce will only accept new information that makes "minor corrections *to information that is already on the record*."  OCP Verification Agenda at 2, P.R. 339, C.R. 309.  In the case of a previously *unreported* program, there was no information already on the record to correct – and thus Commerce lawfully rejected

Consol. Court No. 23-00246                    NON-CONFIDENTIAL VERSION

OCP's attempt to submit untimely new factual information under the guise of a minor correction

to its questionnaire responses.  Such a rejection is well within Commerce's lawful discretion to

enforce its deadlines and to determine how to implement its administrative procedures.  *See*

*SeAH Steel Corp. v. United States*, 659 F. Supp. 3d 1318, 1326 (CIT 2023) (sustaining

Commerce rejection of new information as untimely filed when a respondent first presents the

information at verification and the information does "not corroborate, support, or clarify factual

information already on the administrative record").

> **B.    Commerce Did Not Unlawfully Depart from Its Prior Practice in Rejecting OCP's Untimely New Factual Information Improperly Submitted as a "Minor Correction" at Verification**

OCP argues that Commerce's rejection of the purported "minor correction" is unlawful

because Commerce's decision was arbitrary and otherwise contrary to the agency's practice.

OCP Br. at 17.  OCP claims that "multiple prior agency decisions demonstrate {that}

Commerce's practice is to accept as minor corrections that disclose previously unreported grants

and tax credits, even in instances where they constitute new programs."  OCP Br. at 18.  OCP is

wrong, and the three Commerce decisions that OCP cites are distinguishable.

In *Certain Crystalline Silicon Photovoltaic Products From the People's Republic of*

*China*, in response to Commerce's question in the initial questionnaire whether the Government

of China ("GOC") had provided any other benefits not already reported, the company

respondents reported a number of small grants, which Commerce referred to collectively as

"Discovered Grants."  *Certain Crystalline Silicon Photovoltaic Products From the People's*

*Republic of China: Preliminary Affirmative Countervailing Duty Determination Commerce*, 79

Fed. Reg. 33,174 (Dep't Commerce June 10, 2014), and accompanying Preliminary Decision

Memorandum at 24.  The company respondents provided information on the names of the grant

programs, the amounts received, and other information about the programs in their questionnaire responses. *Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products From the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 79 Fed. Reg. 76,962 (Dec. 23, 2014), and accompanying Issues and Decision Memorandum ("CSPV IDM") at 84. However, Commerce applied AFA with respect to all of the "Discovered Grants" because of the GOC's failure to cooperate. *See id.* At verification, Commerce discovered additional grants and a tax refund not reported by one of the company respondents. *Id.* at 86. Commerce allowed the respondent to provide the names, dates, and amounts received for the unreported grants, but no other additional information about the grants, and Commerce applied AFA with respect to the previously undisclosed tax program. *Id.* Here, OCP similarly failed to report an entirely new tax program until verification. OCP Verification Report at 2, P.R. 349, C.R. 399. Commerce's application of AFA with respect to this program is wholly consistent with the approach taken in *CSPV From China*

In the CVD investigation of *1-Hydroxyethilidene-1, 1-Diphosphonic Acid From China*, a company respondent self-reported receiving benefits under 13 different grant programs, and in some instances multiple awards under the same program. *Countervailing Duty Investigation of 1-Hydroxyethylidene-1, 1-Diphosphonic Acid From the People's Republic of China: Final Affirmative Determination*, 82 Fed. Reg. 14,872 (Dep't Commerce Mar. 23, 2017), and accompanying Issues and Decision Memorandum at 8. At verification, Commerce accepted as a minor correction the respondent's reporting of 14 previously unreported awards that "were the same kinds of grants" the respondent had "already reported, but just for different years." *See* Commerce Memorandum, *Verification of the Questionnaire Responses of Shandong Taihe Chemicals Co., Ltd. and Shandong Taihe Water Treatment Technologies Co., Ltd.:*

Consol. Court No. 23-00246                    NON-CONFIDENTIAL VERSION

*Countervailing Duty Investigation of 1-hydroxyethilidene-1, 1-diphosphonic acid from the People's Republic of China* (Jan. 10, 2017) at 2.  Thus, the grants disclosed for the first time at verification were not an entirely new subsidy program that the Department had not previously investigated.  However, OCP's newly disclosed subsidy program *was* an entirely new subsidy program, one that the Department had not previously investigated, because of OCP's failure to report it in a timely manner.

Finally, in the CVD investigation of *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China*, Commerce accepted as minor corrections information from one of the company respondents concerning "several unreported grants in certain sub-ledgers of their charts of accounts." *Countervailing Duty Investigation of Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 80 Fed. Reg. 34,888 (Dep't Commerce June 18, 2015), and accompanying Issues and Decision Memorandum at 19-20.  These unreported grants were related to programs that the respondent had already reported in responses to the Department's supplemental questionnaires.  *See id.* Commerce thus accepted the new information concerning the additional grant amounts as a minor correction to the information already on the record concerning these programs.  For OCP, however, the newly disclosed tax refund was not related to any subsidy programs that it had reported in its questionnaire responses.

In sum, and contrary to OCP's arguments, Commerce's practice is *not* to accept untimely filed new factual information regarding subsidy programs disclosed for the first time at verification.  Rather, Commerce applies AFA to such programs.  Commerce thus acted lawfully

12

and consistent with prior practice in rejecting OCP's purported minor correction and applying AFA to the OFPPT tax refund program in this case. *Cf.* OCP Br. at 19.

### C.    Commerce's Application of AFA With Respect to the OFPPT Tax Refund is Lawful

In the Final Results, Commerce selected an AFA subsidy rate of 1.27 percent for the OFPPT tax refund program based on total AFA. It did so "because OCP failed to provide requested necessary information in response to our initial questionnaire by the established deadline with regard to its use of the Payroll Tax Refund program, its failure significantly impeded this proceeding, and, as a result, necessary information about this program is missing from the record." IDM at 16-18.

OCP argues that there is no basis in law for Commerce to use facts otherwise available in calculating the subsidy rate for the OFPPT tax refund program. OCP Br. at 19-20. OCP also argues that there was no basis for Commerce to draw adverse inferences because OCP supposedly acted to the best of its ability throughout the review. None of OCP's arguments has merit.

### 1.    The Department Lawfully Resorted to Facts Otherwise Available

Section 776 of the Act requires Commerce to use the "facts otherwise available" to make determinations where "necessary information is not available on the record" or where an interested party: (1) "withholds information that has been requested" by Commerce; (2) fails to provide information within the established deadlines or in the form or manner requested, subject to section 782 of the Act; (3) significantly impedes an investigation; or (4) submits information but the information cannot be verified. 19 U.S.C. § 1677e(a).

OCP expends significant effort attempting to explain why it failed to report the OFPPT tax refund in a timely manner. *See, e.g.*, OCP Br. at 20 ("OCP inadvertently missed the small

refund when preparing its initial questionnaire responses because the OFPPT payroll tax refund

is not provided through OCP's tax return and refund process."). This *post hoc* rationalization is

irrelevant to whether Commerce's application of AFA was lawful under the statute, which

provides that Commerce *shall* use facts otherwise available if any of the statutory factors

described above are met. This Court and the Federal Circuit, explaining this statutory directive,

have held that the reasons for a respondent's failure to provide requested information are

irrelevant – all that matters is that the respondent did not provide the information. *See Nippon*

*Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) ("The focus of subsection (a)

{of 19 U.S.C. § 1677e} is respondent's failure to provide information. The reason for the failure

is of no moment. The mere failure of a respondent to furnish requested information – for any

reason – requires Commerce to resort to other sources of information to complete the factual

record on which it makes its determination."); *Fresh Garlic Producers Ass'n v. United States*,

121 F. Supp. 3d 1313, 1324 (CIT 2015) (stating that "a party's reason for {failing to provide

information} is irrelevant").

OCP also incorrectly argues that none of the statutory conditions for the application of

facts otherwise available are met with respect to its failure to report the OFPPT tax refund until

verification. *First*, OCP argues that there is no gap in the record with respect to the subsidy rate

applicable to this program because there is information about the maximum possible rate for the

program, assuming the entirety of the refund is countervailable. OCP Br. at 20. However, it is

for the Department, not OCP, to determine whether there are gaps in the record and whether it

has received all information necessary to complete its determination. *See Ferrostaal Metals*

*Gmbh v. United States*, 518 F. Supp. 3d 1357, 1376 (CIT 2021) ("It is well established that it is

Commerce, not the respondent, that determines what information is to be provided.") (internal

quotations omitted). Because this tax program was not disclosed until verification, Commerce

did not have the opportunity to collect necessary information regarding OCP's usage of the

program that would ordinarily be provided in a response to the Tax Program Appendix. Further,

because Commerce did not have the opportunity to collect information from the GOM regarding

this newly-discovered tax program, Commerce had no way "to know and analyze whether the

program constituted a financial contribution or is specific, as Commerce was unaware until late

in the proceeding that it needed additional information from the government relating to this

program." IDM at 7. Similarly, the failure also deprived Mosaic of the opportunity to examine

and comment on the program. Thus, there is a gap in the record created by OCP's failure to

disclose this program until verification.

Second, OCP asserts that it did not withhold information, and that it did not fail to

provide information by the established deadlines. OCP Br. at 20-21. The record evidence

contradicts this assertion. The deadline in the initial questionnaire for submitting information

regarding "other assistance" (i.e., subsidy programs not previously investigated) was August 22,

2022. OCP disclosed its usage of the OFPPT program on September 6, 2023. This was more

than a year after the deadline. See OCP Verification Report at 1, P.R. 349, C.R. 399.

Third, OCP argues that the limited information it submitted concerning the OFPPT tax

refund could be verified, because its verification exhibits contained information related to the

total amount of the refund and the account in which the refund was booked. See OCP Br. at 21.

However, the purpose of verification is to assess the accuracy of previously submitted

questionnaire responses – not to develop the factual record for the first time. See Goodluck India

Ltd. v. United States, 11 F.4th 1335, 1344 (Fed. Cir. 2021) ("the purpose of verification is 'to test

information provided by a party for accuracy and completeness.'") (quoting Bomont Indus. v.

*United States*, 733 F. Supp. 1507, 1508 (CIT 1990)).  In this case, there were no questionnaire

responses regarding the OFPPT program, and therefore verification of such questionnaire

responses was impossible.  As Commerce stated in the IDM, OCP's failure to submit timely

information prevented Commerce from thoroughly analyzing the program or requesting

necessary information from the GOM.  IDM at 7.

*Fourth*, OCP argues that it did not impede the proceeding because it "voluntarily

disclosed" the OFPPT tax refund "in the time and manner specified by Commerce and nearly

two months before the *Final Results* in this review."  OCP Br. at 21.  Regardless of whether

OCP's reporting of this new tax subsidy program was "voluntary," OCP is wrong that it reported

the program in the time or manner specified by Commerce.  The initial questionnaire instructed

OCP to report any other benefits received from the GOM during the POR.  Only a timely

response to the initial questionnaire would have constituted a response in the time and manner

specified by Commerce.  Instead, OCP disclosed the existence of this program more than a year

later, at the outset of Commerce's verification – neither the time nor the manner that Commerce

had requested.  This failure to timely disclose the existence of an entirely new subsidy program

impeded the proceeding because "Commerce was unaware until late in the proceeding that it

needed additional information from the government relating to this program."  IDM at 7.

### 2.    Commerce Correctly Applied Adverse Inferences

If "an interested party has failed to cooperate by not acting to the best of its ability to

comply with a request for information," the statute allows Commerce to "use an inference that is

adverse to the interests of that party in selecting from among the facts otherwise available."  19

U.S.C. § 1677e(b)(1)(A); *see also Jindal Poly Films Ltd. of India v. United States*, 439 F. Supp.

3d 1354, 1363 (CIT 2020).  A respondent fails to act to the best of its ability when it does not

exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel Corp.*, 337 F.3d at 1382. This standard "does not condone inattentiveness, carelessness, or inadequate record keeping." *Id*. Rather, it "requires" a respondent to "have familiarity with all of the records it maintains in its possession, custody, or control; and … {to} conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of {their} ability to do so." *Id*.

        Here, OCP did not cooperate to the best of its ability because it apparently lacked familiarity with its own records and failed to thoroughly investigate those records in preparing its response to Commerce's initial questionnaire. OCP states that it "inadvertently missed the small {OFPPT} tax refund … because of the manner in which the refund was provided and the account to which the refund was booked in OCP's records." OCP Br. at 22. This explanation indicates that OCP did not "have familiarity with all of the records it maintains," and that it did not "conduct prompt, careful, and comprehensive investigations of all relevant records," as is required to demonstrate "maximum effort" to cooperate. *Nippon Steel Corp.*, 337 F.3d at 1382. In fact, the Federal Circuit speaks directly to OCP's purported justifications when it states that "{i}n preparing a response to an inquiry from Commerce, it is presumed that respondents are familiar with their own records. It is not an excuse that the employee assigned to prepare a response does not know what files exist, or where they are kept, or did not think – through inadvertence, neglect, or otherwise – to look beyond the files immediately available." *Id.* at 1383.

        Moreover, the fact that OCP eventually discovered the subsidy program when it was preparing for verification confirms that OCP failed to exert maximum efforts in providing

Commerce with the information it requested in its questionnaire response. If OCP had been sufficiently diligent earlier in the proceeding, then it would have discovered the subsidy program then, and Commerce could have investigated it. Because this did not happen, Commerce correctly applied AFA.

Nevertheless, OCP argues that it cooperated to the best of its ability, for two reasons. *First*, OCP claims that by "voluntarily disclosing" the tax refund as a "minor correction," it cooperated to the best of its ability. OCP Br. at 22. However, as explained above, OCP's reporting was not a "minor correction," but rather the untimely submission of new factual information. *Second*, OCP argues that it "put forward the maximum effort possible" because of the number of pages of information it submitted – "more than 16,550 pages{.}" *Id.* at 23. However, papering the record does not establish a respondent's cooperation, nor does any legal authority support such a proposition.

*Finally*, OCP claims that Commerce holds it to an unlawful "standard of perfection" – indeed, that Commerce "punishes" OCP – by "insisting that OCP was obligated to identify this OFPPT refund at the time it filed its initial questionnaire response regardless of the small size of the refund and the manner it was provided and booked in OCP's accounting system." OCP Br. at 22, 24. To the contrary, that is precisely what the "best of its ability" standard contemplates: that company respondents will be "familiar with their own records," that they will "conduct prompt, careful, and comprehensive investigations" of such records, and that they will submit timely information in the manner requested by Commerce. OCP failed on all accounts, and accordingly, Commerce was justified in applying adverse inferences.

### 3.    Commerce's Selection of the AFA Rate Was Supported by Substantial Evidence and Otherwise in Accordance With Law

OCP objects to the AFA rate selected by Commerce for two reasons: *first*, because it is allegedly "not supported by record evidence," and *second*, because OCP believes it is "manifestly unreasonable." Each of these arguments is incorrect.

In assigning a subsidy rate based on facts available with adverse inferences, the Act directs Commerce to "use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country." 19 U.S.C. § 1677e(d)(1)(A)(i). Commerce has developed a hierarchy for selecting an AFA rate, which it followed in this case. *See* IDM at 7-10. Commerce determined that there were no calculated rates for an identical program in this proceeding, but that there were calculated rates for a similar program – namely, the Tax Incentives for Export Operations program, whose 1.27 percent rate was the highest calculated rate for a similar/comparable program from the investigation. *See* IDM at 10.

OCP argues that this rate is "vastly greater than any possible rate that the record itself demonstrates could have resulted from the refund" and, accordingly, is unsupported by the record. OCP Br. at 25. However, the plain text of the statute provides that if Commerce uses an adverse inference in selecting among the facts otherwise available, Commerce is not required to "estimate what the countervailable subsidy rate … would have been if the interested party found to have failed to cooperate … had cooperated." 19 U.S.C. § 1677e(d)(3)(A). Thus, under the statute, Commerce was not required to consider the hypothetical subsidy rate that OCP claims is the *possible* rate that *could* have resulted if it had fully cooperated.

OCP also argues that because Commerce's AFA rate differs from the hypothetical rate that may have applied had OCP cooperated, the "AFA rate assigned by Commerce is unsupported by the record evidence and thus contrary to law." OCP Br. at 25. OCP is incorrect.

19

BUSINESS PROPRIETARY
INFORMATION DELETED

**Consol. Court No. 23-00246**                        NON-CONFIDENTIAL VERSION

The statute and Commerce's regulations set forth a hierarchy that Commerce is to apply in selecting subsidy rates based on adverse inferences.  *See* 19 U.S.C. § 1677e(d)(3)(A); IDM at 8. Commerce followed the law in selecting the highest calculated rate for a similar type of program that was calculated during the investigation.  *See* IDM at 10.  Commerce has the authority to place subsidy rates calculated in prior segments on the record, and thus Commerce's selection of such a rate is lawful.  *See* 19 C.F.R. § 351.308(c)(1)(iii) ("an adverse inference may include reliance on: … information derived from … {a}ny previous administrative review; or {a}ny other information placed on the record.");  *PrimeSource Bldg. Prods. v. United States*, 111 F.4th 1320, 1332 (Fed. Cir. 2024) ("under 19 U.S.C. § 1677e(b)(2), when determining an AFA rate, Commerce may rely on information from prior proceedings, including the original petition."); *Deacero S.A.P.I. de C.V. v. United States*, 996 F.3d 1283, 1299-1300 (Fed. Cir. 2021).

OCP baldly asserts that this AFA rate is "manifestly unreasonable" because it is supposedly so much greater than the hypothetical rate that OCP calculated, but again OCP points to no legal authority that would require Commerce to engage in such a comparison.  To the contrary, the statute specifically states that Commerce is *not* required to estimate what the subsidy rate would have been had the uncooperative respondent fully cooperated.  19 U.S.C. § 1677e(d)(3)(A).  Moreover, as discussed above, the true subsidy rate associated with the OFPPT program is unknown, because OCP deprived Commerce of the opportunity to investigate it.

OCP also argues that Commerce "never explained why selecting a rate more than **[      ]** times greater than that established by the record was reasonable in light of the totality of the circumstances."  OCP Br. at 25.  As noted above, however, Commerce was under no obligation to calculate the hypothetical rate that might have applied had OCP cooperated, nor was it obliged to justify the selected AFA rate in relation to that hypothetical rate.  Instead, Commerce properly

exercised the discretion granted by the statute – namely, to "apply any of the countervailable subsidy rates … specified under {§ 1677e(d)(1)}, including the highest such rate or margin, based on the evaluation by the administering authority of the situation that resulted in the administering authority using an adverse inference in selecting among the facts otherwise available." 19 U.S.C. § 1677e(d)(2). Consistent with the statute, Commerce lawfully applied a "countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country," 19 U.S.C. § 1677e(d)(1)(A)(i), and it did so based on proper evaluation of the situation that resulted in a need to use adverse inferences – namely, OCP's failure to report within the established deadline that it used the OFPPT program. *See* IDM at 7-11, 15-18.

OCP cites *BMW of N. Am. LLC v. United States* to assert that Commerce should have engaged in a more thorough consideration of the "totality of the circumstances," including the "seriousness of the conduct of the uncooperative party." OCP Br. at 25. However, this case is inapposite and does not indicate any deficiency in Commerce's selection of an AFA rate here. In that case, there were significant "procedural anomalies" during the administrative review process such that "BMW was entirely unaware it even had an administrative review pending." *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1296 (Fed. Cir. 2019). The Federal Circuit emphasized the "great deference given to Commerce in making {AFA} determinations," but that, in applying an AFA rate of 126.44 percent, "Commerce did not address how the procedural irregularities surrounding the administrative review process affected its view of BMW's level of culpability," and remanded for further consideration. *Id*. at 1302. Here, by contrast, there were no procedural abnormalities or irregularities to consider, nor does OCP argue that there were any.

*Finally*, OCP argues that, in applying an AFA rate of 1.27 percent, Commerce has "overreach{ed} reality" in establishing a rate that is "manifestly unreasonable." OCP Br. at 26. It is audacious for OCP to argue that Commerce "punishes OCP" by imposing a 1.27 percent subsidy rate. OCP Br. at 22. Furthermore, as discussed above, the statute does not require Commerce to estimate AFA rates based on a respondent's view of commercial reality or what the subsidy rate would have been had the respondent cooperated fully. *See* 19 U.S.C. § 1677e(d)(3)(A); *see also Pro-Team Coil Nail Enter. Inc. v. United States*, No. 2022-2241, 2024 WL 3824005 at *5 (Fed. Cir. Aug. 15, 2024) ("In applying AFA, Commerce is not required to estimate what the dumping margin would have been if the interested party had cooperated or to demonstrate that the dumping margin used by the administering authority reflects an alleged commercial reality of the interested party.") (citations omitted). Further, Commerce stated in the IDM that its selection of an AFA rate balanced the need to induce cooperation with the "dual goal of relevancy." IDM at 17. Commerce then explained that it would adhere to its established hierarchy, and would evaluate the factors of "inducement {of cooperation}, relevancy to the industry and relevancy to the particular program" in selecting a rate. *Id.* The rate that Commerce selected, 1.27 percent, is a rate that Commerce calculated for OCP for a similar subsidy program, *i.e.*, a tax program, in the original investigation. In other words, the selected AFA rate is based on OCP's reality as a recipient of numerous countervailable subsidies. Accordingly, Commerce did not act unlawfully in choosing the AFA rate that it did.

## II.    Commerce's Determination that the GOM's Reductions in Tax Fines and Penalties Program is *de facto* Specific is Lawful

Mosaic agrees with the Defendant's arguments that Commerce's determination that OCP's reductions in tax fines and penalties were *de facto* specific was lawful and supported by substantial evidence, and hereby incorporates those arguments by reference. Def. Br. at 23-35.

Section 771(5A)(D)(iii)(III) of the Act provides that a subsidy is *de facto* specific if

"{a}n enterprise or industry receives a disproportionately large amount of the subsidy." 19

U.S.C. § 1677(5A)(D)(iii)(III). "Disproportionate" is not defined in the statute. It has been

interpreted by this Court to mean "having or showing a difference that is not fair, reasonable, or

expected," and that disproportionality exists when something is "too large or too small in relation

to something {else}." *Hyundai Steel Co. v. United States*, No. 23-00211, 2024 WL 5135390, at

*4 (CIT Dec. 12, 2024) (citing Webster's dictionary). But the statute does not specify the

reference point Commerce is to consider when evaluating whether the amount of subsidy that a

respondent received is "disproportionately" large.

The legislative history of section 771(5A)(D)(iii) provides guidance that "where the

number of enterprises or industries using a subsidy is not large, that first factor alone would

justify a finding of specificity....  On the other hand, where the number of users of a subsidy is

very large, the predominant use and disproportionality factors would have to be assessed."

Uruguay Round Agreements Act Statement of Administrative Action, H.R. Rep. No. 103-316,

Vol. 1 ("SAA") at 931. Implicitly, this means a subsidy can be *de facto* specific even if it is used

by a large number of firms throughout an economy if the facts establish predominant or

disproportionate use. To reason otherwise would read sections 1677(5A)(D)(iii)(II) and (III) out

of the statute. It would also disregard this clear expression of Congressional intent.

The legislative history does not explain how Congress intended Commerce to assess

disproportionality, however, and it provides no guidance as to the relevant reference point

Commerce is to assess when determining whether a recipient's benefit amount is

"disproportionately" large. Thus, Congress has left this question to Commerce's discretion.

Similarly, the legislative history of section 771(5A)(D)(iii) provides limited guidance on how

Commerce is to take account of the extent of economic diversification within the economy in question, especially in relation to the disproportionality inquiry. The SAA provides a concrete example for how an assessment of economic diversification may inform whether subsidy recipients are "limited in number" under 19 U.S.C. § 1677(5A)(D)(iii)(I): "for example, with respect to economic diversification, in determining whether the number of industries using a subsidy is small or large, Commerce could take account of the number of industries in the economy in question." SAA at 931. However, the SAA provides no example of how Commerce's consideration of economic diversification may inform its determination of whether an enterprise or industry receives a "disproportionately large amount of the subsidy" under 19 U.S.C. §1677(5A)(D)(iii)(III). On this question as well, Congress has left it to Commerce's discretion.

Commerce's regulations also do not speak directly to the question of how Commerce is to assess disproportionality. *See* 19 C.F.R. § 351.502. The *Preamble* to the CVD regulations states that "'the analysis of whether an enterprise or industry or group thereof is a dominant user of, or has received disproportionate benefits under, a subsidy program should normally focus *on the level of benefits provided*,' even if sometimes 'it may be impracticable or impossible to determine *the relative level of benefits*'" *Royal Thai Gov't v. United States,* 436 F.3d 1330, 1336 (Fed. Cir. 2006) (emphasis added) (quoting *Countervailing Duties: Final Rule,* 63 Fed. Reg. 65,348, 65,359 (Dep't Commerce Nov. 25, 1998)). The *Preamble* also states that the "point of reference normally will be the enterprises or industries that received benefits under the program." *Final Rule*, 63 Fed. Reg. 65,359. This supports an interpretation of "disproportionately large" as ordinarily involving a comparison between the level of benefits that the respondent received relative to the level of benefits that other subsidy recipients received. The *Preamble* continues

that only in "certain limited circumstances" would it be appropriate to measure disproportionality "in relation to the economy as a whole," but this "situation {is} unusual compared with the majority of cases in which we have analyzed specificity." *Id.*

Recognizing that the statute and regulations do not prescribe how Commerce is to assess whether benefits are "disproportionately large," the Federal Circuit in *AK Steel* held that "determinations of disproportionality … are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case." *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999).[2] The court in *AK Steel* specifically rejected arguments that Commerce *must* analyze whether subsidy amounts are "disproportionate" in relation to the recipients' contribution to the gross domestic product ("GDP") of the economy as a whole. *Id.* at 1384. Commerce therefore has discretion to take a reasonable approach based on the record before it. *See also Bethlehem Steel v. United States*, 140 F. Supp. 2d 1354, 1369 (CIT 2001) ("Because neither 'dominant' nor 'disproportionate' are defined in the relevant statute, this Court is obligated to defer to Commerce's reasonable interpretation thereof.").

The record of this review demonstrates that OCP received a disproportionately large amount of the benefits that the GOM provided under this program during the POR. Specifically,

---

[2] The Commerce decision at issue in *AK Steel* was issued on July 9, 1993, prior to the Uruguay Round Agreements Act ("URAA"), which added the language in section 771(5A) regarding consideration of the extent of economic diversification. The prior text of section 771(5)(B) directed Commerce to "determine whether the bounty, grant, or subsidy in law or in fact is provided to a specific enterprise or industry, or group of enterprises or industries." *See* Omnibus Trade and Competitiveness Act of 1988, Pub. L. 100-418, 102 Stat. 1107 (1988) (amending 19 U.S.C. §1677(5)(B)). Commerce's pre-URAA proposed regulations provided that Commerce would consider "{w}hether certain enterprises, industries, or groups thereof received disproportionately large benefits under a program." *Certain Steel Products From Korea: Final Affirmative Countervailing Duty Determinations and Final Negative Critical Circumstances Determinations*, 58 Fed. Reg. 37,338, 37,342 (Dep't Commerce July 9, 1993) (citing 19 C.F.R. § 355.43(b)(2) (1989)). Thus, the Federal Circuit's holding in *AK Steel* speaks to the proper interpretation of "disproportionality," albeit without the additional context regarding consideration of the extent of economic diversification added in the URAA.

Consol. Court No. 23-00246                                  NON-CONFIDENTIAL VERSION

Commerce requested detailed information from the GOM regarding the total number of subsidy

recipients, the total amount of assistance, and the amount provided to the 50 largest beneficiaries

during the POR and prior three years.  This information shows that there were a large number of

subsidy recipients during the POR – over 70,000 companies – but the average amount of

reduction in waiver of tax penalties was only [                    ].  *See* GOM First Supplemental

Questionnaire Response (Dec. 7, 2022) at 8, P.R. 162, C.R. 154 ("GOM SQR").  In addition, the

record evidence shows that the subsidy was heavily concentrated among the recipients that

received the greatest amounts.  *Id.* at 13.  OCP was the [        ] largest recipient of this subsidy

during the POR and received a subsidy amount of [                    ] in 2021, an amount that

is approximately 900 times larger than the average subsidy amount of [                ].  *See id.*

at 6-8.  The amount that OCP received was also consistently larger than the average subsidy

amount over the prior three years, including more than 700 times greater in 2018 and more than

100 times greater in 2019:

| Year | Number of Companies Receiving Reductions | Cumulative Total Amount of Reductions (MAD) | Average Reduction per Recipient (MAD) | Total Amount of OCP's Reduction (MAD) | OCP's Reduction Amount (as multiple of average) |
|------|------|------|------|------|------|
| 2018 | 28,952 | [          ] | [        ] | [        ] | [        ] |
| 2019 | 10,551 | [          ] | [        ] | [        ] | [        ] |
| 2020 | 9,920 | [          ] | [        ] | [     ] | [   ] |
| 2021 | 71,161 | [          ] | [        ] | [        ] | [        ] |

*See id.*  Based on this record, Commerce reasonably concluded that the "evidence on the record

indicates that OCP received reductions under this program that are significantly (several hundred

times) greater than what the average recipient received."  IDM at 49-50.  Any instance where a

company receives a subsidy amount that is approximately 900 times larger than the average amount is clearly a disproportionately large amount of the subsidy within the meaning of section 771(5A)(D)(iii)(III) of the Act.

OCP presents two arguments for why Commerce's specificity finding is unsupported by substantial evidence and contrary to law, neither of which has merit. *First*, OCP wrongly asserts that Commerce failed to consider the economic diversification of the Moroccan economy. However, as discussed below, the record evidence indicates that Morocco's economy is highly diversified, and Commerce properly considered this fact as the statute and the SAA require. *Second*, OCP argues that Commerce failed to consider OCP's relative size in Morocco's economy, although neither the statute nor Commerce's practice requires such an analysis. The remainder of this section discusses each of these erroneous arguments in turn.

A.    **Commerce Properly Considered the Economic Diversification of the Moroccan Economy in its *De Facto* Specificity Analysis**

OCP wrongly asserts that Commerce failed to properly consider the economic diversification of the Moroccan economy. Specifically, OCP argues that Commerce merely undertook a "simplistic observation about the number of sectors in an economy{} without considering the relative concentration of economic activity within those sectors." OCP Br. at 28. However, the record evidence indicates that economic activities in Morocco are highly diversified, and Commerce properly relied on this evidence to determine that Morocco, in fact, "has numerous manufacturing and service sectors in 21 industrial sectors." IDM at 49 (citing GOM's Initial Questionnaire Response ("GOM IQR") at Exhibit III-4 (Nomenclature Marocaine d'Activities – NMA 2010), P.R. 49, C.R. 29). OCP has not asserted that Morocco's economy is not diversified, nor could it, as the record evidence shows that there are more than 650 different activities within Morocco's 21 industrial sectors, of which the "extraction of natural phosphates"

is only one.  *See* GOM IQR at Exhibit III-4 (Nomenclature Marocaine d'Activities – NMA 2010)

at 3 (noting that the "Moroccan Nomenclature of Activities (NMA 2010) includes… 650

activities coded by four numerical digits").  Moreover, OCP fails to explain how a consideration

of "the relative concentration of economic activity within those sectors" would lead the

Department to a conclusion other than that Morocco's economy is, in fact, highly diversified.

  Further, OCP states that the Department "never employed this cursory economic

diversification analysis as *context* for its specificity finding," but rather that its "purported

economic diversification analysis appears in a standalone paragraph in Commerce's decision that

is completely divorced from its specificity determination, as though Commerce believes the two

questions should be treated independently of each other."  OCP Br. at 28-29.  This is false,

because the paragraph in question clearly discusses Morocco's economic diversification within

the context of the Department's specificity analysis; indeed, Commerce states explicitly in the

paragraph that it was discussing the issue in response to OCP's arguments that it failed to take

Morocco's economic diversification into account in its Preliminary Determination.  *See* IDM at

49.  Citing the Act, Commerce notes that in "evaluating the specificity factors for domestic

subsidies … Commerce must take into account the extent of diversification of economic

activities within the jurisdiction of the authority providing the subsidy."   After describing the

type of data Commerce usually considers in undertaking this analysis, Commerce relies on the

record evidence in reaching its conclusion that there is "a wide diversification of economic

activities in Morocco."  *Id.*  It is not clear why OCP considers this discussion to be "completely

divorced from its specificity determination," when the paragraph is, in fact, central to it.

  OCP next argues that the "correct" economic diversification analysis requires "a

comparison of OCP to those other companies," OCP Br. at 29-30, including a consideration of

the concentration of activity in the phosphate mining industry and OCP's relatively large size.

OCP has invented this alleged requirement out of whole cloth, as there is nothing in the statute,

Commerce's regulations, or the *Preamble* that discusses such an analysis. Moreover, none of the

cases OCP cites in support of its alleged requirement supports its position: none reference nor

review (let alone explain the "correct" methodology for) Commerce's economic diversification

analysis in any meaningful way. *See* OCP Br. at 30 (citing *AK Steel Corp.*, 192 F.3d at 1384-85;

*Bethlehem Steel* 140 F. Supp. 2d 1354, 1369 (2001), *Allegheny Ludlum Corp. v. United States*,

24 CIT 452, 465, 112 F. Supp. 2d 1141, 1153 (2000)). Indeed, the determination under

consideration in *AK Steel* predates the addition of the economic diversification language to the

statute – and even there, the court rejected the "argument that Commerce 'must analyze (and

always has analyzed)' disproportionality by looking at the percentage of the total benefit of a

subsidy program accruing to a particular company or industry{,}" as well as the argument that

Commerce must compare a recipient's subsidy amount to its contribution to GDP. *AK Steel*

*Corp.*, 192 F.3d at 1384-85. Further, the mere fact that OCP is a large company that accounts for

roughly five percent of Morocco's GDP does not detract from Commerce's finding that the

Moroccan economy is widely diversified. Thus, OCP fails to demonstrate that Commerce did

not account for the degree of economic diversification in its analysis.

   In addition, Mosaic takes note of this Court's recent decision in *The Mosaic Company v.*

*United States*, Consol. Court No. 21-00116, 2025 WL 48415 (CIT Jan. 8, 2025) ("*Mosaic II*").

Although the facts underlying that decision differ from those under consideration here,[3] and

---

[3] Specifically, in *Mosaic II*, OCP's share of the reductions in fines or penalties was "82.87 times larger than the average amount received by other companies in Morocco." *Mosaic II* at *10. Here, however, OCP's share is "roughly 900 times larger than the average amount." IDM at 48.

although that decision is not final, the Court's discussion of the economic diversification analysis

is instructive to the facts here.

The *Mosaic II* Court describes the overall "guiding principle" of the specificity test as

explained in the SAA by noting that it is "intended to function as a rule of reason and to avoid

the imposition of countervailing duties in situations where, because of the widespread

availability *and use* of a subsidy, the benefit of the subsidy is spread throughout an economy."

*Mosaic II* at *9 (citing SAA at 930).[4]    The Court further states that "Commerce must distinguish

between subsidies that are provided to or used by discrete segments of the economy and those

that distribute a benefit throughout the entire economy."    *Id*.

Commerce's determination in this proceeding conforms with the Court's discussion in

*Mosaic II*, and is more than adequately supported by the record.    Although this particular subsidy

program may be widely available to all taxpayers in Morocco and have a large number of users,

Commerce correctly found that this does not mean that the subsidy program cannot be

*disproportionately* used by OCP.    As Commerce explained:

> although the program may be *available* to all taxpayers, this fact does not necessarily nor
> automatically mean that it cannot be disproportionately *used* by certain companies.    The
> SAA describes the original purpose of the specificity test, which is to serve 'as an initial
> screening mechanism to winnow out only those foreign subsidies which truly are broadly
> available and widely *used* throughout an economy.' A subsidy program can be both
> broadly available across an economy but used disproportionately by an enterprise or
> group of enterprises compared to others.

IDM at 48.    Commerce then continues to compare the benefits received by OCP to the average

amount of benefits received by other companies in Morocco that used the program, and

---

[4] The relevant sentence of the SAA states in full that "The Administration intends to apply the specificity test in
light of its original purpose, which is to function as an initial screening mechanism to winnow out only those foreign
subsidies which truly are broadly available and widely used throughout an economy."  SAA at 929.

determined that OCP's benefit was "roughly 900 times larger than the average amount."  *Id*. at

48.

Commerce also properly considered Morocco's economic diversification, citing to the

GOM's questionnaire response which indicated that Morocco's economy is highly diversified,

with "numerous manufacturing and service sectors in 21 industrial sectors."  IDM at 49 (citing

GOM IQR at Exhibit III-4, P.R. 49, C.R. 29).  The implications of this finding are clear: OCP,

though perhaps a large company, is but one company in a highly diverse economy with more

than 21 industrial sectors and 650 activities.  Though the subsidy program here may be available

to companies in each of these sectors, OCP nevertheless received a benefit that was

approximately 900 times greater than the average amount that other beneficiaries received.  In

other words, the *amount* of the subsidy that OCP received in this POR relative to the amount

received by other companies – *i.e.*, nearly 900 times the amount received by the average user – is

sufficiently disproportionate to show that the benefit of the subsidy program is concentrated in a

"discrete segment of the economy."  Commerce reasonably concluded on the basis of this record

that OCP received a disproportionately large amount of the subsidy, and therefore that the

program is *de facto* specific.

> **B.    Commerce Reasonably Compared the Benefit Received by OCP Against the Average Benefit, and was Not Required to Consider OCP's Size Relative to Other Companies in Morocco**

OCP argues that Commerce impermissibly "dismiss{ed} evidence regarding OCP's size,

tax base, and economic role in Morocco" when assessing whether it was a disproportionate user

of the program.  OCP Br. at 34.  In making this erroneous argument, OCP misconstrues the

statute, case law, and Commerce's practice.  As explained below, the statute accords Commerce

discretion to analyze disproportionality on a case-by-case basis.  The Federal Circuit has

specifically rejected arguments that Commerce is required to compare a subsidy recipient's benefit amount to its contribution to GDP. Finally, Commerce did not depart from its prior practice in evaluating whether OCP received a disproportionately large amount of the subsidy based on a comparison to the average subsidy amount.

### 1.    Commerce's Determination is Consistent With the Statutory Text

OCP incorrectly states that, in examining whether OCP received a disproportionately large amount of the subsidy, the statute "necessarily requires Commerce *to compare* OCP and its characteristics to those other companies and their characteristics, including with respect to proportionate size and role in the overall Moroccan economy." OCP Br. at 31. There is no basis for this statement in the text of the statute, which only provides that Commerce analyze whether "{a}n enterprise or industry receives a disproportionately large amount of the subsidy." 19 U.S.C. § 1677(5A)(D)(iii)(III). It is undeniable that the statute does not prescribe any particular methodology for the analysis. The SAA also supports this conclusion, as it states that "the weight accorded to particular factors will vary from case to case." SAA at 931.

### 2.    Commerce's Determination Conforms to Relevant Case Law Allowing Fact-Specific Analysis

OCP argues incorrectly that "th{e} requirement to consider a respondent's size has been repeatedly confirmed by both this Court and the Federal Circuit." OCP Br. at 32. In actuality, the decisions of this Court and the Federal Circuit emphasize the importance of a fact-specific analysis, and do not mandate any particular methodology – including a consideration of a company's size.

*First*, OCP misquotes *AK Steel* in asserting that the Federal Circuit has ruled that finding a "'benefit conferred on a large company … disproportionate merely because of the size of the company' is 'an untenable result.'" OCP Br. at 32 (citing *AK Steel Corp.*, 192 F.3d at 1385)

(emphasis omitted). This selective quotation twists the holding of *AK Steel Corp.* beyond recognition. What the Federal Circuit actually held was that the "argument that Commerce 'must analyze (and always had analyzed)' disproportionality by looking at the percentage of the total benefit of a subsidy program accruing to a particular company or industry is not correct. Determinations of disproportionality… are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case." *AK Steel Corp.*, 192 F.3d at 1385. The Federal Circuit specifically noted that a finding of disproportionality based solely on a company's size "*could* produce an untenable result," *id.*, not that it must. The Federal Circuit also rejected the argument that Commerce *must* analyze whether subsidy amounts are "disproportionate" in relation to the subsidy recipients' contribution to GDP. *Id.* at 1384.

Further, although the Federal Circuit in *AK Steel* affirmed Commerce's finding that the respondent did not receive a "disproportionately large" amount of the subsidy, the facts of that case are inapposite to the facts under consideration here. In particular, the respondent in that case received essentially the *same* amount of subsidy benefits as the average beneficiaries. *See id.* at 1385 ("POSCO did not receive a disproportionate benefit because in the same year when POSCO revalued its assets upward by 94.0%, the average increase in asset value was 94.2%."). In contrast, OCP received an amount that is nearly 900 times larger than the amount the average recipient received.

OCP's reliance on *Bethlehem Steel* is misguided for two reasons. *First*, in that case, Commerce assessed disproportionality on an industry basis rather than on an enterprise basis as is the case here. *Bethlehem Steel*, 140 F. Supp. 2d at 1367 ("Commerce's specificity analysis … focused solely on whether the Korean steel industry was the dominant user{.}"). *Second*, the

Commerce decision at issue in *Bethlehem Steel* concluded that a large consumption of electricity was an "inherent characteristic" of the Korean steel industry and, accordingly, that the industry was not a disproportionate user of the program. *See id*. at 1369. Here, by contrast, OCP does not argue that a tendency to incur high tax fines or penalties is an "inherent characteristic" of the Moroccan phosphate industry generally or OCP specifically.

Indeed, the record here indicates that this is not the case. The GOM's questionnaire response describes the 50 largest beneficiaries of this program by the "Recipient Company's Sector."[5] *See* GOM SQR at 8-14, P.R. 162, C.R. 154. This list of Companies describes a multitude of sectors: "Extractive Industries," but also "Manufacturing Industry," "Financial and Insurance Activities," "Trade; Automobile and Motorcycle Repair," "Construction," and "Information and Communication," to name only a few. *Id.* at 8. This evidence indicates that, unlike in *Bethlehem Steel*, it is not an "inherent characteristic" of the Moroccan phosphate industry generally, or OCP specifically, to incur high tax fines or penalties.

Moreover, there is no record evidence that Moroccan companies incur tax fines and penalties in proportion to their size or contribution to Morocco's GDP, or that the GOM approves reductions in tax fines and penalties in proportion to a company's contribution to GDP. In fact, the record shows that the amount of benefits that OCP received in reduced tax fines and penalties fluctuated widely in recent years, despite OCP contributing a relatively stable approximately five percent to Moroccan GDP. Specifically, OCP received reductions in tax fines and penalties from 2018-2021 that ranged from **[     ]** in 2020, to roughly 100 times the

---

[5] The GOM identified only the relevant industry for the top 50 subsidy recipients but stated that it could not provide the names of these companies due to confidentiality. GOM SQR at 20, P.R. 162, C.R. 154.

average amount in 2019, and to more than 700 times and nearly 900 times larger than the

average amount in 2018 and 2021.  *Id.* at 6, 8.

The same is true for a company's size, as there is no evidence on the record that would

indicate a correlation between a company's size and the amount of the subsidy it receives under

this program.  For example, the list of the 50 largest beneficiaries under the program describes

recipients by sector but does not otherwise provide any indication as to the size of the company

or its contributions to Morocco's GDP.  *See id.* at 8-14.  Although it is conceivable that the

magnitude of a company's reductions in tax fines and penalties would be positively correlated

with its size (*i.e.*, large companies have large amounts of revenue, are required to pay

correspondingly large amounts of tax, would incur large tax penalties and fines for failing to do

so, and may receive correspondingly large reductions in these tax penalties and fines), it is

equally conceivable that the correlation is negative (*i.e.*, large companies have large amounts of

revenue, and use some of that revenue to pay professionals to ensure that they do not incur large

tax fines or penalties in the first place).  Regardless, even if the statute required Commerce to

make a determination on this basis (which it does not), there is no information on the record that

would have allowed Commerce to do so.  Notably, the GOM stated that it was prohibited by law

from identifying the names of the top 50 subsidy recipients, thereby depriving Commerce of the

ability to compare the size of other large subsidy recipients to OCP.  *See id.* at 20.

Accordingly, OCP is incorrect when it argues that Commerce impermissibly

"dismiss{ed} evidence regarding OCP's size, tax base, and economic role in Morrocco" when it

assessed whether OCP was a disproportionate user of the program, OCP Br. at 34, because the

record does not contain adequate information to determine whether these factors are indicative of

disproportionality.

Consol. Court No. 23-00246                    NON-CONFIDENTIAL VERSION

Finally, OCP's reliance on *Royal Thai Gov't* is also unavailing, as the Federal Circuit in

that case held that Commerce's evaluation of the magnitude of benefits provided to a company,

and not some other unnecessarily complicated valuation approach or evaluation of a company's

size, was an appropriate methodology for determining disproportionality. *See Royal Thai Gov't*,

436 F.3d at 1336 ("{W}e understand Commerce to have determined that the magnitude of debt

that is restructured is roughly proportional to the benefit conferred by restructuring. We have no

reason to disagree with either determination."). Moreover, this decision emphasizes the degree

of latitude that the statute affords to Commerce in assessing *de facto* specificity, and quotes the

CVD *Preamble* to note that "'the analysis of whether an enterprise or industry or group thereof is

a dominant user of, or has received disproportionate benefits under, a subsidy program should

normally focus on the level of benefits provided,' even if sometimes 'it may be impracticable or

impossible to determine the relative level of benefits.'" *Id.* at 1336 (citing *Final Rule*, 63 Fed.

Reg. at 65,359).

In sum, contrary to OCP's assertions, the decisions of this Court and the Federal Circuit

do not require that Commerce consider a respondent's size in its disproportionality analysis.

Rather the courts have held that Commerce has the "latitude . . . {to} determine{e} the

appropriate method by which to determine the specificity of benefits conferred by subsidies" as

long as the choice of method is reasonable. *Royal Thai Gov't*, 436 F.3d at 1336. This latitude

easily encompasses an analysis that compares the amount of benefit that the recipient received

against the average amount of benefit that other respondents received.

### 3. Commerce Did Not Unlawfully Depart from Prior Practice in its Disproportionality Analysis

OCP next argues that "Commerce's dismissal of {OCP's size is} inconsistent with the

agency's practice of considering the size of an enterprise or industry in deciding whether an

36

enterprise or industry received a disproportionately large amount of a subsidy." OCP Br. at 34.

OCP's argument is unavailing. None of the three prior Commerce determinations it cites in

support of its argument are analogous to the facts of this case, or otherwise establish that

Commerce has a practice of considering the respondent's size.

*First*, two of the three determinations that OCP cites involve a *de facto* specificity

analysis on an industry basis, rather than on an enterprise basis as is the case here. *Compare*

IDM at 49 *with* OCP Br. at 34-35 (citing *Coated Free Sheet Paper From the Republic of Korea:*

*Notice of Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Oct. 25,

2007), and accompanying IDM at 18-20 (focusing on the Korean "paper sector"); *Final Negative*

*Countervailing Duty Determination: Live Swine from Canada*, 70 Fed. Reg. 12,186 (Mar. 11,

2005), and accompanying IDM at 19 (examining the "sectoral distribution of benefits")). These

determinations are thus uninstructive with respect to this determination, which involves a finding

of disproportionality on an enterprise basis.

OCP's reliance on *Dynamic Random Access Memory Semiconductors From the Republic*

*of Korea* is similarly unavailing, as the facts of that determination differ significantly from those

under consideration here. Although that determination did reference consideration of a

company's size relative to all companies in a jurisdiction, the program at issue in that case

altered the amount of tax a company was due to pay – rather than reduced the amount of tax

fines or penalties a company was due to pay. *See Dynamic Random Access Memory*

*Semiconductors From the Republic of Korea: Final Results of Countervailing Duty*

*Administrative Review*, 76 Fed. Reg. 2,336 (Jan. 13, 2011), and accompanying IDM at 3 (citing

*Dynamic Random Access Memory Semiconductors From the Republic of Korea: Preliminary*

*Results of Countervailing Duty Administrative Review*, 75 Fed. Reg. 55,764, 55,767 (Dep't

Commerce Sept. 14, 2010).  That determination was also based on "facts available" rather than

on the actual usage of a program.  *See id.* ("Thus, record information does not allow us to

determine actual use of the program.").

      In any event, this single determination is not evidence of a well-established agency

practice – particularly given the weight of other Commerce determinations where it evaluates

disproportionality by comparing the amount of a recipient's benefits with the amount of the

average recipient's benefits – without any consideration of a company's size.  For example,

Commerce's practice indicates that the mere fact that a subsidy recipient is large does not

insulate the company from a *de facto* specificity finding based on disproportionality.  In *100- to*

*150-Seat Large Civil Aircraft From Canada*, Commerce stated:

> We continue to find that the INI SFA grant is *de facto* specific under section
> 771(5A)(D)(iii)(III) of the Act because Shorts received a disproportionately large amount
> of SFA benefits when compared to other recipients.  We disagree with the European
> Commission's and U.K.'s arguments that the extent of economic diversification in
> Northern Ireland, and Shorts' alleged status as a large player in the economy of Northern
> Ireland which contributes a large part to the total GDP of Northern Ireland, indicate that
> this program is not *de facto* specific….  Even assuming arguendo that Shorts is {a} major
> player in Northern Ireland's economy, this does not mean that the economy lacks
> economic diversification.  Further, even if a company contributes to a large part of a
> Country's GDP, this should not insulate the company from a specificity finding.  As a
> result, we continue to find that the SFA grant program constitutes a countervailable
> subsidy to Bombardier/Shorts.

*100- to 150-Seat Large Civil Aircraft From Canada: Final Affirmative Countervailing Duty*

*Determination*, 82 Fed. Reg. 61,252 (Dep't Commerce Dec. 27, 2017), and accompanying IDM

at 76.  Thus, however large OCP may be relative to Morocco's economy, its size does not shield

it from the conclusion that it is a disproportionate user of a subsidy program.

      Similarly, Commerce's practice indicates that the relevant comparison in a

disproportionality analysis is the amount of subsidy that the enterprise received as compared to

the amount that other enterprises received, not the amount of subsidy that the enterprise received

as compared to the enterprise's total revenue.  For example, in *Forged Steel Fluid End Blocks From Italy*, the Department found a program to be *de facto* specific because the recipient received "disproportionately large {benefits} when compared to the average amount received by all recipients under the program," even though the program was "generally available to all companies."  *Forged Steel Fluid End Blocks From Italy: Final Results of Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg. 53,863 (Dep't of Commerce Aug. 9, 2023), and accompanying IDM at 18.  Multiple other determinations are similar:

- *Non-Oriented Electrical Steel from Taiwan: Final Affirmative Determination in the Countervailing Duty Investigation*, 79 Fed. Reg. 61,602 (Dep't of Commerce Oct. 6, 2014) and accompanying IDM at 28 ("the Department compared CSC's receipt of benefits against the amount all companies in Taiwan received, and as indicated in the usage data, CSC received benefits under the program that greatly exceeded the average exemption amount….For {a related program}, the Department … determined that the benefit received by CSC is among the highest received when compared to the benefit received by other companies. Accordingly, we continue to find that this program is de facto specific to CSC under section 771(5A)(D)(iii)(III) of the Act.").

- *Sugar from Mexico: Final Affirmative Determination in the Countervailing Duty Investigation*, 80 Fed. Reg. 57,337 (Dep't of Commerce Sept. 16, 2015) and accompanying IDM at 43 ("{T}he amount that FEESA and the GAM Group received is not just 'greater' but disproportionate to the amount received by the average user.  This *de facto* specificity analysis is consistent with the Department's established practice, as upheld by the CIT.").

- *Frozen Warmwater Shrimp From Ecuador: Final Affirmative Determination of the Countervailing Duty Investigation*, 89 Fed. Reg. 85,506 (Dep't of Commerce Oct. 21, 2024) and accompanying IDM at 51 ("we found that the share of the benefits received by Santa Priscila under this program during the POI was many times greater than the average benefit received by other program recipients in Ecuador.  As such, we determined that Santa Priscila … received disproportionate benefits under the program and, therefore, that the program was de facto specific under section 771(5A)(D)(iii)(III) of the Act.").

Thus, Commerce did not depart from its prior practice in finding that OCP received a disproportionate share of the benefits based on a comparison of the amount of benefit OCP received against the average amount received by all users of the program.

Consol. Court No. 23-00246                    NON-CONFIDENTIAL VERSION

In sum, Commerce properly considered all facts on the record and provided a reasonable, fact-specific explanation for its approach to this issue.  It determined, based on record evidence, that OCP's tax reductions were 900 times larger than the average amount of benefit received by all users.  IDM at 49.  In so doing, Commerce acted consistently with the statutory text, the holdings of this Court and those of the Federal Circuit, and its established practice.  Accordingly, this Court should sustain Commerce's determination that the GOM's Reductions in Tax Fines and Penalties Program is *de facto* specific pursuant to section 771(5A)(D)(iii)(III) of the Act.

## III.    Commerce's Investigation of "Other Assistance" is Lawful

During the underlying administrative review, Commerce requested information concerning all "other assistance" that the GOM provided to OCP during the POR.  *See* OCP IQR at 129, P.R. 76, C.R. 8.  As a result, Commerce initiated reviews of five programs it had previously investigated.  Here, OCP challenges Commerce's inquiry into all "other forms of assistance" it received from the GOM.  It does so even though Commerce has addressed its arguments, and similar arguments, numerous times in the past, and even though this court considered and rejected OCP's claims.  *See The Mosaic Co. v. United States*, 659 F. Supp. 3d 1285, 1313 (CIT 2023).

Commerce's investigation of the "other assistance" that OCP reported receiving from the GOM was reasonable and otherwise in accordance with law.  As this court has previously held, Commerce has broad investigative discretion under 19 U.S.C. §§ 1671a(a) and 1677d, and its longstanding practice of requesting that respondents provide information about "other forms of assistance" received during the POI is an example of Commerce reasonably exercising this broad discretion.  *Changzhou Trina Solar Energy Co. v. United States*, 195 F. Supp. 3d 1334, 1341-46 (CIT 2016).  Commerce's approach also reflects its statutory mandate, pursuant to 19 U.S.C. §

40

1677d, to "consolidate in one investigation … all subsidies known by petitioning parties to the investigation or by {the Department} relating to that merchandise." 19 U.S.C. § 1677d; *see also Jiangsu Zhongji Lamination Materials Co. v. United States*, 405 F. Supp. 3d 1317, 1343 (CIT 2019) (holding that "because Commerce is urged to ensure 'proper aggregation of subsidization practices,' … Commerce is permitted to request that documentation be placed on the record so that it may determine whether subsidies discovered during the investigation are countervailable.") (citing S. Rep. No. 96-249 at 98 (1979), *reprinted in* 1979 U.S.C.C.A.N. 381, 484; 19 U.S.C. §§ 1671a(a) and 1677d).  OCP's arguments to the contrary find no support in the statute or its legislative history, and the court should reject them – as it already has.  *See The Mosaic Co. v. United States,* 659 F. Supp. 3d 1285, 1313 (CIT 2023) ("OCP claims that Commerce exceeded its statutory authority when it asked OCP about 'any other forms of assistance{.}'  The court finds no merit in this claim.").

OCP argues that "Commerce must possess information demonstrating the 'appearance' of a countervailable subsidy before seeking such information on unspecified programs for which no allegation has been made." OCP Br. at 36.  In requesting information that Commerce "might imagine OCP had received from the GOM," *id.*, OCP argues that "Commerce exceeded its statutory authority."  This argument is based on a mischaracterization of the statutory framework.  Specifically, OCP bases its argument on section 1677d of the Act, which states in pertinent part:

> If, in the course of a proceeding under this subtitle, the administering authority discovers a practice which appears to be a countervailable subsidy, but was not included in the matters alleged in a countervailing duty petition . . . , then the administering authority –
>
> > (1) shall include the practice, subsidy, or subsidy program in the proceeding if the practice, subsidy, or subsidy program appears to be a countervailable subsidy with respect to the merchandise which is the subject of the proceeding{.}

19 U.S.C. § 1677d.  As the text of the provision makes clear, section 1677d requires Commerce

to investigate any practice that it discovers in the course of a CVD proceeding that appears to be

a countervailable subsidy but was not included in a countervailing duty petition.  However, the

statute does not explain how Commerce may collect information relating to such practices, or

when it may do so.  Thus, Congress has left this issue to Commerce's discretion.

   In interpreting this provision, this Court has recognized that the statute "vests

{Commerce} with broad investigative discretion" and, further, that "Commerce's inquiry

concerning the full scope of governmental assistance provided by {a government} and received

by the Respondents in the production of subject merchandise {is} within the agency's

independent investigative authority pursuant to 19 U.S.C. §§ 1671a(a) and 1677d." *Guizhou Tyre*

*Co. v. United States*, 523 F. Supp. 3d 1312, 1339 (CIT 2021) (quoting *Changzhou Trina Solar*

*Energy Co.*, 195 F. Supp. 3d at 1346 (CIT 2016)).  Moreover, the Court has explicitly described

Commerce's request that a respondent provide "information about other forms of governmental

assistance received during the POI beyond those alleged in the petition" as an example of

Commerce exercising its broad investigative discretion.  *Id.*

   OCP's reliance on *Allegheny Ludlum Corp. v. United States*, 25 CIT 816 (2001) is

misplaced.  OCP Br. at 36.  In that case, the court examined Commerce's decision not to

investigate an untimely subsidy allegation made by the petitioner.  *Allegheny Ludlum*, 25 CIT at

816-18.  The Court held that "{a}lthough § 1677d offers a petitioner the opportunity to call

Commerce's attention to a potentially countervailable subsidy that was discovered during the

course of an ongoing countervailing duty investigation, it does not force Commerce to fully

investigate any subsidy." *Id.* at 824.  The court in *Allegheny Ludlum* did not address the entirely

separate question of whether Commerce may request information on any "other forms of

assistance" provided by a subject government that are not described in the petition.  This Court

specifically addressed this point in *Changzhou Trina Solar Energy Co.*, holding that, on

questions of "whether Commerce reasonably exercised its own independent investigative

authority, *Allegheny Ludlum* is not controlling." *Changzhou Trina Solar Energy Co.*, 195 F.

Supp. 3d at 1342.

Further, in every case in which this Court has examined Commerce's authority to

investigate subsidies reported in response to a question regarding "all other assistance," the court

has affirmed that the agency acted within the scope of its statutory authority and rejected the

arguments that OCP makes here.  In *Changzhou Trina Solar Energy Co*., 195 F. Supp. 3d at

1341, Chinese respondents challenged Commerce's application of AFA to subsidy programs

discovered during the course of the investigation that the respondents had not reported as "other

forms of assistance." The respondents argued that Commerce's inquiry into "other forms of

assistance" unlawfully circumvents the petition requirements set forth in 19 U.S.C. § 1671a(a)

and writes out of existence the language in § 1677d that practices newly discovered during an

investigation "appear{} to be a countervailable subsidy." *Id*. 195 F. Supp. 3d at 1341-46

(emphasis added).  The court rejected these arguments, holding that Commerce has broad

investigative authority under the statute and section 1677d contains no limiting language as to

how the agency is to "discover" apparent subsidies during the course of an investigation. *See id*.

Similarly, in *Jiangsu Zhongji*, the court examined Commerce's decision to apply AFA to

find that certain "other assistance" provided by the Government of China (GOC) was

countervailable.  As the court explained, Commerce had asked the GOC in its initial

questionnaire if the GOC had provided "any other forms of assistance" to the subject producers,

but the GOC refused to respond on the grounds that Commerce's request was "premature absent

a more direct inquiry supported by credible evidence and the initiation of a discrete

investigation." *Jiangsu Zhongji*, 405 F. Supp. 3d at 1342.  Zhongji then challenged Commerce's

determination, arguing that Commerce had acted unlawfully because it "failed to identify any

evidence that the subsidies appeared to be specific and countervailable before initiating an

investigation into the programs, in violation of 19 U.S.C. § 1677d."  *Id.*  The court disagreed,

stating:

> Commerce must determine whether a program appears to be countervailable by looking
> at record evidence.  In order to make that determination, therefore, Commerce is
> permitted to request that information be placed on the record regarding any reported
> subsidies.  Zhongji's argument to the contrary would permit Commerce to examine
> unalleged subsidies only where record evidence tangentially demonstrates that a subsidy
> is actually countervailable.  This reading of the statute is too restrictive.  Rather, because
> Commerce is urged to ensure "proper aggregation of subsidization practices," and given
> its investigative authority under 19 U.S.C. §§ 1671a(a) and 1677d, Commerce is
> permitted to request that documentation be placed on the record so that it may determine
> whether subsidies discovered during the investigation are countervailable.

*Id.* at 1343 (citations omitted).  OCP's contrary interpretation of section 1677d of the Act is

overly restrictive and would impinge on Commerce's broad investigative authority to request

information about subsidies provided with respect to subject merchandise.  As it did previously,

this Court should continue to find that OCP's claims regarding "other assistance" lack merit, and

that Commerce's inquiries in this regard were in accordance with law.

## **CONCLUSION**

Mosaic respectfully requests that the Court find that Commerce's determinations

addressed above are reasonable, supported by substantial evidence, and otherwise in accordance

with law and deny the Defendant-Intervenors' motion for judgment on the agency record.

Consol. Court No. 23-00246                    NON-CONFIDENTIAL VERSION

Respectfully submitted,

/s/ David J. Ross
David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Jacob A. Laband

Wilmer Cutler Pickering Hale and Dorr
   LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: david.ross@wilmerhale.com

Dated: January 28, 2025                    *Counsel for The Mosaic Company*

**Consol. Court No. 23-00246**                  **NON-CONFIDENTIAL VERSION**

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this Memorandum in Opposition to OCP's Rule 65.2 Motion for Judgment on the Agency Record complies with the word limitation requirement.  The word count for this submission, as computed by WilmerHale's word processing system, is 13,969 words.


<u>/s/ David J. Ross</u>
(Signature of Attorney)

<u>David J. Ross</u>
(Name of Attorney

<u>The Mosaic Company</u>
(Representative Of)

<u>January 28, 2025</u>
(Date)