**Attachment 1**
**Corrected 56.2 Opening Brief**

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

| | |
|---|---|
| THE MOSAIC COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Consol. Court No. 23-00246** |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| ) | |
| and ) | |
| ) | |
| OCP S.A., ) | |
| ) | |
| Defendant-Intervenor, ) | |
| ) | |
| and ) | |
| ) | |
| THE GOVERNMENT OF THE KINGDOM OF ) | |
| MOROCCO, ) | |
| ) | |
| Defendant-Intervenor. ) | |
| ) | |

**OCP S.A.'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to U.S. Court of International Trade ("CIT") Rule 56.2, Consolidated Plaintiff
and Defendant-Intervenor OCP S.A. ("OCP"), a producer and exporter of phosphate fertilizers
from the Kingdom of Morocco ("Morocco") respectfully moves for judgment on the agency
record on the issues raised in its Complaint challenging certain decisions made by the U.S.
Department of Commerce ("Commerce") in the first administrative review of the countervailing
duty ("CVD") order on phosphate fertilizers from Morocco. *See Phosphate Fertilizers From the
Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2020–2021*,
88 Fed. Reg. 76,726 (Nov. 7, 2023) ("*Final Results*").

As described in the accompanying memorandum, Commerce's decisions were unsupported by substantial evidence on the record or otherwise not in accordance with law. Accordingly, OCP respectfully requests that this Court grant this motion and (1) hold that Commerce's *Final Results* are unlawful; (2) remand the case to Commerce with instructions to correct the errors identified by the Court; and (3) grant such other or further relief that the Court deems just and proper.

Respectfully submitted,

Dated:  August 7, 2024

/s/ William R. Isasi
William R. Isasi
Cynthia C. Galvez
Kathleen McNulty
Edward J. Thomas III
Wanyu Zhang
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001-4956

Micaela McMurrough
Jordan B. Bakst
**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue, 42nd Floor
New York, NY 10018

*Counsel to OCP S.A.*

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

| | |
|---|---|
| THE MOSAIC COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Consol. Court No. 23-00246** |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| ) | |
| and ) | |
| ) | |
| OCP S.A., ) | |
| ) | |
| Defendant-Intervenor, ) | |
| ) | |
| and ) | |
| ) | |
| THE GOVERNMENT OF THE KINGDOM OF ) | |
| MOROCCO, ) | |
| ) | |
| Defendant-Intervenor. ) | |

## <u>ORDER</u>

Upon consideration of the Rule 56.2 Motion for Judgment on the Agency Record of OCP

S.A., and all other papers and proceedings herein, it is hereby

**ORDERED** that OCP S.A.'s motion is **GRANTED**; and it is further

**ORDERED** that the decision of the U.S. Department of Commerce ("Commerce") in

*Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty*

*Administrative Review; 2020–2021*, 88 Fed. Reg. 76,726 (Nov. 7, 2023) ("*Final Results*") is

unsupported by substantial evidence and otherwise not in accordance with law, and that

Commerce's subsequent investigation is void *ab initio*; and it is further

**ORDERED** that the *Final Results* are hereby remanded to Commerce for reconsideration in accordance with the Court's opinion on this matter.

**SO ORDERED.**

_____
Hon. Timothy C. Stanceu, Judge

Dated: _____, 2024
       New York, New York

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE TIMOTHY C. STANCEU, JUDGE**

| | |
|---|---|
| THE MOSAIC COMPANY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **Consol. Court No. 23-00246** |
| ) | |
| UNITED STATES, ) | **NON-CONFIDENTIAL VERSION** |
| ) | |
| Defendant, ) | **Business Proprietary Information** |
| ) | **removed from pages 3, 5−6, 8−12,** |
| and ) | **15−17, 20−21, 25−26, 30, and 33** |
| ) | |
| OCP S.A., ) | |
| ) | |
| Defendant-Intervenor, ) | |
| ) | |
| and ) | |
| ) | |
| THE GOVERNMENT OF THE KINGDOM OF ) | |
| MOROCCO, ) | |
| ) | |
| Defendant-Intervenor. ) | |

**MEMORANDUM IN SUPPORT OF OCP S.A.'s RULE 56.2 MOTION FOR JUDGMENT**
**ON THE AGENCY RECORD**

Dated:  August 7, 2024

William R. Isasi
Cynthia C. Galvez
Kathleen McNulty
Edward J. Thomas III
Wanyu Zhang
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001-4956

Micaela McMurrough
Jordan B. Bakst
**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue, 42nd Floor
New York, NY 10018

*Counsel to OCP S.A.*

Consol. Ct. No. 23-00246

## TABLE OF CONTENTS

RULE 56.2(C) STATEMENT ................................................................................. 1

I.      Administrative Determination Under Review ................................................. 1

II.     Issues Presented ............................................................................................. 1

STATEMENT OF THE FACTS ............................................................................ 2

I.      The Administrative Review ........................................................................... 2

II.     Commerce's Preliminary Results ................................................................. 4

III.    Verification ................................................................................................... 6

IV.     Commerce's Final Results ............................................................................ 7

SUMMARY OF THE ARGUMENT ..................................................................... 9

I.      Commerce's Rejection of OCP's Minor Correction Pertaining to the OFPPT
        Payroll Tax Refund and its Application of Adverse Facts Available Is Contrary to
        Law and Unsupported by Substantial Record Evidence................................. 9

II.     Commerce's *De Facto* Specificity Determination for Reductions in Tax Fines and
        Penalties Is Contrary to Law and Otherwise Not Supported by Substantial Record
        Evidence...................................................................................................... 11

III.    Commerce's Request for Information on "Other Benefits" Is Unlawful. ....... 13

STANDARD OF REVIEW ................................................................................. 14

ARGUMENT ...................................................................................................... 15

I.      Commerce's Rejection of OCP's Minor Correction Pertaining to the OFPPT
        Payroll Tax Refund and its Application of Adverse Facts Available Is Contrary to
        Law and Unsupported by Substantial Record Evidence............................... 15

        A.      Commerce's Decision to Reject OCP's Minor Correction Is Unsupported
                by the Record Evidence. ..................................................................... 16

        B.      Commerce's Decision to Reject OCP's Minor Correction Is Otherwise
                Not in Accordance with the Law. ........................................................ 17

        C.      Commerce's Application of Adverse Facts Available with Respect to
                OFPPT Was Contrary to Law and Unsupported by the Record Evidence. .......... 19

                1.      Commerce's Application of Facts Otherwise Available Is Contrary
                        to Law. ..................................................................................... 20

i

**Consol. Ct. No. 23-00246**

    *2.*    Commerce's Application of Adverse Inferences Is Contrary to Law. ............................................................................... 22

    3.    Commerce's Application of Such a High Adverse Facts Available Rate Is Not Supported by the Record Evidence and Is Contrary to Law. ............................................................................... 25

II.    Commerce's *De Facto* Specificity Determination for Reductions in Tax Fines and Penalties Is Contrary to Law and Otherwise Not Supported by Substantial Record Evidence ........................................................................................ 26

    A.    Commerce's *De Facto* Specificity Determination Is Contrary to Law Because the Agency Failed to Take into Account the Economic Diversification of the Moroccan Economy ........................................ 27

    B.    Commerce's *De Facto* Specificity Determination Is Contrary to Law Because the Agency Failed To Consider OCP's Large Size Compared to Other Companies in Morocco. .............................................. 31

III.    Commerce's Request for Information on "Other Benefits" Is Unlawful. ........................ 36

CONCLUSION ............................................................................................................... 37

Consol. Ct. No. 23-00246

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                     **Page(s)**

*AK Steel Corp. v. United States*,
    192 F.3d 1367 (Fed. Cir. 1999)................................................................30, 32, 34

*Allegheny Ludlum Corp. v. United States*,
    25 CIT 816 (2001) .................................................................................30, 32

*Allegheny Ludlum Corp. v. United States*,
    24 CIT 452, 112 F. Supp. 2d 1141 (2000)..........................................................30

*American Lamb Co. v. United States*,
    785 F.2d 994 (Fed. Cir. 1986)......................................................................37

*Anderson v. U.S. Sec'y of Agric.*,
    30 CIT 1742, 462 F. Supp. 2d 1333 (2006)........................................................19

*Bethlehem Steel Corp. v. United States*,
    25 CIT 307, 140 F. Supp. 2d 1354 (2001) .....................................................30, 32

*BMW of N. Am. LLC v. United States*,
    926 F.3d 1291 (Fed. Cir. 2019)....................................................................25

*Burinskas v. NLRB*,
    357 F.2d 822 (D.C. Cir. 1966) .....................................................................19

*Consol. Bearings Co. v. United States*,
    348 F.3d 997 (Fed. Cir. 2003) .....................................................................19

*Consol. Edison Co. of N.Y. v. NLRB*,
    305 U.S. 197 (1938)................................................................................14

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,
    216 F.3d 1027 (Fed. Cir. 2000)....................................................................26

*Husteel Co. v. United States*,
    98 F. Supp. 3d 1315 (Ct. Int'l Trade 2015) ......................................................24

*JTEKT Corp. v. United States*,
    33 CIT 1797, 675 F. Supp. 2d 1206 (2009)...........................................17, 18, 19, 35

*Loper Bright Enterprises v. Raimondo*,
    144 S. Ct. 2244 (2024)...................................................................21, 22, 29, 32

*Melody Music, Inc. v. F.C.C.*,
    345 F.2d 730 (D.C. Cir. 1965) .....................................................................19

Consol. Ct. No. 23-00246

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)................................................................................................14

*Nat'l Nail Corp. v. United States*,
    390 F. Supp. 3d 1356 (Ct. Int'l Trade 2019) ...........................................................23

*Nippon Steel Corp. v. United States*,
    337 F.3d 1373 (Fed. Cir. 2003)........................................................................23, 24

*NTN Bearing Corp. of Am. v. United States*,
    15 CIT 75, 757 F. Supp. 1425 (1991) ................................................................14, 28

*NTN Bearing Corp. of Am. v. United States*,
    972 F.2d 1355 (Fed. Cir. 1992).............................................................................14

*RHP Bearings Ltd. v. United States*,
    288 F.3d 1334 (Fed. Cir. 2002).............................................................................19

*Royal Thai Gov't v. United States*,
    436 F.3d 1330 (Fed. Cir. 2006).............................................................................32

*Samsung Elecs. Co. v. United States*,
    37 F. Supp. 3d 1320 (Ct. Int'l Trade 2014) ........................................................32, 34

*Samsung Elecs. Co. v. United States*,
    973 F. Supp. 2d 1321 (Ct. Int'l Trade 2014) ...........................................................34

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947)...........................................................................................14

*SolarWorld Ams., Inc. v. United States*,
    910 F.3d 1216 (Fed. Cir. 2018)........................................................................14, 34

*The Mosaic Co. v. United States*,
    659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023) ...................................................11, 27, 37

*Yama Ribbons and Bows Co. v. United States*,
    36 CIT 1250, 865 F. Supp. 2d 1294 (2012) .............................................................14

**Statutes**

19 U.S.C. § 1516a(a)(2)(B)(iii).................................................................................1

19 U.S.C. § 1516a(b)(1)(B)(i).............................................................................14, 25

19 U.S.C. § 1677(5)(B)..........................................................................................36

19 U.S.C. § 1677(5A)(D)(iii)............................................................................. *passim*

19 U.S.C. § 1677(5A)(D)(iii)(I)–(IV)..................................................................27

19 U.S.C. § 1677(5A)(D)(iii)(III)..................................................................12, 31, 34

19 U.S.C. § 1677d..................................................................36

19 U.S.C. § 1677d(1)..................................................................13

19 U.S.C. § 1677e(a)..................................................................20

19 U.S.C. § 1677e(b)(1)..................................................................22

19 U.S.C. § 1677e(d)..................................................................25

**Regulatons**

19 C.F.R. § 351.311..................................................................13, 36

**Administrative Materials**

*Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China/Minor Corrections and Clarifications*, (Mar. 10, 2015)..........................18, 19

*Coated Free Sheet Paper From the Republic of Korea: Preliminary Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 17,507 (Apr. 9, 2007) ............34

*Coated Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Oct. 25, 2007) ..........34

*Countervailing Duty Investigation of Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 80 Fed. Reg. 34,888 (June 18, 2015)..................................................................18, 19

*Crystalline Silicon Photovoltaic Products from the People's Republic of China: Minor Corrections - Wuxi Suntech Power Co., Ltd.*, (Aug. 28, 2014) ....................18

*Dynamic Random Access Memory Semiconductors From the Republic of Korea: Final Results of Countervailing Duty Administrative Review*, 76 Fed. Reg. 2336 (Jan. 13, 2011)..................................................................35

*Final Negative Countervailing Duty Determination: Live Swine from Canada*, 70 Fed. Reg. 12,186 (Mar. 11, 2005)..................................................................35

*Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation: CVD Orders*, 86 Fed. Reg. 18,037 (Apr. 7, 2021)..................................................2

**Consol. Ct. No. 23-00246**

*Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Feb. 16, 2021) ............................36

**Other Authorities**

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040 ..................................27, 28, 29

OCP S.A. ("OCP"), in its role as a Consolidated Plaintiff in the above-captioned

consolidated action, respectfully submits this Memorandum of Points and Authorities in Support

of its Motion for Judgment on the Agency Record in accordance with Rule 56.2(c) of the Rules

of the Court.

## RULE 56.2(C) STATEMENT

## I.    Administrative Determination Under Review

This action seeks judicial review pursuant to 19 U.S.C. § 1516a (a)(2)(B)(iii) of the Final

Results issued by the U.S. Department of Commerce ("Commerce") in the first administrative

review of the countervailing duty ("CVD") order on phosphate fertilizers from the Kingdom of

Morocco, covering the period November 30, 2020 to December 31, 2021 ("the administrative

review" or "the review").  *See Phosphate Fertilizers From the Kingdom of Morocco: Final*

*Results of Countervailing Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 76,726 (Nov. 7,

2023) ("*Final Results*") (P.R. 374), and accompanying Issues and Decision Memorandum

("IDM") (P.R. 370).[1]

## II.    Issues Presented

1.    **Is Commerce's rejection of OCP's minor correction pertaining to a payroll tax
refund from the Office de Formation Professionnelle et de la Promotion du Travail
("OFPPT"), and its subsequent application of adverse facts available ("AFA"),
unsupported by substantial record evidence and otherwise not in accordance with
law?**  Yes.  The record evidence amply demonstrates that the OFPPT tax refund
correction is minor, and the agency's established practice is to accept such corrections as
minor corrections at the beginning of verification.  Furthermore, the factual predicates
required by law for the application of AFA to calculate a CVD rate for this refund are not
present, and the CVD rate applied by Commerce to this program is vastly greater than the
rate the record evidence supports.

---

[1] In this brief, documents contained in the public administrative record are identified by name
and date, followed by "P.R." and the corresponding administrative record number.  Documents
contained in the confidential administrative record are identified by name and date, followed by
"C.R." and the corresponding administrative record number.

1

Consol. Ct. No. 23-00246

2. **Is Commerce's *de facto* specificity finding relating to the GOM's reductions in tax fines and penalties unsupported by substantial record evidence and otherwise not in accordance with law?** Yes. In determining that OCP received a disproportionately large subsidy benefit, the agency failed to take into account the extent of economic diversification in the Moroccan economy as explicitly required by law, failed to adequately explain or support this determination, and failed to consider OCP's large size in Morocco's overall economy.

3. **Is Commerce's request for information from OCP on other forms of governmental assistance not alleged by the petitioner unsupported by substantial record evidence and otherwise not in accordance with law, where Commerce made the request without first having met the required evidentiary threshold to expand the potential programs under investigation?** Yes. Commerce exceeded its statutory authority in requesting that OCP disclose any "other benefits" received from the GOM without having any evidentiary or legal basis for doing so.

## <u>STATEMENT OF THE FACTS</u>

### I.    The Administrative Review

On April 7, 2021, Commerce published a CVD order on phosphate fertilizers from Morocco. *Phosphate Fertilizers from the Kingdom of Morocco and the Russian Federation: CVD Orders*, 86 Fed. Reg. 18,037 (Apr. 7, 2021) ("*CVD Order*"). On May 2, 2022, Plaintiff and Consolidated Defendant-Intervenor, The Mosaic Company ("Mosaic") filed a request that Commerce conduct a first administrative review in the instant *Phosphate Fertilizers from the Kingdom of Morocco* CVD proceeding. *See Phosphate Fertilizers From the Kingdom of Morocco: Request for Countervailing Duty Administrative Review* (May 2, 2022) (P.R. 1). On June 9, 2022, Commerce published notification of its initiation of the first administrative review covering November 30, 2020 to December 31, 2021, as the period of review ("POR"). *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 87 Fed. Reg. 35,165 (June 9, 2022) (P.R. 5).

Commerce issued an initial questionnaire seeking information from the GOM and OCP on June 28, 2022. Commerce's Initial Questionnaire (Jun. 28, 2022) ("Initial Questionnaire")

NON-CONFIDENTIAL

(P.R. 11–12).  In the initial questionnaire, Commerce sought information about OCP's receipt of

reductions in tax fines and penalties from the GOM.  *Id.* at 57–58 (P.R. 11–12).  OCP objected to

this request as this program had been improperly included in the scope of the administrative

review, based on information Commerce had unlawfully obtained during the underlying

investigation.  *See* OCP's Initial Questionnaire Resp. (Aug. 22, 2022) ("OCP IQR") at 36

(P.R. 76; C.R. 8).  Nevertheless, OCP submitted in its initial questionnaire response evidence

demonstrating that these reductions in tax fines and penalties were widely available to taxpayers

in Morocco subject to tax fines or penalties, and that none of OCP's requests for reductions

during the POR were specific to particular activities, sectors, or merchandise.  *Id*. at 36–38

(P.R. 76; C.R. 8).  The GOM separately submitted evidence demonstrating that these reductions

were used by 71,161 companies across 19 distinct sectors in Morocco.  *See* GOM's First

Supplemental Questionnaire Response (Dec. 7, 2022) ("GOM First SQR") at 8, 18, Table Supp-

11 (P.R. 162; C.R. 154).  The GOM also placed on the record evidence relevant to understanding

OCP's receipt of reductions as compared to other companies in Morocco.  That evidence

demonstrated that OCP and its consolidated companies were Morocco's largest corporate group

by annual revenue in 2021, with sales equivalent to 6.6% of Morocco's GDP, while the value of

the reductions provided to OCP amounted to [          ]% of the value of all reductions

granted to corporate taxpayers in 2021.  *See* GOM Initial Questionnaire (Aug. 22, 2022) ("GOM

IQR") (P.R. 44; C.R. 20), vol. I at Exhibit I-1 (P.R. 45; C.R. 21), vol. V at V-16 (P.R. 53;

C.R. 33); GOM First SQR at 4-5, 6 Table Supp-1, 8 Table Supp-2 (P.R. 162; C.R. 154); OCP

IQR at Exhibit GEN-8(j) (P.R. 77; C.R. 11).

     Commerce also sought information in the initial questionnaire about certain "other

benefits" that OCP may have received from the GOM over both the POR and the average useful

life ("AUL") period of ten years (*i.e.*, 2012-2021).  *See* Initial Questionnaire at 61 (P.R. 11–12).

In its initial questionnaire response, OCP explained that Commerce exceeded its statutory

authority in making this request but reluctantly supplied the information to avoid the harsh

penalties OCP would face for declining to respond, namely, a determination based on application

of AFA.  *See* OCP IQR at 129–141 (P.R. 76; C.R. 8).  Based on the information OCP provided

in response to the "other benefits" question, Mosaic filed new subsidy allegations and, on

November 3, 2020, Commerce initiated an investigation into two additional potential subsidy

programs beyond those examined in the original investigation: (i) the provision of port services

and infrastructure for less than adequate remuneration ("LTAR") and (ii) the purchase of

electricity for more than adequate remuneration ("MTAR").  *See* Commerce's New Subsidy

Allegations Mem. (Feb. 16, 2023) (P.R. 176).  Commerce issued supplemental questionnaires to

OCP from August 9, 2022, until March 13, 2023.  OCP cooperated fully with all of Commerce's

requests, submitting over 16,550 pages of information.

## II.    Commerce's Preliminary Results

On May 5, 2023, Commerce published a notice of its preliminary results in the first

administrative review.  *Phosphate Fertilizers from the Kingdom of Morocco: Preliminary*

*Results of the Countervailing Duty Administrative Review, 2020–2021*, 88 Fed. Reg. 29,089

(May 5, 2023) ("*Preliminary Results*") (P.R. 267), and accompanying Preliminary Decision

Memorandum ("PDM") (P.R. 265).  In the *Preliminary Results*, Commerce indicated that

because the POR covered a small portion of 2020 (less than two months), it relied exclusively on

data pertaining to 2021 to determine OCP's preliminary CVD rate.  PDM at 3 (P.R. 265).

Of the programs examined, Commerce preliminarily found, *inter alia*, that the GOM's

reductions in tax fines and penalties were a countervailable subsidy based on a finding that the

reductions were *de facto* specific. *See* PDM at 12 (P.R. 265). Commerce found that OCP was a disproportionate user of this program despite evidence placed on the record that these reductions were widely used by 71,161 companies across 19 distinct sectors in Morocco, *see* GOM First SQR at 8, 18 Table Supp-11 (P.R. 162; C.R. 154), and that the value of the reductions provided to OCP amounted to [          ]% of the value of all reductions granted to corporate taxpayers in 2021. *See* GOM First SQR at 6, Table Supp-1, 8 Table Supp-2 (P.R. 162; C.R. 154). Commerce made this finding without citation to so much as a scintilla of evidence and in the face of robust record evidence to the contrary. *See* PDM at 12 (P.R. 265). Specifically, while the *Preliminary Results* asserted that "certain business proprietary information provided by the GOM indicates that OCP received disproportionately large reductions and waivers under this program relative to the average user," and then cited generally to the Preliminary Calculation Memorandum, PDM at 12, n.58 (P.R. 265), the Preliminary Calculation Memorandum omits any discussion of, or citation to, record evidence to support that OCP "received disproportionately large reductions and waivers." *See 2020-2021 Countervailing Duty Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco: OCP S.A. Calculations for the Preliminary Results* (May 3, 2023) ("Prelim Calc Memo") at 8 (P.R. 261; C.R. 260). Commerce also unlawfully failed to consider or assess "the extent of diversification of economic activities" in Morocco, an analysis that Commerce is legally required to include in a *de facto* specificity analysis. *See* 19 U.S.C. § 1677(5A)(D)(iii), Prelim Calc Memo at 8 (P.R. 261; C.R. 260), PDM at 12, n.58 (P.R. 265).

Also in the *Preliminary Results*, Commerce announced its intent to conduct verification of the information submitted by OCP and the GOM on which its *Final Results* would be based. *See Preliminary Results* at 29,090 (P.R. 267).

NON-CONFIDENTIAL

## III.    Verification

On August 30, 2023, Commerce issued a verification agenda to OCP setting the dates of the verification to occur between September 6-8, 2023.  Verification Agenda to OCP (Aug. 30, 2023) ("OCP Verification Agenda"), at 1 (P.R. 339; C.R. 309).  In that agenda, Commerce also provided the following instruction to OCP: "{i}f you identify errors in the responses while preparing for verification, please provide the following at the outset of verification: 1. a list of the errors; 2. original documentation to show the corrections; and 3. a chart that shows the magnitude of changes to quantitative data."  *Id.* at 6 (P.R. 339; C.R. 309).

Consistent with this instruction, at the outset of verification on September 6, 2023, OCP voluntarily disclosed that, while preparing for verification, it had discovered the existence of a small payroll tax refund from OFPPT within its accounting system.  *See* OCP Verification Report (Oct. 6, 2023) ("OCP Verification Report") at 2 (P.R. 349; C.R. 399).  OCP explained that it inadvertently overlooked this refund at the time it prepared its initial questionnaire response because, unlike other tax refunds, the OFPPT payroll tax refund was not provided through OCP's tax returns but rather a separate application and refund process that was booked to a different account from that typically used to book tax refunds.  *See* OCP Verification Report at 2 (P.R. 349; C.R. 399).  OCP also provided Commerce with information demonstrating that the amount of this refund was diminishingly small and this minor correction, even assuming the entirety of the refund was countervailable, would have resulted in a CVD rate of only [

].  *See* OCP S.A. Verification Exhibits (Sep. 15, 2023) ("OCP Verification Exhibits") at Exhibit VE-16 at 37 (P.R. 346; C.R. 312, 362; OCP Verification Report at 2 (P.R. 349; C.R. 399).  At verification, Commerce personnel

conducted an examination of the account to which the OFPPT refund was booked.  *See* OCP

Verification Report at 12 (P.R. 349; C.R. 399).

Prior to concluding verification on September 8, 2023, Commerce personnel notified

OCP that the agency would reject OCP's minor correction with respect to the OFPPT tax refund.

*See* OCP Verification Report at 1 (P.R. 349; C.R. 399).  On October 6, 2023, Commerce issued a

Verification Report stating that the agency rejected OCP's submission of the OFPPT payroll tax

refund as a minor correction, but otherwise admitting that it found no discrepancies in the

information submitted by OCP throughout the administrative review, *i.e.*, OCP's questionnaire

responses verified.  *See generally*, *id*. (P.R. 349; C.R. 399).  Commerce's verification report

provided **no** explanation for Commerce's reasons for rejecting OCP's submission of the OFPPT

payroll tax refund as a minor correction.  *Id*. at 2 (P.R. 349; C.R. 399).

## IV.    Commerce's Final Results

In October 2023, interested parties, including OCP, timely submitted case and rebuttal

briefs.  *See* OCP Case Brief (Oct. 16, 2023) (P.R. 356; C.R. 403); OCP Rebuttal Brief (Oct. 20,

2023) (P.R. 363; C.R. 406).  Following this briefing from the parties, on November 7, 2023,

Commerce published the *Final Results* of the first administrative review in the Federal Register.

*Final Results* (P.R. 374) and IDM (P.R. 370).  In the *Final Results*, Commerce calculated a final

subsidy rate for OCP of 2.12%.  *Final Results* at 76,726 (P.R. 374).  More than half of that

rate—1.27%—reflected the OFPPT refund.  IDM at 17–18 (P.R. 370).

In particular, in addressing the payroll tax refund from OFPPT, Commerce explained for

the first time in the *Final Results* its decision to reject OCP's minor correction regarding this

refund.  *See* IDM at 15–18 (P.R. 370).  In Commerce's view, the correction was not minor

because OCP had not provided the information about the refund in its initial questionnaire

response.  *See id.* (P.R. 370).  Although all of the information necessary to calculate a CVD rate for the OFPPT refund was on the record as of verification, nearly two months before Commerce issued its *Final Results*, Commerce disregarded this record evidence and instead assigned this program an AFA rate of 1.27%.  *See id.* at 7–11 (P.R. 370).

Regarding OCP's receipt of reductions in tax fines and penalties, Commerce continued to find this program *de facto* specific based on a flawed finding that OCP was a "disproportionate user" of the program, which continued to ignore record evidence that the purported "disproportionate use" was in fact simply a reflection of OCP's relative size in the Moroccan economy.  *Id.* at 48 (P.R. 370).  Commerce offered—for the first time in the *Final Results*—a *de facto* specificity analysis based on a "simple average approach," which compared the total value of the reductions received by OCP to the average amount received across all companies during the POR.  *See id.* at 48 (P.R. 370).  In conducting this analysis, Commerce dismissed OCP's argument that, when the diversification of the Moroccan economy and evidence regarding OCP's large size within that economy was taken into account, OCP was not in fact a disproportionate user of the program.  *See id.* at 49–50 (P.R. 370).  In doing so, Commerce disregarded record evidence showing that OCP received [          ]% of the value of all reductions granted to corporate taxpayers in 2021, even while OCP and its consolidated companies were Morocco's largest corporate group by annual revenue over the same period, with sales equivalent to ***6.6% of Morocco's GDP***.  *See* GOM IQR, vol. V at V-16 (P.R. 53; C.R. 33); GOM First SQR at 4–5 (P.R. 162; C.R. 154); OCP IQR at Exhibit GEN-8(j) (P.R. 77; C.R. 11) (MAD 84,300 million 2021 revenue for OCP); GOM IQR at Exhibit I-1 (P.R. 45; C.R. 21) (MAD 1,284.2 billion 2021 GDP for Morocco).

In its *Final Results*, Commerce also rejected OCP's objections to the agency's request for information from OCP regarding any and all "other benefits" it received from the GOM, including with respect to information Commerce requested about purported programs that the agency has only ever found ***not*** countervailable in a prior segment of this CVD proceeding. IDM at 19–20 (P.R. 370).  Commerce asserted that its request for this information was proper because the agency has broad discretion to determine which information is relevant to its determination and to request that information, and its question regarding "any other benefits" was not vague and does not exceed the agency's information-collecting authority.  *Id*. at 20 (P.R. 370).  Commerce also disputed its prior findings of non-countervailability and indicated that it would continue to seek information about these programs in future reviews.  *Id.* at 22 (P.R. 370).

## SUMMARY OF THE ARGUMENT

I.    **Commerce's Rejection of OCP's Minor Correction Pertaining to the OFPPT Payroll Tax Refund and its Application of Adverse Facts Available Is Contrary to Law and Unsupported by Substantial Record Evidence.**

While preparing for verification, OCP discovered a small payroll tax refund from OFPPT not previously reported to Commerce that would have resulted — at most — in a program-specific CVD rate of [                                              ].  OCP promptly and voluntarily disclosed this small refund as a minor correction at the start of the verification consistent with Commerce's instructions and explained that the refund was overlooked because it was booked to an account not typically associated with tax refund transactions.  Commerce rejected the correction as not minor and subsequently assigned this refund an AFA rate of 1.27%, a CVD rate ***more than* [    ] *times the maximum possible CVD rate*** for the overlooked payroll

tax refund. Commerce's treatment of this voluntarily disclosed payroll tax refund program is unsupported by substantial record evidence and not in accordance with law.

*First*, Commerce's decision to reject OCP's correction regarding the OFPPT payroll tax refund as not minor was unsupported by the record evidence, which demonstrated the manifestly minor nature of the correction. The maximum CVD rate for this program, assuming the entirety of the refund was countervailable, was a mere [                                    ].

*Second*, Commerce's rejection of OCP's minor correction was unlawful because it was arbitrary, capricious, and directly contrary to the agency's practice. Commerce has repeatedly accepted similar corrections as minor corrections under circumstances like these when they have been voluntarily disclosed by respondents at the beginning of verification.

*Third*, Commerce's application of AFA to assign a CVD rate for this program was unlawful and unsupported by record evidence. To apply facts available, Commerce must determine that there is a gap in the record. No such gap existed with respect to calculating a CVD rate for the OFPPT refund because all of the information necessary for the CVD rate calculation was on the record immediately following verification, and nearly two months before Commerce issued the *Final Results.*

Moreover, the statutory prerequisites for application of an adverse inference were not met: OCP acted in good faith and to the best of its ability throughout this review. As OCP explained to Commerce at verification, the small OFPTT tax refund was inadvertently overlooked when OCP prepared its ***11,483-page*** initial questionnaire response because the OFPPT payroll tax refund was not provided through OCP's tax returns, like other tax refunds, but was instead provided through a separate application process and booked in a different OCP account from the one normally used for tax refunds.

10

Finally, Commerce's use of AFA to assign the OFPPT refund a CVD rate vastly greater than any possible rate that could be calculated from the record evidence is unlawful and not supported by the record evidence. The totality of the circumstances here, where OCP missed the small refund because of the manner in which it was provided and recorded in OCPs' books, makes Commerce's assignment of an AFA rate that is [   ] times higher the maximum possible CVD rate, patently unreasonable.

The Court should vacate Commerce's unjustifiable rejection of OCP's minor correction and application of AFA, and remand back to the agency with instructions to accept OCP's payroll tax refund minor correction and to calculate a CVD rate exclusive of AFA and in a manner that is consistent with both the evidence and the law.

## II. Commerce's *De Facto* Specificity Determination for Reductions in Tax Fines and Penalties Is Contrary to Law and Otherwise Not Supported by Substantial Record Evidence.

In its *Final Results*, Commerce found the GOM's reductions of tax fines and penalties to be a countervailable subsidy based on a flawed determination that these reductions were *de facto* specific. These reductions were made available under Article 236 of the Moroccan General Tax Code, which permits **all taxpayers in Morocco** to apply for tax fines or penalties leveled against them to be reduced. As this Court previously recognized in litigation challenging the final determination in the Investigation of this CVD proceeding, reductions of tax fines and penalties under Article 236 are nothing more than "a common, ordinary tax administration program, available to all taxpayers, under which the taxing authority may mitigate a penalty," and finding such a program *de facto* specific would produce an "absurd result." *The Mosaic Co. v. United States,* 659 F. Supp. 3d 1285, 1316 (Ct. Int'l Trade 2023). The Court also found with regard to these reductions that "there is no evidence of dominant or disproportionate use by any enterprise,

11

NON-CONFIDENTIAL

group of enterprises, or industry." *Id.* at 1317 (internal quotation marks omitted).  Commerce nevertheless continues to disregard the Court's guidance, finding instead that these tax reductions under Article 236 were *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III) on the basis that OCP was a "disproportionate user" of the program.

Commerce erred in finding these reductions in tax fines and penalties *de facto* specific, relying on a flawed "simple average approach" adopted for the first time in the *Final Results*. Under this approach, the agency compared the total value of the reductions received by OCP to the average amount received across all companies during the POR, and concluded that OCP "received a share of reductions that was roughly 900 times larger than the average amount," and it was therefore a "disproportionate user" of the program.  However, the record evidence demonstrated that OCP received [          ]% in value of the total amount of reductions granted in 2021, at a time when the consolidated OCP Group was Morocco's largest corporate group by annual revenue, with sales equivalent to 6.6% of Morocco's GDP.

In addition, despite the explicit statutory requirement to give consideration to the diversification of economic activities in Morocco in its *de facto* specificity analysis, Commerce merely paid lip service to the directive set out in the Tariff Act of 1930, as amended (the "Act" or "the Statute").  Had the agency given consideration to the diversification of economic activities in Morocco, Commerce could not rationally have concluded that OCP received a disproportionately large amount of reductions of tax fines and penalties relative to other companies given OCP's size and importance within the Moroccan economy.

Moreover, Commerce refused to consider OCP's large size relative to other companies in Morocco when making its determination that OCP received a disproportionate reduction of tax fines and penalties.  The law, Federal Circuit precedent, and even Commerce's practice requires

Consol. Ct. No. 23-00246

Commerce to account for OCP's large size relative to other recipients of this program when conducting its *de facto* specificity analysis.

The Court should remand Commerce's determination for the agency to reconsider its *de facto* specificity analysis in light of the record evidence demonstrating OCP's large size and importance in the Moroccan economy and in compliance with the applicable law.

## III.    Commerce's Request for Information on "Other Benefits" Is Unlawful.

In its initial questionnaire, Commerce unlawfully asked OCP to disclose any and all "other benefits" it received from the GOM, despite lacking any evidence or allegation that OCP received such benefits. Commerce compounded its unlawful inquiry by requiring OCP to provide information regarding purported programs that Commerce has specifically found are not countervailable. Under the law and regulations, before Commerce may investigate a potential countervailable subsidy not alleged in a Petition, Commerce must determine that a practice "appears to be a countervailable subsidy." *See* 19 U.S.C. § 1677d(1); 19 C.F.R. § 351.311.

The requirement that a potential subsidy "appears" to be countervailable is an evidentiary standard that, once met, permits Commerce to exercise its investigatory powers. Commerce utterly disregarded these procedural safeguards by reversing the statutory mandate and improperly conducted an investigation into all "other benefits" received by OCP **before** developing any evidentiary basis for doing so, and despite the fact that it had previously found several of these programs to be **not** countervailable. Indeed, where Commerce sought information from OCP for purported programs that Commerce had only ever found not countervailable, the evidence affirmatively demonstrated that Commerce had no factual basis to request such information. Because Commerce acted outside of its authority by seeking

Consol. Ct. No. 23-00246

information about these potential programs, the Court should void *ab initio* Commerce's

investigation of them.

<u>**STANDARD OF REVIEW**</u>

The Court will hold unlawful a Commerce determination that is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.

§ 1516a(b)(1)(B)(i); *see NTN Bearing Corp. of Am. v. United States*, 15 CIT 75, 75–84, 757 F.

Supp. 1425, 1427–33 (1991), *aff'd*, 972 F.2d 1355 (Fed. Cir. 1992) (applying the substantial

evidence standard in reviewing initiation and final determinations). "To be in accordance with

law, the agency's decision must be authorized by the statute, and consistent with the agency's

regulations." *See Yama Ribbons and Bows Co. v. United States*, 36 CIT 1250, 1253, 865 F.

Supp. 2d 1294, 1297 (2012) (citation omitted).

Substantial evidence "is more than a mere scintilla" and means "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of

N.Y. v. NLRB*, 305 U.S. 197, 229–30 (1938). Additionally, the agency's rationale must establish

"a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n

of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).

Consideration of the substantial evidence standard "look{s} to the record as a whole, including

evidence that supports as well as evidence that *fairly detracts* from the substantiality of the

evidence." *SolarWorld Ams., Inc. v. United States*, 910 F.3d 1216, 1222 (Fed. Cir. 2018)

(emphasis added) (internal quotation marks and citation omitted). Finally, Commerce's decision

must be judged on the reasoning articulated by the agency, and a reviewing court "may not

supply a reasoned basis for the agency's action that the agency itself has not given." *Motor

Vehicle Mfrs.*, 463 U.S. at 43 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

14

NON-CONFIDENTIAL

## ARGUMENT

**I.     Commerce's Rejection of OCP's Minor Correction Pertaining to the OFPPT Payroll Tax Refund and its Application of Adverse Facts Available Is Contrary to Law and Unsupported by Substantial Record Evidence.**

In preparing for verification, OCP discovered within its accounting system the existence of a small payroll tax refund from OFPPT that OCP inadvertently overlooked and thus, had not previously reported to Commerce. OCP promptly and voluntarily disclosed this small refund as a minor correction at the start of verification, *consistent with Commerce's instructions* regarding how to address minor errors identified in preparation for verification. *See* OCP Verification Report at 2 (P.R. 349; C.R. 399). OCP explained that: (i) the amount of the refund was diminishingly small; (ii) this refund would have a diminishingly small impact on the CVD rate; and (iii) OCP had inadvertently overlooked this refund because of the unique circumstances in which the refund occurred. *See* OCP Verification Report at 2 (P.R. 349; C.R. 399). Once the refund was discovered, OCP provided Commerce all information needed to calculate the maximum possible CVD rate for this program well before publication of the *Final Results*, including verified information demonstrating the amount refunded. *See* OCP Verification Exhibits at Exhibit VE-16 at 37 (P.R. 346; C.R. 312, 362); OCP Verification Report at 2 (P.R. 349; C.R. 399). Even assuming the full amount of the OFFPT tax refund constituted a countervailable subsidy, the resulting CVD benefit of this program would have been a mere [                                                                          ]%. *See infra* at pp. 17.

Notwithstanding the trivial nature of the OFPPT refund and despite OCP's voluntary disclosure **consistent with Commerce's instructions**, Commerce rejected OCP's minor correction at verification, and then compounded its error by refusing to provide a coherent reason for doing so in its Verification Report. *See* OCP Verification Report at 2 (P.R. 349; C.R. 399).

15

Only in the *Final Results* did Commerce explain that—contrary to the record evidence

demonstrating how small the refund was and its established practice to accept such corrections as

minor—it considered the correction was not minor because it was first disclosed at verification,

rather than by the deadline for OCP's response to the initial questionnaire in this review. *See*

IDM at 15–16 (P.R. 370). In the agency's view, OCP's mistake in not reporting a payroll tax

refund with a maximum CVD rate of [                                    ] "significantly

impeded this proceeding." *See id.* (P.R. 370). After rejecting OCP's minor correction,

Commerce assigned this program an AFA rate of 1.27%. *See id.* at 15–18 (P.R. 370).

Because Commerce's rejection of OCP's minor correction and application of AFA is

unsupported by the record evidence and otherwise contrary to the law, the Court should vacate

Commerce's decision with regard to this refund, and remand back to the agency with instructions

to accept OCP's submission of this refund as a minor correction and to calculate a CVD rate in a

manner consistent with the evidence on the record and otherwise in accordance with the law.

### A.    Commerce's Decision to Reject OCP's Minor Correction Is Unsupported by the Record Evidence.

Consistent with its practice at verification, Commerce's verification agenda expressly

instructed OCP how to report minor corrections to its questionnaire responses at the beginning of

verification. *See* OCP Verification Agenda at 6 (P.R. 339; C.R. 309). Pursuant to these

instructions, at the outset of verification, OCP reported as a minor correction a small payroll tax

refund of [                    ] received from OFPPT that OCP discovered as it prepared for

verification. OCP Verification Report at 2 (P.R. 349; C.R. 399). OCP explained to Commerce

that this refund was first discovered during preparation for verification because, unlike other tax

refunds, the OFPPT payroll tax refund was not provided through OCP's tax returns. Instead, the

OFPPT refund was provided through a separate application process and booked in a different

16

**NON-CONFIDENTIAL**

OCP account from the one normally used for tax refunds, and consequently, OCP did not

discover the existence of this refund until preparing for verification.  *See* OCP Verification

Report at 2 (P.R. 349; C.R. 399).  OCP presented to Commerce accounting records necessary for

the agency to verify the information provided.  *See* OCP Verification Exhibits at Exhibit VE-16

at 37 (P.R. 346; C.R. 312, 362); OCP Verification Report at 2, 12 (P.R. 349; C.R. 399).  Finally,

OCP demonstrated that the maximum CVD rate possible for this refund was only [      ]%.  *See*

OCP Case Brief at 33, 35 (C.R. 403; 356); OCP Verification Report at 2 (P.R. 349; C.R. 399).

(The denominator Commerce used for determining CVD rates in this review was

[                          ], *see* Prelim Calc Memo at 2 (P.R. 261; C.R. 260) (unchanged in the

*Final Results*), which, when applied to the refund of [                ], results in a [      ]%

CVD rate).

 Commerce refused to accept the OFPPT tax refund as a minor correction, asserting that

the correction was not minor in nature.  IDM at 15–16 (P.R. 370).  Commerce acted unlawfully

when it sought, contrary to the record evidence, to characterize a correction that leads to, at most,

a mere [                                        ] CVD rate as not minor.  The

correction here is manifestly minor by any reasonable definition of that term.  Accordingly,

Commerce's decision to reject the OFPPT refund as not minor is not supported by the record

evidence.

 **B.** **Commerce's Decision to Reject OCP's Minor Correction Is Otherwise Not in Accordance with the Law.**

 In addition to being unsupported by the record evidence, Commerce's decision to reject

OCP's reporting of this small tax refund from OFPPT as a minor correction is unlawful as it is

arbitrary and otherwise contrary to the agency's practice.  *JTEKT Corp. v. United States*, 33 CIT

1797, 1831–32, 675 F. Supp. 2d 1206, 1238 (2009) (explaining that Commerce's actions are

Consol. Ct. No. 23-00246

"arbitrary" when they differ in similar circumstances absent reasonable explanation).  In the

*Final Results*, Commerce determined for the first time that OCP's OFFPT minor correction was

not minor because it had not been previously reported.  *See* IDM at 15–16 (P.R. 370).  However,

the agency's position proves too much, as it would establish a rule mandating that ***any*** reporting

at the beginning of verification of a previously unreported program—no matter how small and

without regard to its minuscule effect on a CVD rate—is, by definition, not minor.  As multiple

prior agency decisions demonstrate, Commerce's practice is to accept as minor corrections that

disclose previously unreported grants and tax credits, even in instances where they constitute

new programs.  For example:

- In *Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China*, Commerce accepted multiple grants that had not been reported prior to verification, but were presented as minor corrections during verification and described by the respondent as "program{s}" that it "missed" in its "original response."  *See* Memorandum from Justin M. Neuman and Gene H. Calvert, through Mark H. Hoadley, to The File, *Countervailing Duty Investigation of Certain Crystalline Silicon Photovoltaic Products from the People's Republic of China: Verification of the Questionnaire Responses Submitted by Wuxi Suntech Power Co., Ltd. and its Cross-Owned Companies* (Oct. 3, 2014) at 11 (ACCESS Barcode 3233091); *Crystalline Silicon Photovoltaic Products from the People's Republic of China: Minor Corrections - Wuxi Suntech Power Co., Ltd.*, (Aug. 28, 2014) at 6 (ACCESS Barcode 3224207).

- In *1-Hydroxyethylidene-1, 1-Diphosphonic Acid from China*, Commerce accepted "a total of 14 previously unreported grants" that were presented at verification as minor corrections.  *See* Memorandum from Matthew Renkey and Javier Barrientos, through Paul Walker, to The File, *Verification of the Questionnaire Responses of Shandong Taihe Chemicals Co., Ltd. and Shandong Taihe Water Treatment Technologies Co., Ltd.: Countervailing Duty Investigation of 1-hydroxyethilidene-1, 1-diphosphonic acid from the People's Republic of China* (Jan. 10, 2017) at 2 (ACCESS Barcode 3535537).

- In *Countervailing Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China*, Commerce accepted as minor corrections "several unreported grants in certain sub-ledgers of . . . chart of accounts."  *See Countervailing Duty Investigation of Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 80 Fed. Reg. 34,888

18

Consol. Ct. No. 23-00246

(June 18, 2015), and accompanying IDM at 19–20.  In its minor correction submission, respondent CCT explained that it had initially overlooked some of these grants due to the unique circumstances through which they were booked.  *See Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China/Minor Corrections and Clarifications* (Mar. 10, 2015) at Att. 1, p. 2 (ACCESS Barcode 3263608).

It is axiomatic that agencies may not treat similar situations differently.  *See, e.g.*, *Anderson v. U.S. Sec'y of Agric.*, 30 CIT 1742, 1749, 462 F. Supp. 2d 1333, 1339 (2006) ("Agencies have a responsibility to administer their statutorily accorded powers fairly and rationally, which includes not 'treat{ing} similar situations in dissimilar ways.'" (alteration in original) (quoting *Burinskas v. N.L.R.B.,* 357 F.2d 822, 827 (D.C.Cir.1966) (citing *Melody Music v. F.C.C.*, 345 F.2d 730 (D.C. Cir.1965))).  The Federal Circuit and this Court have explained that where Commerce acts differently in similar circumstances without a reasonable explanation, the agency's actions will be arbitrary.  *See, e.g.*, *JTEKT Corp.*, 33 CIT at 1831–32, 675 F. Supp. 2d at 1238; *Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003) (citing *RHP Bearings v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002)).  In rejecting OCP's reporting of the small OFPPT refund as a minor correction, Commerce acted arbitrarily: it has repeatedly accepted as minor corrections much more significant corrections disclosed for the first time at verification.  To act consistently with its past practice, Commerce must accept this small OFPPT tax refund as a minor correction.

## C.   Commerce's Application of Adverse Facts Available with Respect to OFPPT Was Contrary to Law and Unsupported by the Record Evidence.

Commerce's unlawful rejection of OCP's minor correction was compounded by the agency's determination to apply AFA to assign a CVD rate for the OFPPT refund.  Commerce violated the law because there was no requisite gap in the record for the agency to fill, and there

was no basis to apply adverse inferences because OCP acted to the best of its ability throughout this review.

> **1.      Commerce's Application of Facts Otherwise Available Is Contrary to Law.**

There is no basis in the law for Commerce to use facts otherwise available in calculating the CVD rate for the OFPPT refund.  Under 19 U.S.C. § 1677e(a), Commerce is authorized to use facts otherwise available when calculating the CVD rate for a program only when necessary to fill a gap in the record, or in situations where a party withholds requested information, fails to provide such information by the appropriate deadlines or in the form and manner requested, significantly impedes a proceeding, or provides the requested information, but the information cannot be verified.  *See* 19 U.S.C. § 1677e(a).  None of these conditions are met with respect to the CVD rate for the OFPPT tax refund.

*First*, there is no gap in the record with respect to the CVD rate because the record demonstrates exactly what the maximum possible CVD rate is for this program, assuming the entirety of the refund is countervailable.  As discussed above, *see supra* at pp. 17, when the amount of the refund which is on the record is divided by the denominator in this administrative review, the resulting CVD rate would be a mere [      ]%.

*Second*, OCP also did not withhold information.  OCP provided the amount of the OFFPT refund to Commerce at the beginning of verification and explained that OCP inadvertently missed the small refund when preparing its initial questionnaire response because the OFPPT payroll tax refund is not provided through OCP's tax return and refund process.  *See* OCP Verification Report at 2, 12 (P.R. 349; C.R. 399); OCP Verification Exhibits at Exhibit VE-16 at 37 (P.R. 346; C.R. 312, 362).  Instead, the OFPPT refund is provided through a separate application process and booked in a different OCP account from the one normally used for tax

refunds.  *See* OCP Verification Report at 2, 12 (P.R. 349; C.R. 399).  As a result, OCP did not

discover the existence of this small refund until preparing for verification, at which point it

disclosed the refund as a minor correction.  *See id.* at 2 (P.R. 349; C.R. 399); OCP Verification

Exhibits at Exhibit VE-16 at 37 (P.R. 346; C.R. 312, 362).

>   *Third*, OCP also did not fail to provide the information by the established deadline.  OCP

voluntarily disclosed the information at the beginning of verification, as instructed by Commerce

(*see* OCP Verification Agenda at 6 (P.R. 339; C.R. 309)), and in ample time for Commerce to

consider this information before issuing the *Final Results*.  *See* OCP Verification Report at 2

(P.R. 349; C.R. 399).

>   *Fourth*, the information submitted by OCP regarding the OFPPT refund could be

verified.  *See id.* at 12 (P.R. 349; C.R. 399) (stating that Commerce examined the account in

which the OFPPT tax refund was booked during verification); *see also* OCP Verification

Exhibits at Exhibit VE-16 at 37 (P.R. 346; C.R. 312, 362) (a verification exhibit which includes

the full amount of the OFPPT refund).

>   *Fifth* and finally, the record fails to support Commerce's conclusion that OCP in any way

impeded the proceeding.  OCP voluntarily disclosed this refund—a refund that was so small that

it could result in no greater than a [        ]% CVD rate—in the time and manner specified by

Commerce and nearly two months before the *Final Results* in this review.  No further

information was needed or requested by Commerce to calculate a CVD rate for this tax refund.

Indeed, any interpretation of the statutory term "impedes a proceeding" to include OCP

voluntarily disclosing this small tax refund as a minor correction is transparently unreasonable,

***not*** the "best" interpretation of the Statute in the circumstances.  *Loper Bright Enters. v.*

*Raimondo*, 144 S. Ct. 2244, 2266 (2024) ("In the business of statutory interpretation, if it is not

the best, it is not permissible."). Accordingly, none of the legal conditions necessary for the application of facts available were present in this review.

      *2.*      **Commerce's Application of Adverse Inferences Is Contrary to Law.**

Commerce's application of adverse inferences in applying facts otherwise available is similarly contrary to law. The Statute provides that Commerce may apply an adverse inference when selecting from among the facts otherwise available only if a party "has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). Rather than not cooperating, the facts demonstrate that OCP acted to the best of its ability to comply with Commerce's request for information throughout the review.

As discussed above, OCP explained that it inadvertently missed the small OFPTT tax refund when preparing its initial questionnaire response because of the manner in which the refund was provided and the account to which the refund was booked in OCP's records. *See supra* at pp. 6–7, 16–17. As a result, OCP did not discover the existence of this small refund until preparing for verification, at which point it promptly disclosed the refund as a minor correction in accordance with Commerce's instructions. *See* OCP Verification Report at 2 (P.R. 349; C.R. 399); OCP Verification Exhibits at Exhibit VE-16 at 37 (P.R. 346; C.R. 312, 362). These are the actions of a respondent acting to the best of its ability to comply with Commerce's request for information, not a respondent failing to cooperate. Any interpretation of the statutory term "failed to cooperate" that encompasses OCP voluntarily disclosing this small tax refund as a minor correction punishes OCP for following Commerce's own instructions regarding such corrections, and is patently unreasonable and ***not*** the best interpretation of the Statute. *Loper Bright Enters.*, 144 S. Ct. at 2266.

Consol. Ct. No. 23-00246

Both the Court and the Federal Circuit have been clear that, in applying adverse inferences, Commerce cannot simply adopt a conclusory position. Rather, the agency ***must*** explain why the specific circumstances of a case establish that it was reasonable to expect the respondent to have provided more forthcoming responses. *Nat'l Nail Corp. v. United States*, 390 F. Supp. 3d 1356, 1373 (Ct. Int'l Trade 2019) ("{a}n adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made; i.e., under circumstances in which it is ***reasonable*** to conclude that less than full cooperation has been shown" (emphasis added) (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1383 (Fed. Cir. 2003)).

Here, the circumstances under which OCP reported the OFPPT tax refund as a minor correction—because of an inadvertent mistake pertaining to a small tax refund resulting from the manner in which the refund was provided and booked in OCP's accounting system—simply do not support that OCP failed to fully cooperate in this review. To the contrary, the record reflects quite the opposite; OCP cooperated fully throughout the entire administrative review, putting forward the maximum effort possible, ***submitting more than 16,550 pages of verified information***. *See* OCP S.A. Section III Affiliated Companies Response (40 pages) (Jul. 19, 2022) at 1 (P.R. 23; C.R. 3); Response to Petitioner's Comments on OCP Affiliation Questionnaire Response (42 pages) (Aug. 8, 2022) at 1 (P.R. 30; C.R. 7); OCP IQR (9,636 pages) (P.R. 76; C.R. 8); OCP S.A. Section III Initial Questionnaire Response – Certain Financial Statements and Responses for Government Loan Guarantees and Direct Loans (1,847 pages) (Sept. 1, 2022) at 1 (P.R. 89; C.R. 76); OCP S.A. Supplemental Questionnaire Response on Affiliated Companies (788 pages ) (Sept. 6, 2022) at 1 (P.R. 104; C.R. 108); OCP S.A. Supplemental Questionnaire Response on Affiliated Companies: Reconciliations for

23

Consol. Ct. No. 23-00246

Phosphoric Acid (484 pages) (Sept. 16, 2022) at 1 (P.R. 113; C.R. 119); Submission of Factual

Information to Rebut, Clarify, or Correct Petitioner's Factual Information (181 pages) (Sept. 27,

2022) at 1 (P.R. 122; C.R. 136); Response to Petitioner's New Subsidy Allegations (133 pages)

(Oct. 11, 2022) at 1 (P.R. 130; C.R. 144); OCP S.A. Response to Second Supplemental

Questionnaire (757 pages) (Dec. 7, 2022) at 1 (P.R. 163; C.R. 156); OCP S.A.'s Rebuttal to

Petitioner's New Subsidy Allegations Supplemental Questionnaire Response (40 pages) (Dec.

14, 2022) at 2 (P.R. 167; C.R. 177); New Factual Information (635 pages) (Mar. 22, 2023) at 1

(P.R. 202; C.R. 203); OCP S.A. Response to Third Supplemental Questionnaire (249 pages)

(Apr. 21, 2023) at 1 (P.R. 242; C.R. 222); OCP S.A. New Subsidy Allegations Questionnaire

Response (723 pages) (Apr. 24, 2023) at 1 (P.R. 244; C.R. 232); OCP S.A. New Subsidy

Allegations Questionnaire Response – Port Services and Infrastructure Template (68 pages)

(Apr. 28, 2023) at 1 (P.R. 256; C.R. 259); OCP S.A. New Subsidy Allegations Supplemental

Questionnaire Response (82 pages) (Jul. 6, 2023) at 1 (P.R. 308: C.R. 284); OCP Verification

Exhibits (870 pages) (Sept. 15, 2023) at 1 (P.R. 346; C.R. 312).

Both this Court and the Federal Circuit have held that the "best of its ability" standard

"does not require perfection and recognizes that mistakes sometimes occur." *Nippon Steel

Corp.*, 337 F.3d at 1382; *see, e.g., Husteel Co. v. United States*, 98 F. Supp. 3d 1315, 1356 (Ct.

Int'l Trade 2015). By insisting that OCP was obligated to identify this OFPPT refund at the time

it filed its initial questionnaire response regardless of the small size of the refund and the manner

it was provided and booked in OCP's accounting system, Commerce *ignores* the circumstances

surrounding OCP reporting the refund as a minor correction, *ignores* the maximum effort OCP

put forth throughout this administrative review, *ignores* that "mistakes sometime occur," and

holds OCP to a standard of perfection that the Court and the Federal Circuit have made clear is contrary to law.

> **3.    Commerce's Application of Such a High Adverse Facts Available Rate Is Not Supported by the Record Evidence and Is Contrary to Law.**

Finally, Commerce's decision, for the first time in the *Final Results*, to assign an AFA CVD rate for the OFPPT refund that is vastly greater than any possible rate that the record itself demonstrates could have resulted from the refund is contrary to, rather than supported by, the record evidence.  As explained above, the record evidence conclusively demonstrates that the maximum possible CVD rate for this refund—assuming the entirety of the refund is countervailable—would be [      ]%.  *See supra* at pp. 17.  Contrary to this record evidence, Commerce assigned OFFPT a CVD rate of 1.27%, a program-specific rate more than *[    ] times greater* than the maximum rate established by the record evidence.  As a result, the AFA rate assigned by Commerce is unsupported by the record evidence and thus contrary to law.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i) (explaining that the Court "shall" hold unlawful a Commerce determination that is "unsupported by substantial evidence on the record, or otherwise not in accordance with law").

The rate is also contrary to law because Commerce never explained why selecting a rate more than [    ] times greater than that established by the record was reasonable in light of the totality of the circumstances.  *See* 19 U.S.C. § 1677e(d)(2) (requiring Commerce to evaluate the situation that resulted in the agency using adverse inferences when selecting an AFA rate); *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1302 (Fed. Cir. 2019) ("Our case law establishes that Commerce must consider the totality of the circumstances in selecting an AFA rate, including, if relevant, the seriousness of the conduct of the uncooperative party.").  In the instant

review, OCP voluntarily reported a small tax refund as a minor correction rather than in its initial questionnaire response because of the manner in which the refund was granted and recorded in OCP's records. Assigning an AFA rate that is more than [    ] times greater than the maximum possible CVD rate is manifestly unreasonable.

An AFA rate is "intended 'to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase intended as a deterrent to non-compliance.'" *Id.* at 1300 (quoting *F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000)). The Federal Circuit has cautioned that, "{w}hile 'a higher adverse margin creates a stronger deterrent,' Commerce must not 'overreach reality in seeking to maximize deterrence.'" *Id.* In the circumstances here, the agency's decision to assign an AFA rate over [    ] times higher than that supported by the record has, in the words of the Federal Circuit, "overreach{ed} reality." *Id.*

\*       \*       \*

For the forgoing reasons, Commerce's rejection of OCP's minor correction is unsupported by the record evidence and unlawful. The Court should vacate Commerce's decision to reject OCP's minor correction and apply AFA, and remand back to the agency with instructions to accept OCP's submission of this refund as a minor correction and to calculate a CVD rate in a manner that is consistent with the evidence on the record and otherwise in accordance with the law.

## II.     Commerce's *De Facto* Specificity Determination for Reductions in Tax Fines and Penalties Is Contrary to Law and Otherwise Not Supported by Substantial Record Evidence.

As described above, this Court has already observed that reductions pursuant to Article 236 are both generally available and widely used, that finding such a program *de facto*

**Consol. Ct. No. 23-00246**

specific would produce an "absurd result," and that, with respect to this program, "there is no evidence of dominant or disproportionate use by any enterprise, group of enterprises, or industry." *The Mosaic Co.,* 659 F. Supp. 3d at 1316–17 (internal quotation marks omitted). Despite this Court's guidance and overwhelming record evidence demonstrating that OCP received a proportionally very small amount of these reductions, Commerce nevertheless found (again) that reductions in tax fines and penalties under Article 236 are *de facto* specific, resulting in precisely the "absurd result" this Court had cautioned against. Because Commerce's specificity determination is unsupported by substantial evidence, and otherwise not in accordance with law, the Court should reject that determination and remand it back to the agency.

A. **Commerce's *De Facto* Specificity Determination Is Contrary to Law Because the Agency Failed to Take into Account the Economic Diversification of the Moroccan Economy.**

Commerce ***may*** find a subsidy is *de facto* specific when one or more of the factors set out in 19 U.S.C. § 1677(5A)(D)(iii)(I)–(IV) exist. *See* 19 U.S.C. § 1677(5A)(D)(iii). In making such a determination, Commerce ***is required*** to take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy. *See* 19 U.S.C. § 1677(5A)(D)(iii) ("In evaluating the factors set forth in subclauses (I), (II), (III), and (IV), the administering authority shall take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy"); *see also* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, at 931 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040, at 4243 ("SAA"). The SAA explains that economic diversification should "serve to ***inform the application*** of" the specificity factors, meaning it

27

Consol. Ct. No. 23-00246

provides "*a clearer context* within which the *de facto* factors would be analyzed."  *See* SAA at 931 (emphasis added).

In the *Final Results*, Commerce acknowledged for the first time that it was required to take into account the extent of Morocco's economic diversification in conducting its *de facto* specificity analysis.  *See* IDM at 49 (P.R. 370).  However, the agency limited its evaluation to a cursory observation that a number of "industrial sectors" exist in Morocco.  *Id.* at 49 (P.R. 370) ("{T}he record demonstrates that Morocco has numerous manufacturing and service sectors in 21 industrial sectors.  This information reflects a wide diversification of economic activities in Morocco.").  Commerce's cursory analysis of the extent of diversification in the Moroccan economy is contrary to law for multiple reasons.

As an initial matter, Commerce failed to explain how a simplistic observation about the number of sectors in an economy—without considering the relative concentration of economic activity within those sectors—is an adequate basis upon which to conclude "a wide diversification of economic activities" exists.  Relying on the mere number of economic sectors, without considering their relative roles in the overall economy, provides an inadequate evidentiary basis under the law for Commerce's determination that Morocco's economy includes "a wide diversification of economic activities."  *See NTN Bearing Corp.*, 15 CIT at 75–84, 757 F. Supp. at 1427–33 (applying the substantial evidence standard in reviewing initiation and final determinations).

More importantly, Commerce never employed this cursory economic diversification analysis as *context* for its specificity finding.  *See* IDM at 49 (P.R. 370).  To the contrary, the agency's purported economic diversification analysis appears in a standalone paragraph in Commerce's decision that is completely divorced from its specificity determination, as though

Consol. Ct. No. 23-00246

Commerce believes the two questions should be treated independently of one another. *See id.* at 49–50 (P.R. 370). Commerce failed to explain in even the barest terms how its economic diversification analysis informed its finding regarding specificity based on disproportionate use, contrary to the statutory requirements. *See* 19 U.S.C. § 1677(5A)(D)(iii). Any interpretation of "take into account the extent of diversification of economic activities" that permits Commerce to find disproportionate use without ever explaining how the economic diversification of the economy informs that specificity determination is unreasonable, and certainly not the best interpretation of the Statute. *Loper Bright Enters.*, 144 S. Ct. at 2266.

A correct application of 19 U.S.C. § 1677(5A)(D)(iii) requires Commerce to incorporate its economic diversification analysis directly into its specificity determination such that the diversification provides context that informs the specificity determination. *See* SAA at 931. Because Commerce considered in this review whether OCP received a "disproportionately" large amount of reductions *as compared to* other companies in Morocco, Commerce's economic diversification analysis necessarily required a comparison of OCP to those other companies, including, for example, the concentration of economic activity in Morocco to the phosphate mining industry and OCP's relatively large size compared to other companies in Morocco. Indeed, when such context is properly considered, it is clear that OCP did not receive a disproportionately large amount of reductions of tax fines and penalties relative to other companies.

OCP and its consolidated companies—***which comprise the entire Moroccan phosphate industry***—were Morocco's largest corporate group by annual revenue in 2021, with sales equivalent to ***6.6% of Morocco's GDP***. *See* GOM IQR at vol. V, V-16 (P.R. 53; C.R. 33); GOM First SQR at 4–5 (P.R. 162; C.R. 154); OCP IQR at Exhibit GEN-8(j) (P.R. 77; C.R. 11) (MAD

84,300 million 2021 revenue for OCP); GOM IQR at Exhibit I-1 (P.R. 45; C.R. 21) (MAD

1,284.2 billion 2021 GDP for Morocco).  With record evidence demonstrating that OCP received

[          ]% in value of the total amount of reductions granted in 2021, at a time when the

company generated nearly [     ] times that percentage of Moroccan GDP, there is simply no way

for the agency to defend the conclusion that OCP's percentage of tax reductions was

"disproportionately large" during the POR.  *See* GOM First SQR at 6, Table Supp-1 & 8, Table

Supp-2 (P.R. 162; C.R. 154).

     Not surprisingly, this small percentage of overall refunds stands in stark contrast to much

higher percentages that Commerce has declined to find disproportionate in other *de facto*

specificity analyses.  *See AK Steel Corp. v. United States*, 192 F.3d 1367, 1384–85 (Fed. Cir.

1999) (affirming Commerce's non-disproportionality finding where Korean producers "received

86.6% of the benefit" of an alleged subsidy); *see also Bethlehem Steel v. United States*, 25 CIT

307, 322, 140 F. Supp. 2d 1354, 1369 (2001), *Allegheny Ludlum Corp. v. United States*, 24 CIT

452, 465, 112 F. Supp. 2d 1141, 1153 (2000).  In addition, the "Extractive Industries" sector, of

which OCP is only a part, received only 2.4% of the total amount of reductions during the POR.

The largest share of the total reductions were awarded to "Trade; Automobile and Motorcycle

Repair" (25.3%) and "Construction" (16%) industries.  *See* GOM First SQR at 18 (P.R. 162;

C.R. 154).

     By refusing to connect its purported economic diversification analysis to its *de facto*

specificity finding, Commerce failed to account for "the extent of diversification of economic

activities" in Morocco as required under the law.  19 U.S.C. § 1677(5A)(D)(iii).  In so doing,

Commerce also disregarded relevant record evidence regarding the concentration of economic

activities in Morocco to the phosphate mining industry and OCP's relative size in that economy.

Consol. Ct. No. 23-00246

*See* IDM at 48 (P.R. 370).  Commerce merely paid lip service to the legal requirement that it otherwise failed to fulfill.  Because Commerce failed to take into account economic diversification as context informing its specificity analysis, Commerce's *de facto* specificity finding is unsupported by substantial evidence and otherwise not in accordance with law.

    **B.**    **Commerce's *De Facto* Specificity Determination Is Contrary to Law Because the Agency Failed To Consider OCP's Large Size Compared to Other Companies in Morocco.**

In an effort to bolster the credibility of its flawed economic diversification analysis, Commerce separately and unlawfully dismissed as "irrelevant" to its disproportionality analysis evidence regarding OCP's relative size in Morocco's economy.  *See* IDM at 50 (P.R. 370).  Specifically, Commerce asserted that OCP was a disproportionate user "regardless of whether OCP is a large company or incurred tax fines and penalties when other companies did not," and justified this assertion on the grounds that the agency was "not required to examine *why* OCP received a disproportionate amount of subsidy benefits."  *Id.* (P.R. 370) (emphasis in original).  Contrary to law and longstanding agency practice, Commerce erred in dismissing OCP's relative size in the Moroccan economy as irrelevant to its disproportionality analysis under 19 U.S.C. § 1677(5A)(D)(iii)(III).

First, Commerce's failure to account for OCP's large size relative to other recipients of the reductions is contrary to the express requirements of the Statute.  As noted above, the very nature of any examination of whether OCP received a "disproportionately" large amount of reductions *as compared to* other companies in Morocco necessarily requires Commerce *to compare* OCP and its characteristics to those other companies and their characteristics, including with respect to proportionate size and role in the overall Moroccan economy.  Indeed, any interpretation of "disproportionate" that would ignore OCP's size is unreasonable, and not the

Consol. Ct. No. 23-00246

best reading of the Statute. *Loper Bright Enters.*, 144 S. Ct. at 2266. In any event, this requirement to consider a respondent's size has been repeatedly confirmed by both this Court and the Federal Circuit. The Federal Circuit has ruled that finding "a benefit conferred on a large company . . . disproportionate *merely because of the size of the company*" is "an untenable result." *AK Steel Corp.*, 192 F.3d at 1385 (emphasis added); *see also Samsung Elecs. Co. v. United States*, 37 F. Supp. 3d 1320, 1322 (Ct. Int'l Trade 2014), *Royal Thai Gov't v. United States*, 436 F.3d 1330, 1336 (Fed. Cir. 2006), *Bethlehem Steel*, 25 CIT at 320–23, 140 F. Supp. 2d at 1368–70, *Allegheny*, 24 CIT at 465, 112 F. Supp. 2d at 1153.

In *Bethlehem Steel*, this Court also held that a disparity in the amount of benefit received is not alone sufficient to support a *de facto* specificity finding. 25 CIT 307, 140 F. Supp. 2d 1354 (2001). In that case, the respondents received a discounted electricity price from the government if they met certain criteria, such as curtailing electricity usage during designated times. *Id.* at 319–20, 1367. The Court upheld Commerce's conclusion that the subsidy provided to the steel industry was not disproportionate even though the industry received over 51% of the benefits, because "there is nothing in the record to indicate this percentage was disproportionately higher *than would be expected*" given the fact that the steel industry inherently consumes a large amount of electricity. *Id.* at 322, 1369 (emphasis added). Noting that the fact that a large consumer of electricity receiving a large amount of benefit merely "reflect{ed} the commercial realities of the industry in question," the Court emphasized that imposing countervailing duties "where disparity alone is demonstrated" but no evidence is produced indicating that the benefit is specific "is anathema to the purpose of the countervailing duty laws." *Id.*

In this administrative review, record evidence demonstrated that OCP's size explained the difference between the amount of reductions OCP received and the simple average of reductions received by other companies.  As explained above, OCP and its consolidated companies were Morocco's largest corporate group by annual revenue in 2021, with sales equivalent to 6.6% of Morocco's GDP.  *See supra* pp. 8, 12, 29 (citations omitted).  Indeed, the evidence demonstrates that OCP paid [                    ] MAD (approximately [

]) in just corporate income tax in 2021.  *See* OCP IQR at Exhibit GEN-1(a) (P.R. 77; C.R. 9) (showing total corporate income tax of [                    ] MAD).  Taxes and fees owed by OCP were thus larger in magnitude to those paid, on average, by the tens of thousands of other companies that used the same reduction program in 2021, and most all of these businesses were subject to taxes and fees on a smaller scale than OCP.  GOM First SQR at 8 (P.R. 162; C.R. 154) (showing that 71,161 companies received reductions in 2021).  Moreover, the record evidence demonstrates that tax fines and penalties are generally assessed based on a percentage of the taxes or fees owed, *see, e.g.*, GOM IQR, vol. II at Exhibit II-2 (P.R. 47; C.R. 22) (Articles 200 and 208) (indicating that employers are subject to a 5% surcharge for filing an amendment of payroll tax after the deadline and additional surcharges at 0.5%, 5% and 20% for delayed payment).  Thus, any fines or penalties assessed against a uniquely large company such as OCP, and any corresponding reductions in those tax fines and penalties, will necessarily be larger than those assessed against the average company.

Notwithstanding this substantial record evidence showing that OCP's size explains the difference in size between the reductions OCP received, and the simple average of reductions received by other companies, ***Commerce brushed this evidence aside***.  IDM at 49–50 (P.R. 370).  Its purported justification for doing so—that the agency "is not required to examine *why* OCP

received a disproportionate amount of subsidy benefits," *id.* at 50 (P.R. 370) (emphasis in

original)—is unpersuasive and contrary to the holding of this Court.  Specifically, this Court has

interpreted 19 U.S.C. § 1677(5A)(D)(iii)(III) to require that, where the agency bases a finding of

disproportionate use solely upon a comparison of respondent's share of the benefit received to

the simple average of the benefit received by other recipients, "{Commerce} ***must explain, with***

***specific reference to the facts of this case***, why such a comparison is indicative of

disproportionality."  *Samsung Elecs. Co.*, 37 F. Supp. 3d at 1322 (emphasis added) (citing

*Samsung Elecs. Co. v. United States*, 973 F. Supp. 2d 1321, 1328 (Ct. Int'l Trade 2014)).

Commerce failed to do so here, in contravention of the law.

Moreover, Commerce is not free to dismiss evidence regarding OCP's size; instead, the

agency must take into account "all the facts and circumstances of a particular case" in

conducting a disproportionality analysis, *AK Steel Corp.*, 192 F.3d at 1385, and must consider

the entirety of the record, including evidence that detracts from its decision.  *SolarWorld Ams.,*

*Inc.*, 910 F.3d at 1222.  It was therefore impermissible for Commerce to dismiss evidence

regarding OCP's size, tax base, and economic role in Morocco, on the presumption that OCP's

share of reductions in fines and penalties should have been similar in magnitude to those

received, on average, by the tens of thousands of other, smaller, companies that used this

program in 2021.

Commerce's dismissal of this same evidence was also inconsistent with the agency's

practice of considering the size of an enterprise or industry in deciding whether an enterprise or

industry received a disproportionately large amount of a subsidy:

- In *Coated Free Sheet Paper From Korea*, Commerce measured the share of lending
  received by the respondent ***sectors against the sectors' share of Korea's***
  ***manufacturing GDP*** and determined that the benefit they received was not
  disproportionately large ***compared to their "contribution" to the GDP***.  *See Coated*

Consol. Ct. No. 23-00246

> *Free Sheet Paper from the Republic of Korea: Notice of Final Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 60,639 (Oct. 25, 2007), and accompanying IDM at 18–20 (emphasis added); *see also Coated Free Sheet Paper From the Republic of Korea: Preliminary Affirmative Countervailing Duty Determination*, 72 Fed. Reg. 17,507, 17,511–12 (Apr. 9, 2007).

- In *Live Swine From Canada*, Commerce **compared the percentage of benefits** the swine producers received among agricultural producers, **to the percentage of income** the swine producers received among the same group and found that the benefit received was not disproportionately large. *Final Negative Countervailing Duty Determination: Live Swine from Canada*, 70 Fed. Reg. 12,186 (Mar. 11, 2005), and accompanying IDM at 19.

- In *Dynamic Random Access Memory Semiconductors From Korea*, Commerce found, only after evaluating the benefit received **relative to its size among all companies in Korea,** that the respondent received a disproportionately large amount of the subsidy. *Dynamic Random Access Memory Semiconductors From the Republic of Korea: Final Results of Countervailing Duty Administrative Review*, 76 Fed. Reg. 2,336 (Jan. 13, 2011), and accompanying IDM at 3.

By deviating from agency practice without any explanation, Commerce acted arbitrarily. *See JTEKT Corp.*, 33 CIT at 1831–32, 675 F. Supp. 2d at 1238 (citation omitted) (finding Commerce's actions arbitrary where the agency "offer{s} insufficient reasons for treating similar situations differently) (internal quotations and citation omitted). When OCP's size within Morocco's economy is properly taken into consideration, the entirety of record evidence confirms that OCP did not receive a disproportionately large amount of benefit relative to its large size within Morocco's economy.

*        *        *

In sum, Commerce's determination that OCP received a disproportionate amount of reductions in tax fines and penalties based on a simple average of the value of reductions received by other companies, and without due consideration of OCP's large size within the Moroccan economy, was not in accordance with law and otherwise unsupported by substantial evidence on the record. The Court should therefore remand this determination to the agency.

Consol. Ct. No. 23-00246

III.    **Commerce's Request for Information on "Other Benefits" Is Unlawful.**

In the administrative review, Commerce continued without statutory authority to demand

information from OCP regarding any and all "other benefits" it received from the GOM,

including information about purported programs that Commerce has only ever found ***not***

countervailable in prior segments of this CVD proceeding.  OCP's Case Brief at 41–47

(P.R. 356; C.R. 403); Compl. at 10–12 (counts 5 and 6).  Under the law and regulations,

Commerce must possess information demonstrating the "appearance" of a countervailable

subsidy before seeking such information on unspecified programs for which no allegation has

been made.  19 U.S.C. § 1677d; 19 C.F.R. § 351.311; *see also Allegheny Ludlum Corp. v. United

States*, 25 CIT 816, 825 (2001) (internal quotation marks and citation omitted) (affirming

Commerce's remand redetermination where it stated that it does not go on "fishing expeditions,

investigating any and all government practices that might affect the respondents").  In requesting

that respondents like OCP must disclose any "other benefits" that Commerce might imagine

OCP had received from the GOM—without any evidentiary or legal basis for doing so—

Commerce exceeded its statutory authority.

Indeed, in those instances where Commerce sought information from OCP for purported

programs for which Commerce had only ever found the programs not countervailable, for

example, the provision of rail transport services (*see* OCP IQR at Exhibit RAIL-12 at 12–14

(P.R. 81; C.R. 75); *Phosphate Fertilizers From the Kingdom of Morocco: Final Affirmative

Countervailing Duty Determination*, 86 Fed. Reg. 9,482 (Feb. 16, 2021) and accompanying IDM

at 6, 87) the evidence affirmatively demonstrated that Commerce did not have a factual basis to

request such information.  The Statute defines a subsidy as "a financial contribution . . . to a

person and a benefit is thereby conferred."  19 U.S.C. § 1677(5)(B).  Where Commerce has

previously found that no benefit was conferred, it has found that there was no subsidy under the Statute. Absent new information to the contrary, Commerce has no basis to investigate such purported programs.

Commerce's unlawful "fishing expedition" impermissibly seeks to bypass the requirement for predicate evidence that Congress and the Statute impose upon Commerce before the agency is allowed to initiate an investigation, forcing OCP and other respondents to prepare and submit thousands of pages of responses and exhibits, expending great time and effort. *See, e.g., Allegheny Ludlum Corp.*, 25 CIT at 824 (finding CVD proceedings to be "costly and time consuming") *citing to American Lamb Co. v. United States*, 785 F.2d 994, 1002-04 (Fed. Cir. 1986). OCP acknowledges that this Court previously rejected OCP's argument regarding the other assistance question in the Investigation litigation. *The Mosaic Co.*, 659 F. Supp. 3d at 1312–14. However, as this decision is not yet final and conclusive, OCP respectfully raises this argument again in this action for purposes of preserving it for any future appeal. Compl. at Count 5 (¶¶ 40–44).

## CONCLUSION

For all of these reasons, OCP respectfully requests that the Court hold the determination in the *Final Results* unsupported by substantial evidence and otherwise not in accordance with law, and remand to Commerce to: (1) accept OCP's OFPPT payroll tax refund as a minor correction and calculate a CVD rate exclusive of AFA; (2) reconsider its specificity determination regarding tax fines and penalties with due consideration for the diversification of the Moroccan economy and OCP's large size within that economy, and (3) void *ab initio* its investigation into all "other benefits" received by OCP and into purported programs the agency previously found are not countervailable.

**Consol. Ct. No. 23-00246**

Respectfully submitted,

Dated:  August 7, 2024

/s/ William R. Isasi
William R. Isasi
Cynthia C. Galvez
Kathleen McNulty
Edward J. Thomas III
Wanyu Zhang
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001-4956

Micaela McMurrough
Jordan B. Bakst
**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue, 42nd Floor
New York, NY 10018

*Counsel to OCP S.A.*

**Consol. Ct. No. 23-00246**

### <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to paragraphs 2(B)(1) and (2) of the U.S. Court of International Trade's Standard Chambers Procedures, the undersigned hereby certifies that the attached Memorandum of Law in Support of OCP S.A.'s Rule 56.2 Motion for Judgment on the Agency Record, filed August 7, 2024, contains 11,621 words, including footnotes, and excluding the table of contents, table of authorities, counsel's signature block, and this certificate, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum word count limitation set forth in the Court's Standard Chambers Procedures.

<u>/s/ William R. Isasi</u>
William R. Isasi