**Attachment 3**
**Corrected Response Brief**

# UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| THE MOSAIC COMPANY, <br><br>         Plaintiff, <br><br>     v. <br><br> UNITED STATES, <br><br>         Defendant, <br><br>     and <br><br> OCP S.A., <br><br>         Defendant-Intervenor, <br><br>     and <br><br> THE GOVERNMENT OF THE KINGDOM OF MOROCCO, <br><br>         Defendant-Intervenor. | **Consol. Court No. 23-00246** <br><br> <u>**NON-CONFIDENTIAL VERSION**</u> <br><br> **Business Proprietary Information removed from pages ii, 5–7, 9–11, 13–14, 16, 18–20, 22, 25–26, and 31–44.** |

## RESPONSE BRIEF OF CONSOLIDATED-PLAINTIFF AND DEFENDANT-INTERVENOR OCP S.A. IN OPPOSTION TO THE MOSAIC COMPANY'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Dated: January 28, 2025

William R. Isasi
Kathleen McNulty
Edward J. Thomas III
Wanyu Zhang
Julia Shults
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001-4956

Micaela McMurrough
Jordan B. Bakst
**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue, 42nd Floor
New York, NY 10018

*Counsel to OCP S.A.*

# TABLE OF CONTENTS

RULE 56.2(C) STATEMENT ...................................................................... 1

I.    Administrative Determination Under Review .................................. 1

II.   Issues Presented ............................................................................ 1

STATEMENT OF THE FACTS ................................................................. 2

I.    Commerce Included an Allocated Portion of HQ, Support, and Debt Costs in the
      COP Buildup for Phosphate Rock. ................................................. 2

II.   Commerce Calculated a World Benchmark Price Using Export Prices for
      Phosphate Rock Comparable to OCP's Rock. ................................ 4

III.  Commerce Determined that OCP Provided Adequate Remuneration to ANP for
      the Provision of Port Services and Infrastructure. ......................... 6

SUMMARY OF THE ARGUMENT .......................................................... 7

I.    Commerce's Determination to Include an Allocated Portion of OCP's HQ,
      Support, and Debt Costs in the COP Buildup for Phosphate Rock Is Supported by
      Substantial Evidence and Otherwise in Accordance with Law. ...... 7

II.   Commerce's Selection of Prices for Inclusion in the World Benchmark Price
      Calculation for Phosphate Rock Is Supported by Substantial Evidence and
      Otherwise in Accordance with Law ............................................... 8

III.  Commerce's Determination that ANP's Provision of Port Services to OCP Was
      Not Countervailable Is Supported by Substantial Evidence and Otherwise in
      Accordance with Law. .................................................................. 10

STANDARD OF REVIEW ...................................................................... 11

ARGUMENT ......................................................................................... 12

I.    The Court Should Affirm Commerce's Inclusion of an Allocated Portion of
      OCP's HQ, Support, and Debt Costs in the COP Buildup for Phosphate Rock ..... 12

      A.   Mosaic's Argument that OCP's HQ, Support, and Debt Costs Are Not
           Sufficiently Related to Rock Production Ignores this Court's Prior
           Decisions and Is Contradicted by the Record Evidence and Commerce's
           Practice ............................................................................. 13

      B.   Mosaic's Argument that Commerce Should Have Excluded Particular
           Types of HQ, Support, and Debt Costs Is Inconsistent with this Court's
           Prior Decisions and the Record Evidence .......................... 18

C.      Mosaic's Argument that Commerce Should Not Allocate OCP's HQ and Support Costs Based on Site Costs Mischaracterizes Commerce's Decision and Is Contradicted by the Record Evidence.......................................... 21

D.      Mosaic's Argument that Commerce Should Not Allocate OCP's Debt Costs Based on Capital Expenditures Is Contradicted by the Record Evidence................................................................................................................. 24

II.    Commerce's Selection of Phosphate Rock Benchmark Prices is Supported by Substantial Evidence and Otherwise in Accordance with Law. ........................................ 26

A.      Mosaic's Argument to Exclude Prices for Rock from China and Syria from the Benchmark Calculation Is Contradicted by the Evidence and Commerce Practice. ............................................................................... 27

B.      Mosaic's Arguments to Exclude Egypt Rock Prices from the Benchmark Calculation Have Already Been Rejected by this Court and Continue to Be Unsupported by Record Evidence. ....................................... 29

C.      Mosaic's Arguments to Include Phosphate Rock Prices from [          ] in the Benchmark Calculation are Not Support by Record Evidence and Contrary to Law. ............................................................... 32

III.   Commerce's Determination that ANP Conferred No Benefit on OCP Is Supported by Substantial Evidence and Otherwise in Accordance with Law. .................................. 35

A.      Mosaic Mischaracterizes Commerce's Determination in Arguing Commerce Gave Undue Weight to ANP's Profitability........................................ 36

B.      Mosaic's Argument that ANP Agreed to [                              ] Is Contradicted by the Record Evidence.............................................................. 40

C.      Mosaic Incorrectly Claims Commerce Failed to Address Its Argument that ANP [                                              ]. .................................. 42

CONCLUSION................................................................................................................ 45

## TABLE OF AUTHORITES

**Cases**                                                                                 **Pages**

*Allied Pac. Food (Dalian) Co. v. United States*,
    32 CIT 1328 (2008) ......................................................................................21

*Consol. Edison Co. of N.Y. v. NLRB*,
    305 U.S. 197 (1938).......................................................................................12

*Imperial Sugar Co. v. United States*,
    181 F. Supp. 3d 1284 (Ct. Int'l Trade 2016) ..........................................12

*NTN Bearing Corp. of Am. v. United States*,
    15 CIT 75, 757 F. Supp. 1425 (1991)..........................................11, 15

*NTN Bearing Corp. of Am. v. United States*,
    972 F.2d 1355 (Fed. Cir. 1992)..................................................................11

*NTN Bearing Corp. of Am. v. United States*,
    24 CIT 385, 104 F. Supp. 2d 110 (2000) ..............................................15

*Nucor Corp. v. United States*,
    633 F. Supp. 3d 1302 (2023) .....................................................................38

*Save Domestic Oil, Inc. v. United States*,
    357 F.3d 1278 (Fed. Cir. 2004)................................................................38

*The Mosaic Company v. United States*,
    659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023) ............................... *passim*

*The Mosaic Company v. United States*,
    No. 21-00117, Slip Op. 24-4 (Ct. Int'l Trade Jan. 19, 2024)..........16, 17

*The Mosaic Company v. United States*,
    No. 21-00116, Slip Op. 25-3 (Ct. Intl' Trade Jan. 8, 2025)..............13, 18

*Timken U.S. Corp. v. United States*,
    421 F.3d 1350 (Fed. Cir. 2005)................................................................12

*Universal Camera Corp. v. NLRB*,
    340 U.S. 474 (1951).......................................................................................12

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)...........................................................................11

19 U.S.C. § 1677(5)(E)........................................................................................34

19 U.S.C. § 1677b(b)(3)(B) ...................................................................................18

28 U.S.C. § 2637 ...................................................................................................21

**Regulations**

19 C.F.R. § 351.511(a)(2)(iii) ....................................................................... *passim*

**Administrative Materials**

*Biodiesel from the Republic of Argentina: Final Affirmative Countervailing Duty
    Determination*, 82 Fed. Reg. 53,477 (Nov. 16, 2017) ............................................37

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Korea:
    Final Results and Partial Recission of Countervailing Duty Administrative
    Review, 2019*, 87 Fed. Reg. 6,842 (Feb. 7, 2022) ...................................37

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final
    Results of Countervailing Duty Administrative Review, 2019*,
    87 Fed. Reg. 20,821 (Apr. 8, 2022) ...................................................37, 38

*Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final
    Results and Partial Rescission of Countervailing Duty Administrative Review,
    2020*, 88 Fed. Reg. 21,606 (Apr. 11, 2023) ........................................42

*Certain Hot-Rolled Carbon Steel Flat Products from India: Notice of Preliminary
    Results of CVD Administrative Review*, 73 Fed. Reg. 1578, 1591-92
    (Jan. 9, 2008) .................................................................................................17

*Certain Softwood Lumber Products from Canada: Notice of Preliminary Results
    of Countervailing Duty Administrative Review*, 70 Fed. Reg. 33,088, 33,110
    (June 7, 2005) ...............................................................................................17

*Circular Welded Carbon Steel Pipes and Tubes from Turkey: Final Results of
    Countervailing Duty Administrative Review, Calendar Year 2018*, 86 Fed.
    Reg. 6866 (Jan. 25, 2021) ............................................................................31

*Coated Free Sheet Paper from Indonesia: Final Affirmative Countervailing Duty
    Determination*, 72 Fed. Reg. 60,642 (Oct. 25, 2007) ..........................................28

*Countervailing Duty Investigation of Fine Denier Polyester Staple Fiber from the
    People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg.
    3120 (Jan. 23, 2018) .....................................................................................29

*Large Diameter Welded Pipe from the Republic of Korea: Final Results of
    Countervailing Duty Administrative Review, 2018–2019*, 87 Fed. Reg. 5,780
    (Feb. 2, 2022) ...............................................................................................38

*Notice of Final Results of Antidumping Duty Administrative Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 73,437 (Dec. 12, 2005) .......................................................................................................................20

*Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative Countervailing Duty Determination*, 86 Fed. Reg. 9482 (Feb. 16, 2021) .............................34

*Phosphate Fertilizers from the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review, 2022*, 89 Fed. Reg. 88,952 (Nov. 12, 2024) .......................................................................................................................18

*Phosphate Fertilizers from the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review, 2020–2021*, 88 Fed. Reg. 76,726 (Nov. 7, 2023) .........................................................................................................1

*Phosphate Fertilizers from the Kingdom of Morocco: Preliminary Results of the Countervailing Duty Administrative Review, 2020–2021*, 88 Fed. Reg. 29,089 (May 5, 2023).........................................................................................................2

*Sweaters Wholly or in Chief Weight of Man-Made Fiber from the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 55 Fed. Reg. 32,659, 32,662 (Aug. 10, 1990).........................................................................20

*Wooden Bedroom Furniture from the People's Republic of China: Final Results of Anitdumping Duty Administrative Review and New Shipper Review*, 73 Fed. Reg. 49,162 (Aug. 20, 2008)......................................................................18

**Other Authorities**

Uruguay Round Agreements Act: Statement of Administrative Action, H.R. Rep. No. 103–316, at 892 (1994), *as reprinted in* 1994 U.S.C.C.A.N. 4040 .................................40

OCP S.A. ("OCP"), in its role as Defendant-Intervenor in the above-captioned

consolidated action, submits this response to The Mosaic Company's ("Mosaic") Rule 56.2

motion for judgment on the agency record. *See* The Mosaic Company's Mem. in Supp. of

R. 56.2 Mot. for J. Upon the Agency Record (Aug. 7, 2024), ECF No. 45 ("Mosaic Br."). For

the reasons set forth below, OCP respectfully submits that the Court should deny Mosaic's

motion in its entirety.

<u>RULE 56.2(C) STATEMENT</u>

**I.      Administrative Determination Under Review**

Mosaic challenges specific aspects of the U.S. Department of Commerce's

("Commerce") determination in the first administrative review of the countervailing duty

("CVD") order on phosphate fertilizers from the Kingdom of Morocco ("Morocco"), covering

the period November 30, 2020 to December 31, 2021 ("the administrative review" or "the

review"). *See Phosphate Fertilizers from the Kingdom of Morocco: Final Results of CVD*

*Administrative Review, 2020–2021*, 88 Fed. Reg. 76,726 (Nov. 7, 2023) ("*Final Results*")

(P.R. 374), and accompanying Issues and Decision Memorandum ("IDM") (P.R. 370).

**II.     Issues Presented**

1.  **In measuring the adequacy of remuneration for phosphate mining rights, did
    Commerce err by including an allocated portion of OCP's HQ, support, and
    debt costs in the cost of production buildup for phosphate rock?** No. The
    record evidence conclusively establishes that OCP incurred HQ, support, and debt
    costs in support of rock production, and that these costs cannot be further
    segregated into those related or unrelated to rock production in OCP's accounting
    system. Record evidence also establishes that OCP incurs HQ and support costs
    and site costs in support of OCP's day-to-day operations, and incurs debt costs to
    fund capital expenditures. Commerce therefore properly allocated OCP's HQ and
    support costs on the basis of OCP's site costs and debt costs based on capital
    expenditures to determine the portion of OCP's HQ, support, and debt costs to
    include in the cost of production buildup for phosphate rock.

2.  **Did Commerce err by including in the calculation of a benchmark price for
    phosphate rock world market prices for Egyptian, Chinese, and Syrian**

phosphate rock that Commerce determined was comparable to the rock produced by OCP, while excluding certain other prices for rock Commerce that determined was not comparable to rock produced by OCP? No. The record evidence conclusively establishes that Egyptian, Chinese, and Syrian phosphate rock is comparable to OCP's rock based on bone phosphate of lime content and thus, Commerce properly included these world market prices in the benchmark price calculation. Record evidence also establishes that phosphate rock from certain other countries was not comparable to OCP's rock and thus, Commerce properly excluded prices for such rock from the benchmark price calculation.

3. **Did Commerce err in determining that ANP's provision of port services to OCP was not a countervailable subsidy?** No. Commerce correctly determined that ANP set concession fees in accordance with market principles and, consequently, that no benefit was conferred to OCP.

## STATEMENT OF THE FACTS

Below, OCP provides the relevant legal and factual background for the issues raised in

Mosaic's appeal of Commerce's *Final Results*.[1]

## I. Commerce Included an Allocated Portion of HQ, Support, and Debt Costs in the COP Buildup for Phosphate Rock.

In the first administrative review, Commerce determined a government price for

phosphate rock based on a cost of production ("COP") buildup constructed from OCP's actual

costs to mine phosphate ore and produce phosphate rock (the underlying good conveyed via the

mining rights) during the Period of Review ("POR"). *See Phosphate Fertilizers from the*

*Kingdom of Morocco: Preliminary Results of the CVD Administrative Review, 2020–2021*, 88

Fed. Reg. 29,089 (May 5, 2023) ("*Preliminary Results*") (P.R. 267) and accompanying

Preliminary Decision Memorandum ("PDM") at 10 (P.R. 265). In the *Preliminary Results*,

Commerce adopted the same approach as that first used in the Investigation phase of this CVD

---

[1] Pursuant to Rule 81(k) of this Court, the factual background that follows is generally limited to facts necessary to correct inaccuracies or omissions in Mosaic's brief.

proceeding and determined—without explanation—to exclude all of OCP's HQ, support, and debt costs from the COP buildup for phosphate rock. *2020-2021 CVD Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco: OCP S.A. Calculations for the Preliminary Results* (May 3, 2023) ("Prelim Calc Memo") at 5 (P.R. 261; C.R. 260).

After issuance of the *Preliminary Results*, in early September 2023, Commerce conducted an on-site verification in Morocco of the information submitted by OCP and the Government of Morocco ("GOM"). OCP Verification Report (Oct. 6, 2023) ("OCP Verification Report") at 1 (P.R. 349; C.R. 399). Shortly thereafter, this Court released its opinion in the litigation relating to the Investigation segment of this CVD proceeding (the "Investigation litigation"), holding that Commerce's exclusion of OCP's HQ, support, and debt costs from the COP buildup for rock was "*per se* unreasonable" because record evidence established that OCP incurred these expenses in support of its rock production. *See Mosaic v. United States* ("*Mosaic I*")*, 659 F. Supp. 3d 1285, 1300 (Ct. Int'l Trade 2023). The Court also rejected as "nonsensical" Mosaic's assertions that OCP was obligated to segregate its HQ, support, and debt costs into those related and unrelated to rock production, finding that OCP "could not place on the record 'segregated' SG&A cost data that did not exist." *Id.* at 1301. The Court reasoned that—because OCP recorded these expenses only at the corporate level—OCP "necessarily resorted to an allocation method" to determine the appropriate portion of these expenses to include in the COP buildup for phosphate rock. *Id.* The Court remanded back to Commerce with instruction to either accept OCP's cost allocation method or show it to be unreasonable in light of an alternative methodology. *Id.*

On November 7, 2023, Commerce released its *Final Results* and found, consistent with the Court's opinion, that substantial record evidence demonstrated that OCP's HQ, support, and

debt costs are indirect costs that support rock production, and therefore must be included in the COP buildup for phosphate rock. IDM at 33–35 (P.R. 370). Commerce employed allocation methodologies to determine the portion of these costs for inclusion in the cost buildup, allocating OCP's HQ and support costs based on each site's share of site costs,[2] and allocating OCP's debt costs based on each site's share of capital expenditures. *See id.* at 33–37 (P.R. 370). Commerce adopted these allocation methods based on record evidence of OCP's "reported costs, including HQ, Support, and Debt costs," which Commerce verified, finding "no discrepancies." *Id.* at 35 (P.R. 370).

## II. Commerce Calculated a World Benchmark Price Using Export Prices for Phosphate Rock Comparable to OCP's Rock.

In the *Final Results*, Commerce calculated a benchmark price for phosphate rock by averaging world market prices for phosphate rock from several countries reported in multiple third-party sources. IDM at 27 (P.R. 370). Both OCP and Mosaic submitted phosphate rock prices sourced from Profercy, as well as corresponding methodology sheets explaining that Profercy provides reliable market prices for all major phosphate products worldwide and detailing the steps that Profercy takes to ensure that its prices reflect market conditions. OCP New Factual Information Submission (Mar. 23, 2023) ("OCP NFI Submission") at Ex. NFI-3, Ex. NFI-6 (P.R. 202–03; C.R. 203–04); Mosaic New Factual Information Submission (Mar. 22, 2023) ("Mosaic NFI Submission") at Ex. 1(g), Ex. 5 (P.R. 190; C.R. 181).

From these data, Commerce selected world market prices for only phosphate rock it determined to be comparable to OCP's rock, as measured by the industry-accepted standard bone

---

[2] Commerce's IDM sometimes refers to these costs as "total site costs," though Commerce correctly excluded raw materials, amortization, and non-current expenses from the site costs. *See* IDM at 35 (P.R. 370). Throughout this brief, OCP refers to these costs as "site costs."

phosphate of lime ("BPL") content (or P2O5 content) of the rock. IDM at 27 (P.R. 370); PDM

at 9 (P.R. 265). Commerce examined OCP's total volume of rock produced in 2021 and

corresponding verified BPL data. OCP Verification Rep. at 5, 9-10 (P.R. 349; C.R. 399). Based

on this data, Commerce developed a BPL range using the reported BPL content for OCP's rock

in 2021, [

]. Prelim

Calc Memo at 3 (P.R. 261; C.R. 260). If a price submitted by OCP or Mosaic corresponded to

rock with BPL content that overlapped with the [          ] range used by Commerce, the

agency included it in the rock benchmark calculation. *See* IDM at 27 (P.R. 370). Conversely, if

a rock price submitted by OCP or Mosaic fell outside of this range, Commerce excluded it from

the benchmark calculation. *See id.* (P.R. 370). Commerce ultimately included in the benchmark

calculation world market prices for rock from Egypt, China, and Syria, and other countries,

because these prices were for rock with a BPL content range similar to the BPL content range of

the rock produced by OCP during the POR. *Id.* at 27–28 (P.R. 370).

In a separate business proprietary memorandum accompanying the *Final Results*,

Commerce declined to include in the world benchmark calculation prices for rock from [

] because the BPL content of that rock was outside the established range used to

construct the benchmark price. IDM at 1, 23–24 (P.R. 370); Memorandum from Jaron Moore to

the File, *Final Results of the CVD Administrative Review of Phosphate Fertilizers from the*

*Kingdom of Morocco: Business Proprietary Information Accompanying the Issues and Decision*

*Memorandum for the Final Results* (Nov. 2, 2023) ("BPI IDM") at 4–5 (P.R. 372; C.R. 410).

### III. Commerce Determined that OCP Provided Adequate Remuneration to ANP for the Provision of Port Services and Infrastructure.

During the POR, OCP held concession agreements with ANP at the ports of Casablanca,

Jorf Lasfar, and Safi. *See* OCP New Subsidy Allegations ("NSA") Questionnaire Response

(Apr. 24, 2023) ("OCP NSA QR") at 4 (P.R. 244; C.R. 232). ANP charged OCP [




]. GOM NSA Questionnaire Response

(Apr. 24, 2023) ("GOM NSA QR") at PORT-I-3 (P.R. 246–47; C.R. 244, 249). ANP ensured

that [                                    ] to an amount [

], and reported an operating profit and net profit in 2019, 2020, and 2021. *See*

GOM NSA QR at PORT-I-5, PORT-I-3, Ex. PORT-1 (P.R. 246–47; C.R. 244–45); *see also*

GOM NSA Supplemental Questionnaire Response ("GOM NSA SQR") (June 30, 2023) at 11

(P.R. 303; C.R. 268). OCP reported the [                        ] it paid to ANP over the POR in

Exhibits PORT2-1(a) through (c). OCP NSA Supplemental Questionnaire Response (July 6,

2023) ("OCP NSA SQR") (P.R. 308; C.R. 284). Commerce reviewed ANP's accounting system

during verification, confirmed values in ANP's 2021 financial statements, and observed ANP's

use of [                ] to project fees and profitability associated with its concessions. *See*

Memorandum from Janaé Martin and Jaron Moore to the File, *CVD Administrative Review of*

*Phosphate Fertilizers from the Kingdom of Morocco: Verification of the Questionnaire*

*Responses of the Government of Morocco* (Oct. 6, 2023) ("GOM Verification Report") at 3–6

(P.R. 350; C.R. 400).

Based on this verified evidence, Commerce considered, among other things, ANP's

price-setting philosophy and costs to evaluate the adequacy of the remuneration OCP paid to

ANP.  Commerce observed that ANP reasonably anticipated "[                    ]" in connection

with OCP's concessions because OCP [

                                                    ], and that this [

                    ].  Memorandum from James Maeder to Lisa W. Wang, *CVD Administrative*

*Review of Phosphate Fertilizers from the Kingdom of Morocco: Post-Preliminary Analysis* (Oct.

11, 2023) ("*Post-Preliminary Memo*" or "PPM") at 6 (P.R. 351; C.R. 401).  Noting that ANP

generated [                                                    ] and was profitable overall, Commerce

determined in its *Post-Preliminary Memo* that ANP set concessions fees to OCP consistent with

market principles, and therefore conferred no benefit to OCP.  *Id.* at 1, 3–6 (P.R. 351, C.R. 401).

Commerce's determination was unchanged in the *Final Results*.  IDM at 52–54 (P.R. 370).

## SUMMARY OF THE ARGUMENT

**I.      Commerce's Determination to Include an Allocated Portion of OCP's HQ, Support, and Debt Costs in the COP Buildup for Phosphate Rock Is Supported by Substantial Evidence and Otherwise in Accordance with Law.**

Despite the Court's express prior findings, Mosaic baselessly continues to argue that

Commerce should have excluded from the cost buildup for phosphate rock all or most of OCP's

HQ, support, and debt costs because these costs are, in Mosaic's estimation, not sufficiently

related to OCP's phosphate rock production.  Mosaic also attacks as distortive Commerce's

methodologies for allocating these costs for inclusion in the buildup.  Mosaic's arguments should

be rejected as inconsistent with prior rulings of this Court and the record evidence.

This Court previously determined that OCP's HQ, support, and debt costs must be

included in the cost buildup because they are incurred in support of OCP's rock production, and

that an allocation methodology is needed to identify the portion of costs to include because these

costs cannot be segregated into those related or unrelated to rock production. Commerce correctly determined that the record evidence in this review—which again confirms that OCP incurs these costs in support of rock production—demands the same conclusion.

Mosaic's challenge to Commerce's methodologies for allocating these costs is also baseless. As a primary matter, Mosaic failed to exhaust administrative remedies with respect to proposing any alternative allocation methodologies during the review. Commerce's methodology for allocating HQ and support costs based on site costs reflects that OCP incurs HQ and support costs, as well as site costs, in support of its day-to-day operations, and that OCP's production sites benefit from this spending. Similarly, Commerce's allocation of debt costs based on each production site's relative share of capital expenditures properly reflects evidence establishing that OCP incurs debt to fund capital improvements associated with rock production. Because, contrary to Mosaic's arguments, Commerce's inclusion of a portion of OCP's HQ, support, and debt costs in the COP buildup for phosphate rock, and the allocation methodology the agency used to do so, are supported by evidence and case law, the Court should affirm Commerce's results on this issue.

## II. Commerce's Selection of Prices for Inclusion in the World Benchmark Price Calculation for Phosphate Rock Is Supported by Substantial Evidence and Otherwise in Accordance with Law.

Mosaic wrongly claims that Commerce erred by including Chinese and Syrian export prices in the world benchmark price calculation. According to Mosaic, intervention by the Chinese government in its domestic market allegedly distorted Chinese export prices, while U.S. and European sanctions against Syria allegedly distorted Syrian export prices. These assertions are without support and should be rejected.

While Mosaic purports to identify government measures that target Chinese and Syrian *domestic* markets, the relevant market for the purpose of Commerce's analysis is the ***world export*** market for phosphate rock, and Mosaic fails to establish that these measures had a distortive effect on such ***export*** prices. Moreover, Commerce's practice confirms that distortions in a domestic market do not merit finding that export prices from that country are distorted or that they should be excluded from a benchmark price calculation; Mosaic's reliance on a single, inapposite case in support of its argument is unavailing. Commerce's inclusion of Chinese and Syrian export prices in the benchmark calculation was lawful and should be affirmed.

Mosaic also incorrectly contends that Commerce should have excluded Egyptian rock prices from the calculation of a world benchmark price because such Egyptian rock is purportedly lower quality than rock produced by OCP. Specifically, Mosaic argues that Egyptian rock prices are determined not by BPL, but by levels of impurities—measured by the Minor Element Ratio ("MER"). In rejecting Mosaic's arguments in the *Final Results*, Commerce found that record evidence did not support a finding that MER determined Egyptian rock prices and, in any event, Mosaic had failed to demonstrate the existence of any differences between the MER of the Egyptian rock included in the benchmark price calculation and that of OCP's rock. Moreover, Mosaic's arguments for excluding Egyptian rock prices from the benchmark have already been rejected by this Court, and Mosaic has presented no new evidence that would justify changing this result.

Finally, Mosaic argues that Commerce should have included rock prices from [          ] in the benchmark price calculation. Mosaic ignores the fact that BPL content of rock from these countries falls outside the range of [               ] used by Commerce to select world market prices for inclusion in the benchmark price calculation, and instead argues that

Commerce's BPL range should be expanded, based on an erroneous claim that phosphate rock

produced by OCP during the POR had a BPL of up to, and potentially exceeding, 78%.  Mosaic

relies on a single, non-contemporaneous internet source published well before the POR, which

discuses, at a general level, the BPL content of rock that OCP *may* produce for export.  Because

this source speaks to only hypothetical production, rather than actual production during the POR,

and is contradicted by extensive verified evidence, Commerce properly rejected Mosaic's

argument, and declined to include export prices from [                    ] in the benchmark price

calculation.

### III. Commerce's Determination that ANP's Provision of Port Services to OCP Was Not Countervailable Is Supported by Substantial Evidence and Otherwise in Accordance with Law.

Mosaic claims that Commerce wrongly determined that ANP set OCP's concession fees

consistent with market principles and therefore conferred no benefit to OCP, arguing that the

agency improperly weighed evidence, failed to adequately explain its decision, and did not

account for contradictory evidence.  These arguments are meritless.

Consistent with 19 C.F.R. § 351.511(a)(2)(iii), Commerce assessed whether ANP set

OCP concession fees in accordance with market principles by considering several factors,

including ANP's price setting philosophy and costs.  Having assessed these factors, Commerce

found that ANP incurred [                ] in connection with OCP's concessions such that the

concession fees charged to OCP [                                                    ].

Commerce further verified that—[

                        ].  On this basis, Commerce determined that the remuneration provided by

OCP to ANP was consistent with market principles, and the concessions ANP provided to OCP

were not a countervailable subsidy.  Commerce's determination was consistent with its practice

of finding that no benefit is conferred when prices charged by a government authority result in

the authority recovering its costs and making a profit.

Ignoring the facts, Mosaic mischaracterizes the evidence by claiming that—because

[                                                                                                          ] over

time—[                                                                                ].  Mosaic's claims are pure

conjecture, with no evidentiary support.  To the contrary, record evidence demonstrates that the

totality of remuneration paid by OCP to ANP in connection with its concession agreements was

sufficient to [                                         ], and was therefore consistent with market principles.

Mosaic also argues that Commerce should have measured the benefit to OCP as [

].  However, in addition to misconstruing Commerce's practice, Mosaic ignores

the fact that the terms and characteristics of OCP's concessions [

].  For these reasons, attempted comparisons [

] are simply not probative of whether the prices ANP charged to

OCP constitute adequate remuneration.  Mosaic's claims to the contrary are without support.

Because Commerce sufficiently explained its determination that ANP set concession fees

in accordance with market principles and supported that decision with substantial evidence, its

determination should be affirmed.

## **STANDARD OF REVIEW**

The Court will hold unlawful a Commerce determination that is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i); *see NTN Bearing Corp. of Am. v. United States*, 15 CIT 75, 75–84, 757

F. Supp. 1425, 1427–33 (1991), *aff'd*, 972 F.2d 1355 (Fed. Cir. 1992) (applying the substantial

evidence standard in reviewing initiation and final determinations). Substantial evidence "is more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229–30 (1938). Although an assessment of "substantiality of evidence must take into account whatever in the record fairly detracts from its weight," that does not mean the Court may "displace the {agency's} choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). The Court may not "reweigh" the evidence. *Imperial Sugar Co. v. United States*, 181 F. Supp. 3d 1284, 1304 (Ct. Int'l Trade 2016). In addition, substantial evidence does not require that Commerce must have addressed all arguments by a party, so long as the agency's path to its determination is "reasonably discernible." *Valeo North Am., Inc. v. United States*, 404 F. Supp. 3d 1303, 1318–19 (Ct. Int'l Trade 2019) (citing *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354 (Fed. Cir. 2005)).

## ARGUMENT

I.  **The Court Should Affirm Commerce's Inclusion of an Allocated Portion of OCP's HQ, Support, and Debt Costs in the COP Buildup for Phosphate Rock.**

In the *Final Results*, Commerce found the record demonstrated that OCP's HQ, support, and debt costs support rock production and that these costs cannot be segregated into costs related or unrelated to rock production. Mosaic argues Commerce erred in its determination and should instead have excluded all of OCP's HQ, support, and debt costs from the COP buildup for phosphate rock, or in the alternative, selectively excluded specific categories of these costs as allegedly irrelevant to phosphate rock production. Mosaic also argues that Commerce's methodology for allocating OCP's HQ and support costs and its methodology for allocating debt costs overstate these costs and are distortive. Mosaic's arguments have already been rejected by

this Court and are unsupported by the record evidence, and the Court should reject them again here and affirm Commerce's inclusion of these costs in (and its methodologies for allocating a portion of them to) the COP buildup.

> **A.** **Mosaic's Argument that OCP's HQ, Support, and Debt Costs Are Not Sufficiently Related to Rock Production Ignores this Court's Prior Decisions and Is Contradicted by the Record Evidence and Commerce's Practice.**

In *Mosaic I*, the Court rejected the exact argument Mosaic advances here, finding instead that the proposition that OCP could identify how each line item of its HQ, support, and debt costs relates to the production of phosphate rock was "nonsensical." *See* 659 F. Supp. 3d at 1301; Mosaic Br. at 15–17. Recently, this Court again confirmed that HQ, support, and debt costs are indirect costs reasonably related to rock production. *See Mosaic v. United States* ("*Mosaic II*"), No. 21-00116, Slip Op. 25-3, at 17 (Ct. Int'l Trade Jan. 8, 2025). Mosaic provides no basis for the Court to reach a different decision here.

Commerce supported its determination in the *Final Results* that OCP incurs HQ, support, and debt costs in support of rock production with substantial evidence, including evidence that costs recorded to OCP's HQ and support cost center include those for [

]. *See* IDM at 35, n.205 (P.R. 370) (citing OCP Initial Questionnaire Response (Aug. 22, 2022) ("OCP IQR") at 82–85, Ex. MIN-16 (P.R. 76, 80; C.R. 8, 15)). The agency also cited to evidence establishing that OCP incurs debt to fund capital improvements associated with rock production, including rock storage facilities and rock washing stations. *See* IDM at 35, n.209 (P.R. 370) (citing to OCP IQR at 84–85, Ex. MIN-15 (P.R. 76, 80; C.R. 8, 15)).

Commerce's finding that these costs cannot be reasonably further segregated into costs related or unrelated to rock production was also fully supported by the evidence. *See, e.g.,* IDM at 35, n.207 (P.R. 370) (citing OCP Submission of Factual Information to Rebut, Clarify, or Correct Petitioner's Factual Information (Sept. 27, 2022) ("OCP RFI Submission") at 6–7 (P.R. 122; C.R. 136) (reporting that these costs are recorded on a company-wide basis and cannot be traced directly to a product in OCP's accounting system)); IDM at 35, n.211 (P.R. 370) (citing OCP IQR at 75–77, 80–85, Ex. MIN-12(a), Ex. MIN-12(b) (C.R. 8, 15, P.R. 76, 80). Commerce verified this evidence in-person in Morocco. *See* IDM at 35 (P.R. 370). Much of this evidence is nearly identical to that cited by this Court in support of its holding in *Mosaic I*. *See* 659 F. Supp. 3d at 1300–01.

Notwithstanding this evidence and this Court's prior ruling, Mosaic repeatedly asserts that HQ, support, and debt costs should be excluded from the COP buildup for rock because they are unrelated to rock production. For example, Mosaic claims Commerce failed to address its arguments that particular types of HQ and support costs bear no relation to OCP's rock production because these costs [                                        ] to OCP's production volumes. Mosaic Br. at 18–19. Mosaic refers to time periods during which [


                                        ]. *Id*. at 18. These claims rest on the erroneous presumption that these costs can be tied *directly* to OCP's production volumes, ignoring the fundamentally *indirect* nature of these expenses.

As both Commerce and this Court have explained, record evidence confirms that OCP's HQ and support expenses *indirectly* support rock production, and would thus not necessarily manifest any such volume-based relationship. *See* IDM at 35 (P.R. 370) ("In contrast to direct

costs . . . which may be attributed to OCP's production activities, HQ and support costs are recorded at a company-wide level.") (citations omitted); *Mosaic II,* Slip Op. 25-3 at 17 ("Commerce appropriately included headquarters, support and debt costs as indirect costs in its cost of production calculation.").

Mosaic also advances the novel claim that a remand is required because Commerce "unlawfully" imposed a burden of proof upon Mosaic by establishing a presumption that OCP's HQ, support, and debt costs are related to OCP's rock production activities. Mosaic Br. at 15–16. OCP agrees with the Government that the relevant question before the Court is whether Commerce's determination is supported by substantial evidence. *See* Defendant Response to Plaintiffs' Mot. for J. Upon the Agency Record, at 50–51 (Jan. 14, 2025), ECF No. 57 (" Gov't Resp."). For the reasons outlined above, substantial evidence supports Commerce's finding that OCP's HQ, support, and debt costs are related to rock production, and Mosaic's inability to overcome that evidence does not constitute impermissible burden shifting. *Id.*

Mosaic's citations to *NTN Bearing* in support of this argument are also inapposite. Mosaic Br. at 15–16. In *NTN Bearing*, the Court ***rejected*** a claim—very similar to that which Mosaic makes here—that Commerce should have required the respondent to show that its reported billing adjustments were directly related to relevant sales before accepting the billing adjustments. *See NTN Bearing Corp. of Am. v. United States*, 24 CIT 385, 433–34, 104 F. Supp. 2d 110, 151 (2000). Commerce had determined in the review that it was not possible for the respondent to demonstrate such a direct link. *Id.* at 433–38. The Court affirmed Commerce's determination, finding that "the record clearly indicates that Commerce properly used its acquired knowledge of the {respondent's} computer system and databases to conclude that {the

respondent} could not provide the information in the preferred form," and "properly scrutinized {the} reported billing adjustments before concluding that {they} were reliable." *Id*. at 441.

Mosaic next criticizes as inconsistent with agency practice what it deems to be "Commerce's wholesale inclusion of OCP's {HQ, support, and debt} costs" in the COP buildup for rock  Mosaic Br. at 19.  But Mosaic is mistaken; Commerce did ***not*** include "wholesale" OCP's HQ, support, and debt costs in the COP buildup, but instead included only an allocated ***portion*** of these costs, which resulted in the exclusion of [          ] of OCP's reported HQ, support, and debt costs from the COP buildup for rock.  *Compare* OCP IQR at Ex. MIN-12(a) (C.R. 8, 15; P.R. 76, 80) (reporting total HQ, support, and debt costs of [          ] MAD), *with* Memorandum from Jaron Moore to the File, *Final Results of the CVD Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco: OCP S.A. Calculations for the Final Results* (Nov. 2, 2023) at Att. 1, Tab "OCPMiningCosts" ("*Final Calculations*") (P.R. 371; C.R. 408–09) (including only [          ] MAD of these costs in the COP buildup).

More fundamentally, Mosaic misrepresents Commerce's practice.  Mosaic cites to the Court's consideration of the second redetermination in the CVD investigation of *Phosphate Fertilizers from the Russian Federation* to argue that Commerce should only include the indirect HQ, support, and debt costs that directly support rock production in the COP buildup.  Mosaic Br. at 19 (citing *The Mosaic Company v. United States*, No. 21-00117, Slip Op. 24-4 (Ct. Int'l Trade Jan. 19, 2024)).  But, as the Government correctly explains, in that proceeding, Commerce refused to include a profit figure in the numerator of a profit ratio calculation about which it had "no information."  *See* Gov't Resp. at 53; *see also Phosphate Fertilizers from the Russian Federation: Final Results of Redetermination Pursuant to Court Remand Slip Op. 23-99 in Consol. Ct. No. 21-00117* (Oct. 11, 2023) at 16–17 ("*Fertilizers from Russia Second Remand*

*Results*"), *aff'd, The Mosaic Company v. United States*, No. 21-00117, Slip Op. 24-4 (Ct. Int'l Trade Jan. 19, 2024). In contrast, Commerce found here that it had ample, verified information demonstrating OCP's HQ, support, and debt costs support rock production. *See, e.g.*, IDM at 36 (P.R. 370) ("the record contains verified evidence indicating that OCP incurred HQ, Support, and Debt Costs in the production of phosphate rock").

Mosaic also cites *Softwood Lumber from Canada* for the proposition that Commerce may take into account only those indirect costs a respondent "must" incur to produce subject merchandise. *See* Mosaic Br. at 20. OCP agrees with Commerce's explanation that *Softwood Lumber from Canada* does not establish a limitation on inclusion of indirect costs in a cost buildup, and certainly does not provide that "*only"* costs a respondent "must" incur may be included. IDM at 33–34 (P.R. 370) (emphasis in original); *see also* Gov't Resp. at 53–55. This is consistent with multiple other cases in which Commerce included similar indirect costs in cost buildups without finding that the respondent "must" incur such expenses. *See, e.g., Certain Softwood Lumber Products from Canada: Notice of Preliminary Results of CVD Administrative Review*, 70 Fed. Reg. 33,088, 33,110 (June 7, 2005) (unchanged in final, 70 Fed. Reg. 73,448); *Certain Hot-Rolled Carbon Steel Flat Products from India: Notice of Preliminary Results of CVD Administrative Review*, 73 Fed. Reg. 1578, 1591-92 (Jan. 9, 2008) (unchanged in final, 73 Fed. Reg. 40,295).

Mosaic's reliance on *Hot-Rolled Steel from India* is also misplaced. Mosaic cites this decision for the proposition that Commerce cannot include indirect costs incurred by OCP at the **headquarters** level (*i.e.*, OCP's HQ, support, and debt costs) in the COP buildup for rock, but rather should have included only indirect costs incurred at the **production site** level. Mosaic Br. at 20. This Court has recently rejected this exact argument: it found that OCP's site-level

indirect costs are distinct from headquarter-level indirect costs, and affirmed Commerce's inclusion of headquarters-level costs in the COP buildup for phosphate rock. *See Mosaic II*, Slip Op. 25-3 at 16–17.

In addition, contrary to Mosaic's claim, Commerce never announced any rule excluding headquarters-level indirect costs from the COP buildup in *Hot-Rolled Steel from India*, and Commerce's inclusion of an allocated portion of these indirect costs in the COP buildup is entirely consistent with all other segments of this CVD proceeding, the agency's practice generally, and the law. *See, e.g.*, *Phosphate Fertilizers from the Kingdom of Morocco: Final Results of Redetermination Pursuant to Court Remand in 23-134 in Consol. Ct. No. 21-00116* (Jan. 12, 2024) at 9; *Phosphate Fertilizers from the Kingdom of Morocco: Final Results of CVD Administrative Review, 2022*, 89 Fed. Reg. 88,952 (Nov. 12, 2024), and accompanying IDM at 20; *Wooden Bedroom Furniture from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and New Shipper Review*, 73 Fed. Reg. 49,162 (Aug. 20, 2008), and accompanying IDM at Comment 11 (including "outside services (i.e., third party services)" as overhead similar to OCP's [          ] and [                              ]); *see also* 19 U.S.C. § 1677b(b)(3)(B) (instructing that COP shall include an amount for selling, general, and administrative expenses).

### B. Mosaic's Argument that Commerce Should Have Excluded Particular Types of HQ, Support, and Debt Costs Is Inconsistent with this Court's Prior Decisions and the Record Evidence.

Mosaic argues that, even if the Court declines to rule that Commerce should have excluded ***all*** of OCP's HQ, support, and debt costs from the COP buildup for rock, the agency should have performed a line-item review to exclude specified categories of costs Mosaic deems irrelevant to OCP's rock production, rather than adopting Commerce's "all or nothing" approach.

Mosaic Br. at 21–23. Yet again, Mosaic disregards this Court's prior rulings and evidence that these indirect costs cannot be segregated as Mosaic proposes, while also fundamentally mischaracterizing Commerce's determination.

As explained above, Commerce did not adopt an "all or nothing" approach to including OCP's HQ, support, and debt costs in the COP buildup for rock; it used an allocation to determine the ***portion*** of these costs to include in the COP buildup. Commerce's allocation resulted in **the exclusion of [                                                    ] from the COP buildup for rock.** *See supra* Argument Section I.A. Furthermore, Mosaic's insistence on a line-item review of OCP's costs ignores this Court's rulings that it is "nonsensical" to require segregation of OCP's costs in the manner Mosaic proposes. *Mosaic II,* Slip Op. 25-3 at 17 (citing 659 F. Supp. 3d at 1300–01).

Consistent with the Court's holding, Commerce explained that an allocation was necessary to accurately determine the portion of these indirect costs to include in the COP buildup for rock (precisely because they could not be further segregated). *See* IDM at 33–37 (P.R. 370); *see also Mosaic I*, 659 F. Supp. 3d at 1301. To selectively remove some of these costs because they are purportedly less related to rock production than others fundamentally ignores their indirect nature and the established need to allocate them.

Mosaic also attempts to single out OCP's [          ] for exclusion from the COP buildup alleging they are insufficiently related to rock production. This effort is also unavailing. To start, there is nothing extraordinary about companies engaging in [                    ] and the record demonstrates that it is customary for phosphate producers to record costs related to [          ]. *See* OCP IQR at Ex. MIN-19 at [    ] (P.R. 76, 80; C.R. 8, 16) (establishing that the Jordan Phosphate Mines Company ("JPMC"), a comparable producer of phosphate rock,

included in financial reporting contained in its 2021 Annual Report billions of Jordanian Dinars

in [          ]).  As indirect expenses, these [          ] support all of OCP's production

activities including its rock production.  *See Notice of Final Results of Antidumping Duty*

*Administrative Review: Certain Softwood Lumber Products from Canada*, 70 Fed. Reg. 73,437

(Dec. 12, 2005), and accompanying IDM at 34 (G&A expenses are included in a cost buildup

because they generally support a company).

 Removing categories of OCP's HQ, support, and debt costs such as [          ] prior to

allocating them would undermine Commerce's goal of achieving an apples-to-apples comparison

between the constructed government price of OCP's phosphate rock and a benchmark price

comprised of world market prices for phosphate rock.  *See,* IDM at 44 (P.R. 370).  This

comparison should account for costs of [          ], which other producers account for in setting

a price for their phosphate rock sold into the world market.  *See* OCP IQR at Ex. MIN-19 at [   ]

(P.R. 76, 80; C.R. 8, 16); *see also, Sweaters Wholly or in Chief Weight of Man-Made Fiber from*

*the Republic of Korea: Final Determination of Sales at Less Than Fair Value*, 55 Fed. Reg.

32,659, 32,662 (Aug. 10, 1990) (including [                              ]).

Mosaic's attempt to malign OCP's [          ] as too large also wrongly implies—without

citation to any law, regulation, or agency practice—that Commerce is tasked under the CVD law

with policing the quantity of [                              ] a company incurs.  *See*

Mosaic Br. at 23.

 In addition to asserting that Commerce should have selectively excluded whole

categories of HQ and support costs from the COP buildup for phosphate rock, Mosaic also

asserts generally that Commerce should have excluded debt costs that did not relate to OCP's

phosphate rock production.  But Mosaic identifies not a single specific debt cost that it believes

Commerce should have excluded. *See id*. at 21–23. Mosaic's argument is entirely

unsubstantiated, and must also be rejected. *See, e.g.*, *Allied Pac. Food (Dalian) Co. v. United

States*, 32 CIT 1328, 1340 (2008) (explaining that Commerce may not rely on unsupported

inferences).

For the forgoing reasons, Commerce's rejection of Mosaic's invitation to exclude

particular HQ, support, and debt costs from the pool of costs to be allocated should be affirmed.

### C. Mosaic's Argument that Commerce Should Not Allocate OCP's HQ and Support Costs Based on Site Costs Mischaracterizes Commerce's Decision and Is Contradicted by the Record Evidence.

Mosaic argues that Commerce's allocation methodology for HQ and support costs

overstates OCP's HQ and support costs and does not accurately reflect the degree to which

OCP's phosphate mining units benefited from HQ and support spending. Mosaic then adds that

Commerce failed to provide any support or explanation for its rejection of Mosaic's arguments.

Mosaic Br. at 24–27. Mosaic's arguments should be rejected because they are procedurally

improper and fundamentally mischaracterize both the evidence and Commerce's decision.

As an initial matter, and as the Government notes in its brief, Mosaic failed to offer any

alternative methodology for allocating OCP's HQ and support costs before the agency. *See*

Gov't Resp. at 46–49. To the extent Mosaic requests that this Court remand back to the agency

with instructions to consider alternative methodologies, this request should be rejected for failure

to exhaust administrative remedies. *See* 28 U.S.C. § 2637. The allocation methodology

employed by Commerce about which Mosaic now complains was on the record of this

proceeding for nearly a year prior to the submission of case briefs before the agency. *Compare*

OCP IQR (P.R. 76; C.R. 8), *with* Mosaic Case Brief (Oct.16, 2023) (P.R. 355; C.R. 402).

Mosaic's criticism of Commerce's allocation methodology is also unsupported by record evidence. Mosaic makes the extraordinary claim that, because OCP shared an address with other companies, "{t}his suggests that a significant portion of {OCP's} HQ/Support costs were incurred by separate legal entities," and OCP's HQ and support costs were thus "inflated." Mosaic Br. at 24–25. The mere fact that OCP shares an address with other companies does not establish that OCP is recording costs incurred by other companies in its own books and records. As the Government notes, these HQ and support costs were recorded in OCP's *audited* books and records, which Commerce *verified* in the instant review. Gov't Resp. at 55–56; *see also* IDM at 35 (P.R. 370). Mosaic's claim is frivolous and should therefore be rejected.

Mosaic also argues that Commerce did not support its decision to allocate HQ and support costs on the basis of site costs (exclusive of freight, raw materials, amortization, and financial and non-current expenses) and that this allocation methodology is distortive. Mosaic Br. at 26–27. To the contrary, Mosaic's arguments were addressed by Commerce, which explained that Mosaic "fail{ed} to substantiate its claim that OCP's method of allocation was distortive, nor did the petitioner suggest an alternative allocation method." *See* IDM at 36 (P.R. 370). Mosaic's argument is also directly contradicted by the evidence demonstrating that OCP incurs both HQ and support costs and site costs in support of OCP's day-to-day operations. OCP IQR at 82–84, Ex. MIN-12(b) (P.R. 76, 80; C.R. 8, 15) (explaining OCP's HQ and support costs include [


]); *id.* (P.R. 76, 80; C.R. 8, 15) (describing site costs to include [

], which are also incurred in support of day-to-day operations).

Mosaic also raises arguments regarding the costs to be included in the sum of site costs used to allocate OCP's HQ and support costs; these arguments are unsupported by evidence. For instance, Mosaic asserts that categories of costs, such as costs of raw materials, should be included in the sum of site costs because OCP includes similar types of costs in HQ and support. Mosaic Br. at 27 (citing to OCP IQR at Ex. MIN-18 (P.R. 76, 80; C.R. 8, 16)). Notably, the exhibit to which Mosaic cites does not even mention raw materials, let alone establish that any raw material costs booked to HQ and support are similar to those costs booked to the industrial sites.

In any event, Mosaic's argument for including raw material costs in the sum of site costs is directly contradicted by the evidence. Because world market prices for raw materials are volatile, OCP's raw material costs experience similar volatility. *See* OCP IQR at Ex. GEN-8(j), pp.13, 20–21 (P.R. 76–77; C.R. 8, 11) (discussing volatility in the price of raw materials consumed by OCP, such as sulfur, sulfuric acid, and ammonia). Mosaic offers no explanation or evidence why it would be appropriate for Commerce to assume that OCP's production sites benefit from OCP's HQ and support spending at similarly volatile levels. Commerce considered and properly rejected this and other arguments Mosaic raised regarding the allocation of HQ and support costs. *See also* IDM at 31 (P.R. 370) (noting and rejecting Mosaic's argument that "{t}he allocation proposed by OCP for its HQ and Support costs . . . is distortive").

Mosaic also argues that Commerce inappropriately excluded international freight charges—such as ocean freight—and financial expenses from the sum of site costs which Commerce used to allocate OCP's HQ and support costs.[3] Mosaic Br. at 27. With respect to

---

[3] While Mosaic refers to these expenses as simply "freight," the record is clear that these expenses are comprised of international freight charges. *See* OCP SQR2 at 14–15 (P.R. 163; C.R. 156)

international freight, Mosaic's argument is fundamentally flawed because both the rock benchmark price as well as the constructed government price for rock are both ***exclusive*** of international freight charges. *See* OCP IQR at Ex. MIN-12(b) (P.R. 76, 80; C.R. 8, 15) (calculating OCP's HQ and support costs and subtracting "Freight" and "Freight (demurrage)"); Final Calculations at Att. 1, Tab "RockBenchmark" (P.R. 371; C.R. 408–09) (including only FOB prices); OCP Second Supplemental Questionnaire Response (Dec. 7, 2022) ("OCP SQR2") at 14–15 (P.R. 163; C.R. 156) (explaining OCP excluded international freight charges such as ocean freight from its COP buildup for rock). Indeed, this Court has affirmed Commerce's exclusion of international freight charges from the rock benchmark price. *Mosaic I* at 1309.

Similarly, with respect to the exclusion of financial expenses, Mosaic's argument overlooks that these exact same financial expenses are also ***excluded*** from the site costs included in the constructed government price for rock. *See* OCP IQR at Ex. MIN-3 (P.R. 76, 80; C.R. 8, 15) (calculating site costs in row 91 by adding certain cost items together but ***not*** including financial expenses). Thus, there is no basis to include international freight or financial expenses in the sum of site costs Commerce uses to allocate HQ and support costs.

Ultimately, Commerce supported its decision to allocate OCP's HQ and support costs on the basis of site costs exclusive of certain cost items with substantial evidence demonstrating that OCP incurs both HQ and support costs and site costs in support of OCP's day-to-day operations. In contrast, Mosaic's arguments are contradicted by the evidence. Commerce's allocation of OCP's HQ and support costs should be affirmed by this Court.

### D.     Mosaic's Argument that Commerce Should Not Allocate OCP's Debt Costs Based on Capital Expenditures Is Contradicted by the Record Evidence.

Distinct from Commerce's allocation of OCP's HQ and support costs based on site costs, Commerce determines the portion of OCP's debt costs to include the COP buildup for phosphate

rock using an allocation appropriately based on each production site's share of capital expenditures. This allocation is supported by substantial evidence demonstrating that OCP incurs debt costs to fund these capital expenditures. *See* IDM at 35 (P.R. 370) (citing to OCP IQR at 84, Ex. MIN-12, Ex. MIN-15 (P.R. 76, 80; C.R. 8, 15). Despite the clear record evidence, Mosaic seeks to argue that the evidence fails to support this allocation. Moreover, and for the same reasons identified above for OCP's HQ and support costs, Mosaic failed to exhaust administrative remedies with respect to proposing alternative allocation methodologies for OCP's debt costs. *See supra* Argument Section I.C. The Court should reject Mosaic's argument and affirm Commerce's allocation of OCP's debt costs based on capital expenditures.

Mosaic argues that Commerce should not have allocated debt costs based on each production site's relative share of OCP's capital expenditures because "OCP did not issue debt solely to fund capital expenditures" but allegedly "also uses debt to fund general corporate activities." Mosaic Br. at 27. However, the exhibit to which Mosaic cites directly contradicts this claim and shows that OCP's general corporate purposes included financing capital expenditures. *See id.* (citing to OCP IQR at Ex. MIN-15, p.97 (P.R. 76, 80; C.R. 8, 15) (explaining that "general corporate purposes" include "financing capital expenditures")). Moreover, the record demonstrates that OCP is engaged in a capital-intensive business that must issue debt to fund its capital expenditures. OCP IQR at 84 (P.R. 76; C.R. 8); *see also id.* at Ex. MIN-12(b) (P.R. 80; C.R. 15) (reporting site-specific capital expenditures over the AUL totaling over [          ]); *id.* at Ex. MIN-12(a) (P.R. 80; C.R. 15) (reporting debt costs during the POR of [          ]). The record also establishes that "{t}he financing and debt costs associated with OCP's mining operations primarily represent interest expenses on loans it has used to fund capital improvements associated with its mining operations." *Id.* at 84 (citing Ex.

MIN-15) (P.R. 76, 80; C.R. 8, 15). Accordingly, Commerce's allocation of debt costs based on each production site's relative share of capital expenditures is fully supported by the record evidence.

Mosaic also attacks Commerce's choice not to offset OCP's debt costs with any financial income. Mosaic Br. at 25. Yet, Mosaic fails to identify the purported financial income that should be used to offset OCP's debt costs, or why such income should be used to offset costs where, as is the case here, Commerce is constructing a buildup of the ***costs*** to produce phosphate rock. IDM at 33 (P.R. 370) ("When performing the cost build-up, we will take into consideration the relevant production costs associated with producing and pricing the phosphate rock."). Thus, Commerce correctly rejected Mosaic's argument in the *Final Results*. *See* IDM at 36, n.220 (P.R. 370) (explaining that "the petitioner fails to substantiate its claim that OCP's method of allocation was distortive," and citing this Court's holding that Commerce may reject speculative assertions). Accordingly, Mosaic's challenge should be rejected, and this Court should affirm Commerce's allocation of OCP's debt costs based on capital expenditures.

## II. Commerce's Selection of Phosphate Rock Benchmark Prices is Supported by Substantial Evidence and Otherwise in Accordance with Law.

Mosaic's arguments that Commerce should have excluded from the benchmark price calculation certain world market prices from Egypt, China, and Syria, while including prices from [                    ] are directly contradicted by the evidence and agency practice, and are also contrary to law. Accordingly, the Court should reject Mosaic's claims and affirm Commerce's selection of phosphate rock prices for inclusion in the benchmark.[4]

---

[4] *See* OCP Complaint (May 12, 2021) at 11–12 (Count Six), ECF No. 12 (while OCP is not currently challenging Commerce's mining rights methodology because the agency calculated no benefit for mining rights in the instant review, OCP has reserved its right to raise claims in this (continued…)

A.    **Mosaic's Argument to Exclude Prices for Rock from China and Syria from the Benchmark Calculation Is Contradicted by the Evidence and Commerce Practice.**

Mosaic claims Commerce failed to meaningfully address evidence purportedly showing that Chinese and Syrian phosphate rock export prices were distorted and should therefore have been excluded from the benchmark price calculation. Contrary to Mosaic's claims, Commerce explicitly assessed Mosaic's arguments in the *Final Results* and rejected those arguments on the grounds that Mosaic:

> failed to point to market dynamics in the destination countries for the exports in question that would lead to a finding of distortion, nor has it provided sufficient information to support that argument that government influence in these respective countries is causing ***export prices*** to other markets to be distorted.

IDM at 28 (P.R. 370) (emphasis in original); *see also id.* at 24, n.122–24 (P.R. 370). As explained below, Commerce's rejection of Mosaic's argument is fully supported by record evidence.

The market Commerce evaluates for measuring the adequacy of remuneration for the provision of phosphate mining rights is the world market for phosphate rock. PDM at 9–11 (P.R. 265); Prelim Calc Memo at 3 (P.R. 261; C.R. 260). The question before Commerce was therefore whether evidence demonstrated that the allegedly distortive measures identified by Mosaic in China and Syria resulted in distortions to the ***export prices on the world market*** for phosphate rock. IDM at 28 (P.R. 370); PDM at 10–11 (P.R. 265); Prelim Calc Memo at 2–3 (P.R. 261; C.R. 260). As Commerce confirmed, the evidence does not demonstrate any such distortions. IDM at 28 (P.R. 370). Rather, the measures Mosaic identified are purported government actions within or targeting the ***domestic*** markets of China and Syria. Mosaic

---

action related to Commerce's mining rights methodology depending on the disposition of Mosaic's mining rights claims, including any remand).

Benchmark Rebuttal Submission (Apr. 5, 2023) ("Mosaic Benchmark Rebuttal") at 2–4, Exs. 1-5 (China), Exs. 10–13 (Syria) (P.R. 227; C.R. 215).

OCP agrees with the Government's response that Mosaic has failed to provide sufficient evidence demonstrating that **export** prices from China were distorted. Gov't Resp. at 38. In addition, Commerce has explained in prior cases that export taxes and bans affect **domestic**, and not **export**, prices. *See, e.g., Coated Free Sheet Paper from Indonesia: Final Affirmative CVD Determination*, 72 Fed. Reg. 60,642 (Oct. 25, 2007) and accompanying IDM at 29–30 (finding that an export ban on logs reduced the price of domestically sold logs). OCP also agrees with the Government that *Rebar from Turkey* is inapposite because there is no showing here that the market dynamics of Chinese exports are similar to those in that case, which resulted from Russia's predominance in the natural gas sector. Gov't Resp. at 38–39 (citing Mosaic Br. at 29).

OCP also agrees with the Government's response to Mosaic's argument that government sanctions have made Syrian goods "toxic," resulting in "secretive trade in cheap Syrian phosphate exports." Mosaic Br. at 30. The Government correctly explains that Mosaic's evidence, amounting to a "single offhand statement," is plainly inadequate to demonstrate that Syrian export prices are distorted. Gov't Resp. at 39–40. Furthermore, given the methodology used to collect the Syrian price data included in the benchmark calculation, such purportedly "secretive" sales would not have been included in these pricing data. *See* OCP NFI Submission at Ex. NFI-6, p.2 (P.R. 202–03; C.R. 203–04) (explaining that pricing information "must be considered reliable and accurate by Profercy . . . {and} will be checked with multiple participants in the market"). Indeed, Mosaic's reliance on an article focusing on one alleged shipment that took place in 2022 would suggest that, to the extent they existed at all, any such secretive sales occurred after the POR.

As Commerce's explained in the *Final Results*, the agency fully considered Mosaic's arguments and correctly determined—based on the evidence—that Chinese and Syrian export prices should remain in the benchmark calculation because these prices "provide a reasonable measure of world prices for phosphate rock, and not domestic prices." IDM at 27–28 (P.R. 370). Moreover, Commerce has previously explained that the mere fact that ***domestic*** market distortions may exist does not provide a basis to find that ***export*** prices from that market are distorted. *CVD Investigation of Fine Denier Polyester Staple Fiber from the People's Republic of China: Final Affirmative Determination*, 83 Fed. Reg. 3120 (Jan. 23, 2018), and accompanying IDM at 35 (finding that even where domestic prices are distorted, export prices from that market would reflect the "commercial realities on the world market for such goods or services"). Thus, Commerce's inclusion of Chinese and Syrian export prices in the benchmark calculation is supported by substantial record evidence, consistent with agency practice, and should be affirmed.

**B.      Mosaic's Arguments to Exclude Egypt Rock Prices from the Benchmark Calculation Have Already Been Rejected by this Court and Continue to Be Unsupported by Record Evidence.**

Mosaic repeats its same claim—previously made in the Investigation litigation—that world market prices for phosphate rock from Egypt should be excluded from the benchmark calculation because of purported impurities in Egyptian rock that affect price. This Court rejected this argument, finding it "unconvincing," and concluding Commerce "could have regarded" the evidence relied upon by Mosaic "as having little if any probativity on the issue presented." *Mosaic I*, 659 F. Supp. 3d at 1308. Because Mosaic simply repeats this argument, relying on the same defective evidence it cited in the Investigation litigation, and offers no new grounds on which the Court should reconsider its prior holding, the Court should again reject

Mosaic's claims.  *Compare* Mosaic Br. at 32 (quoting 2017 CRU Report submitted in Mosaic Benchmark Rebuttal at Ex. 6 (P.R. 227; C.R. 215)), *with Mosaic I*, 659 F. Supp. 3d at 1308–09 (discussing the same 2017 CRU Report).

Commerce considered Mosaic's argument in the instant review, analyzed the evidence relied on by Mosaic, and correctly determined that it did not support the exclusion of prices for Egyptian phosphate rock with similar BPL content to OCP's phosphate rock from the benchmark calculation.  IDM at 28 (P.R. 370).  Commerce specifically rejected Mosaic's assertion that the price of Egyptian rock was determined by MER as insufficiently supported by factual evidence. *Id.*  Commerce also found that Mosaic failed to demonstrate that any differences existed between the MER of the Egyptian rock included in the benchmark price calculation and OCP's rock.  *Id.*

Commerce's determination was correct:  Mosaic failed to adduce any evidence that purported MER impurities affected Egyptian rock world market prices.  To the contrary, the evidence confirms that BPL content is the ***only*** characteristic on which the submitted world market pricing data are delineated.  *See, e.g.*, OCP NFI Submission at Exs. NFI-1–NFI-3 (P.R. 202–03; C.R. 203–04); OCP RFI Submission at Ex. RFI-8(a) at 2 (explaining that phosphate rock is graded according to P2O5) (P.R. 122–23; C.R. 136,141); OCP Verification Exhibits (Sept. 15, 2023) at Ex. VE-15, p.2 ("BPL . . . is the primary driver of the price of phosphate rock.") (P.R. 346; C.R. 312, 360).

Moreover, Mosaic's assertion that the prices for Egyptian phosphate rock included in the benchmark calculation correspond to rock of a lower quality than the rock produced by OCP in 2021 lacks any support in the record.  Mosaic cites to a single 2011 American Chamber of Commerce article that focuses on one Egyptian mine producing low grade phosphate rock with

24% to 26% P2O5 (which converts to ***52.45% to 56.82%*** BPL)[5] to argue that the prices in the benchmark calculation are for Egyptian rock of a lower quality than OCP's rock. Mosaic Br. at 32. Importantly, the phosphate rock prices from Egypt that Commerce included in the benchmark price calculation are for rock with a BPL content ranging from [          ]. Final Calculations at Att. I, Tab "RockBenchmark." (P.R. 371; C.R. 408–09). Thus, ***the world market prices in the benchmark calculation are for Egyptian rock that is demonstrably not the same as the rock discussed in Mosaic's article*** with a much lower BPL content. Furthermore, this article was published in 2011, meaning it applies to rock from a decade before the rock on which the 2021 Egypt world market prices are based.

Relying on *Circular Welded Carbon Steel Pipes and Tubes from Turkey* ("*CWP from Turkey*"), Mosaic argues that the prices for Egyptian rock should be excluded from the benchmark calculation because the record demonstrates that the purported impurities in this rock make it extremely difficult or impossible to use this rock for certain downstream application. Mosaic Br. at 31–32. OCP agrees with the Government's response that *CWP from Turkey* is inapposite because in that case there was evidence distinguishing the respondent's input purchases between comparable and non-comparable grades of the relevant input whereas no such evidence exists here with respect to MER levels of the relevant rock. Gov't Resp. at 42–43 (citing Mosaic Br. at 31). Additionally, *CWP from Turkey* is distinguishable because evidence in that case confirmed that certain grades of the input were used to produce non-subject merchandise. *CWP from Turkey: Final Results of CVD Administrative Review, Calendar Year*

---

[5] P2O5 content converts to BPL content based on the uncontested 2.1853 conversion factor. *See, e.g.,* Mosaic Benchmark Submission (Mar. 22, 2023) at Ex. 4(a), p.7 (P.R. 191; C.R. 197).

*2018*, 86 Fed. Reg. 6866 (Jan. 25, 2021), and accompanying IDM at 14–15 & n.64.  No such

evidence exists here.

As it did in the Investigation litigation, this Court should once again affirm Commerce's

inclusion of prices for Egyptian rock in the benchmark calculation.

### C.    Mosaic's Arguments to Include Phosphate Rock Prices from [       ] in the Benchmark Calculation are Not Support by Record Evidence and Contrary to Law.

Mosaic argues that Commerce improperly excluded from the phosphate rock benchmark

calculation prices from [                    ] and "provided no explanation whatsoever in the *Final*

*Results*" for doing so.  Mosaic's argument is demonstrably false, unsupported by the record

evidence, and otherwise contrary to law.  Mosaic Br. at 33–34.

In the instant review, as in the Investigation, Commerce selected world market prices for

inclusion in the benchmark price calculation based on a BPL range that was set, at the lower end,

by the average BPL of OCP's rock consumed locally in 2021 (*e.g.*, for fertilizer production), and

at the higher end by the average BPL content of rock OCP produced for export in 2021.  Prelim

Calc Memo at 3 (P.R. 261; C.R. 260); OCP IQR at 90 (P.R. 76; C.R. 8).  The average BPL

content of OCP's rock for local consumption and export were reported in OCP's normal books

and records and verified by Commerce, resulting in Commerce using a BPL range of [

] to select world market prices for rock with similar BPL content for inclusion in the

benchmark price calculation.  Prelim Calc Memo at 3 (P.R. 261; C.R. 260); OCP IQR at 90 (P.R.

76; C.R. 8); OCP Verification Report at 4–5 (P.R. 349; C.R. 399); and OCP Verification

Exhibits at Ex. VE-1(h) (P.R. 346; C.R. 320–23).

Notwithstanding this verified evidence, Mosaic argues that Commerce should have

included in the benchmark price calculation prices for rock from [                 ] with a BPL

content of [                    ] based on an erroneous claim that "phosphate rock locally

consumed and exported by OCP has a BPL of up to, and potentially exceeding, 78 percent."

Mosaic Br. at 33; *see also* OCP NFI Submission at Ex. NFI-3 (for BPL content of rock from

[                    ]) (P.R. 202–03; C.R. 203–04).[6]  To support this claim, Mosaic relies on a

single chart published on the internet long before the POR, which discusses—at a general

level—the BPL content of rock that OCP ***may*** be capable of producing for export.  Mosaic Br. at

33 (citing Mosaic Deficiency Comments on the GOM's and OCP's Initial CVD Questionnaire

Responses (Sept. 13, 2022) ("Mosaic IQR Deficiency Comments") at Ex. 7 (P.R. 110; C.R. 118).

As explained above, however, the BPL range set by Commerce was based on detailed

information from OCP's books and records regarding phosphate rock that OCP ***actually***

***produced during the POR***.  Accordingly, Commerce correctly rejected Mosaic's argument that

the agency should have set the BPL range higher to include rock prices from [                    ]

in the benchmark price calculation.

Mosaic is also wrong to assert that Commerce provided no explanation for excluding

rock prices from [                    ] from the benchmark calculation.  Commerce provided a

thorough explanation of its decision in a separate business proprietary memorandum

incorporated by reference in the IDM.  BPI IDM at 3–5 (P.R. 372; C.R. 410).  Commerce

explained that Mosaic's argument had no merit because the BPL content of phosphate rock from

[                    ] is outside the established range used to construct the benchmark price.  IDM

at 1, 23–24 (P.R. 370); BPI IDM at 4–5 (P.R. 372; C.R. 410).  Commerce also explained that it

did not find a page from OCP's website listing phosphate rock with BPL content as high as 75%

---

[6] The BPL content for [                    ] is calculated by multiplying the P2O5 content by the
conversion factor of 2.1853.

probative for purposes of establishing the BPL range because it used "OCP's reported and verified data to construct an average BPL content of OCP's phosphate rock" for the POR. BPI IDM at 5 (P.R. 372; C.R. 410). Commerce's decision in the instant review is entirely consistent with its treatment of the same argument in the Investigation phase of this proceeding. *Phosphate Fertilizers from the Kingdom of Morocco: Final Affirmative CVD Determination*, 86 Fed. Reg. 9482 (Feb. 16, 2021) and accompanying IDM ("INV IDM") at 17–18.

Mosaic's argument is also contrary to law. Under the CVD law, Commerce is required to account for the market conditions when evaluating the adequacy of remuneration. 19 U.S.C. § 1677(5)(E). Here, Commerce uses the BPL range to select world market prices for phosphate rock with a similar BPL content to the rock OCP produced during the 2021 POR. Prelim Calc Memo at 3; IDM at 27. By using the BPL content of rock OCP produced during the POR, Commerce is taking into account the market conditions for phosphate rock as required under the CVD law. 19 U.S.C. § 1677(5)(E). As discussed above, verified evidence derived from OCP's books and records demonstrates that, during the POR, the average BPL content of rock for local consumption was [        ] and for export was [        ]. OCP Verification Report at 4–5 (P.R. 349; C.R. 399); OCP Verification Exhibits at Ex. VE-1(h) (P.R. 346; C.R. 312, 320–23). In contrast, the webpage relied on by Mosaic predates the POR and consists of rock with BPL content materially different than the rock OCP produced during the POR. *See* INV IDM at 17; BPI IDM at 5 (P.R. 372; C.R. 410). Selecting world market prices based on such general, stale, and inconsistent information would fail to take into account the market conditions for phosphate rock and thus would be contrary to law.

Mosaic also argues that OCP's reported average BPL content of rock for "expedited" rock did not cover "all rock extracted during the POR." Mosaic Br. at 34. The verified evidence

demonstrates that "expedited" rock "refers to all phosphate rock that is beneficiated and consumed locally or exported" and that this "constitutes the vast majority of OCP's production," accounting for over 99% of OCP's production. OCP IQR at 90, n.94 (P.R. 76; C.R. 8); OCP SQR2 at 5–13 (P.R. 163; C.R. 156); OCP's Verification Exhibits at Ex. VE-8 (reconciling OCP's total reported extracted rock with OCP's annual production reports) (P.R. 346; C.R. 312, 349–52); OCP's Verification Report at 9 (explaining that Commerce observed no discrepancies when it reviewed OCP's production reports derived from OCP's production system when verifying the total volume of phosphate ore extracted from OCP's mines) (P.R. 349; C.R. 399). Thus, Mosaic's argument is directly contradicted by the evidence and must be rejected.

Commerce's determination to exclude phosphate rock prices from [          ] was thus based on substantial record evidence and otherwise in accordance with law. This Court should accordingly affirm Commerce's determination in the *Final Results* not to expand the BPL range to include phosphate rock prices from [          ] in the benchmark calculation.

## III. Commerce's Determination that ANP Conferred No Benefit on OCP Is Supported by Substantial Evidence and Otherwise in Accordance with Law.

Mosaic argues that Commerce's determination that ANP set the prices for OCP's concession agreements consistent with market principles was arbitrary and unsupported by the evidence because Commerce purportedly: (1) gave undue weight to ANP's profitability and did not sufficiently explain its analysis of how ANP [

] in setting its concession fees; (2) ignored evidence that [

]; and (3) disregarded arguments and evidence that ANP [

]. Mosaic Br. at 34–45. As explained below, Mosaic's arguments must be rejected because they misrepresent Commerce's determination, agency practice, and the decisions of this Court.

A.    **Mosaic Mischaracterizes Commerce's Determination in Arguing Commerce Gave Undue Weight to ANP's Profitability.**

Mosaic does not contest that ANP was profitable during the POR in its brief. *Id.* Indeed,

Commerce verified that [                                                                    ] were profitable during

the POR. PPM at 6 (P.R. 351; C.R. 401); *see* GOM Verification Report at 5 (P.R. 350;

C.R. 400). Instead, Mosaic argues that Commerce placed undue weight on ANP's profitability

in determining that ANP set OCP's prices in accordance with market principles. Mosaic. Br.

at 35. Mosaic also asserts that Commerce failed to provide a meaningful explanation for its

determination and failed to address certain contrary evidence. *Id.* at 35–36. Mosaic's arguments

must be rejected because they are based on obvious mischaracterizations of Commerce's

determination and agency practice.

OCP agrees with the Government's response that Commerce did not rely solely on

ANP's profitability in determining that ANP's prices were set in accordance with market

principles, and that Mosaic failed to raise this argument in the administrative proceedings. Gov't

Resp. at 64. In fact, Commerce comprehensively considered multiple factors that include, for

example: ANP's price-setting philosophy for concessions agreements; any costs borne by ANP

(*e.g.*, terminal infrastructure, dredging, common area maintenance); fees agreed upon between

ANP and other concession-holders following competitive bidding; and the prospective

concession-holder's business plan. PPM at 5 (P.R. 351; C.R. 401). Commerce also considered

that "ANP's [

                                                                    ], because [

                                                                    ]," and any alleged differences between

the concession fees that OCP and other concessionaires pay could be explained by ANP's

"[                         ]" in connection with the OCP concessions. *Id.* at 5–6 (P.R. 351; C.R. 401).

In any event and contrary to Mosaic's argument, neither Commerce's regulations nor its practice requires the agency to consider evidence beyond that showing that ANP's prices charged to OCP were [                                                    ].  Commerce's regulations prescribe no particular evidence the agency must consider in determining whether a price is set in accordance with market principles.  *See* 19 C.F.R. § 351.511(a)(2)(iii).  The preamble to Commerce's regulations explains that the agency may consider factors such as the government's price setting philosophy and costs (including rates of return sufficient to ensure future operations), and explicitly states that Commerce "may rely on ***one*** or more of these factors in any particular case."  *See Countervailing Duties; Final Rule*, 63 Fed. Reg. 65,348, 65,378 (Nov. 25, 1998) ("*Preamble*") (emphasis added).

Consistent with the *Preamble*, when determining that government prices are set in accordance with market principles, Commerce regularly relies on evidence showing such prices are sufficient to permit the recovery of costs and generate a profit.  *See, e.g., Biodiesel From the Republic of Argentina: Final Affirmative CVD Determination*, 82 Fed. Reg. 53,477 (Nov. 16, 2017), and accompanying IDM at 20–21 (explaining that the tripling of an export tax on soybeans kept Argentina's domestic soybean prices artificially low relative to the world market soybean price); *Certain Carbon and Alloy Steel Cut-to-Length Plate From the Republic of Korea: Final Results and Partial Recission of CVD Administrative Review, 2019*, 87 Fed. Reg. 6,842 (Feb. 7, 2022) and accompanying IDM at 22 (explaining Commerce's "well-established" approach under 19 C.F.R. § 351.511(a)(2)(iii) is to evaluate if prices charged by the government allow for cost-recovery plus a rate of profit); *Certain Cold-Rolled Steel Flat Products From the Republic of Korea: Final Results of CVD Administrative Review, 2019*, 87 Fed. Reg. 20,821 (Apr. 8, 2022), and accompanying IDM at 20–22 (same); *Large Diameter Welded Pipe From the*

*Republic of Korea: Final Results of CVD Administrative Review, 2018–2019*, 87 Fed. Reg. 5,780 (Feb. 2, 2022), and accompanying IDM at 17–18 (same); *see also Nucor Corp. v. United States*, 633 F. Supp. 3d 1302, 1306, 1310–11 (Ct. Int'l Trade 2023) (affirming Commerce's practice of determining that prices charged by a government entity to a respondent are consistent with market principles where the prices are sufficient to allow the government entity to recover costs and earn a profit).

OCP further agrees with the Government's argument that Mosaic's reliance on *Wind Towers from Malaysia* is misplaced because, in that case, Commerce found the record was incomplete with respect to cost and profit information. Gov't Resp. at 65. This is in contrast to the instant review, where Commerce had robust and ***verified*** cost and profit information to evaluate the prices ANP charged to OCP. *See, e.g.,* PPM at 5–6 (P.R. 351; C.R. 401) (explaining that "the GOM did provide total cost and total revenue data on a port-by-port basis as maintained in ANP's normal accounting books and records"); GOM Verification Report at 3–5 (P.R. 350; C.R. 400) (verifying ANP's operating costs and revenue data, financial statements, and port-specific accounting information).

Mosaic further asserts that Commerce relied on "conclusory assertions" and failed to provide a meaningful explanation for its determination that [

] when it sets prices. Mosaic Br. at 35–36. Mosaic is incorrect. Commerce examined the record evidence and articulated a clear connection between that evidence and its determination that ANP charged prices to OCP that covered ANP's costs and generated a profit. *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1282 (Fed. Cir. 2004) (requiring that Commerce articulate "rational connection between the facts found and the choice made"). For example, Commerce:

- noted ANP negotiated contracts according to normal market conditions, taking account of costs borne by ANP, fees agreed between ANP and other concession-holders after competitive bidding, and prospective concessionaires' business plans.  PPM at 5 (P.R. 351; C.R. 401);

- considered that ANP negotiated [                                        ] were sufficient to cover ANP's costs and produce a profit.  *Id.* at 5 (P.R. 351; C.R. 401);

- explained that ANP's profitability [                              ] where ANP reasonably anticipated incurring [               ] because OCP [

                                    ].  *Id.* at 5 (P.R. 351; C.R. 401);

- explained that ANP negotiated fees based on [                        ] such that ANP could charge substantially higher concession fees than if it were to tether those fees to its own profitability.  *Id.* at 5–6 (P.R. 351; C.R. 401);

- noted that ANP reported an operating profit and net profit during the POR.  *Id.* at 6 (P.R. 351; C.R. 401).

Mosaic further argues that Commerce failed to address supposedly contrary evidence identified by Mosaic including that:  (1) the [               ] submitted by the GOM accounted for OCP's rate of return, rather than ANP's; (2) ANP relied on a [

                        ] which considered profitability from the perspective of the concessionaire; and (3) there was a purported lack of contemporaneous evidence to support the GOM's assertion that [

            ].  Mosaic Br. at 36–38.  Mosaic once again mischaracterizes Commerce's determination.

Commerce explicitly considered that ANP's [

                        ] allowed ANP to set higher concession fees, because "given ANP's [               ] as a result of these concession agreements, tethering the level of concession fees to ANP's profitability would result in substantially lower concession fees."  PPM at 5–6 (P.R. 351; C.R. 401).  For this reason, Commerce recognized that ANP relied

on [

].  *Id.* at 6 (P.R. 351; C.R. 401).

In any event, Commerce is not required to address every argument raised by Mosaic.  *See* Uruguay Round Agreements Act: Statement of Administrative Action, H.R. Doc. No. 103–316, at 892 (1994) (requiring Commerce to discuss material issues so the path of the agency may be reasonably discerned).  OCP agrees with and adopts by reference the Government's argument that Mosaic has no basis for assuming that evidence of [

] is even relevant to the determination.  *See* Gov't Resp. at 61.

**B.      Mosaic's Argument that ANP Agreed to [                                        ] Is
          Contradicted by the Record Evidence.**

Mosaic asserts that Commerce failed to address its argument that the mix of [

] OCP paid to ANP demonstrates that ANP [

].  Mosaic Br. at 38–39.  Mosaic's arguments are premised on [        ] that allegedly show that ANP [                                                    ] with OCP.  *See id.*  According to Mosaic, the result of these negotiations was that OCP's payments to ANP [

].  *Id.* at 40.  The evidence shows that Mosaic is simply incorrect.

The [        ] that Mosaic cites establish merely that ANP and OCP engaged in [

]; they do not demonstrate ANP [

].  *See* GOM NSA Supplemental Questionnaire Response (June 30, 2023) ("GOM NSA SQR") at Ex. SUPP-PORT-2 (P.R. 303–04; C.R. 268–69).  Moreover, Mosaic's argument that OCP was [

] is directly contradicted by record evidence.  In 2021, OCP paid

[

] at this port.[7]  *See* OCP NSA SQR at

Ex. PORT2-1(b) (showing [

]) (P.R. 308; C.R. 286).  In addition, OCP paid [

].  *Id.* at Ex. PORT2-1(a) (showing payment of [

]) (P.R. 308; C.R. 285).  Considering OCP's

total payments to ANP made under all three concession agreements in 2021, OCP paid [

] and was in no way [

].  *See id.* at Ex. PORT2-1 (in 2021 OCP paid ANP a total of [

]) (P.R. 308; C.R. 285–87).

In any event, the percentage of [                                    ] OCP paid to ANP during the

POR is not material to Commerce's determination because the agency does not evaluate the price

ANP charged OCP based on [                                              ].  Instead, Commerce is

required to evaluate the ***totality*** of remuneration paid—the total of [                          ] OCP

paid to ANP.  *See, e.g.*, *Hyundai Steel v. United States*, Ct. No. 21-304, 2023 WL 6240149, at

*3–*4 (Ct. Int'l Trade Sept. 26, 2023) (requiring Commerce to consider the port construction

costs that Hyundai incurred in evaluating the total remuneration paid).  Thus, whether OCP paid

more or less [                                    ] to ANP is not, itself, material to whether ANP

charged OCP prices consistent with market principles, and Commerce was therefore not required

to explicitly address this issue.  *See supra* Argument Section III.A.

---

[7] The fee amounts reported by OCP are from ***invoices issued*** in 2021.  *See* OCP NSA QR at 11. The fees reported by the GOM are for ***activities that occurred*** in 2021, regardless of what year the invoice was issued.  *See* GOM NSA SQR2 at 13.  Regardless of the reporting method for these fees, Mosaic's argument that [                                                        ] is directly contradicted by this evidence.

### C. Mosaic Incorrectly Claims Commerce Failed to Address Its Argument that ANP [ ].

Mosaic argues that Commerce failed to address its argument that ANP engaged in [

] in favor of OCP based on evidence that purportedly demonstrated [

].

Mosaic Br. at 40–42. Mosaic's argument must be rejected because it misconstrues Commerce's analysis, and the agency did in fact address this argument.

First, Mosaic's argument fundamentally misconstrues Commerce's analysis of ANP's provision of port services in Morocco. In asking Commerce to compare the prices ANP charged OCP to the prices ANP charged other concession holders in Morocco, Mosaic ignores that Commerce has determined that such in-country prices cannot be used to evaluate the adequacy of remuneration. Commerce explicitly determined that it was conducting a market principles analysis under 19 C.F.R. § 351.511(a)(2)(iii) because the port service market within Morocco was distorted, and prices for such services in Morocco could not be used to evaluate the adequacy of the remuneration OCP paid to ANP. PPM at 3–4 (P.R. 351; C.R. 401); *see also Certain Cold-Rolled Steel Flat Products from the Republic of Korea: Final Results and Partial Rescission of CVD Administrative Review, 2020*, 88 Fed. Reg. 21,606 (Apr. 11, 2023), and accompanying IDM at 72 (explaining that a 19 C.F.R. § 351.511(a)(2)(iii) "analysis is not to conduct a preferentiality or price discrimination analysis, but, rather, to understand the methodology used to develop {the prices} and whether the rates that are charged . . . are consistent with market principles").

Furthermore, Commerce ***did*** address Mosaic's arguments regarding ANP's [

]. Based on a careful consideration of verified evidence, Commerce found that it could not compare OCP's fees paid to ANP to the fees paid by other

concessionaires to ANP because "the multifaceted considerations underlying each concession agreement make it ***impossible*** to reasonably compare concession agreements on a fee-to-fee basis."  PPM at 5 (P.R. 351; C.R. 401) (emphasis added); *see* GOM Verification Report at 7 (noting that "each terminal is separate and distinct" with "unique equipment and configurations at each terminal based on the nature of the cargo") (P.R. 350; C.R. 400).

Differences between [

] further illustrate that Mosaic's proposed comparison is impossible, as Commerce correctly determined.[8]  *See* PPM at 5 (P.R. 350; C.R. 400).  For example, while OCP invested in the [                                                                                          ] at each port it operates,

[                                                    ] did not.  *See* GOM NSA Second Supplemental Questionnaire Response (Aug. 28, 2023) ("GOM NSA SQR2") at 6, 9 (P.R. 335; C.R. 298).  In addition, [                        ] shipped dramatically different volumes through ANP.  *See* GOM Verification Exhibits at Ex. 1A, p.7 (OCP shipped [

] at the Port of Casablanca in 2021) (C.R. 365); GOM NSA SQR2 at 9 (noting differing traffic projections for different concessionaires) (P.R. 335; C.R. 298).

Despite these fundamental differences across concession agreements, Mosaic argues that the record to which it cited in its case brief before the agency (but not before this Court) purportedly demonstrated that [

].  Mosaic

---

[8] The Court should also disregard Mosaic's argument that the [
                                                    ] suggests ANP was cross-subsidizing OCP.
Mosaic Br. at 36 n.4.  Mosaic failed to exhaust administrative remedies by declining to raise this argument during the administrative proceeding.  *See Boomerang Tube, LLC, TMK IPSCO v. United States*, 856 F.3d 908, 912-13 (Fed. Cir. 2017) (requiring arguments to be exhausted before Commerce).

Br. at 41–42 (*citing* Mosaic Case Br. 23–25).  Mosaic fails to cite to any record evidence before this Court to support its claim, and its argument conflates concessionaires' obligations pertaining to [                                                                     ].  Port "infrastructure" includes items such as new quays and extended piers.  *See, e.g.*, OCP NSA QR at Ex. PORT-2(b), Concession Agreement at Arts. 3.1, 3.2 ([                                                                     ]) (P.R. 244; C.R. 233).  In contrast, port "superstructures" include items such as conveyor belts or weighbridges.  *See id.* at Art 3.2 ([                                                   ]) (P.R. 244; C.R. 233).  Indeed, Commerce verified that [                                                                     ].  *See* PPM at 5 (P.R. 351; C.R. 401); GOM Verification Report at 6 (P.R. 350; C.R. 400).  Thus, the conditions and considerations underlying OCP's concession agreements were, in fact, quite different from those underlying the concessions agreements of other concessionaires and Commerce was correct to reject Mosaic's comparison of fees charged across these agreements.

As demonstrated above, Commerce considered multiple factors and sufficiently explained how ANP [                                                   ] in setting concession fees to OCP.  Evidence regarding the totality of remunerations paid by OCP demonstrates that [                                                   ], and evidence regarding differences among concession agreements refute Mosaic's argument that ANP [                         ].  For these reasons, Mosaic's arguments should be rejected.

## <u>CONCLUSION</u>

For all of these reasons, OCP respectfully requests that the Court deny Mosaic's Rule 56.2 motion for judgment on the agency record in its entirety and sustain the foregoing aspects of Commerce's *Final Results.*

Dated: January 28, 2025

Respectfully submitted,

/s/ William R. Isasi
William R. Isasi
Kathleen McNulty
Edward J. Thomas III
Wanyu Zhang
Julia Shults
**COVINGTON & BURLING LLP**
One CityCenter
850 Tenth Street, N.W.
Washington, D.C. 20001-4956


Micaela McMurrough
Jordan B. Bakst
**COVINGTON & BURLING LLP**
The New York Times Building
620 Eighth Avenue, 42nd Floor
New York, NY 10018

*Counsel to OCP S.A.*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the attached Response Brief of Consolidated Plaintiff and Defendant-Intervenor OCP S.A., filed January 28, 2025, contains 13,575 words, including footnotes, and excluding the table of contents, table of authorities, counsel's signature block, and this certificate, according to the word count function of the word-processing system used to prepare this brief, and therefore complies with the maximum word count limitation set forth in the Court's Standard Chambers Procedures.

/s/ William R. Isasi
William R. Isasi