UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE:  THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| THE MOSAIC COMPANY,<br><br>                    Plaintiff,<br><br>          v.<br><br>UNITED STATES,<br><br>                    Defendant,<br><br>     and<br><br>OCP S.A.,<br><br>                    Defendant-Intervenor,<br><br>     and<br><br>THE GOVERNMENT OF THE KINGDOM OF MOROCCO,<br><br>                    Defendant-Intervenor. | Consol. Court No. 23-00246<br><br>__NON-CONFIDENTIAL VERSION__<br><br>**Business Proprietary Information Removed From Pages i-ii, 2-7, 14-20** |

## __THE MOSAIC COMPANY'S REPLY IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD__

David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Jake A. Laband
Wilmer Cutler Pickering Hale and Dorr
  LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037

March 3, 2025                    *Counsel for The Mosaic Company*

Consol. Court No. 23-00246                      NON-CONFIDENTIAL VERSION

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................1

ARGUMENT .......................................................................................................1

I.   Commerce's Calculation of the Cost Buildup for Phosphate Rock is
     Unlawful ...................................................................................................1

     A.   Commerce's Inclusion of the Entirety of OCP's HQ/Support and
          Debt Costs in the Cost Buildup was Improper............................................1

     B.   Commerce Failed to Address Mosaic's Argument that OCP's
          Proposed Allocation Methodology Arbitrarily Inflated the Cost
          Buildup.....................................................................................................5

     C.   Mosaic Did Not Fail to Exhaust Its Administrative Remedies..................7

II.  Commerce's Selection of Phosphate Rock Benchmark Prices is
     Unlawful ...................................................................................................9

     A.   Defendants' *Post Hoc* Justifications Cannot Cure Commerce's
          Failure to Address Record Evidence Showing that Chinese and
          Syrian Export Prices Are Distorted...........................................................9

     B.   Defendants' *Post Hoc* Justifications Cannot Cure Commerce's
          Failure to Address Record Evidence Indicating that Egyptian
          Export Prices are Distorted .....................................................................12

     C.   Commerce's Failure to Include Prices from Certain Countries That
          Produce Phosphate Rock with Comparable BPL Levels Is Unlawful.....................14

III. Commerce Failed to Address Mosaic's Arguments and Substantial
     Evidence Demonstrating ANP Does Not Set Prices in Accordance With
     Market Principles .....................................................................................16

CONCLUSION....................................................................................................21

BUSINESS PROPRIETARY
INFORMATION DELETED  NON-CONFIDENTIAL VERSION

## TABLE OF AUTHORITIES

Page(s)

**STATUTES**

19 U.S.C. § 1677f(i)(3)(A) ...................................................................................7, 8

**REGULATIONS**

19 C.F.R. § 351.511(a)........................................................................13, 14, 17, 18

**CASES**

*Albemarle Corp. & Subsidiaries v. United States,*
    821 F.3d 1345 (Fed. Cir. 2016)........................................................................12

*Altx, Inc. v. United States,*
    167 F. Supp. 2d 1353 (CIT 2001) ......................................................................7

*Atlantic Sugar, Ltd. v. United States,*
    744 F.2d 1556 (Fed. Cir. 1984)..........................................................................9

*Bethlehem Steel Corp. v. United States,*
    140 F.Supp.2d 1354 (CIT 2001) .....................................................................20

*Committee Overseeing Action for Lumber International Trade Investigations or*
    *Negots. v. United States,* 701 F. Supp. 3d 1334 (CIT 2024)................................8

*Globe Metallurgical Inc. v. United States,*
    781 F.Supp.2d 1340 (CIT 2011) ........................................................................9

*LTV Steel Co. v. United States,*
    985 F. Supp. 95 (CIT 1997)................................................................................8

*Mittal Steel Point Lisas Ltd. v. United States,*
    548 F.3d 1375 (Fed. Cir. 2008).......................................................................18

*Mosaic Co. v. United States,*
    659 F. Supp. 3d 1285 (CIT 2023)......................................................................4

*Motor Vehicle Manufacturers Association of U.S., Inc. v. State Farm Mutual*
    *Automobile Insurance Co.,*
    463 U.S. 29 (1983).....................................................................................20, 21

*NMB Singapore Ltd. v. United States,*
    557 F.3d 1316 (Fed. Cir. 2009)...............................................................7, 12, 21

[
               ] ....................................................................................19

Case 1:23-cv-00246-TCS    Document 83    Filed 03/03/25    Page 4 of 26

Consol. Court No. 23-00246    BUSINESS PROPRIETARY    NON-CONFIDENTIAL VERSION
                              INFORMATION DELETED

[

                                              ] ....................................................................19

*Qingdao Taifa Group Co. v. United States*,
        637 F. Supp. 2d 1231 (CIT 2009) ...................................................9

*RZBC Group Shareholding Co. v. United States*,
        100 F. Supp. 3d 1288 (CIT 2015) .................................................10

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ............................................10

*Shantou Red Garden Foodstuff Co. v. United States*,
        815 F. Supp. 2d 1311 (CIT 2012) ...................................................8

*Timken Co. v. United States*,
        894 F.2d 385 (Fed. Cir. 1990)...........................................3, 4, 9, 14

*Universal Camera Corp. v. NLRB*,
        340 U.S. 474 (1951) ........................................................................9

*Zhengzhou Huachao Industrial Co. v. United States*,
        37 C.I.T. 677 (2013) ........................................................................9

**ADMINISTRATIVE DETERMINATIONS**

*Phosphate Fertilizers From the Kingdom of Morocco: Final Results of
        Countervailing Duty Administrative Review; 2020-2021*, 88 Fed. Reg.
        76,726 (Dep't Commerce Nov. 7, 2023) ................................................. passim

Consol. Court No. 23-00246

## INTRODUCTION

Plaintiff and Consolidated Defendant-Intervenor The Mosaic Company ("Mosaic") respectfully submits this reply brief in support of its Rule 56.2 motion for judgment on the record. This reply brief addresses arguments that the Consolidated-Plaintiff and Defendant-Intervenor OCP, S.A. ("OCP"), Defendant-Intervenor the Government of Morocco ("GOM"), and Defendant, the United States made in their response briefs (collectively, "Defendants"). *See* OCP Resp., ECF No. 64; GOM Resp., ECF No. 61; Def. Resp., ECF No. 57.

As demonstrated below, Defendants fail to rebut Mosaic's arguments that Commerce's *Final Results* are unsupported by substantial evidence and otherwise not in accordance with law. Accordingly, Mosaic respectfully requests that the Court grant its motion for judgment on the agency record and remand to Commerce for redetermination consistent with the Court's opinion.

## ARGUMENT

### I. Commerce's Calculation of the Cost Buildup for Phosphate Rock is Unlawful

#### A. Commerce's Inclusion of the Entirety of OCP's HQ/Support and Debt Costs in the Cost Buildup was Improper

In its *Final Results*, Commerce improperly included the entirety of OCP's HQ/Support and Debt costs in the cost buildup. *Final Results*, P.R. No. 374, ECF No. 24-5, and accompanying Issues and Decision Memorandum, P.R. No. 370, ECF No. 24-4 ("IDM") at Comment 6. Defendant attempts to justify this approach by asserting that an "attempt{} to further segregate OCP's reconciled and verified costs in a manner inconsistent with its accounting methodology would have been unreasonable and extremely complex." Def. Resp. at 48. Defendant's conclusory and results-driven defense of Commerce's approach is meritless. OCP developed its allocation methodology precisely because its normal accounting methodology does not assign such costs to the production of phosphate rock. *See* OCP Initial Questionnaire

- 1 -

Response (Aug. 22, 2022) ("OCP 8/22/22 IQR"), Exhibit GEN-8(j) at 12, P.R. 77, C.R. 11 (demonstrating that "Head Office" activities are tracked separately from production activities). Thus, *any* attempt to assign HQ/Support and Debt costs to the cost buildup – including OCP's own approach – is done "in a manner inconsistent with {OCP's normal} accounting methodology." In light of OCP's departure from its normal accounting methodology, Commerce should have reviewed OCP's approach with a particularly critical eye and confirmed that any cost it was seeking to include in the buildup did, in fact, relate to the production of phosphate rock.

In the *Preliminary Results*, Commerce properly excluded OCP's HQ/Support and Debt costs from the cost buildup. OCP Prelim. Calc. Memo. at 5, P.R. 261, C.R. 260. But in the *Final Results*, Commerce reversed itself and included the entirety of the costs in the buildup.[1] IDM at 33-37. Commerce rationalized this reversal on the grounds that "the record contains evidence that OCP's HQ and Support costs are relevant to OCP's production and pricing of phosphate rock." IDM at 35. In actuality, in light of the record evidence, the most that can reasonably be stated is that some small portion of OCP's HQ/Support costs may relate to the production of phosphate rock. However, there was no such evidence with respect to the vast majority of OCP's reported costs, as Mosaic discussed in its opening brief. *See* Mosaic Br., ECF No. 45, at 16-17.[2]

---

[1] OCP criticizes Mosaic's statement that Commerce included the entirety of its HQ/Support costs in the buildup because Commerce allocated only a portion of the costs to phosphate rock production. OCP Br. at 16. OCP is engaging in semantics. To be clear, Commerce included the entirety of OCP's HQ/Support costs. It then allocated a portion of those costs to phosphate rock production. It did not exclude any amount, such as the [              ]. *See* OCP 9/1/22 IQR at Exhibit GEN-4(a)(iii), P.R. 90, C.R. 78; Mosaic Br. at 23.

[2] This was a result of OCP's decision to submit minimal explanation and documentation in support of its proposed cost buildup. As Mosaic noted in its case brief, OCP failed to provide supporting documentation even after receiving multiple supplemental questionnaires and repeated extensions of time to gather such information. *See* Mosaic Case Br. at 12-14, P.R. 355, C.R. 402.

BUSINESS PROPRIETARY
                    INFORMATION DELETED    NON-CONFIDENTIAL VERSION

In fact, the record shows that [        ] percent of the total HQ/Support costs were associated

with [                                    ], which are *not* relevant to OCP's production and

pricing of phosphate rock.  *See* OCP 4/21/23 TSQR at 11 n.21, Exhibit MIN3-4(a), P.R. 242,

C.R. 222, 226.  Defendant concedes that Commerce failed to address this evidence – which fairly

detracts from the substantiality of the evidence – in the *Final Results*.[3]  Commerce's failure was

unreasonable and renders its decision unsupported by substantial evidence.  *See Timken Co. v.*

*United States*, 894 F.2d 385, 388 (Fed. Cir. 1990) ("The existence of substantial evidence must

be determined in view of the record as a whole, including 'whatever fairly detracts from the

substantiality of the evidence.'").

The Defendants' efforts to rebut Mosaic's arguments fail.  Defendant asserts that

Mosaic's arguments "rely on the faulty premise that Commerce may not include any of OCP's

HQ and support costs in the cost buildup unless OCP would be able to segregate these costs into

those related and unrelated to phosphate rock production . . . "  Def. Resp. at 52.  But this is

precisely what Commerce did, in the opposite direction.  In the *Final Results*, Commerce

determined that as long as there was any evidence that any portion of OCP's HQ/Support costs

related to the production of phosphate rock, it would include the entirety of the HQ/Support costs

in the cost buildup, even if there was evidence demonstrating that significant portions of those

costs had no relation to the production of phosphate rock.

Further, Defendant cites this Court's opinion in *Mosaic I* in support of Commerce's

approach, asserting that "as the Court observed in *Mosaic I*, OCP could not have segregated the

costs in such a manner," because "the{} costs are recorded on a company-wide basis and are not

*directly* tied to production in OCP's accounting methodology."  Def. Resp. at 52 (emphasis

---

[33] *See* Def. Resp. at 48 (stating that "Commerce did not explicitly address {this} specific argument . . . .").

added).  Defendant's argument is a *non sequitur*.  This Court did not hold in *Mosaic I* that Commerce must include the entirety of OCP's HQ and Support costs in the cost buildup even if **[**

**]** portions of the costs are *unrelated* to production activities.  Rather, the Court held that it was unreasonable to exclude *all* of OCP's corporate-wide SG&A costs.  *Mosaic Co. v. United States*, 659 F.Supp.3d 1285, 1301 (CIT 2023) ("*Mosaic I*").

Notably, a significant portion of the HQ/Support costs that OCP incurred in AR1 are not corporate-wide SG&A costs.  Indeed, a **[          ]** portion is not related to OCP's production activities at all – directly or indirectly.  Rather, OCP incurs these costs in connection with its many various business activities that are wholly unrelated to phosphate production.  *See* Mosaic Br. at 17-18.  This evidence fairly detracts from the reasonableness of Commerce's decision to include the entirety of OCP's reported HQ/Support and Debt costs in the cost buildup.  *See Timken Co.*, 894 F.2d at 388.

Defendant cites OCP's assertion that its production of phosphate rock has four phases that "involve distinct and diverse activities involving multiple mining sites, processing facilities, and transportation hubs," and states that OCP "provided descriptions, explanations, and supporting documentation for these *related* costs."  Def. Resp. at 55 (emphasis added).  This argument illustrates the flaw in Commerce's analysis: OCP documented a small amount of costs that arguably are *related* to its phosphates production.  But the record shows that OCP's AR1 HQ/Support costs also include **[          ]** costs that are entirely *unrelated* to phosphate production.  Commerce could have easily segregated costs that the record shows are clearly *unrelated – i.e.*, neither directly nor indirectly related – to OCP's phosphate production activities in a manner consistent with the Court's holding in *Mosaic I*.  Commerce's failure to do so

**BUSINESS PROPRIETARY INFORMATION DELETED**    **NON-CONFIDENTIAL VERSION**

renders its decision unlawful, as it is contrary to prior practice and unsupported by substantial evidence.  *See* Mosaic Br. at 19-21.

### B.    Commerce Failed to Address Mosaic's Argument that OCP's Proposed Allocation Methodology Arbitrarily Inflated the Cost Buildup

The Defendants fail to rebut Mosaic's argument that Commerce unlawfully failed to address Mosaic's arguments about the flaws in OCP's methodology.[4]  In its *Rebuttal Brief* in the underlying proceeding, Mosaic identified two broad categories of flaws that significantly and unjustifiably distorted the total amount of HQ/Support and Debt costs included in the cost buildup.  First, Mosaic argued that OCP included unrelated costs in its calculation of total HQ/Support costs, which artificially inflated the total amount of costs to be allocated.  Mosaic Rebuttal Br. at 11-13, P.R. 362, C.R. 405.  In its response brief, OCP asserts that Commerce could include unrelated costs because "it used an allocation to determine the ***portion*** of these costs to include in the COP buildup."  OCP Resp. at 19.  This argument assumes that the costs were related to one of the two allocation bases – phosphate rock mining or chemical production – in the first place.  However, the record demonstrates that many of these costs relate neither to OCP's phosphate rock mining nor to its chemicals production business units.

Most notably, MAD [                    ], which accounts for [        ] percent of the total HQ/Support costs, is attributable to [                                    ].  OCP 4/21/23 TSQR at 11 n.21, Exhibit MIN3-4(a), P.R. 242, C.R. 222, 226.  This line item consists of non-production related expenses such as [


                                    ].  OCP 9/1/22 IQR at Exhibit GEN-4(a)(iii), P.R. 90, C.R. 78.

These expenses are wholly unrelated ***either to phosphate rock mining or to chemical***

---

[4] As noted above, Defendant concedes as much it its brief.  *See* Def. Resp. at 48.

*production*.  The fact that OCP allocated only a "portion" of these expenses to each business unit does not cure the problem, because there is no justification for apportioning *any* of the expenses to either activity.  Commerce's failure to remove such expenses from the overall pool of HQ/Support costs was unreasonable and contrary to law.  *See* Mosaic Br. at 24-27.

Second, Mosaic argued that OCP developed an allocation basis that assigned a disproportionately large share of the HQ/Support and Debt costs to the cost buildup.  Mosaic Rebuttal Br. at 14-15, P.R. 362, C.R. 405.  For example, OCP allocates costs across the two mining and two chemical production sites on the basis of total site cost.  However, OCP's calculation of total site costs arbitrarily excludes [

].  *See* OCP 8/22/22 IQR, Exhibit MIN-18, P.R. 80, C.R. 16.

OCP argues that its exclusion of the [                    ] is justified because [

].  OCP Resp. at 23.  This is another *non sequitur*.   The record shows that OCP uses the

[                    ] overwhelmingly for chemical production.  [

] are attributable to [                                ], which, according to OCP's own production chart, are exclusively used [                        ].  OCP 8/22/22 IQR, Exhibits GEN-3 and GEN-8(j) at 20, P.R. 77, C.R. 11. Thus, even if it is true that the costs are [          ], this is not a legitimate basis to exclude them from the total site costs.  OCP's results-driven approach dramatically lowers the costs attributed to [

], with minimal effect on those allocated to [                                ], creating an unreasonable bias in its allocations.

These two categories of methodological errors significantly distorted OCP's proposed cost buildup and unjustifiably resulted in a finding of **zero** benefit for the Mining Rights for LTAR program – despite the fact that phosphate rock is the principal raw material input into the

**BUSINESS PROPRIETARY INFORMATION DELETED**    NON-CONFIDENTIAL VERSION

subject merchandise, and that OCP produced **[                    ]** of phosphate rock during the Period of Review ("POR"), which it received effectively for free. *See* Mosaic Br. at 14-15. Commerce unlawfully failed to address these arguments and evidence in its *Final Results*.

The statute requires Commerce to provide "an explanation of the basis for its determination that addresses relevant arguments{} made by interested parties." 19 U.S.C. § 1677f(i)(3)(A). While the agency need not address every argument and piece of evidence, it must address significant arguments and evidence which seriously undermines its reasoning and conclusions. *Altx, Inc. v. United States*, 167 F.Supp.2d 1353, 1359 (CIT 2001). Failure to do so renders its determination unlawful. *See NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1320 (Fed. Cir. 2009). Commerce summarily concluded – without support or justification – that OCP's proposed allocation methodology was reasonable, and it accepted OCP's HQ/Support costs in their entirety, converting the preliminary countervailing duty rate of 13.63 percent *ad valorem* to a final rate of zero. IDM at 36. Commerce did not address any of Mosaic's critiques of OCP's proposed allocation methodology. *Id.* A remand is appropriate for the agency to address the record evidence and provide the explanation necessary for judicial review. *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*, 701 F. Supp. 3d 1334, 1340 (CIT 2024).

### C.    Mosaic Did Not Fail to Exhaust Its Administrative Remedies

In attempting to justify Commerce's failure to assess the deficiencies Mosaic identified, Defendants argue that Mosaic did not substantiate its allegations or suggest an alternative methodology. Def. Resp. at 48-49; OCP Resp. at 21. These arguments are unavailing.

As an initial matter, Mosaic did substantiate its allegations. Mosaic argued at length about the distortions that OCP's allocation methodology introduced into Commerce's

calculations, *see* Mosaic Rebuttal Br. at 5-15, but Commerce failed to address Mosaic's arguments.  Defendant concedes as much in its brief.  Def. Resp. at 48.

It is also false that Mosaic did not suggest an alternative methodology.  Def. Resp. at 48-49.  Although Mosaic opposed the inclusion of OCP's HQ/Support costs as a general matter, Mosaic also identified specific categories of costs that were particularly distortive and asked Commerce to exclude them from the cost buildup.[5]  Commerce failed to address these arguments.

In any event, Mosaic was not obliged to suggest an alternative methodology to trigger Commerce's obligation to "address{} relevant arguments{.}"  19 U.S.C. § 1677f(i)(3)(A).  As noted above, all that matters is that Mosaic presented arguments concerning deficiencies in OCP's proposed methodology.  It is indisputable that Mosaic did.

This Court should also reject OCP's assertion that Mosaic failed to exhaust its administrative remedies.  Although OCP disingenuously claims that its allocation methodology was on the record for nearly a year before the filing of case briefs, OCP Resp. at 21, OCP fails to note that Commerce rejected OCP's allocation methodology in the preliminary results.  OCP Prelim. Calc. Memo. at 5, P.R. 261, C.R. 260.  It was not until Commerce reversed itself in the *Final Results* that an alternative methodology became relevant.  This Court has routinely held that a party does not fail to exhaust its remedies in such circumstances.  *See, e.g.*, *Shantou Red Garden Foodstuff Co. v. United States*, 815 F.Supp.2d 1311, 1334 (CIT 2012); *LTV Steel Co. v. United States*, 985 F.Supp. 95, 120 (CIT 1997) ("A party ... may seek judicial review of an issue that it did not raise in a case brief if Commerce did not address the issue until its final decision, because in such a circumstance the party would not have had a full and fair opportunity to raise

---

[5] *See* Mosaic Rebuttal Br. at 11-13 ("Since OCP has failed to establish how such expenses relate to OCP's phosphate rock mining activities, these expenses should be wholly excluded from the cost buildup.").

the issue at the administrative level."); *Qingdao Taifa Grp. Co. v. United States*, 637 F.Supp.2d

1231, 1236-37 (CIT 2009); *Globe Metallurgical Inc. v. United States*, 781 F.Supp.2d 1340, 1357

(CIT 2011); *Zhengzhou Huachao Indus. Co. v. United States*, 37 C.I.T. 677, 686 (2013).

For these reasons, this Court should reject Defendants' arguments that Mosaic did not

substantiate its allegations or exhaust its administrative remedies.  Commerce's failure to address

the distortions that Mosaic identified in the *Final Results* necessitates a remand for further

consideration.

**II.    Commerce's Selection of Phosphate Rock Benchmark Prices is Unlawful**

**A.    Defendants' *Post Hoc* Justifications Cannot Cure Commerce's Failure to
      Address Record Evidence Showing that Chinese and Syrian Export Prices
      Are Distorted**

Mosaic made two separate arguments concerning the distortion of export prices from

China and Syria in its Case Brief.  Commerce failed to address either argument in the *Final*

*Results* – and, indeed, failed even to acknowledge the record evidence regarding distinct market

distortions in each country.  *See* IDM at 27-28.  Commerce's failure to address Mosaic's

arguments and the record evidence that fairly detracts from its decision render the *Final Results*

unsupported by substantial evidence.  *See Timken Co.*, 894 F.2d at 388 (quoting *Atl. Sugar, Ltd.*,

744 F.2d at 1562); *Universal Camera Corp.*, 340 U.S. at 488.

The Defendants claim that Mosaic did not provide sufficient evidence demonstrating that

export prices in China and Syria were distorted.  Def. Resp. at 38; OCP Resp. at 29.  Their

arguments are *post hoc* justifications that cannot cure Commerce's failure to address Mosaic's

argument in the first instance.  It is well established that Commerce's findings can be sustained,

if at all, based only on the reasoning and explanations provided by the agency in its published

determination.  *RZBC Grp. Shareholding Co. v. United States*, 100 F.Supp.3d 1288, 1309 n.4

(CIT 2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943)). Defendants' arguments also fail on the merits.

For China, the Defendants assert that Mosaic has "failed to provide sufficient evidence demonstrating that **export** prices from China were distorted." Def. Resp. at 38; OCP Resp. at 28. These assertions are incorrect. Mosaic submitted multiple new exhibits explaining that the GOC's interventions in the market necessarily affect export prices – evidence that Commerce unlawfully ignored. For example, in September 2021 (*i.e.*, during the POR), the GOC banned "the export of phosphate, a major component of commercial fertilizer, through 2022." Mosaic Benchmark Rebuttal, Exhibit 3, P.R. 227, C.R. 215; *see also* Mosaic Case Br. at 10 & n.40, P.R. 355, C.R. 402. The GOC's interventions in the market, including the export ban imposed during the POR, distorted the supply of Chinese phosphate rock in international trade, making Chinese export prices unrepresentative of the world market price for comparable phosphate rock.

For Syria, the Defendants describe Mosaic's evidence as a "single offhand statement." Def. Resp. at 39-40; OCP Resp. at 28. As an initial matter, the Defendants' arguments are, yet again, *post hoc* justifications, because none of the points they make appear in Commerce's determination.[6] *See* IDM at 27-28. They also mischaracterize the record evidence, because they ignore the substantial new evidence that Mosaic submitted in the underlying proceeding – all of which Commerce failed to consider. For example, in November 2020 (*i.e.*, after the conclusion of the investigation), the United States imposed additional economic sanctions on a range of Syrian entities, including the Syrian Ministry of Petroleum and Minerals, which operates Syria's phosphate mines in partnership with Stroytransgaz (a sanctioned party). *See* Mosaic Benchmark

---

[6] Defendant cites page 28 of the IDM in support of its arguments about Syria. This is misleading because the IDM does not discuss any of the points Defendant makes on pages 39-40 of its response brief. *Compare* IDM at 28 *with* Def. Resp. at 39-40.

Rebuttal, Exhibit 10, P.R. 227, C.R. 215; Mosaic Pre-Preliminary Comments at 11, P.R. 236, C.R. 218.  Mosaic submitted new evidence concerning these sanctions, as well as other evidence that was not on the record of the original investigation (because it did not exist at that time).  *See* Mosaic Benchmark Rebuttal, Exhibits 10-13, P.R. 227, C.R. 215.  Commerce made no reference to this evidence in its cursory discussion of Syria.  *See* IDM at 27-28.

The Defendants also ignore that the United States and other allied nations have imposed strict prohibitions on all dealings with sanctioned jurisdictions like Syria, which dramatically reduces foreign demand for Syrian phosphate rock.  Any commercial actor who engages in transactions with the Syrian phosphate industry does so at significant legal peril.  *See* Mosaic Benchmark Rebuttal, Exhibit 10 at 5, P.R. 227, C.R. 215.  This increased legal risk necessarily reduces demand for Syrian exports, thereby reducing the price that a purchaser would be willing to pay.[7]  Thus, these sanctions distort Syrian *export prices* because they cause Syria to export its goods "at a political discount because its goods are so toxic to handle."  Mosaic Benchmark Rebuttal, Exhibit 11 at 5, P.R. 227, C.R. 215.  The sanctions thus result in "{c}heap Syrian phosphate exports."  *Id*. at 1.

Rather than engaging with Mosaic's arguments and new evidence, Commerce simply repeated its flawed finding from the original investigation – that is, a finding based on a different factual record than the one at issue in this proceeding.  IDM at 27-28 ("As stated in the investigation regarding similar arguments regarding the consideration of market distortion…").  Commerce must base its determination on the record evidence before it in the current review and may not rely on facts or findings from a prior proceeding as a substitute for an independent

---

[7] Defendant misunderstands this principle in arguing that "it would be logical to expect" that sanctions, and tactics to evade sanctions, would "drive the price up, rather than down."  Def. Resp. at 40.  In actuality, it is "logical" that increased legal risk and cost will necessarily *reduce* demand for Syrian phosphate and, as a result, *reduce* the price that Syrian phosphate can command on the international market.

analysis of the present record.  *See, e.g.*, *Albemarle Corp. & Subsidiaries v. United States*, 821

F.3d 1345, 1356 (Fed. Cir. 2016) ("{I}t is well established . . . that the Department must base its

decisions on the record of the administrative proceeding before it in each review").

For example, Commerce stated that Mosaic "failed to point to market dynamics in the

destination countries for the exports in question that would lead to a finding of distortion...."

IDM at 28.  This is plainly incorrect, as Mosaic did point to such market dynamics – namely, that

a purchaser that engages in transactions with the Syrian phosphate industry does so at significant

legal peril, which drives down Syrian export prices.  *See* Mosaic Benchmark Rebuttal, Exhibit

10.  Commerce did not address the issue of sanctions at all.  IDM at 28.  Its conclusory finding

does not satisfy the substantial evidence standard, especially when there were multiple pieces of

record evidence contradicting it.  *See NMB Sing. Ltd.*, 557 F.3d at 1319-20.

In sum, Commerce failed to engage with significant new information in the record

indicating that Chinese and Syrian export prices are distorted.  Defendants' *post hoc*

rationalizations are unavailing and, in any case, cannot cure Commerce's failure to address

Mosaic's arguments.  This Court should reject their arguments and remand to Commerce to

address the record evidence indicating that Chinese and Syrian export prices are distorted.

**B.**     **Defendants' *Post Hoc* Justifications Cannot Cure Commerce's Failure to Address Record Evidence Indicating that Egyptian Export Prices are Distorted**

The Defendants also fail to rebut that Commerce failed to adequately address Mosaic's

arguments concerning the quality of Egyptian phosphate rock.  Commerce's regulation on LTAR

programs, 19 C.F.R. § 351.511(a)(2)(i), directs the agency to consider "product similarity" and

"other factors affecting comparability" in deriving benchmarks.  Rather than engaging with the

new record evidence that Mosaic submitted, Commerce summarily dismissed Mosaic's

arguments concerning Egyptian phosphate rock in two short sentences.  IDM at 28.  The
Defendants' attempts to buttress Commerce's decision are, yet again, *post hoc* rationalizations.

The Defendants incorrectly assert that Mosaic "rel{ies} on the same defective evidence it
cited in the Investigation litigation, and offers no new grounds on which the Court should
reconsider its prior holding{.}"  OCP Resp. at 29; Def. Resp. at 42.  In actuality, there are
multiple pieces of new evidence on the record in this review.  *See* Mosaic Benchmark Rebuttal,
Exhibits 7-9, P.R. 227, C.R. 215.  For example, Exhibit 7 is an article that discusses "the
information available on the main phosphate occurrences in Egypt regarding their geology,
mineralogical and chemical composition, reserves, production, industrial value, and other related
data."  *Id.*, Exhibit 7 at 3.  Exhibit 8 is an industry publication that discusses "industry woes" in
Egypt – in particular, distortions in its market relative to that of other phosphate producers.
Exhibit 9 describes concerns among Indian purchasers that "Egyptian exporters have been
shipping low-quality rock phosphate to India."  *Id.*, Exhibit 9 at 1.  Commerce failed to address
any of this new evidence, none of which was before Commerce in the original investigation.

The Defendants argue that there is no record support for Mosaic's argument that
Egyptian phosphate rock is of a lower quality than that produced by OCP.  *See* Def. Resp. at 42-
43; OCP Resp. at 30.  This is incorrect, as indicated by the multiple pieces of new evidence
Mosaic submitted.  Mosaic 9/13/22 Comments, Exhibits 8-10, P.R. 110, C.R. 118; Mosaic
Benchmark Rebuttal, Exhibits 6-9, P.R. 227, C.R. 215.  In addition, OCP argues that record
"evidence confirms that BPL content is the *only* characteristic on which the submitted world
market pricing data are delineated."  OCP Resp. at 30.  This contradicts the position OCP took
before the U.S. International Trade Commission, where it argued that both the BPL level and the
Minor Elements Ratio affect downstream uses and product characteristics, stating that "the BPL

13

and the Minor Elements Ratio . . . is an essential parameter calculated from ore composition

which impacts the quality of the final fertilizer. . . . The rock quality can also play a role in

reaching certain chemical specifications and grain size that customers require."  Mosaic 9/13/22

Comments, Exhibit 10, P.R. 110, C.R. 118.  This evidence demonstrates that Egyptian phosphate

rock is not "comparable" to OCP's phosphate rock within the meaning of 19 C.F.R. §

351.511(a).  Commerce failed to address this evidence, which fairly detracts from its conclusion,

rendering its decision unsupported by substantial evidence.  *See Timken Co.*, 894 F.2d at 388.

### C.    Commerce's Failure to Include Prices from Certain Countries That Produce Phosphate Rock with Comparable BPL Levels Is Unlawful

In the *Final Results*, Commerce excluded phosphate rock prices from [                                    ]

on the basis that "the phosphate rock produced by these countries contains BPL content outside

of the established range used to construct the benchmark price."  IDM BPI Supplement at 4-5,

P.R. 372, C.R. 410.  As Mosaic demonstrated in its opening brief, Commerce did so even though

record evidence indicates that OCP does, in fact, produce phosphate rock with BPL levels as

high as 75 percent, which is comparable to the BPL levels of phosphate rock from [

].  *See* Mosaic Br. at

33-34.  Defendants' efforts to defend Commerce's determination are without merit.

OCP argues that record evidence contradicts Mosaic's argument that OCP's reported

average BPL content of rock for "expedited" rock did not cover all rock extracted during the

POR.  OCP Resp. at 34-35.  In reality, by its own definition, OCP's "expedited" rock includes

only rock that OCP has completely processed, and excludes rock that OCP has diverted to

storage.  As OCP states: "{e}xpedited rock is all phosphate rock that has passed through *all*

phases of the production process – extraction, stone removal, beneficiation, transportation, and

chemical transformation at fertilizer plants or export – *excluding any rock held in storage*."  OCP

12/7/22 SSQR at 5-6, P.R. 163, C.R. 156 (emphasis added); *see also* OCP 8/22/22 IQR at 90, n.94, P.R. 76, C.R. 8.  OCP's questionnaire responses indicate that it placed significant quantities of phosphate rock into storage during the POR.  *See* OCP 8/22/24 IQR, Exhibit MIN-13, P.R. 80, C.R. 15 (Mining Value Chain Flow Chart).  The BPL content reports that OCP submitted in its questionnaire response – and which Commerce relied upon to find that phosphate rock from [

                    ] does not have comparable BPL levels – only cover OCP's "expedited" rock.  *See id.* at 89-91, Exhibit MIN-21, P.R. 80, C.R. 16.  Accordingly, because the average BPL content of the rock that OCP reported in Exhibit MIN-21 includes *only* rock that OCP has passed through the entirety of its production process, the average BPL content that Commerce relied upon does not necessarily reflect the BPL content of all of OCP's mined phosphate.

      Further, Mosaic introduced evidence sourced from OCP's own marketing material demonstrating that OCP mines phosphate rock with BPL levels up to 75 percent.  *See* Mosaic, 9/13/22 Comments at 20 & n.50, Exhibit 7 (last accessed Sept. 12, 2022), P.R. 110, C.R. 118.  OCP describes this evidence as "general, stale, and inconsistent." OCP Resp. at 34.  To the contrary, the fact the evidence predates the countervailing duty order buttresses its reliability, because OCP had no reason at the time to inaccurately describe the BPL content of its phosphate rock.  Similarly, Defendant asserts that this "undated, unverified" source cannot "supersede the verified information OCP submitted to measure the BPL of the phosphate rock it actually produced{.}" Def. Resp. at 44.  However, Defendant ignores that Commerce did not calculate a BPL range for the benchmark based on all the rock that OCP *actually produced*; rather, it calculated a range based only on the rock that OCP *expedited*.  *See* OCP Prelim. Calculations at 3, P.R. 261, C.R. 260 (using prices which "correspond to the [

                    ]).

In sum, Commerce's failure to include prices from [                    ] in the benchmark is unlawful because the record shows OCP does, in fact, produce phosphate rock with BPL levels comparable to these sources.  Defendants' *post-hoc* arguments cannot cure Commerce's failure to address this record evidence contradicting its conclusions.  This Court should remand to Commerce for further consideration.

### III.    Commerce Failed to Address Mosaic's Arguments and Substantial Evidence Demonstrating ANP Does Not Set Prices in Accordance With Market Principles

Commerce found that ANP's provision of port services and infrastructure to OCP and its cross-owned affiliates did not confer a benefit.[8]  Mosaic demonstrated in its opening brief that Commerce's decision is arbitrary and unsupported by substantial evidence because Commerce ignored substantial record evidence indicating that ANP [


], Mosaic Br. at 36-43, and because ANP's supposed profitability is an insufficient basis to find that its prices were set in accordance with market principles within the meaning of 19 C.F.R. § 351.511(a)(2)(iii).  *Id.* at 35-36.  The Defendants' *post hoc* rationalizations fail to rebut Mosaic's arguments, and the Court should reject them.

Defendant asserts that Mosaic failed to exhaust its administrative remedies with respect to its argument that "ANP's profitability is non-dispositive," and that the Court should decline to consider it.  *See* Def. Resp. at 64.  This assertion is without merit because Defendant mischaracterizes Mosaic's arguments, and because Mosaic did include arguments on this issue in its case brief.  *See* Mosaic Case Br. at 19-28, P.R. 355, C.R. 402.

---

[8] The GOM also argues that this program did not constitute a financial contribution and was not specific.  GOM Resp. at 23-25.  The Court should disregard these arguments because Commerce did not address these issues in the *Final Results*.  *See* IDM at 50-51.

As an initial matter, Mosaic has never argued that profitability is determinative, Def. Resp. at 64, or that Commerce relied "solely" on ANP's profitability, OCP Resp. at 36. Rather, Mosaic argued that, given its prior practice, Commerce "placed great weight" on ANP's profitability, when in fact profitability is insufficient for a finding that a government authority's prices are set in accordance with market principles – especially when coupled with all the other evidence on the record. *See* Mosaic Br. at 34-35.

Additionally, Mosaic did not fail to exhaust its administrative remedies with respect to its arguments regarding Commerce's reliance on evidence of ANP's profitability. Commerce first addressed the countervailability of this subsidy program in the Post-Preliminary Memorandum. Commerce found that the program conferred no benefit during the POR because of ANP's "price-setting philosophy," and because "ANP generated [

] and was profitable overall." Department Post-Preliminary Memorandum ("PPM") at 6, P.R. 351, C.R. 401. Mosaic addressed these preliminary findings in its case brief before Commerce – arguing that Commerce erred in evaluating ANP's profitability and that its "price-setting methodology fails to account for its costs, revenues, *and profits*{.}" Mosaic Case Br. at 20 (emphasis added); *see also id.* at 19-28, P.R. 355, C.R. 402.

It was not until the *Final Results* that Commerce emphasized ANP's profitability as a leading factor in its decision. Mosaic responded by arguing before this Court that Commerce "placed great weight" on ANP's profitability, but that such profitability does not mean that it sets its prices "consistent with market principles within the meaning of 19 C.F.R. § 351.511(a)(2)(iii)." Mosaic Br. at 35. In sum, Mosaic did not fail to exhaust because it presented arguments concerning ANP's  profitability (and Commerce's consideration thereof)

**BUSINESS PROPRIETARY**
**INFORMATION DELETED**

"at the time appropriate under {Commerce's} practice." *See Mittal Steel Point Lisas Ltd. v. United States*, 548 F.3d 1375, 1384 (Fed. Cir. 2008).

The Defendants argue that Commerce "articulated a clear connection between {record} evidence and its determination that ANP charged prices to OCP that covered ANP's costs and generated a profit." OCP Resp. at 38. To the contrary, in the PPM, Commerce merely repeated the GOM's own statements in its narrative response. *See* PPM at 5-6 ("The GOM stated…. The GOM stated…. The GOM reported…. The GOM also reported…. The GOM explained…. Specifically, as it related to OCP, the GOM notes…. Because of this, according to the GOM…. Thus, the GOM states that…. Given the GOM's narrative explanation, … we preliminarily determine that this program conferred no benefit to OCP during the POR.").

In the *Final Results*, Commerce reached its conclusions without any independent reasoning – instead making conclusory statements and citing back to conclusory statements in the PPM. For example, in response to Mosaic's argument that "ANP's price-setting methodology fails to account for its costs, revenues, and profits as a commercial operator would," IDM at 53 (citing Mosaic Case Br. at 20, P.R. 355, C.R. 402), Commerce merely noted that "ANP reported an operating profit and net profit in 2019, 2020, and 2021," and then stated that "Commerce examined the methodology that ANP uses when setting concession fees, which indicates that ANP does account for its costs, revenues, and profits when it sets prices." IDM at 53. This conclusory statement provides no reasoning of how the methodology results in market-based fees; it also fails to engage with Mosaic's arguments and the contrary evidence that Mosaic cited.

As Mosaic explained in its 56.2 brief, the [

**BUSINESS PROPRIETARY
INFORMATION DELETED**    **NON-CONFIDENTIAL VERSION**

**]**.  Mosaic Br. at 36-37.  This **[**



**]**.

Mosaic Deficiency Comments on GOM NSA SSQR (Sept. 11, 2023) at 2-5, P.R. 344, C.R. 311;

GOM 8/28/23 NSA SSQR at Exhibit 2D-SUPP-PORT-3 at 13-15, P.R. 336, C.R. 299.  Such

evidence does not demonstrate that the ANP took into account its own costs, revenues, and

profits in setting concession fees to OCP.[9]

For other important issues, Commerce failed even to mention Mosaic's arguments.  For

example, Mosaic argued that the ANP's prices are not set in accordance with market principles

because the ANP **[**                                        **]**.[10]  However, Commerce does not discuss

Mosaic's **[**                        **]** arguments even once in its PPM, IDM, or in the Business

Proprietary Information Supplement to the IDM.  And this is despite Mosaic having cited

substantial record evidence indicating that other concessionaires **[**

---

[9] The GOM argues that the ANP would have **[**

**]**, GOM Resp. at
13, but this merely confirms Mosaic's argument that **[**            **]** the ANP used is not suited for purpose and does
not demonstrate that the ANP sets its prices "in accordance with market principles."  Mosaic Br. at 36-37.  The
GOM's argument is a *post hoc* rationalization that appears nowhere in Commerce's decision.
[10] The GOM claims that Commerce did not need to address Mosaic's arguments concerning **[**                    **]**.
GOM Resp. at 17-18.  However, the cited cases are unsupportive.  *See* **[**

**]**.

**BUSINESS PROPRIETARY INFORMATION DELETED** NON-CONFIDENTIAL VERSION

].[11] *Compare* Mosaic Case Br. at 28-30, P.R. 355, C.R. 402 (citing GOM 8/28/23 NSA SSQR at 13-15, P.R. 355, C.R. 298), *with* PPM at 5-6 *and* IDM at 52-54.  The same is true for Mosaic's arguments concerning the lack of evidence that ANP had [                                        ],[12] which Commerce failed even to acknowledge.  Commerce's failure to consider this important aspect of the problem renders its decision unlawful.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) (hereinafter "*State Farm*").

Defendant-Intervenors' attempts to bolster Commerce's inadequate decision making, *see, e.g.*, GOM Resp. at 9-25; OCP Resp. at 42-44, are impermissible *post hoc* justifications.[13]  *See Bethlehem Steel Corp. v. United States*, 140 F.Supp.2d 1354, 1366 (CIT 2001).  Their arguments to this Court cannot supplant Commerce's obligation to address Mosaic's arguments and articulate a rational connection between the facts on the record and the decisions made.  *State*

---

[11] The GOM argues, "Mosaic's attempts to compare concession agreements do not withstand scrutiny," and disputes that the ANP charges [      ] fees to OCP compared to other concessionaires.  GOM Resp. at 20-21.  The GOM mischaracterizes the record.  For each of the three other concession agreements that the GOM provided, [                                                      ] compared to OCP.  *See* GOM NSA SQR, [        

                        ].  Mosaic Case Br. at 28-30, P.R. 355, C.R. 402 (citing GOM 8/28/23 NSA SSQR at 13-15, P.R., 335, C.R. 298).  Commerce failed to provide any analysis of this record evidence in the *Final Results*.
[12] The GOM disputes Mosaic's argument, citing Commerce's verification report which states that, at verification, the ANP demonstrated how the fixed fee level [                                ] could be adjusted, which affects [                  ].  GOM Resp. at 14.  The ANP's demonstration at verification is not contemporaneous evidence that the ANP did, in fact, [                                            ] when it negotiated OCP's concessions.
[13] For example, the GOM argues that Mosaic's comparison of the concession agreements is flawed because other concessionaires [

                                    ].  GOM Resp. at 14-15.  This is entirely *post hoc* justification, as Commerce itself did not address any of the similarities or differences between the concession agreements on the record.

20

Case 1:23-cv-00246-TCS    Document 83    Filed 03/03/25    Page 25 of 26

Consol. Court No. 23-00246                                   NON-CONFIDENTIAL VERSION

*Farm*, 463 U.S. at 30.  The GOM argues that "Commerce's rejection of Mosaic's arguments is 'reasonably discernible' based on Commerce's adoption in the *Final Results* of its Post-Preliminary Analysis Report."  GOM Resp. at 13, n.6.  But it is not enough for Commerce to *reject* a party's arguments, the agency must provide an explanation for doing so.  *NMB Sing. Ltd.*, 557 at 1319-20 (citations omitted) ("{A} final determination by Commerce must include 'an explanation of the basis for its determination that addresses relevant arguments{} made by interested parties who are parties to the investigation or review.'").  A remand is therefore necessary for further consideration.

## CONCLUSION

For the reasons discussed above, Mosaic respectfully requests that the Court reject all arguments made by Defendants and grant Mosaic's motion for judgment on the agency record in its entirety.

Respectfully submitted,

/s/ David J. Ross
David J. Ross
Jeffrey I. Kessler
Stephanie E. Hartmann
Jacob A. Laband

Wilmer Cutler Pickering Hale and Dorr
    LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
Telephone: (202) 663-6300
Facsimile: (202) 663-6363
Email: david.ross@wilmerhale.com

*Counsel for The Mosaic Company*

Dated: March 3, 2025

Consol. Court No. 23-00246