Slip Op. 25-34

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE MOSAIC COMPANY,<br><br>     Plaintiff,<br><br>  v.<br><br>UNITED STATES,<br><br>     Defendant,<br><br>  and<br><br>THE GOVERNMENT OF THE KINGDOM OF MOROCCO and OCP S.A.,<br><br>     Defendant-Intervenors. | Before: Timothy C. Stanceu, Judge<br><br>Consol. Court No. 23-00246 |

## OPINION AND ORDER

[Sustaining in part, and remanding in part, an agency determination in an administrative review of a countervailing duty order on phosphate fertilizers from Morocco]

Dated: April 1, 2025

*David J. Ross*, Wilmer Cutler Pickering Hale and Dorr LLP, of Washington, D.C., for plaintiff and defendant-intervenor The Mosaic Company. With him on the brief were *Jeffrey I. Kessler*, *Stephanie E. Hartmann*, *Alexandra S. Maurer*, and *Jake A. Laband*.

*William R. Isasi*, Covington & Burling LLP, of Washington, D.C., for plaintiff and defendant-intervenor OCP S.A. With him on the brief were *Cynthia C. Galvez*, *Kathleen McNulty*, *Wanyu Zhang*, *Julia Shults*, *Micaela McMurrough*, *Hardeep Josan*, and *Jordan B. Bakst*.

*Jonathan M. Zielinski*, Cassidy Levy Kent (USA) LLP, of Washington, D.C., for defendant-intervenor the Government of the Kingdom of Morocco.  With him on the brief were *James E. Randall, IV* and *Stephen A. Laufer*.

*Sosun Bae*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant.  With her on the brief were *L. Misha Preheim*, Assistant Director, *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Patricia M. McCarthy*, Director.  Of counsel on the brief was *Ashlande Gelin*, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

Stanceu, Judge:  In this consolidated action, plaintiff (and defendant-intervenor) The Mosaic Company ("Mosaic") and plaintiff (and defendant-intervenor) OCP S.A. ("OCP") contested a final determination of the International Trade Administration, U.S. Department of Commerce ("Commerce" or the "Department").  The contested determination concluded an administrative review of a countervailing duty ("CVD") order on phosphate fertilizers from the Kingdom of Morocco ("Morocco").

Before the court are the plaintiffs' motions for judgment on the agency record, submitted under USCIT Rule 56.2.  Concluding that the contested determination is contrary to law in one respect, the court issues a remand order to Commerce.

## I. BACKGROUND

### A.  The Contested Decision

The contested determination (the "Final Results") was published as *Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 76,726 (Int'l Trade Admin. Nov. 7, 2023), P.R. Doc. 374,

ECF No. 92-2 ("*Final Results*").[1]  Commerce incorporated in the Final Results by reference an accompanying "Issues and Decision Memorandum."  *Issues and Decision Memorandum for the Final Results of the Countervailing Duty Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco; 2020–2021* (Int'l Trade Admin. Nov. 1, 2023), P.R. Doc. 370, ECF No. 92-2 ("*Final I&D Mem.*").  Commerce issued a "Post-Final Determination" (also identified as the "BPI Supplement to IDM") on November 2, 2023 that provided explanation supplementing the Issues and Decision Memorandum.  *Final Results of the Countervailing Duty Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco: Business Proprietary Information Accompanying the Issues and Decision Memorandum for the Final Results* (Int'l Trade Admin. Nov. 2, 2023), P.R. Doc. 372, ECF No. 92-2 ("*Post-Final Determination*").

## B.  The Parties

Plaintiff and defendant-intervenor OCP is a state-owned producer of phosphate fertilizers.[2]  OCP was the sole respondent in the review.

---

[1] Documents in the Joint Appendix (Mar. 14, 2025), ECF Nos. 93 (Conf.) & 92 (Public) are cited herein as "P.R. Doc. __."  Citations to Joint Appendix documents are to the public versions.

[2] In assigning the 2.12% subsidy rate to "OCP S.A.," Commerce stated that it "has found the following companies to be cross-owned with OCP S.A.: Jorf Fertilizers Company I; Jorf Fertilizers Company II; Jorf Fertilizers Company III; Jorf Fertilizers Company IV; and Jorf Fertilizers Company V." *Phosphate Fertilizers From the Kingdom of Morocco: Final Results of Countervailing Duty Administrative Review; 2020–2021*, 88 Fed. Reg. 76,726, 76,726 n.4 (Int'l Trade Admin. Nov. 7, 2023), P.R. Doc. 374, ECF No. 92-2.

Plaintiff and defendant-intervenor Mosaic is a domestic producer of phosphate fertilizer that was the petitioner in the countervailing duty investigation.

The Government of the Kingdom of Morocco is also a defendant-intervenor in this case.

### C. The Administrative Review

Commerce issued the countervailing duty order on phosphate fertilizers from the Kingdom of Morocco (the "Order") in 2021. *Phosphate Fertilizers From the Kingdom of Morocco and the Russian Federation: Countervailing Duty Orders*, 86 Fed. Reg. 18,037 (Int'l Trade Admin. Apr. 7, 2021) (*"Order"*). The Final Results concluded the first administrative review of the Order ("first review") and pertained to a period of review ("POR") of November 30, 2020 through December 31, 2021. *Final Results*, 88 Fed. Reg. at 76,726.

Commerce issued preliminary results of the first review (the "Preliminary Results") in May 2023. *Phosphate Fertilizers From the Kingdom of Morocco: Preliminary Results of the Countervailing Duty Administrative Review, 2020–2021*, 88 Fed. Reg. 29,089 (Int'l Trade Admin. May 5, 2023), P.R. Doc. 267, ECF No. 92-2 ("*Prelim. Results*"). Incorporated therein was a "Decision Memorandum for the Preliminary Results of the Countervailing Duty Administrative Review; 2020–2021: Phosphate Fertilizers from the Kingdom of Morocco" (Int'l Trade Admin. Apr. 28, 2023), P.R. Doc. 265, ECF No. 92-2 ("*Prelim. Decision Mem.*"). In the Preliminary Results, Commerce calculated a

preliminary net subsidy rate of 14.49% *ad valorem* for OCP.  *Prelim. Results*, 88 Fed. Reg.

at 29,090.

### D.  The Final Results

For the Final Results, Commerce determined a combined net subsidy rate of

2.12% *ad valorem* for OCP.  *Final Results*, 88 Fed. Reg. at 76,726.  The rate included

individual *ad valorem* subsidy rates for five government programs, as follows:

"Government Loan Guarantees," 0.02%; "Tax Incentives for Export Operations," 0.71%;

"Reductions in OCP's Tax Fines and Penalties," 0.01%; "Revenue Exclusions for

Minimum Tax Contributions," 0.06%; and "Customs Duty Exemptions for Capital

Goods, Machinery, and Equipment," 0.05%.  *Final I&D Mem*. 11–12.  These five subsidy

rates totaled 0.85%.  The remainder of the 2.12% combined subsidy rate, 1.27%, resulted

from the Department's determining that OCP untimely reported a "payroll tax refund"

and thereby failed to respond timely to a request for information.  *Id.* at 7–11.  Rejecting

OCP's position that Commerce should have accepted the reporting of the refund as a

"minor correction," Commerce imposed the 1.27% subsidy rate as "facts otherwise

available" under section 776(a) of the Tariff Act of 1930, *as amended* ("Tariff Act"),

19 U.S.C. § 1677e(a), with an "adverse inference" under section 776(b) of the Tariff Act,

19 U.S.C. § 1677e(b).[3]  *Id.* at 15–18.

---

[3] Citations to the United States Code are to the 2018 version.  Citations to the Code of Federal Regulations are to the 2023 version.

### E.  Proceedings in the Court of International Trade

Plaintiffs brought their respective actions in late 2023.  Court No. 23-246 (*The Mosaic Company v. United States*), Summons (Nov. 28, 2023), ECF No. 1; Compl. (Dec. 28, 2023), ECF No. 10; Court No. 23-00261 (*OCP S.A. v. United States*), Summons (Dec. 7, 2023), ECF No. 1; Compl. (Jan. 8, 2024), ECF No. 9.  The two cases are consolidated under Consolidated Court No. 23-00246.  Order (Feb. 15, 2024), ECF No. 30.

Plaintiffs filed their Rule 56.2 motions for review on the agency record in August 2024.  Rule 56.2 Mot. for J. on the Agency R. Submitted on Behalf of The Mosaic Company (Aug. 7, 2024), ECF Nos. 88 (Conf.) & 90 (Public) ("Mosaic's Mot.");  OCP S.A.'s R. 56.2 Mot. for J. on the Agency R. (Aug. 7, 2024), ECF Nos. 75 (Conf.) & 76 (Public) ("OCP's Mot.").  Defendant submitted a response to both motions earlier this year.  Def.'s Resp. to Pls.' Mots. for J. upon the Admin. R. (Jan. 14, 2025), ECF No. 57 (Conf.) & 58 (Public) ("Def.'s Resp.").  The Government of the Kingdom of Morocco also submitted a response to Mosaic's motion earlier this year.  Rule 56.2 Resp. Br. of the Gov. of the Kingdom of Morocco (Jan. 28, 2025), ECF Nos.  61 (Conf.) & 62 (Public).  Mosaic and OCP have responded to each other's Rule 56.2 motions.  Resp. Br. of Consol.-Pl. and Def.-Int. OCP S.A. in Opp'n to the Mosaic Co.'s Rule 56.2 Mot. for J. on the Agency R. (Jan. 28, 2025), ECF Nos. 77 (Conf.) & 78 (Public) ("OCP's Resp."); The Mosaic Co.'s Mem. in Opp'n to OCP's Rule 56.2 Mot. for J. upon the Agency R. (Jan. 28, 2025), ECF Nos. 89 (Conf.) & 91 (Public).  They also submitted replies to the responses.

Reply Br. of Consol.-Pl. and Def.-Int. for OCP S.A. in Support of OCP S.A.'s Rule 56.2

Mot. for J. on the Agency R. (Mar. 3, 2025), ECF Nos. 80 (Conf.) & 81 (Public); The

Mosaic Co.'s Reply in Support of its Rule 56.2 Mot. for J. upon the Agency R. (Mar. 3,

2025), ECF Nos. 82 (Conf.) & 83 (Public).

## II. Discussion

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction under section 201 of the Customs Courts Act of

1980, 28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced

under section 516A of the Tariff Act, 19 U.S.C. § 1516a, including an action contesting a

final determination that Commerce issues to conclude an administrative review of a

countervailing duty order, *id.* § 1516a(a)(2)(B)(iii).

In reviewing a final determination, the court "shall hold unlawful any

determination, finding, or conclusion found . . . to be unsupported by substantial

evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).  Substantial evidence refers to "'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"  *SKF USA, Inc. v.*

*United States*, 537 F.3d 1373, 1378 (Fed. Cir. 2008) (quoting *Consol. Edison Co. of New York*

*v. Nat'l Lab. Rels. Bd.*, 305 U.S. 197, 229 (1938)).

### B. Countervailing Duties under the Tariff Act

Section 701(a) of the Tariff Act, 19 U.S.C. § 1671(a), provides generally that a "countervailing duty" is imposed if Commerce determines that a foreign government or other public entity (an "authority") "is providing . . . a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States" and the U.S. International Trade Commission reaches an affirmative injury or threat determination with respect to that merchandise.

A "countervailable subsidy" may exist where a government authority "provides a financial contribution" to a person, "a benefit is thereby conferred," and the subsidy meets a "specificity" requirement as defined by the Tariff Act. 19 U.S.C. § 1677(5). "A benefit shall normally be treated as conferred where there is a benefit to the recipient, including—," *id.* § 1677(5)(E), ". . . in the case where goods or services are provided, if such goods or services are provided for less than adequate remuneration," *id.* § 1677(5)(E)(iv).

### C. Claims of the Plaintiffs

Mosaic contests the Department's decisions not to countervail two government programs. It claims, on several grounds, that Commerce erred in determining that OCP received "no measurable benefit" from the Government of Morocco's provision of mining rights for phosphate ore. Mosaic's Mot. 13–33. It also claims that Commerce

impermissibly decided not to countervail the Moroccan government's provision to OCP

of what it describes as "port services and infrastructure" subsidies.  *Id*. at 34–45.

OCP claims that Commerce unlawfully rejected its reporting of the payroll tax

refund and the resulting use of facts otherwise available, with an adverse inference, to

impose the 1.27% subsidy rate for this refund.  OCP's Mot. 15–26.  It claims also that

Commerce unlawfully determined that the program of the Moroccan government

providing relief from tax fines and penalties satisfies the "specificity" requirement of

the Tariff Act.  *Id.* at 26–35.  Finally, it claims that Commerce overstepped its authority

in requesting from OCP information on unspecified "other benefits."  *Id.* at 36–37.

### D.  Determination of "No Benefit" from the Provision of Mining Rights

In the countervailing duty investigation culminating in the issuance of the Order,

Commerce found that "[t]he Moroccan government, which owns all mineral reserves,

granted OCP a monopoly to mine phosphate."  *Mosaic Co. v. United States*, 47 CIT __, __,

659 F. Supp. 3d 1285, 1298 (2023) (citation omitted) ("*Mosaic I*").  Commerce determined

in the investigation that the Moroccan government provided the phosphate mining

rights to OCP for less than adequate remuneration and thereby conferred a benefit upon

OCP, calculating a subsidy rate of 18.42% for the provision of the mining rights.  *Id.*,

47 CIT at __, 659 F. Supp. 3d at 1292.  Agreeing with OCP's claim that Commerce had

made certain errors in calculating the subsidy rate, this Court ordered Commerce to

reconsider that calculation.  *Id.*, 47 CIT at __, 659 F. Supp. 3d at 1299–1305.  In response

to this Court's opinion and order in *Mosaic I*, Commerce issued on remand a determination that this Court sustained in part and remanded in part. In that determination, Commerce calculated a reduced subsidy rate of 5.86%, a result that is subject to further revision based on the outcome of the continuing litigation. *See Mosaic Co. v. United States*, 49 CIT __, __, 744 F. Supp. 3d 1367, 1370–1371 (2025) ("*Mosaic II*").

In the Preliminary Determination, Commerce determined a subsidy rate of 13.63% *ad valorem* for the provision of phosphate mining rights. *Prelim. Decision Mem.* 11. Using an analysis it previously used in the countervailing duty investigation, Commerce preliminarily concluded that the government of Morocco provided phosphate mining rights to OCP for less than adequate remuneration and thereby conferred a benefit upon OCP. *Id*. at 10–11. Commerce reversed its decision in the Final Results, concluding that the provision of phosphate mining rights did not confer a measurable benefit during the period of review. *Final I&D Mem.* 12. The methodology Commerce used to reach this negative determination is described below.

Commerce determines the adequacy of remuneration "in relation to *prevailing market conditions* for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review." 19 U.S.C. § 1677(5)(E)(iv) (emphasis added). To address "prevailing market conditions" in the subject country, the Department's regulations establish a hierarchy for determining what is adequate remuneration. 19 C.F.R. § 351.511(a)(2). Under a "tier-one" analysis, Commerce

compares "the government price to a market-determined price for the good or service

resulting from actual transactions in the country in question." *Id.* § 351.511(a)(2)(i). If

there is no usable market-determined price, Commerce applies a "tier-two" analysis,

comparing "the government price to a world market price where it is reasonable to

conclude that such price would be available to purchasers in the country in question."

*Id.* § 351.511(a)(2)(ii). As a matter of practice, Commerce does not use a tier-two

analysis "[w]here the government is the sole provider of a . . . service." *See*

*Countervailing Duties*, 63 Fed. Reg. 65,348, 65,377–78 (Int'l Trade Admin. Nov. 25, 1998).

Because Commerce was investigating mining rights provided by the Moroccan

government, Commerce applied a "tier-three" analysis, under which it "will normally

measure the adequacy of remuneration by assessing whether the government price is

consistent with market principles."[4] 19 C.F.R. § 351.511(a)(2)(iii).

The Department's application of a tier-three analysis was complicated by the

Moroccan government's provision to OCP of an intangible, i.e., phosphate mining

rights, which Commerce did not consider susceptible to a market price analysis. *Final*

*I&D Mem.* 33. Similarly, Commerce considered the material being mined, phosphate

ore, also to be a product for which Commerce could not ascertain a market price.

Commerce therefore examined "beneficiated phosphate rock," an intermediate product

---

[4] The general "tier-three" methodology was used in the countervailing duty
investigation and described in *Mosaic Co. v. United States*, 47 CIT __, __, 659 F. Supp. 3d
1285, 1298–99 (2023) ("*Mosaic I*").

OCP manufactured in the process of producing phosphate fertilizer and for which it could obtain data on prices in the world market. *Id.* To compare with a world market price, Commerce constructed a price at which OCP would have sold beneficiated phosphate rock by performing a "build-up" consisting of OCP's direct costs of production, its selling, general and administrative expenses ("SG&A"), and profit. *Id.* at 33, 39–41. Commerce then compared that constructed price with a calculated ("benchmark") world market price, *Prelim. Decision Mem.* 10–11, concluding for the Final Results that OCP received no measurable benefit from the government's provision of the mining rights, *Final I&D Mem.* 12. Mosaic raises, essentially, two claims in challenging the Department's determination of no measurable benefit.

Mosaic's first claim is that Commerce unlawfully included certain company-wide costs incurred by OCP, "HQ [headquarters]/Support Costs and Debt costs," in the cost buildup for beneficiated phosphate rock. Mosaic's Mot. 13. Mosaic argues that Commerce should have excluded all, or almost all, of the Headquarters, Support, and Debt costs from that calculation as unrelated to phosphate rock mining and beneficiation. *Id.* at 13–23. According to this argument, "at most some small portion of OCP's HQ and Support costs could arguably be relevant." *Id.* at 16. Mosaic contends, first, that because "Commerce had already included in the cost buildup . . . 'site indirect costs' for OCP's Gantour and Khouribga mines," which are "separate and apart from the HQ/Support and Debt costs," Commerce should not have included OCP's

headquarters, support, and debt costs at all. *Id.* at 20. It argues, in the alternative, that even were Commerce justified in including some such costs, it overstated those costs by including "specific categories" of OCP's costs that it views as "unrelated to its phosphate mining and rock production," *id*. at 21–23, and erred further in accepting OCP's method of allocating a portion of the total headquarters, support, and debt costs to the production of phosphate rock, *id*. at 24–27.

Mosaic's second claim is that Commerce made errors in calculating its benchmark world market price for beneficiated phosphate rock. Specifically, it argues that Commerce unreasonably included phosphate rock prices for China and Syria, which prices it views as distortive. *Id*. at 28–31. It contends, further, that Commerce should not have included in the benchmark the prices for Egyptian phosphate rock, which it argues is of lower quality and therefore not comparable to OCP's product. *Id*. at 31–33. Finally, it argues that Commerce, contrary to record evidence, excluded from the benchmark the prices for beneficiated phosphate rock pertaining to Jordan and Togo. *Id*. at 33–34.

### 1. Inclusion of HQ/Support Costs and Debt Costs in the Cost Buildup for OCP's Production of Beneficiated Phosphate Rock

In calculating the cost buildup for OCP's production of beneficiated phosphate rock, Commerce included amounts for certain indirect costs identified in OCP's records as "HQ [headquarters], Support, and Debt costs." *Final I&D Mem.* 33, 35. Commerce did so based on its finding that this category included costs incurred in OCP's

phosphate rock production. *Id*. at 36 ("[T]he record contains verified evidence indicating that OCP incurred HQ, Support, and Debt Costs in the production of phosphate rock.").

Commerce described the HQ and Support costs as including costs for "insurance," "electronic equipment," and "HQ [headquarters] personnel," who "provide training to industrial personnel at OCP's mines, support the acquisition of industrial materials at each site, and provide technology services to the mining sites that are critical to operations." *Id*. at 35 (citing various OCP questionnaire responses and exhibits and the Department's verification report). As to the "Debt" costs, Commerce stated that "OCP notes that phosphate mining is a capital-intensive activity, and thus financing and debt costs are routinely an essential part of its mining operations" and that the included debt costs "primarily represent interest expenses on loans used to fund capital improvements associated with its mining operations." *Id*. (citing *Phosphate Fertilizer from the Kingdom of Morocco:* OCP S.A. Section III Initial Questionnaire Response 84–85 & Exhibits MIN-12(b) and MIN-15 (Aug. 22, 2022), P.R. Doc. 76–77, 80–81, ECF No. 92-1 ("*OCP's Initial Questionnaire Resp.*")).

The HQ, Support, and Debt costs were "recorded at the company-wide level," *id.*, and thus were not broken out specifically with respect to beneficiated phosphate rock production activities in OCP's books and records. Commerce explained that "although the record indicates these costs are related to production, they are not directly tied to

production in OCP's accounting methodology, and thus, cannot be reasonably further segregated into costs that are 'relevant' or 'irrelevant' to phosphate rock production." *Id.* Commerce explained, further, that "to report these costs, OCP used an allocation methodology, which it based on the proportion of each of its production sites' share of total costs and capital expenditures." *Id*. (footnote omitted). Commerce accepted OCP's allocation method. *Id*. at 36.

Mosaic asserts that "Commerce unlawfully included *all* of OCP's HQ/Support and Debt costs in the tier-three cost buildup, including expenses that are unrelated to OCP's phosphate mining and beneficiation," an action it characterizes as "an unexplained departure from agency precedent." Mosaic's Mot. 19. Mosaic makes the related argument that "Commerce failed to explain how its acceptance of the entirety of OCP's HQ/Support and Debt costs reflects the 'unique nature of OCP's phosphate mining and processing operations.'" *Id*. at 17 (quoting *Final I&D Mem*. 34 ("Our tier-three analysis appropriately addresses the unique nature of OCP's phosphate mining and processing operations.")). Mosaic mischaracterizes the Department's decision, which, rather than entailing "acceptance of the entirety of OCP's HQ/Support and Debt costs," *id.*, included in the cost buildup only an allocated portion of those costs.

Mosaic also claims, unpersuasively, that few if any of the costs at issue actually were related to the production of beneficiated phosphate rock. *Id*. at 16 ("[A]t most, some small portion of OCP's HQ and Support costs could arguably be relevant."). The

proprietary information it cites, *id*. at 16–18, identifies various costs and activities unrelated to phosphate mining and beneficiation but does not by itself establish that OCP's allocation method was invalid or unreasonable.  OCP first calculated the percentage of its "costs and capital expenditures" that were incurred in its production of beneficiated phosphate rock and applied that percentage to its total HQ, Support and Debt costs, which were indirect costs.  *Id*. at 10.  Because it impliedly presumed that the indirect HQ/Support and Debt costs related to phosphate rock production in the same proportion as did direct costs, the method was neither precise nor specific as to actual indirect costs as incurred, and it may have been inaccurate in that respect.  But this shortcoming, standing alone, does not mean that the allocation method was unreasonable given the state of the record evidence, according to which the indirect HQ/Support and Debt costs were recorded only on a company-wide basis.

Mosaic argues, further, that OCP "documented" only a small portion of certain of its costs related to phosphate production and pricing, *id*. at 16–17 and that significant indirect costs were not directed to production or pricing of that material.  But this argument overlooks that OCP used a broad-based, general method of allocation rather than an attempted segregation of its individual costs—an endeavor Commerce recognized as unfeasible.  *See Final I&D Mem.* 35 (acknowledging that "when reporting its costs of production, OCP allocated these costs to each mining site on the basis of total site costs" and that OCP's HQ, Support, and Debt costs were recorded at the "company-

wide" level and "cannot be reasonably further segregated into costs that are 'relevant' or 'irrelevant' to phosphate rock production").

In explaining why it considered the allocation method to be reasonable, Commerce recognized that this method may not have been "perfect" or "perfectly accurate." *Id.* at 36 n.219. Commerce cited and quoted *Wheatland Tube Corp. v. United States*, 17 CIT 1230, 1247, 841 F. Supp. 1222, 1236 (1993) for the principle that "even if Commerce's methodology is not perfect, nor perfectly accurate, the court will uphold Commerce's methodology as reasonable 'based on the information at {Commerce's} disposal' and a satisfactory record of reliability.'" *Id.* Notably, and as Commerce mentioned, Mosaic did not present an alternative method of allocation that it believed would have been superior. *Id.* at 36 ("Moreover, the petitioner fails to substantiate its claim that OCP's method of allocation was distortive, nor did the petitioner suggest an alternative allocation method.").

Mosaic also argues that Commerce should have "placed the burden on OCP to justify how each line item that it sought to include in the cost buildup" was relevant to phosphate rock production and instead "removed the burden from OCP, and found that as long as OCP could document that *any* of the line items could arguably be related to mining operations, it would accept *all* of OCP's HQ/Support and Debt costs, unless *Mosaic* could demonstrate that it is distortive to do so." Mosaic's Mot. 15–16 (citing *Final I&D Mem.* 36). This argument, too, mischaracterizes the Department's decision.

Commerce did not "accept *all* of OCP's HQ/Support and Debt costs" and allowed only an allocated portion of them. *Id.* at 16. It did so based, first, on its finding that certain costs that were recorded on a company-wide basis were shown by record evidence to be related to the production of beneficiated phosphate rock, an intermediate material in the production of phosphate fertilizer. Commerce found, second, that company-wide Headquarters, Support, and Debt costs could not be segregated individually in relation to phosphate rock production and, therefore, that an allocation method was required. Third, Commerce reasonably concluded that the broad-based allocation method used by OCP was reasonable in light of the Department's own findings and the imprecise state of the record evidence.

Mosaic's argument that Commerce impermissibly shifted a burden from OCP to Mosaic also mischaracterizes the Department's decision. OCP was not relieved of its burden, as Commerce required OCP "to report all costs associated with its production and pricing of phosphate rock." *Final I&D Mem*. 33. In response, "OCP provided its production costs, including amounts for certain indirect costs classified as HQ, Support, and Debt." *Id*. (citing *OCP's Initial Questionnaire Resp*. 80–88 & Exhibits MIN-3 and MIN-12(b)). Commerce noted that "OCP's reported costs were verified with no discrepancies noted." *Id*. (citing *Countervailing Duty Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco: Verification of the Questionnaire Responses of OCP S.A.* (Int'l Trade Admin. Oct. 6, 2023), P.R. Doc. 349, ECF No. 92-2 ("*OCP Verification*

*Report*").  OCP's reporting described phosphate rock production as involving

"extraction, stone removal, beneficiation, and transportation" with "distinct and diverse

activities involving multiple mining sites, processing facilities, and transportation hubs

(*i.e.*, rail terminals and pipelines)."  *Id*. at 34.  Commerce reasonably concluded that OCP

met its burden of demonstrating that it incurred significant indirect costs as well as

direct costs in performing these processes.  Mosaic's various attempts to minimize the

indirect costs by focusing attention on some such costs that were unrelated to

phosphate rock production, *see* Mosaic's Mot. 16–18, are not persuasive in light of

OCP's questionnaire responses.

Mosaic argues that "Commerce erred by refusing to exclude specific categories of

OCP's HQ/Support and Debt costs that are unrelated to its phosphate mining and rock

production," *id*. at 21, and that "OCP made no effort to omit those costs from its

proposed allocation," *id*. at 22.  According to Mosaic, "Commerce could have asked

OCP to identify and eliminate extraneous costs, or it could have done so itself, but it

failed to do so."  *Id*.  This argument is contrary to the record evidence that OCP's

Headquarters, Support, and Debt costs were recorded only at the company-wide level

and could not be further segregated.  Excluding from the allocation methodology the

indirect costs that were not relevant to phosphate rock production could have produced

a result that understated the indirect costs that *were* relevant to phosphate rock

production.  The allocation method chosen by OCP, and accepted by Commerce,

required instead that the total, company-wide Headquarters, Support and Debt costs be used as the starting point for the calculation.  Mosaic fails to demonstrate that the Department's methodology was *per se* unreasonable.

Pointing to OCP's "affiliates and joint ventures" that are "separate legal entities," Mosaic states that "many of the entities were co-located at the same address as OCP's headquarters office," a fact that, Mosaic alleges, "suggests that a significant portion of the HQ/Support costs were incurred by separate legal entities."  Mosaic's Mot. 24.  This argument is mere speculation and, as defendant and OCP argue, is contradicted by the evidence that the costs at issue were recorded in OCP's audited books and records. Def.'s Resp. 55–56; OCP's Resp. 22.

Also speculative is Mosaic's argument, Mosaic's Mot. 25, that the allocation "significantly overstates" OCP's Debt costs "by omitting financial income."  In support, Mosaic offers the observation that "Commerce has acknowledged that it is standard practice for companies to store funds necessary to cover their daily cash requirements in short-term income producing products to minimize the costs associated with maintaining such funds."  *Id*. (citing past decisions by Commerce).  Mosaic's Rule 56.2 motion does not direct the court to record evidence demonstrating that OCP reduced its interest costs by holding short-term income producing products and fails to show that Debt costs recorded in OCP's books and records were inflated in this way.

Mosaic argues, further, that the allocation method is "distortive" based on its assertion that HQ/Support costs increased during a time period when the "costs of phosphate rock production" did not. *Id*. at 26 (citations omitted).  The Department's allocation methodology sought to capture both the direct and indirect costs of producing the phosphate rock, and fluctuations in indirect costs do not establish that the Department's allocation method was distortive.

Mosaic argues that "OCP's allocation of Debt costs based on the capital expenditures of its four operational sites is distortive because OCP did not issue debt solely to fund capital expenditures" and "use[d] its debt issuances to fund general corporate activities." *Id.* at 27.  Commerce did not find that OCP used its debt *solely* to fund capital expenditures.  Commerce found instead that the Debt costs "*primarily* represent interest expenses on loans used to fund capital improvements associated with its mining operations." *Final I&D Mem.* 35 (emphasis added) (citing *OCP's Initial Questionnaire Resp.* 84–85 & Exhibits MIN-12(b) and MIN-15).  Nor was it essential to the Department's analysis that the Debt costs fund only capital expenditures.  As discussed previously, Commerce used an allocation method to estimate the proportion of Debt costs (along with the HQ and Support costs) that would be attributed to beneficiated phosphate rock production.

In conclusion, Mosaic fails to support its claim that few or none of the Headquarters, Support and Debt costs related to production of beneficiated phosphate

rock.  Nor do any of the various objections Mosaic raises convince the court that the

Department's method of allocating the Headquarters, Support and Debt costs to the

production of that intermediate material was distortive or otherwise unreasonable in

light of the record evidence from which Commerce performed its analysis.

### 2.  Determination of a World Market Price for Beneficiated Phosphate Rock

To calculate a world market price for beneficiated phosphate rock, Commerce

selected and averaged price data from various countries, using the "bone phosphate of

lime" ("BPL") content as a parameter for its selection of data from among the price data

submitted by interested parties.[5]  *See* Def.'s Resp. 36.  Commerce selected "[c]ertain

worldwide prices . . . based on their similarity in BPL level, and therefore,

comparability, to OCP's own phosphate rock."  *Final I&D Mem.* 27.

OCP produced beneficiated phosphate rock with varying levels of BPL.  To

derive a world market price for comparison with OCP's production of this intermediate

material, Commerce included from among the data the prices of beneficiated phosphate

rock with BPL levels that "fall within or overlap with the BPL range of OCP's phosphate

rock" and averaged these prices to calculate the final benchmark price.  Def.'s Resp. 37.

By this method, Commerce determined it appropriate to use prices from China, Syria,

and Egypt.  *Id.*

---

[5] This Court previously noted that the percentage of BPL content can be
expressed as 2.1852 times the phosphorous pentoxide ($P_2O_5$) content.  *Mosaic I*, 47 CIT at
__, 659 F. Supp. 3d at 1305 & n.7.

In contesting the benchmark price, Mosaic claims, first, that Commerce erred in not excluding prices for China and Syria from its calculated benchmark price, whose prices it characterizes as "distorted." Mosaic's Mot. 28–31. It maintains, second, that Commerce should have excluded prices for Egypt on a contention that the Egyptian product was of lower quality than OCP's product. *Id*. at 31–33. Finally, Mosaic claims that Commerce should not have excluded prices for Jordan and Togo, which it argues were of a BPL range comparable to OCP's product. *Id*. at 33–34. For the reasons discussed below, the court concludes that these claims lack merit.

### a. Export Prices for China and Syria

Mosaic argues that the Chinese data are distorted based on its contention that the Chinese government "declared phosphate rock a strategic resource, and it has taken steps to restrict exports of phosphate rock, including by imposing export taxes and an export ban, starting in September 2021, *i.e.*, during the POR." *Id*. at 28–29. Mosaic argues that Syrian export prices for phosphate rock are distorted because "the United States and the European Union imposed sanctions on entities involved in Syria's phosphate industry, including the Syrian Ministry of Petroleum and Minerals and Russian oil and gas company Stroytransgaz, which operate Syria's phosphate mines." *Id*. at 30. Commerce rejected these arguments, concluding that Mosaic had "failed to point to market dynamics in the destination countries for the exports in question [i.e., the exports from China and Syria] that would lead to a finding of distortion, nor has it

provided sufficient information to support that argument that government influence in these respective countries is causing *export prices* to other markets to be distorted." *Final I&D Mem.* 28.

It is possible that the Chinese activities Mosaic cites affected China's export prices for phosphate rock, but whether, and to what extent, they did is speculative and does not rest on probative record evidence. For its tier-three analysis, Commerce reasonably presumed that Chinese export prices for beneficiated phosphate rock were influenced by world market conditions. *See* 19 C.F.R. § 351.511(a)(2)(iii) (Commerce "will normally measure the adequacy of remuneration by assessing whether the government price is consistent with market principles."). Similarly, Mosaic did not demonstrate that the record evidence pertaining to export sanctions required Commerce to exclude prices of beneficiated phosphate rock exported from Syria, which also were sold into the global marketplace. While Commerce possibly could have made different choices when it decided to include the price data for Chinese and Syrian exports, Mosaic fails to show that the evidence of record compelled it to do so.

### b. Export Prices for Egypt

Mosaic argues that the Egyptian exports were of a lower quality than OCP's and therefore not comparable to OCP's phosphate rock, pointing to what it terms the "minor element ratio," or "MER," "which is the ratio of iron, magnesium, and aluminum content to phosphate ($P_2O_5$) content." Mosaic's Mot. 31–32. According to

Mosaic, the Egyptian product is 24–26% $P_2O_5$ due to iron impurities while "OCP produces phosphate rock with $P_2O_5$ percentages as high as 36.15." *Id*. at 32. Commerce rejected Mosaic's argument during the review, concluding that "the petitioner's claims regarding Egyptian Phosphate's Minor Element Ratio (MER) [] are insufficiently supported by factual evidence" and that "the petitioner does not provide a comparison of the MER to OCP's phosphate rock to demonstrate the differences between Egyptian phosphate rock and OCP's phosphate rock." *Final I&D Mem*. 28 (citation omitted).

Mosaic has failed to show that variances in MER levels required Commerce to reject the Egyptian data or, more broadly, that comparing relative MER levels was essential to the Department's analysis. Commerce compared world price data on products similar to OCP's with respect to BPL, which is itself a measure of purity. Mosaic does not demonstrate that the Department's focus on BPL levels was *per se* unreasonable. Also, as Commerce found, Mosaic did not identify record evidence allowing Commerce to compare the MER levels of Egyptian phosphate rock and OCP's product. Mosaic's Rule 56.2 motion sidesteps this deficiency, arguing that "Commerce failed to explain why any further 'comparison' was needed, and it failed to ask the parties to submit such a comparison." Mosaic's Mot. 32–33. As a plaintiff contesting the Department's determination, it was up to Mosaic to submit for the record such evidence as it believed would support its argument before Commerce and, later, its claim before the court.

Consol. Court No. 23-00246                                              **Page 26**

### c. Export Prices for Togo and Jordan

Mosaic argues that phosphate rock mined in Togo and Jordan, which have BPL levels in the range of 74–78, is comparable to the BPL levels of the phosphate rock mined by OCP and that Commerce erred in excluding prices for these countries from its calculation. *Id*. at 33–34.[6] The dispute arose because Mosaic submitted for the record evidence from OCP's website indicating that OCP produced phosphate rock with BPL levels as high as 75. *Id*. at 33. Commerce relied instead on data OCP reported during the review, which Commerce verified. Commerce found that OCP's reported BPL data are not comparable to the BPL levels of the two countries. Def.'s Resp. 44 (citing *Post-Final Determination* 5).

The court concludes that the record contains substantial evidence to support the Department's decision not to use the data for Togo and Jordan. Commerce reasonably chose to rely upon the reported and verified data from the review rather than the website information, which Mosaic has not tied directly to the POR. Mosaic cites no record evidence that would have compelled Commerce to find that OCP's reported and verified data were unreliable.

---

[6] In their respective briefs, Mosaic and OCP claimed confidential treatment for the identity of Jordan and Togo and their associated BPL levels, but they "no longer find a basis to claim confidential treatment for this information" and "jointly agree that the identity of the countries . . . and associated BPL levels . . . should be treated as public information." Joint Resp. to Court's Mar. 4, 2025 Order 1–2 (Mar. 18, 2025), ECF. No. 94.

### E. Decision Not to Countervail the Provision of Port Services

Mosaic claims that OCP received a benefit in the form of what it describes as "port services and infrastructure" subsidies. Mosaic's Mot. 34–45. Mosaic asserts, essentially, that OCP received a countervailable benefit in its payment of "concession fees" to the Moroccan port authority, Agence Nationale des Ports ("ANP"), that enabled OCP to operate its own facilities at several Moroccan ports (at Casablanca, Jorf Lasfar, and Safi). Mosaic argues that substantial record evidence demonstrates that these fees "are not set in accordance with market principles" and that Commerce incorrectly found to the contrary. *Id.* at 34. Defendant counters that "Commerce reasonably determined, based on substantial record evidence, that ANP's pricing was consistent with market principles, and that the provision of port services did not confer a benefit to OCP during the period of review." Def.'s Resp. 59. The court concludes that Mosaic's claim is meritless.

To determine whether the concession fees were less than adequate remuneration, Commerce decided to perform a "tier-three" analysis under 19 C.F.R. § 351.511(a)(2)(iii), *Final I&D Mem.* 52–53, a decision no party contests. Commerce explained that "[u]nder this tier-three analysis, we are assessing whether the prices charged by ANP (*i.e.*, the concession fees) are set in accordance with market principles through an analysis of factors such as ANP's price-setting philosophy and costs, including rates of return sufficient to ensure future operations." *Id*. at 53 (citing *Post-Preliminary Analysis of the*

*Countervailing Duty Administrative Review of Phosphate Fertilizers from the Kingdom of Morocco; 2020–2021* 5 (Int'l Trade Admin. Oct. 11, 2023), P.R. Doc. 351, ECF No. 92-2 ("*Post-Preliminary Analysis*")).  Commerce added that "[i]n accordance with our past practice, we have not put the factors into any hierarchy, as one or more factors may apply in any particular case."  *Id*. (citing *Countervailing Duties*, 63 Fed. Reg. 65,348, 65,378 (Int'l Trade Admin. Nov. 25, 1998)).

In determining that the payment of the concession fees conferred no benefit to OCP during the period of review, Commerce found that "ANP reported both an operating profit and net profit in 2019, 2020, and 2021."  *Id*. (citation omitted).  Commerce stated that it "examined the methodology that ANP uses when setting concession fees, which indicates that ANP does account for its costs, revenues, and profits when it sets prices.  Accordingly, this record information, in addition to ANP's profitability from 2019–2021, supports a determination that ANP's prices are set in accordance with market principles."  *Id*.

In contesting the conclusion that OCP received no benefit from the arrangement by which it paid concession fees to operate port facilities, Mosaic argues that "the mere fact that a government authority's provision of services is profitable does not mean that it sets prices consistent with market principles within the meaning of 19 C.F.R. § 351.511(a)(2)(iii)."  Mosaic's Mot. 35.  In support of this argument, Mosaic cites only past administrative determinations by Commerce, *id.* at 35–36, which are binding

neither on Commerce nor on the court as an interpretation of the regulation.  Moreover, Commerce did not rely solely on ANP's overall profitability in reaching its determination that OCP received no benefit, having also found that ANP accounts for its costs, revenues, and profits when it sets concession prices.

Mosaic contests the latter finding as unsupported by substantial evidence, arguing that "record evidence demonstrates the opposite," i.e., that ANP did not account for costs, revenues, and profits in setting its concession fees.  *Id.* at 36.  The record evidence does not support Mosaic's argument.  Mosaic cites certain questionnaire responses of the Government of Morocco, which it characterizes as failing to "account for *ANP's* costs or desired revenues or profits."  *Id*. at 36–37.  The questionnaire responses Mosaic cites do not come close to demonstrating that ANP did not consider costs, revenues, and profits in setting the fees for the concessions.  Nor does Mosaic address the flaw in its argument posed by record evidence, uncontradicted by Mosaic, that OCP, not ANP, operated the terminals at the three ports and that ANP did not provide port "services" other than managing water and electricity connections to those ports.  *See* Def.'s Resp. 56 (citing *Post-Preliminary Analysis* 3 and a questionnaire response of the Moroccan government).  The record evidence as a whole allowed Commerce to consider the concession fees in light of the limited nature of the services ANP provided—which Commerce reasonably could infer to have limited the

government's costs of providing those services—in contrast to the extensive functions

and costs for which OCP itself was responsible in operating the concessions at the ports.

### F.  Use of Facts Otherwise Available with an Adverse Inference for OCP's Failure to Report the Payroll Tax Refund

#### 1.  Facts Otherwise Available and Adverse Inferences under 19 U.S.C. § 1677e

Under section 776 of the Tariff Act, 19 U.S.C. § 1677e, when "an interested party

or any other person" withholds requested information, *id.* § 1677e(a)(2)(A), untimely

submits requested information, *id.* § 1677e(a)(2)(B), or "significantly impedes a

proceeding," *id.* § 1677e(a)(2)(C), or when information offered "cannot be verified as

provided in section 1677m(i) of this title [19 U.S.C. § 1677m(i)]," *id.* § 1677e(a)(2)(D),

Commerce "shall, subject to section 1677m(d) of this title [19 U.S.C. § 1677m(d)], use the

facts otherwise available in reaching the applicable determination under this subtitle."

If Commerce "finds that an interested party has failed to cooperate by not acting

to the best of its ability to comply with a request for information," Commerce "may use

an inference that is adverse to the interests of that party in selecting from among the

facts otherwise available."  *Id.* § 1677e(b)(1)(A).  Commerce often refers to these

provisions in the aggregate as "adverse facts available" or "AFA."

#### 2.  Application of Facts Otherwise Available and an Adverse Inference to OCP's Failure to Report the Payroll Tax Refund

OCP received a payroll tax refund from the Moroccan government's "Office de

Formation Professionelle et de la Promotion du Travail" ("OFPPT").  *Final I&D Mem.* 13;

*OCP Verification Report* 2.  In the initial questionnaire it issued to OCP on June 28, 2022,

Commerce asked the following question:

> Has the government, or entities owned in whole or in part by the
> government, directly or indirectly, provided to the producers or exporters
> of the subject merchandise under review any other non-recurring benefits
> over the 10-year {average useful life (AUL)} (*i.e.*, the POR and preceding
> nine years), or recurring benefits during the POR?

*Final I&D Mem.* 16 (quoting *Administrative Review of Phosphate Fertilizers from the*

*Kingdom of Morocco: Countervailing Duty Questionnaire* 61 (Int'l Trade Admin. June 28,

2022), P.R. Doc. 11–12, ECF No. 92-1).  The deadline for OCP's response was August 8,

2022.  *Id.*

"Commerce normally treats tax refunds, such as the payroll tax refund from

OFPPT, as providing recurring benefits."  *Id.* (citation omitted).  According to

Commerce, OCP was "obligated" to disclose this refund in its response to the initial

questionnaire.  *Id.*  OCP attributes its delay to an "inadvertent mistake."  OCP's Mot. 23.

Commerce found that "OCP reported its use of this program for the first time during

verification," which occurred from September 6, 2023—September 8, 2023, as a "minor

correction."  *Final I&D Mem.* 13, 15–16; *OCP Verification Report* 1- 2, 12.  Along with its

disclosure, OCP submitted accounting records and its own proposed calculated subsidy

rate for the program, which it alleges would have been extremely small.  OCP's

Mot. 15–17.

Commerce found the disclosure of this program "represents untimely new factual information," not a "minor correction." *Final I&D Mem.* 16–17.  Concluding that "necessary information about this program is missing from the record" and that the proceeding had been "significantly impeded," *id.* at 16, Commerce rejected OCP's data in its entirety and assigned a 1.27% *ad valorem* rate to the program based on the application of facts otherwise available with an adverse inference, *id.* at 7, 10–11. Commerce chose the adverse inference rate "for a similar/comparable program in the same proceeding," the "Tax Incentives for Export Operations program," "because it confers the same type of benefit as the Payroll Tax Refund program, *i.e.*, tax savings as provided by the GOM [government of Morocco]." *Id.* at 10.  The 1.27% rate "is the highest calculated rate for a similar/comparable program from the investigation," *id.*, as Commerce sought "to use a rate that is sufficiently adverse to effectuate the statutory purpose of section 776(b) of the Act [19 U.S.C. § 1677e(b)] to induce respondents to provide Commerce with complete and accurate information in a timely manner," *id.* at 9.

OCP contests the Department's application of facts otherwise available with an adverse inference as "Contrary to Law and Unsupported by Substantial Record Evidence" and asks the court to "vacate Commerce's decision with regard to this refund, and remand back to the agency with instructions to accept OCP's submission of this refund as a minor correction and to calculate a CVD rate in a manner consistent

with the evidence on the record." OCP's Mot. 15–16. OCP offers several reasons: the payroll tax refund is "manifestly minor" and would have had "a diminishingly small impact on the CVD rate," *id.* at 10, 15; the Department's rejection of OCP's submission was "contrary to the agency's practice," *id.* at 17–19; and OCP "did not withhold information" or create a "gap" in the record, because OCP had provided Commerce with "all of the information necessary" for its calculation by the end of the verification period, *id.* at 10, 19–26.

The court does not find merit in OCP's claim. OCP does not contend that the payroll tax refund information submitted at verification would not have resulted in a countervailing duty. Moreover, Commerce acted within its authority in determining that the information in question, which pertained to a government program not previously reported, was not a "minor correction" to information previously submitted. Even were its effect on a countervailing duty rate presumed to have been small and disproportionate to the adverse inference rate, as OCP argues, the payroll tax refund at issue was not an insignificant amount of money. Also, Commerce chose its adverse inference rate according to a method authorized by 19 U.S.C. § 1677e(b), a method OCP does not directly contest.

OCP is unconvincing in arguing, OCP's Mot. 18–19, that Commerce departed from its "practice [] to accept as minor corrections that disclose previously unreported grants and tax credits" and that it failed to provide "a reasonable explanation" for this

alleged departure. OCP cites prior agency determinations in support of this argument, but Commerce found them "inapposite" because they "did not concern entirely new programs that appear to be countervailable subsidies, as OCP's payroll tax refund does." *Final I&D Mem.* 17. The refund was a "previously unreported program that record evidence demonstrates provided OCP assistance during the POR" and was "unlike the programs that Commerce encountered and declined to apply AFA to in" the cases OCP cites. *Id.* The court concludes that Commerce provided a "reasonable explanation" for its use of facts otherwise available with an adverse inference and thereby could justify any departure from past practice that may have occurred. *See Consol. Bearings Co. v. United States*, 348 F.3d 997, 1007 (Fed. Cir. 2003); *RHP Bearings Ltd. v. United States*, 288 F.3d 1334, 1347 (Fed. Cir. 2002); *JTEKT Corp. v. United States*, 33 CIT 1797, 1832, 675 F. Supp. 2d 1206, 1238 (2009).

Finally, the court is not persuaded by OCP's argument that there was no "gap" in the record. There can be no dispute that the information, which was material to the Department's efforts to identify and act upon potentially countervailable government subsidies, was submitted more than a year after the deadline for a response to the questionnaire. In such a circumstance, section 776(a)(2)(B) of the Tariff Act specifically authorizes the use of facts otherwise available in response to the untimely submission of requested information. 19 U.S.C. § 1677e(a)(2)(B). Moreover, Commerce reasonably

found, and OCP does not rebut convincingly, that the untimeliness of the submitted information significantly impeded its proceeding.  *See id*. § 1677e(a)(2)(C).

### G.  Determination that Morocco's Program for Relief from Tax Fines and Penalties Meets the "Specificity" Requirement of the Tariff Act

The Moroccan government maintains a program under which taxpayers may apply for and receive reductions in tax fines and penalties.  Noting that OCP received reductions under that program during the period of review, Commerce concluded that OCP received a benefit and determined that the program satisfied the requirement of *de facto* specificity provided for in 19 U.S.C. § 1677(5A)(D)(iii)(III).  *Final I&D Mem.* 47–50.  OCP claims that the Department's specificity determination is contrary to law and otherwise unsupported by substantial evidence.  OCP's Mot. 26–35.  The court agrees.

Commerce may determine a subsidy to be *de facto* specific if any one of four factors are found:

    (I)      The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.
    (II)    An enterprise or industry is a predominant user of the subsidy.
    (III)  An enterprise or industry receives a disproportionately large amount of the subsidy.
    (IV)  The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

19 U.S.C § 1677(5A)(D)(iii).  In the first review, Commerce concluded that during the period of review OCP received "a disproportionately large amount of the subsidy"

within the meaning of subparagraph (III). It based its conclusion on its finding that

"OCP was a disproportionate user of this program because it received a share of

reductions that was roughly 900 times larger than the average amount" received by a

company in Morocco. *Final I&D Mem.* 48 (citation omitted).

In *Mosaic II*, this Court set aside a determination by Commerce highly similar to

that contested in this case, ruling that the program for reduction of tax fines and

penalties did not satisfy the *de facto* specificity requirement of subparagraph (III) of

19 U.S.C § 1677(5A)(D)(iii). *Mosaic II*, 49 CIT at __, 744 F. Supp. 3d at 1378–81. This

Court reasoned that the Department's specificity determination was "a decision of a

type disapproved by the Statement of Administrative Action ("SAA") accompanying

the Uruguay Round Agreements Act," H.R. Rep. No. 103–316, at 929–30 (1994) ("*SAA*").

*Id.*, 49 CIT at __, 744 F. Supp. 3d at 1379. *Mosaic II* cited the principle set forth in the

SAA that "'the specificity test was intended to function as a rule of reason and to avoid

the imposition of countervailing duties in situations where, because of the widespread

availability *and use* of a subsidy, the benefit of the subsidy is spread throughout an

economy.'" *Id.* (quoting *SAA* 930). "The SAA contrasts such non-countervailable

subsidies with those 'provided to or used by discrete segments of an economy.'" *Id.*

(quoting *SAA* 930). "The SAA quoted approvingly language in *Carlisle Tire & Rubber*

*Co. v. United States*, 5 CIT 229, 233, 564 F. Supp. 834, 838 (1983), opining that 'such things

as public highways and bridges, as well as a tax credit for expenditures on capital

investment' that is 'available to all industries and sectors,' should not be considered to satisfy the specificity requirement."  *Id.* (quoting *SAA* 929–30).

Under the guiding principle addressed in the SAA, Commerce must distinguish between subsidies that are provided to or used by discrete segments of the economy and those, such as the program at issue, that distribute a benefit throughout the entire economy.  *See id.* (quoting *SAA* 929 ("describing the specificity requirement as a 'screening mechanism to winnow out . . . broadly available and widely used' foreign subsidies and recognizing that 'all governments, including the United States, intervene in their economies to one extent or another, and to regard all such interventions as countervailable subsidies would produce absurd results'")).  This Court recognized in *Mosaic II* that the benefit of the program was not limited to corporations, or to enterprises in general, and that "[n]either the group consisting of all taxpayers (the potential beneficiaries), nor the actual beneficiaries (those taxpayers receiving some form of penalty relief) constitute a 'discrete segment of the economy.'"  *Mosaic II*, 49 CIT at __, 744 F. Supp. 3d at 1379.  As this Court previously stated in *Mosaic I*, the SAA "cautions against the overreaching and indiscriminate type of specificity finding Commerce employed in this case."  47 CIT at __, 659 F. Supp. 3d at 1316.

In addition, Commerce has not reached a valid factual finding that OCP was a "disproportionate" user of the program within the meaning of 19 U.S.C § 1677(5A)(D)(iii)(III).  OCP points to record evidence that it and its consolidated

companies "were Morocco's largest corporate group by annual revenue in 2021, with

sales equivalent to *6.6% of Morocco's GDP* [gross domestic product]." OCP's Mot. 29–30

(citing questionnaire responses of OCP and of the Moroccan government). OCP also

cites record evidence that "tax fines and penalties are generally assessed based on a

percentage of the taxes or fees owed," *id*. at 33 (citations omitted), and that OCP

received only a miniscule percentage of the total value of the reductions, *id*. at 30. As it

did in the investigation, Commerce dismissed these "relative size" arguments during

the review, concluding that the size of the company relative to other companies

receiving penalty reductions was irrelevant. As this Court stated in *Mosaic II*, "[t]his

objection defies logic and common sense. Commerce cited no evidence to support its

assumptions that a company's total reduction in tax fines or penalties has no

relationship to the total amount of its revenue or to the total taxes for which it is liable."

*Mosaic II*, 49 CIT at __, 744 F. Supp. 3d at 1380. "Nor did Commerce make any attempt

to demonstrate that OCP got some preferential treatment or other atypical benefit from

the Moroccan government's administration of the widely available tax fine and penalty

relief program." *Id.*

In summary, the Department's specificity determination does not accord with the

limiting principle set forth in the SAA, in which Congress expressed its intent that a

broad-based, nationwide program such as Morocco's procedure allowing relief from tax

fines and penalties is not the type of program that satisfies the specificity requirement in

the statute.  Moreover, the Department's disproportionality analysis wrongfully

ignored highly probative evidence of OCP's relative size.  Therefore, the court must set

aside the specificity determination and remand it for reconsideration and corrective

action.

### H.  Request for Information from OCP on Unspecified "Other Benefits"

OCP claims that Commerce acted unlawfully in requesting from OCP

information on unspecified "other benefits" it received from the Moroccan government.

OCP's Mot. 36–37.  As OCP acknowledges, *id*. at 37, this Court rejected essentially this

same claim in *Mosaic I*, 47 CIT at __, 659 F. Supp. 3d at 1312–14.  OCP states that it is

raising this argument again to preserve it "for any future appeal."  *Id*.

In seeking to preserve its argument for appeal, OCP does not address the two

flaws this Court identified in the previous claim.  *Mosaic I* concluded, first, that the

statutory provision upon which OCP relied, 19 U.S.C. § 1677d, did not support the

limitations OCP advocated with respect to "the means or methods by which Commerce

'discovers a practice which appears to be a countervailable subsidy.'"  *Mosaic I*, 47 CIT

at __, 659 F. Supp. 3d at 1313 (quoting 19 U.S.C. § 1677d).  Second, with respect to

congressional intent, this Court rejected the argument that the statutory phrase

"appears to be a countervailable subsidy," 19 U.S.C. § 1677d, is an evidentiary standard

precluding Commerce from exercising the investigative powers Congress intended it to

have.  *Id*.  The court concludes that the parallel claim OCP raises in contesting the

results of the first review suffers from the same two flaws that *Mosaic I* identified and,

therefore, must be rejected in this litigation.

### III.  CONCLUSION AND ORDER

For the reasons discussed in the foregoing, the court remands the Final Results to

Commerce for reconsideration of its *de facto* specificity determination for any subsidy

OCP received from Morocco's tax fines and penalties reduction program.

Therefore, upon consideration of all papers and proceedings had herein, and

upon due deliberation, it is hereby

**ORDERED** that OCP S.A.'s Rule 56.2 Motion for Judgment on the Agency
Record (Aug. 7, 2024), ECF Nos. 75 (Conf.) & 76 (Public) be, and hereby is, granted in
part and denied in part; it is further

**ORDERED** that the Rule 56.2 Motion for Judgment on the Agency Record
Submitted on Behalf of The Mosaic Company (Aug. 7, 2024), ECF Nos. 88 (Conf.) & 90
(Public) be, and hereby is, denied; it is further

**ORDERED** that Commerce, consistent with this Opinion, shall issue a new
determination upon remand (the "Remand Redetermination") that complies with this
Opinion and Order; it is further

**ORDERED** that Commerce shall submit the Remand Redetermination to the
court within 90 days of the date of this Opinion and Order; it is further

**ORDERED** that Mosaic and OCP shall have 30 days from the submission of the
Remand Redetermination to submit to the court comments thereon; and it is further

**ORDERED** that defendant shall have 15 days from the date of the last comment submission to submit to the court its response to the comments submitted by Mosaic and OCP.

                                                        /s/ Timothy C. Stanceu
                                                       Timothy C. Stanceu
                                                       Judge

Dated: April 1, 2025
New York, New York